UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE AQUA METALS, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 17-cv-07142-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS AND MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 93, 97 |

This is a consolidated securities class action brought by Plymouth County Retirement Association and Denis and Theresa Taillefer's private company 1103371 Ontario Ltd. (collectively, the "Plymouth Group") against Defendant Aqua Metals, Inc. ("Aqua Metals" or the "Company") and its co-founders Stephen R. Clarke, Thomas Murphy, and Selwyn Mould ("Officer Defendants" and collectively with Aqua Metals, "Defendants"). In its consolidated class action complaint, Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). Dkt. No. 83 ("CCAC") at 1. Pending before the Court is Defendants' motion to dismiss the consolidated class action complaint. Dkt. No. 93 ("Mot."). Plaintiff also filed a motion to strike exhibits for which Defendants requested judicial notice and incorporation by reference. Dkt. No. 97. For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss and Plaintiff's motion to strike.

I.  **BACKGROUND**

Lead Plaintiff Plymouth Group brings this securities class action "on behalf of investors who purchased or otherwise acquired common stock of Aqua Metals" between May 19, 2016 and November 9, 2017, inclusive (the "Class Period"). CCAC at 1. The following facts are taken from the CCAC and judicially noticeable documents.

## A. AquaRefining Technology

Aqua Metals is a Delaware corporation with its principal place of business in California. CCAC ¶ 30. Officer Defendants Stephen R. Clarke (President, CEO, and Chairman of the Board), Thomas Murphy (Chief Financial Officer and Director), and Selwyn Mould (Chief Operating Officer) founded the Company to provide a lower cost and environmentally-conscious alternative to lead-acid battery ("LAB") recycling. *Id.* ¶¶ 31–33, 46–47. This alternative method involves a process called "AquaRefining," in which Aqua Metals' proprietary machines, modules with electrolyzer units, separate and recycle the lead components in LABs. *Id.* ¶¶ 46–49. The AquaRefining modules use "electroplating" to continuously separate the lead from other components, and through an electrolyte-chemical process the lead is processed and digested to create pure lead. *Id.* ¶ 49. This differs from smelting, the traditional method of LAB recycling, in that it does not require a high-temperature chemical reaction (which results in significant emissions), thereby making AquaRefining more efficient and non-polluting. *Id.* ¶ 45.

## B. Summary of Alleged False and Misleading Statements

On May 19, 2016, at the beginning of the Class Period, Aqua Metals announced its agreement with Interstate Batteries Systems International, Inc. ("Interstate Batteries"), a leading battery recycler. Dkt. No. 93-15, Ex. 14;[1] CCAC ¶¶ 8, 115. Interstate Batteries agreed to supply more than a million automotive batteries and other LABs to Aqua Metals as "feedstock" for the Company's "AquaRefineries," the first of which was located in Nevada's Tahoe-Reno Industrial Complex ("TRIC" or "Reno Plant"). Dkt. No. 93-15, Ex. 14 at 1; CCAC ¶ 115. In the press release, Defendant Clarke commented that Interstate Business "is an ideal partner for us as we scale our business." Dkt. No. 93-15, Ex. 14 at 2; CCAC ¶ 115. The press release also announced that the AquaRefinery in TRIC was "set to open in July 2016." Dkt. No. 93-15, Ex. 14 at 1.

That same day, Aqua Metals filed its Form 10-Q for the quarter ending March 31, 2016 ("Q1'16 10-Q") with the Securities and Exchange Commission ("SEC"). Dkt. No. 93-3, Ex. 2;

---

[1] All numbered exhibits referenced are attached to the Declaration of Michael R. Hogue, Dkt. No. 93-1 ("Hogue Decl."), and all lettered exhibits referenced are attached to the Declaration of Nicole Lavallee, Dkt. No. 96 ("Lavallee Decl.").

2

CCAC ¶ 116. The Q1'16 10-Q disclosed Aqua Metal's plan of operations as follows:

> As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong. Consequently, we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day. Our TRIC facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.
>
> Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the second quarter of 2016. We expect to install our first AquaRefining modules in approximately the second quarter of 2016 and to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the third quarter of 2016. In keeping with our modular approach, we intend to commence commercial LAB recycling operations shortly after the first AquaRefining module is delivered.

CCAC ¶ 117. In its Q1'16 10-Q, Aqua Metals included risk factors warning investors that "[w]hile the testing of our AquaRefining process has been successful to date, there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a large commercial scale." Dkt. No. 93-3, Ex. 2 at 6.

The Company made substantially similar statements in a May 24, 2016 corporate update press release and during its quarterly earnings call ("Q1'16 Conference Call"). *See* Dkt. No. 93-16, Ex. 15; Dkt. No. 93-47, Ex. 46. During the Q1'16 Conference Call, Defendant Clarke stated that he believed Aqua Metals was "ready to compete in the global $22 billion market," as the company was "generating massive interest in the market." CCAC ¶ 125. He went on to inform analysts that the TRIC plant remained "on track to achieve 80 metric tons of lead per day output by the end of 2016 and on track to expand that to 160 metric tons per day by 2018." *Id*.

In November 2016, Aqua Metals announced that it had produced the "first-ever AquaRefined lead" at the TRIC plant. Dkt. No. 93-22, Ex. 21; CCAC ¶ 153. The lead was reported to be more than 99.99% pure. *Id*. "[W]hen fully commissioned, the TRIC facility will have the capacity to produce 120 metric tons per day (T/day) of lead; a 50% improvement over the previously announced 80 T/day capacity." Dkt. No. 93-22, Ex. 21. Aqua Metals also filed its Form 10-Q for the third quarter disclosing to investors that:

3

> While the testing of our AquaRefining process has been successful to date, there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a large commercial scale. As of the date of this report, we have built and operated both a small-scale unit of our AquaRefining process and a full-size production prototype. In addition, on October 28, 2016, we commenced limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module. While we believe that our development, testing and limited production to date has proven the concept of our AquaRefining process, we have not undertaken the processing of used LABs nor have we commenced the production of lead in large commercial quantities. We expect to commence the commercial recycling of used LABs during the fourth quarter of 2016 and increase our production of lead to 120 tonnes per day early in 2017. However, there can be no assurance that as we commence large scale operations at our TRIC facility that we will not incur unexpected costs or hurdles that might restrict the desired scale of our intended operations or negatively impact our projected gross profit margin.

Dkt. No. 93-5, Ex. 4 at 21. A substantially similar statement was repeated in Aqua Metals' Form Prospectus in connection with its November 21, 2016 public offering. *See* CCAC ¶¶ 181–83.

On February 9, 2017, Aqua Metals announced through a press release that it had secured a partnership with Johnson Controls International plc ("Johnson Controls"), the world's largest manufacturer of automotive batteries. *Id.* ¶ 192. Under the agreement, Johnson Controls would be the first licensee for AquaRefining technology, supply Aqua Metals with batteries to recycle, purchase AquaRefined metals, and acquire just under 5% of Aqua Metals' outstanding shares. *Id.* ¶ 193. Less than a week after this announcement, the Company released its quarterly corporate update, summarizing the highlights from the fiscal year ended December 31, 2016. *Id.* ¶¶ 201–02. That same day, Aqua Metals held its fiscal year-end conference call, where Defendant Clarke announced that the TRIC AquaRefinery "moved from commissioning to operational." *Id.* ¶ 205. He also disclosed that the Company was expanding the refinery's capacity from "120 tons to 160 tons" of pure lead per day, and that the Company was "making lead from batteries" they had "broken." *Id.* ¶¶ 207, 210. Defendant Clarke also said that the Company had "products ready to ship." *Id.* ¶ 210.

By the middle of the second quarter in 2017, the TRIC AquaRefinery was "in commercial operation and generating revenue." *Id.* ¶ 229. Defendant Clarke on May 9, 2017 disclosed that

Aqua Metals was "aggressively scaling up operations and ramping [its] capacity to reach 120 metric tonnes per day by the end of 2017." *Id*. He also outlined that for the rest of 2017, the Company planned to "ramp up production at AquaRefinery 1 [TRIC] and to prepare for accelerated build-out of additional facilities, while concurrently moving forward with our plans for additional AquaRefineries . . . and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018." *Id*. ¶ 232. During the quarterly conference call that same day, Defendant Clarke reiterated that the TRIC plant was operating and "in revenue." Dkt. No. 93-51, Ex. 50 at 2. Defendant Clarke also disclosed some of the challenges and issues Aqua Metals was facing, including the difficulty of achieving a "much higher degree of separation [of the compounds] than is normal in this industry." *Id*. at 5–6; CCAC ¶ 234. After the May 9 disclosures, Plaintiff alleges that the stock price declined by $4.34 or 26%, from $16.65 per share on May 9, 2017 to $12.31 per share on May 10, 2017. CCAC ¶ 243.

Aqua Metals hosted its first "Analyst Visitor Day" at the end of May 2017 and "Investor Day" at the beginning of August 2017. *Id*. ¶¶ 249, 264. Selected analysts and investors were given a tour of the AquaRefinery located in TRIC. *Id*. A May 31, 2017 press release regarding the visit stated that the analysts were able to "view the critical processes at the AquaRefinery as they happened." *Id*. ¶ 249. The August 2, 2017 press release similarly stated that the investors were able to "view the full production process at the AquaRefinery as it happened." *Id*. ¶ 264. One investor was quoted as saying he was "impressed with the accelerating progress in the commission process." *Id*. ¶ 265.

A week after the August visit, on August 9, 2017, the Company, in its Form 10-Q for the second quarter ending June 30, 2017, announced that given the limitations in processing capacity for the current AquaRefining modules, the Company might begin producing lead compounds (versus primary grade lead). Dkt. No. 93-8, Ex. 7 at 14. Because there was uncertain demand for lead compounds, the Company stated it might choose to run the modules at "less than 120 tonnes per day." *Id*. Specifically, the Company disclosed:

> We have implemented numerous process improvements and expect to be capable of producing significantly more than 120 metric tonnes of recycled lead per day by the end of 2017. This is more

5

> battery processing capacity than we can utilize with 16 AquaRefining modules. As such, until we have increased our AquaRefining capacity, we will have the option of producing lead compounds from un-used AquaRefining feedstock. The lead compounds have a less established market and some demand uncertainty. For this reason, following the commission of all 16 modules, we may choose to run TRIC at less than 120 tonnes per day, should this provide for a more optimal product mix.

*Id*. Plaintiff alleges that after release of this news, Aqua Metals' stock price dropped again, from $10.87 to $8.31. CCAC ¶ 283.

On September 27, 2017, Aqua Metals filed a Form 8-K with the SEC updating the market on its partnership with Johnson Controls. Dkt. No. 93-9, Ex. 8; CCAC ¶ 285. According to the 8-K, Aqua Metals delivered written notice of its "readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead." *Id*. The two companies had commenced meetings to further the discussions surrounding the conversion or retrofit of the Johnson Controls facility. *Id*.

Towards the end of the year, on October 23, 2017 and November 9, 2017, the Company provided the market with an update on its plant's operations. CCAC ¶¶ 289–97. Plaintiff alleges that these two disclosures were corrective disclosures. *Id*. In the October 23, 2017 press release, Aqua Metals stated that it had a total of 15 AquaRefining modules "on-site and in-place, with one to be shipped." Dkt. No. 93-35, Ex. 34. Aqua Metals expected that all 16 modules would be "installed and commissioned by the end of the year [2017], and "[r]amp up of AquaRefined lead production is expected to continue through the fourth quarter of 2017 and into 2018." *Id*. However, Plaintiff alleges that Defendants "admitted" they had "only produced 'small quantities of AquaRefined lead'" and the Company was purportedly still in the process of "trying to commission AquaRefining." CCAC ¶¶ 289–90. Plaintiff claims that on release of this news, the stock price declined 17.9%, from $5.37 to $4.41. *Id*. ¶ 292.

At the end of the Class Period on November 9, 2017 Aqua Metals issued its third quarter corporate update and repeated updates similar to those in the October 23, 2017 press release. Dkt. No. 93-36, Ex. 35. Defendant Clarke was quoted as saying that Aqua Metals had many challenges scaling their operations on a commercial level, a topic Defendants elaborated on during the quarterly conference call that same day. *See id*.; *see also* Dkt. No. 93-53, Ex. 52. One such

1 challenge disclosed during the conference call was that the lead produced by the modules was
2 "sticky," meaning that in some cases, manual assistance was required to separate the elements.
3 Dkt. No. 93-53, Ex. 52 at 4; CCAC ¶ 296. In response to this news, Plaintiff alleges that the
4 Company's stock price fell 20.8% over a period of three trading days, from $3.79 to $3.00.
5 CCAC ¶ 297.

## II. REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE

Defendants request that the Court take judicial notice of or consider incorporated by reference the following 54 documents: (1) SEC filings (Exs. 1–12); (2) press releases (Exs. 13–45); (3) earnings calls transcripts (Exs. 46–53); and (4) an online article (Ex. 54). Dkt. No. 93 at 5 n.2; Hogue Decl., Exs. 1–54. Plaintiff filed a motion to strike, objecting to Defendants' request as to 46 of the 54 documents. Dkt. No. 97 at 1–2. Plaintiff also requests that the Court take judicial notice of four documents: (1) a historical stock chart generated by Bloomberg; (2) Aqua Metals' August 8, 2018 press release; (3) Aqua Metals' October 12, 2018 press release; and (4) a Schedule 13D amendment filed with the SEC on May 16, 2017. Dkt. No. 95; Lavallee Decl., Exs. A–D.

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine. *See* 899 F.3d 988 (9th Cir. 2018). Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. *Id*. at 999. Separately, the incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. *Id*. at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. *Id*. However, it is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id*. at 1014.

7

Plaintiff objects to Defendants' request to the extent that Defendants seek to introduce the documents "for the truth of the matters asserted therein, to dispute factual issues, or for any other purpose." Dkt. No. 97 at 5. The Court will only consider the SEC filings, press releases, and conference call transcripts that Plaintiff alleges contain false and/or misleading statements for the purpose of determining what was disclosed to the market. Therefore, the Court **GRANTS** Defendants' request for judicial notice as to Exhibits 2–9, 14–21, 23–35, and 46–52. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings subject to judicial notice); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (same); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice of press releases); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979–80 (N.D. Cal. 2010) (taking judicial notice of slide presentations to analysts).

Defendants' Exhibits 1, 10–13, 22, 36–45, and 53–54 are not relevant to the Court's analysis. The Court also did not consider the eight additional documents Defendants offered in their opposition to Plaintiff's motion to strike, Exhibits 55–62. *See* Dkt. No. 103. Therefore, Defendants' request as to those exhibits is **DENIED AS MOOT**. Because the Court also does not consider Plaintiff's Exhibits A–D in resolving Defendants' motion to dismiss, it **DENIES AS MOOT** Plaintiff's request for judicial notice.

The Court thus **DENIES IN PART AND GRANTS IN PART** Plaintiff's motion to strike.

### III. LEGAL STANDARD

#### A. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**B. Heightened Pleading Standard**

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Under this section, the SEC promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting

9

1 fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

**IV. DISCUSSION**

The crux of Plaintiff's complaint is that Defendants allegedly made materially false and misleading statements and failed to disclose problems Aqua Metals was having in ramping up its lead recycling process. CCAC ¶¶ 3–5. Specifically, Plaintiff alleges that Defendants concealed that the "technology had not been successfully tested in the California Testing Facilities, the Reno Plant was not operating, the critical modules could not run for any length of time and Aqua Metals had not commissioned its process, commercialized AquaRefining or sold any AquaRefined lead during the Class Period." *Id.* ¶ 16. Plaintiff also alleges that per confidential witnesses ("CWs"), the May and August 2017 site visits were "dog and pony shows carefully orchestrated to conceal" problems in the AquaRefining process. *Id.* ¶ 152(b)(i).

In their motion to dismiss, Defendants contend that the CCAC should be dismissed because it violates the prohibition on puzzle pleading. Mot. at 10–11. Defendants also argue that Plaintiff fails to satisfy the heightened pleading standard under the PSLRA, as the CCAC fails to plead particularized facts showing any statement was false when made and that Defendants made the public statements with scienter. *Id.* at 11–35.

**A. Exchange Act Claims**

**i. Section 10(b) and Rule 10b–5(b)**

Plaintiff's first claim alleges that Defendants made false and misleading statements to the public, in violation of Section 10(b) and Rule 10b–5(b) of the Exchange Act. To assert a claim under the PSLRA for false and misleading statements, a plaintiff must identify "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). Allegations of misleading statements based on omissions must meet the materiality requirement—that is, a plaintiff must show that there is "a substantial likelihood that the disclosure of the omitted fact

10

would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Defendants contend that the CCAC is a "puzzle pleading," in violation of the requirement of Federal Rule of Civil Procedure 8 that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a); Mot. at 10–11. Courts have routinely dismissed claims for puzzle pleading based on plaintiff's failure to set forth a "short and plain statement" in violation of Rule 8(a), and failure to make each allegation "simple, concise and direct" in violation of Rule 8(d). *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (quotations omitted). "In the securities fraud context, the term 'puzzle pleading' refers to a pleading that requires the defendant(s) and the court to 'match up' the allegedly false and misleading statements that form the basis of the plaintiff's claims with the reasons those statements are misleading." *Tarapara v. K12 Inc.*, No. 16-CV-4069-PJH, 2017 WL 3727112, at *9 (N.D. Cal. Aug. 30, 2017). Courts "have repeatedly lamented plaintiffs' counsels' tendency to place the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." *Wenger*, 2 F. Supp. 2d at 1244 (quotations omitted and alterations in original).

The Court agrees with Defendants that the Rule 10b–5(b) allegations employ impermissible "puzzle pleading" and should be dismissed for this reason. *See* Mot. at 10–11. The CCAC references over 45 public disclosures, which are summarized and quoted over a span of 203 paragraphs, without alleging in detail exactly *which* statement is misleading and *why* the alleged misstatement is misleading and/or false. Instead, the CCAC follows each group of allegedly false or misleading statements with broad, general explanations that largely fail to identify the specific statements to which they apply. *See, e.g.*, CCAC ¶¶ 130, 152, 179, 187, 191, 200, 221, 228, 248, 257, 260, 263, 269, 284, 288. For example, with respect to statements in paragraphs 115 through 129 of the CCAC, Plaintiff provides an explanation of why it contends the statements are misleading, but this explanation broadly applies to statements "above regarding the then-existing status, success and commercialization of the AquaRefining process." *Id*. ¶ 130(a). It

11

is not obvious to the Court what subset of the dozens of allegedly false and misleading statements listed in paragraphs 115 through 129 were made "regarding the then-existing status, success and commercialization of the AquaRefining process." Any or all of the statements listed in the preceding paragraphs arguably could be so characterized. *See McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008 WL 2951275, at *7 (N.D. Cal. July 25, 2008) ("[T]he complaint here contravenes applicable pleading standards by juxtaposing the same series of generic conclusions against each set of block quotes, without differentiation or specificity.")

While the length and scope of the CCAC do not, by themselves, result in a "puzzle pleading" warranting dismissal, *see Tarapara*, 2017 WL 3727112, at *10, Plaintiff asks the Court to match hundreds of individual statements with corresponding allegations of falsity presented in a web of inter-referenced paragraphs strewn throughout the complaint. *See, e.g.*, CCAC ¶ 260(a) (statements "regarding building additional facilities" are "false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)–(iii)," as well as "the reasons discussed in paragraphs 130(e), 152(d)(i)–(iii)"). And merely bolding and italicizing swaths of text does not assist the Court in determining which statements are allegedly misleading and why, in light of the multitude of reasons Plaintiff lists. *See In re ECOtality, Inc. Sec. Litig.*, No. 13-03791-SC, 2014 WL 4634280, at *3 (N.D. Cal. Sept. 16, 2014) ("[Plaintiff's complaint] highlight[s] certain portions of those documents with bold and italic type. The quotations are followed by paragraphs describing various alleged deficiencies. However, not a single sentence connects any of the allegedly misleading statements with contradictory facts known to defendants at the time. The Court will not attempt to divine Plaintiffs' intentions by trying to match potentially misleading statements with the alleged problems facing [Defendant].").

Because Plaintiff's CCAC contains a myriad of purported false statements with no specific explanation as to which specific statement in the long blocks of text is alleged to be false or misleading, Plaintiff fails to meet the exacting pleading requirements of the PSLRA. Therefore, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's Section 10(b) and Rule 10b–5(b) claim **WITH LEAVE TO AMEND**. If Plaintiff chooses to file an amended complaint, Plaintiff must identify and specify each allegedly false or misleading statement, whether such statement is

12

alleged to be an affirmative misrepresentation or false or misleading by omission, and describe why the specific statement was materially false or misleading when made. For any statements that are alleged to be false or misleading by omission, Plaintiff must clearly specify what the omission is and why the omission is material. This must be done on a statement-by-statement basis.[2]

**ii. Section 10(b) and Rule 10b–5(a) and (c) Scheme Liability Claim**

Plaintiff's CCAC also alleges that Defendants violated Rules 10b–5(a) and (c) by engaging in a "plan, scheme and course of conduct which was intended to . . . deceive[] the investing public" and "cause[] Lead Plaintiff and other members of the Class to purchase Aqua Metals' securities at artificially inflated and distorted prices." CCAC ¶ 365; *see also id*. ¶¶ 366–72. As Plaintiff points out, Defendants did not challenge the scheme liability claim in their opening brief, and for this reason alone the Court could deny their motion to dismiss this claim. *See Eberle v. City of Anaheim*, 901 F.2d 814, 817-18 (9th Cir. 1995) (ruling that issues not raised in opening brief may not properly be raised for the first time in reply brief). Nonetheless, because Defendants contend that they did not separately address this claim because it is "a dressed-up misrepresentation/omission claim which Defendants addressed in detail" in their opening brief, the Court addresses that argument. *See* Dkt. No. 101 ("Reply") at 2.

To allege a violation of Rule 10b–5(a) and (c) and 17 C.F.R. § 240.10b–5(a) and (c), a plaintiff must allege the same elements as a Rule 10b–5(b) claim, except that a scheme liability claim cannot be based solely on false or misleading statements, but must instead involve deceptive conduct "beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011). Thus, to plead a scheme liability claim, a plaintiff must allege: "(1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the alleged deceptive or

---

[2] Because Defendants argue that the majority of Plaintiff's alleged misstatements are non-actionable forward-looking statements, the Court strongly advises Plaintiff, if it chooses to amend, to clearly identify which potentially forward-looking statements it believes are unprotected "mixed" statements and what the alleged "present fact[s]" in those statements are. *See* Opp. at 26–28.

United States District Court
Northern District of California

manipulative act; (5) economic loss; and (6) loss causation." *Rabkin v. Lion Biotechnologies, Inc.*, No. 17-CV-02086-SI, 2018 WL 905862, at *16 (N.D. Cal. Feb. 15, 2018); *see also New York City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 996 (N.D. Cal. 2009). Scheme liability allegations are subject to Rule 9(b)'s heightened pleading standards. *In re Bank of Am. Corp.*, No. 09-MD-02014 JSW, 2011 WL 740902, at *6 (N.D. Cal. Feb. 24, 2011) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 498 F.3d 87, 102 (2d. Cir. 2007)).[3]

The Court finds that the alleged misconduct is distinct from and goes beyond the making of the alleged misrepresentations. The purportedly deceptive conduct at issue here is the "orchestrat[ed] on-site visits and demonstrations" that "deliberately concealed problems concerning the commercialization of the Company's AquaRefining process." CCAC ¶ 367. As alleged, Defendants used these invitational site visits to assuage analysts' concerns in response to skepticism in the market about whether the AquaRefining process was viable. *Id*. ¶¶ 224–25 (Defendant Clarke stating: "We believe the best way to address this misinformation is to *openly show analysts and investors our facility in operation as we continue to scale it up*." (emphasis in original)). However, according to CWs, the modules were not actually able to operate for more than an hour before they broke down. *Id*. ¶¶ 75, 78, 95. Plaintiff alleges that in light of that fact, employees were told not to run the "machines until [the visitors] show up" and would receive a call to start the machines about five minutes before visitors arrived. *Id*. ¶¶ 82, 84; *see also id*. ¶¶ 82 (CW2 claiming they "only ran the machines when investors came to the plant"), 100 ("CW4 said, because the module could not operate for more than about an hour before it would break down, CW4 had to start it at a time where it would run during the investors' visit and not break down."). Defendants Clarke and Mould "ran the show" and would escort visitors around the plant for only five to ten minutes and spend their remaining time in a conference room. *Id*. ¶¶ 90, 100. As alleged, these staged glimpses of the Company's facilities and processes presented a different picture than what the CWs describe as the true state of affairs. Despite Defendants' arguments to

---

[3] As noted, Defendants only challenge Plaintiff's scheme liability claim for failure to properly plead a deceptive or manipulative act that is not a mere recasting of Plaintiff's Rule 10b–5(b) claim. *See* Reply at 2. Defendants do not argue that Plaintiff has failed to plead any of the other elements, so the Court does not address arguments Defendants have not raised.

14

the contrary, these acts are sufficiently alleged to have been fraudulent in and of themselves, without depending on the alleged misrepresentations. *See* Reply at 3 n.3.

Plaintiff also claims that Defendants orchestrated these sham visits with the deliberate aim of artificially inflating the value of Aqua Metals stock. CCAC ¶ 365. According to Plaintiff, after these visits, Defendants issued press releases informing the market that visitors "were able to view the critical processes at the AquaRefinery as they happened," and requested that "analysts who attended the visitor day [ ] update their coverage reports to reflect findings from the site visit." *Id*. ¶¶ 249–51. Defendant Clarke, in an apparent response to an accusation that the AquaRefining process did not work, responded by saying that there have been "about 90 people through the facility watching [the AquaRefining modules] work now at some point, [and] some of those 90 people will start communicating … and explaining actually it does work." *Id*. ¶ 279. These alleged sham visits purportedly led analysts, with the encouragement of Defendants, to disseminate reports containing misleading information about the process, when in truth the visits concealed "problems" with the viability of the AquaRefining process, such as the inability of the modules to operate for more than an hour. *Id*. ¶ 367.

Plaintiff has sufficiently alleged that Defendants intentionally engaged in a fraudulent scheme to conceal material facts, thereby leading to the dissemination of untrue statements about the commercial viability of the process. This alleged scheme went beyond the making of any alleged misrepresentations and statements. Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's Section 10(b) and Rule 10b–5(a) and (c) scheme liability claim.

### iii. Section 20(a) Control Person Liability Claim

Plaintiff alleges a Section 20(a) claim against the Officer Defendants on a "control person" theory of liability. CCAC ¶¶ 373–78. To prove a prima facie case under Section 20(a), plaintiff must prove: "(1) a primary violation of federal securities laws"; and "(2) that the defendant exercised actual power or control over the primary violator." *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Defendants do not argue that the Officer Defendants did not have control; rather, they contend that the Section 20(a) claim must be dismissed because there was no primary violation of federal securities laws. Mot. at 36–37. The Court finds that Plaintiff

15

has adequately pled a primary violation of Section 10(b) and Rule 10b–5(a) and (c), and now addresses whether Plaintiff adequately pled that the Officer Defendants had "control" over Aqua Metals.

"Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard*, 228 F.3d at 1065 (alterations in original). "The plaintiff need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). If the plaintiff establishes that the defendant is a controlling person, a defendant is entitled to a good faith defense if the defendant "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *Id.*

"Allegations of day-to-day oversight of a company's operations and involvement" have been found sufficient to "presume control over the transactions." *Rabkin*, 2018 WL 905862, at *19. "[A]lthough a person's being an officer or director does not create any presumption of control, it is a sort of red light." *Arthur Children's Tr. v. Keim*, 994 F.2d 1390, 1397 (9th Cir. 1993). Because of the intensely factual nature of the control inquiry, some courts have found that control liability claims can be dismissed at the motion to dismiss stage only if a plaintiff fails to adequately plead a primary violation. *See Loritz v. Exide Techs.*, No. 2:13-CV-2607-SVW-EX, 2014 WL 4058752, at *15 (C.D. Cal. Aug. 7, 2014) (citing *Zucco Partners*, 552 F.3d at 990); *see also Rabkin*, 2018 WL 905862, at *19 (relying on *Loritz*); *In re CytRx Corp. Sec. Litig.*, No. CV141956GHKPJWX, 2015 WL 5031232, at *17 (C.D. Cal. July 13, 2015) (same).

Plaintiff alleges that the Officer Defendants, by virtue of their "high-level positions," "participation in and/or awareness of Aqua Metals' operations," and "direct and supervisory involvement in the day-to-day operations of Aqua Metals," controlled and influenced the Company. CCAC ¶¶ 374–75. Given the Officer Defendants' high-level positions (CEO, CFO, and COO, *see* CCAC ¶¶ 31–33) and the fact that Defendants Clarke and Mould allegedly were direct participants in the orchestration of the "dog and pony shows," the Court finds that Plaintiff

has sufficiently pled that the Officer Defendants had the requisite control over Aqua Metals.[4] *See In re CytRx*, 2015 WL 5031232, at *17 (plausible that defendants had control "given that Plaintiffs have successfully alleged primary liability against each of these Defendants, as it would be illogical to conclude that they were not in control of their own potential Exchange Act violations.") The Court therefore **DENIES** Defendants' motion to dismiss Plaintiff's Section 20(a) control liability claim.

### B. Securities Act Claims

#### i. Section 11 Claim

Under Section 11 of the Securities Act, issuers, underwriters, and other participants in a public securities offering are liable for material misstatements of fact or material omissions in a registration statement. 15 U.S.C. § 77k. Plaintiff alleges that the offering documents in connection with the November 21, 2016 public offering were false and misleading. CCAC ¶¶ 187, 413–20. The offering documents include the November 15, 2016 Form 424B5 Preliminary Prospectus (which incorporates the September 2, 2016 Registration Statement) and a November 17, 2016 Form 424B5 Prospectus Supplement. *Id*. ¶¶ 180–81, 380–82. For the same reasons as discussed in the Court's analysis of Plaintiff's Rule 10b–5(b) claim, the Court finds that Plaintiff's puzzle pleading fails to fulfill the exacting pleading requirements of the PSLRA and **GRANTS** the motion to dismiss as to the Section 11 claim.[5] *See* Section IV(A)(i), *supra.*

---

[4] The Court finds that Defendant Murphy's control person liability is a closer call. But given his high-level position, allegations of day-to-day involvement, and Defendants' failure to address the control inquiry, the Court finds his control is adequately pled at this stage.

[5] Although Defendants do not argue in their motion that Plaintiff lacks standing to pursue a Section 11 claim, as a threshold issue, the Court notes that it does not appear that Plaintiff has sufficiently alleged standing. "To have standing to bring suit under Section 11, a plaintiff must have purchased stock in the offering at issue, or trace later-purchased stock back to that offering." *Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1022 (N.D. Cal. 2011) (citing *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 n.4 (9th Cir. 1999)). A plaintiff must "do more than simply state in conclusory terms that its shares are 'directly traceable,'" but rather, "plead facts from which a court may 'reasonably infer' that this is the case." *Rabkin*, 2018 WL 905862, at *20. Because there is no scienter requirement under Section 11, the standing provision is narrow. *In re Century Aluminum*, 749 F. Supp. 2d at 978.

There are no allegations in the CCAC from which the Court may "reasonably infer" that Plaintiff purchased shares pursuant to the November 2016 public offering. And because this was not the Company's initial public offering, *see* CCAC ¶ 30 ("Aqua Metals completed its IPO in August 2015 and its common stock trades on the NASDAQ"), it is not clear to the Court how Plaintiff will

17

### ii. Section 15 Control Person Liability Claim

Plaintiff's claim under Section 15 of the Securities Act is expressly premised on the Section 11 violation. CCAC ¶¶ 422–26. Since Plaintiff fails to allege a Section 11 claim against Defendants, the Section 15 claim must be **DISMISSED**. *See Plichta*, 790 F. Supp. 2d at 1023.

## V. CONCLUSION

Accordingly, the Court **GRANTS IN PART IN PART AND DENIES IN PART** Defendants' motion to dismiss and Plaintiff's motion to strike. The Court **DENIES** Defendants' motion to dismiss the Section 10(b), Rule 10b–5(a) and (c) scheme liability claim and Section 20(a) control person liability claim, and **GRANTS** the motion to dismiss the Section 10(b), Rule 10b–5(b) false and misleading statements claim, Section 11 claim, and Section 15 control person liability claim **WITH LEAVE TO AMEND**. In amending, Plaintiff is directed to comply with the standards stated above. Plaintiff should only replead its Section 11 and Section 15 claims if it can, in good faith, allege a sufficient basis for standing to pursue its Section 11 claim. Any amended complaint must be filed within twenty-eight (28) days of the date of this order.

**IT IS SO ORDERED.**

Dated: 8/14/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

be able to prove that any of its purchased shares were traceable to the November 2016 offering. *See Plichta*, 790 F. Supp. 2d 1012, 1022–23 (N.D. Cal. 2011) ("Plaintiffs have not explained, however, how even with discovery, they hope to be able to prove that any of their shares are traceable to the original offering, given that the shares are fungible and that millions of shares were already being traded on the open market at the time of the offering."). And Plaintiff's certifications do not shed any light as to whether its shares were purchased pursuant to the November 2016 offering. *See* CCAC Exs. A, B.

18