Nicole Lavallee (SBN 165755)
Kristin J. Moody (SBN 206326)
A. Chowning Poppler (SBN 272870)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        kmoody@bermantabacco.com
        cpoppler@bermantabacco.com

*Counsel for the Lead Plaintiff Plymouth County Group*
*and Co-Lead Counsel for the Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE AQUA METALS, INC. SECURITIES LITIGATION | Lead Case No.: 4:17-cv-07142-HSG |
| | **AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS** |
| This document Relates to: All Actions. | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ............................................................................... 7

III.    INTRADISTRICT ASSIGNMENT .......................................................................... 8

IV.     THE PARTIES ........................................................................................................ 8

    A.      Lead Plaintiff – The Plymouth County Group .................................................. 8

    B.      Defendants ........................................................................................................ 9

        1.      The Company ........................................................................................ 9

        2.      Officer Defendants ............................................................................... 9

V.      BACKGROUND AND SUBSTANTIVE ALLEGATIONS .................................... 12

    A.      Traditional Lead-Acid Battery Recycling ....................................................... 12

    B.      Aqua Metals And Its Purported AquaRefining Process ................................... 13

    C.      The Process Was Malfunctioning And Not Commercially Viable Prior To And
        Throughout The Class Period ......................................................................... 16

    D.      Detailed Former Employee Accounts .............................................................. 17

    E.      Defendants' Representations To The Market ................................................... 30

        1.      Defendants Tout The Interstate Batteries' Investment In Aqua Metals And
            The Purported Status Of The AquaRefining Technology As Of Q1 2016 .......... 31

        2.      Defendants' August And September 2016 Statements Regarding Aqua
            Metals' Open House At Its TRIC Facility And The Existing Status Of The
            AquaRefining Technology As Of Q2 2016 ......................................................... 38

        3.      Defendants' November 2016 Announcement Of The Production Of
            AquaRefined Lead At TRIC And The Purported Status Of The
            AquaRefining Technology As Of Q3 2016 ......................................................... 45

        4.      Aqua Metals Closes Its November 2016 Public Offering ................... 56

        5.      Clarke's December 22, 2016 Interview Regarding The Purported Status Of
            The Company's Efforts ...................................................................... 57

        6.      Defendants Tout A Strategic Partnership With Johnson Controls
            International plc .................................................................................. 58

7. Defendants' February And March 2017 Statements Regarding Q4 2016 And YE 2017 ................................................................................. 60

8. Defendants' March And April 2017 Statements Touting The Market's Reaction To AquaRefining ....................................................... 66

F. While The Truth Slowly Begins To Emerge in Spring 2017, Defendants Continued To Mislead The Market ............................................................... 67

1. Defendants' May 2017 Statements Regarding The Purported Status Of The AquaRefining Technology As Of Q1 2017 ........................ 67

2. In May And June 2017 Defendants Continue To Tout The Market's Reaction To The AquaRefining Technology ........................ 73

3. Defendants' June And July 2017 Statements Regarding The Purported Status Of AquaRefining ...................................................... 76

4. Defendants Continue To Tout Site Visits To The Reno Plant ............. 78

5. Defendants' August 9, 2017 Statements And Partial Corrective Disclosures ...... 79

6. Defendants' September 2017 Statements Regarding The Johnson Controls Partnership ...................................................... 82

7. The October 23, 2017 Partial Corrective Disclosure ........................... 83

8. The November 9, 2017 Class Period Ending Corrective Disclosure ................... 84

G. Post Class Period Events ................................................................. 86

1. Following the Disclosure Of Sticky Lead Issues, The Company's Statements Effectively Confirmed That The AquaRefining Process Had Not Been Functioning. ....................................................... 86

2. Investors Express Serious Doubts About The Company's Statements And Leadership ...................................................... 89

3. Key Management "Resign" ................................................................. 90

4. The "Strategic Partnership" With Johnson Controls Is Stalled Pending Development Of The AquaRefining Process ........................ 93

VI. DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD BY STAGING "DOG AND PONY" SHOWS IN VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(A) & (C). ..................................................................... 94

VII.    DEFENDANTS' MATERIAL MISREPRESENTATIONS ...................................... 101

    A.    Defendants Issued False And Misleading Statements That Aqua Metals Had
          Achieved Certain Specific Key Milestones When It Had Not, All Of Which Are
          Actionable Affirmative Statements Of Fact ........................................................... 101

          1.    Defendants Misled Investors With Affirmative Statements That
                AquaRefining Had Been Successfully Tested And Proven ............................. 101

          2.    Starting In November 2016, Defendants Misled Investors With Affirmative
                Statements That The Company's AquaRefining Technology Was Producing
                Ultra-Pure Lead At The Reno Plant That Was "Flowing Like A Waterfall",
                That It Had Completed The Commissioning Phase And Was Commencing
                The Transition To Commercial Operations ........................................................ 107

          3.    In 2017, Defendants Misled Investors With Affirmative Statements That
                Aqua Metals Had Transitioned Into Full Commercial Operations And Had
                Commenced The Production Of Lead When It Had Not .................................... 117

          4.    Having Touted Aqua Metals' Commercial Operations, Defendants Issued
                False And Misleading Statements In May 2017 To Justify The Company's
                Failure To Generate Revenues .......................................................................... 123

    B.    Defendants Issued False And Misleading Statements Regarding Site Visits, All Of
          Which Are Actionable Statements Of Fact ............................................................. 126

          1.    Defendants Issued Affirmative Material Misrepresentations Regarding
                Analyst And Investor Visits ............................................................................... 126

          2.    Defendants Endorsed And Adopted Affirmative Material
                Misrepresentations By Analysts And Investors ................................................ 130

          3.    Defendants Issued Additional Affirmative Material Misrepresentations
                Regarding Site Visits ......................................................................................... 135

    C.    Defendants' Issued False and Misleading Statements Concerning The "Strategic
          Partnerships" With Interstate Batteries And Johnson Controls ............................... 139

          1.    Defendants' Statements Touting That The Partnerships With Interstate
                Batteries And Johnson Controls Validate The AquaRefining Technology
                Were Materially False And Misleading ............................................................. 139

          2.    Defendants' Statements Touting That The Partnerships With Interstate
                Batteries And Johnson Controls De-Risking Aqua Metals Ramp Up And
                Providing It What It Needs To Scale And Grow Were Materially False And
                Misleading .......................................................................................................... 143

3. Defendants' Statements Regarding The Retrofitting Of A Johnson Controls Facility Were Materially False And Misleading ............................................ 148

D. Defendants Issued Materially False And Misleading Statements Concerning Licensing ............................................................................................................. 151

1. Mixed Statements ............................................................................................ 151

2. Forward Looking ............................................................................................. 155

E. Defendants Issued Materially False And Misleading Statements Concerning Lead Production Rates ...................................................................................... 159

1. Affirmative Material Misrepresentations ....................................................... 159

2. Mixed Statements ............................................................................................ 163

VIII. ADDITIONAL ALLEGATIONS OF SCIENTER ................................................... 181

A. The Consistent Accounts By Former Employees That The AquaRefining Process Was Malfunctioning And Defendants' Knowledge Of And/Or Reckless Disregard Of The Problems Evidences Scienter ................................. 181

1. The Defendants Knew Of And/Or Recklessly Disregarded That The AquaRefining Technology Was Malfunctioning Even Before The Reno Plant Was Built ............................................................................................... 182

2. The Defendants Knew of And/or Recklessly Disregarded The Failures At The Reno Plant And With The AquaRefining Process .................................... 183

3. The Consistent Accounts Ty Former Employees Of Defendants' Direct Involvement In Fraudulent Visitor Presentations And Images Evidences Scienter ............................................................................................................ 184

4. The Nature And Significance Of The Problems With AquaRefining, Which Is The Company's Core Business, Further Support Allegations Of Scienter ..... 186

5. The Insider Selling Supports Scienter ............................................................. 187

a. Murphy And Mould Profited From The Fraud By Selling Off Large Blocks Of Personal Holdings Of Aqua Metals Common Stock At Inflated Prices ................................................................................... 187

b. Interstate Batteries Sold Significant Shares Of Aqua Metals Stock Just Before The Truth Began To Be Revealed ...................................... 190

c. The Defendants Consummated The November 2016 Offering In Order To Exploit The Artificial Inflation In The Company's Common Stock ....................................................................................... 191

IX.     LOSS CAUSATION ................................................................................................ 192

X.      PRESUMPTION OF RELIANCE ....................................................................... 195

XI.     CLASS ALLEGATIONS ........................................................................................ 196

XII.    NO SAFE HARBOR ............................................................................................... 198

XIII.   COUNTS .................................................................................................................... 199

XIV.    PRAYER FOR RELIEF ....................................................................................... 203

XV.     DEMAND FOR TRIAL BY JURY ...................................................................... 204

Court-appointed Lead Plaintiff the Plymouth County Group, which is comprised of the Plymouth County Retirement Association, Denis Taillefer and his private company, 1103371 Ontario Ltd ("Lead Plaintiff"), brings claims individually and on behalf of investors who purchased or otherwise acquired common stock of Aqua Metals, Inc. ("Aqua Metals," "AQMS" or the "Company"), including shares sold in the November 21, 2016 Offering (defined below), between May 19, 2016 and November 9, 2017, inclusive (the "Class Period"), and were damaged as a result (the "Class").

Lead Plaintiff brings claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") against Aqua Metals and its three co-founders, Stephen R. Clarke ("Clarke"), Thomas Murphy ("Murphy") and Selwyn Mould ("Mould") (collectively, the "Defendants").

Lead Plaintiff alleges the following based upon personal knowledge as to the allegations specifically pertaining to Lead Plaintiff and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon an investigation of Lead Counsel, which included a review and analysis of (a) U.S. Securities and Exchange Commission ("SEC") filings by Aqua Metals; (b) press releases and other public statements; (c) securities analyst reports and media reports about the Company; and (d) interviews with former Aqua Metals' employees who were employed by Aqua Metals before and/or during the Class Period. Lead Plaintiff believes that further substantial evidentiary support exists for these allegations, and will be revealed after a reasonable opportunity for discovery.

# I.    SUMMARY OF THE ACTION

1.    Aqua Metals is a one-trick pony that went public in 2015 with promises to revolutionize the lead-acid battery ("LAB" or the "batteries") recycling industry through its AquaRefining technology. Indeed, Aqua Metals' sole line of business is "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining."

2.    LAB recyclers generate income by breaking down and extracting the various components from the batteries, including and most significantly lead, and selling them. By some accounts, LAB recycling is a $22 billion industry that is expected to grow over the next few years.

However, because traditional LAB recycling involves the smelting and processing of lead resulting in the emissions of noxious gases, LAB recycling is a highly regulated industry. Aqua Metals claimed that its AquaRefining process would revolutionize industry by producing pure and ultra-pure lead at high yield while reducing the environmental impact of smelting, which uses extremely high heat, and at a lower cost than smelting. At the core of the AquaRefining process are the "modules." The modules are each made up of six electrolyzers. Each electrolyzer contains several rotating disks upon which the lead is electroplated and then the lead is intended to continuously be removed.

3.     Throughout the Class Period, Aqua Metals mislead investors about the success of Aqua Metals' purportedly proven AquaRefining technology. Defendants painted a vivid picture of consecutive key milestones being achieved – notably having first successfully tested then commissioned and finally commenced commercial production of AquaRefining.

4.     The news of this revolutionary technology was well-received by the LAB industry and exciting to the investing market. Indeed, based on the Company's reports of its progress and actual achievements, Aqua Metals' stock price soared from its Initial Public Offering ("IPO") price of $5.00 in August 2015 to a Class Period high of $21.89 on March 13, 2017.

5.     However, as explained below, Defendants' statements regarding the Company's achievements were untrue and misleading when made. AquaRefining never worked during the Class Period because of significant unresolved and pervasive problems and was still being tested such that the "first-ever AquaRefinery" plant was never operational. Indeed, at the end of the Class Period, Defendants conceded that the technology was unproven, malfunctioning, and that the modules were only being run in test mode. ¶¶ 261, 278, 282, 286.[1] As news about the true status of the AquaRefining technology was revealed, the stock price fell, closing at $3.79 on the last day of the Class Period. Now, almost two years later, the stock price still has not recovered and it trades below $2.00. The following chart reflects the price of Aqua Metals' stock from May 1, 2016 to date:

---

[1] References to "¶" or "¶¶" are to paragraphs of this Complaint.



6.      To be clear, this case is not about the fact that AquaRefining did not become profitable as quickly as hoped or the fact that AquaRefining did not generate revenue during the Class Period. Rather, Defendants are liable to Class members because they falsely portrayed the then-existing facts regarding the success, capability and operations of the AquaRefining technology.  Throughout the Class Period, Defendants touted having achieved specific milestones when, in reality, the AquaRefining technology was unproven and had not achieved commercial viability.  As a result of these untrue and misleading statements, Class members purchased their shares at artificially inflated prices.

7.      The story begins with the fact that, by the start of the Class Period, Aqua Metals had hyped that it had "successfully tested" its AquaRefining technology at Aqua Metals' Oakland and Alameda facilities (the "California Testing Facilities"), and that it was on track to produce 80 metric tons of recycled lead per day by the fourth quarter of 2016 ("Q4 2016") and then ramp up to 160 tons per day.

8.      On the first day of the Class Period, the Company touted a new partnership with Interstate Battery System International, Inc. ("Interstate Batteries"), the country's leading battery recycler, stating that this partnership constituted a "strong validation of [the AquaRefining] technology" and would allow the Company to ramp up and accelerate its growth.  Analysts' response to this strategic partnership was strong.  For example, in response to this news, an Oppenheimer & Co. Inc. ("Oppenheimer") report stated that the Interstate Batteries (which is 49% owned by Johnson

Controls (defined below)) partnership was indeed a "validation of its product quality from the global leader in lead acid batteries."

9.     Shortly thereafter, Aqua Metals touted that it had completed the construction of its "first-ever AquaRefinery" near Reno, Nevada, at the Tahoe Reno Industrial Complex ("TRIC" or the "Reno Plant").   Defendants claimed that the Reno Plant "open[ed] for business" in August 2016. Then, in November 2016, the Company announced that the Reno Plant had "produced" AquaRefined lead that was over 99.99% pure and that it was expanding its production to 120 tons of lead production per day by early 2017, a 50% improvement over the 80 tons per day that was previously announced.   It also reiterated its production rate of 160 tons of lead per day by 2018.   The Company also released images of block and bars (ingots) of purportedly ultra pure AquaRefined lead.

10.     Riding the wave of Defendants' hype, Aqua Metals closed a secondary public offering of 2.3 million shares of its common stock at a price of $10.00 per share, for gross proceeds of $23 million, on November 21, 2016, six months into the Class Period (the "November 2016 Offering").   In a November 21, 2016 press release, the Company explained:

> Aqua Metals intends to use the net proceeds from the offering to accelerate its AquaRefining product development and licensing efforts inclusive of pre-sales and post-sales support staff and infrastructure, enhance processes to further improve operating margins, regulatory activities, working capital and other general corporate purposes.

11.     Building on its oft-repeated partnerships with Interstate Batteries and others, the Company touted a key partnership with Johnson Controls International plc ("Johnson Controls" or "JCI"),[2] the world's largest manufacturer of automotive batteries, on February 9, 2017.   Clarke touted the partnership with Johnson Controls as "a tremendous step forward," enabling Aqua Metals to transition to licensing its AquaRefining process.   Oppenheimer called this agreement "transformative," a "demonstration of JCI's belief in the technology" and "a marquee validation of AQMS' technology and business model."

---

[2] This defined term includes the successor company, Clarios, which purchased Johnson Controls Battery Group, Inc. in May 2019.

1    12.    Just days later, on February 14, 2017, the Company claimed to have achieved the

2    crucial milestone of moving from the commissioning phase to the operational phase of its

3    AquaRefining process, stating that it had "successfully built, commissioned and ***beg[un] producing***

4    ***products*** at the world's first AquaRefinery" as well as having "deepened our strategic relationships

5    with major players throughout the industry."

6    13.    When, shortly thereafter, a short seller questioned whether AquaRefining could ever be

7    commercially viable, the Company publicly invited investors and analysts to its facility to see the

8    AquaRefining process in action.   The Company described the visits as a way to "openly show"

9    analysts and investors the "facility in operation" – consistent with its "belief in transparency."   In a

10    May 31, 2017 press release, Clarke described the visits as a "behind-the-scenes look at our process,"

11    including the full production process of AquaRefining on simultaneously running modules.

12    14.    In its press release touting the success of its first official analyst visit day, the Company

13    stated that it expected analysts to update their coverage reports to reflect findings from the site visit.

14    As prompted, several analysts issued favorable reports stating they saw the full AquaRefining process

15    in operation including the production of recycled lead.   For example, Oppenheimer reported "seeing

16    the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up

17    and operational" and the Company was "tracking [its] estimates well."   The report went on, "[w]e

18    observed six semi truckloads of material delivered and taken away during our four-hour visit."   In

19    addition, National Securities Corporation issued a report describing the visits as "incrementally

20    positive for transparency" and stating that the "modules were up and running and producing recycled

21    lead.… [T]he fact that we observed trucks delivering used batteries for off-loading and recycling, and

22    more importantly, finished recycled lead packaged and ready to be shipped out [is] highly

23    encouraging."

24    15.    By this time, the Company was repeatedly stressing that its focus was on expansion,

25    through licensing its technology and equipment to third parties as well as additional recycling

26    facilities, increasing its capacity to 800 tons per day, with shipments of the AquaRefining equipment

27    beginning in 2017.

28

16.     In truth, however, the highly touted revolutionary technology had not been successfully tested in the California Testing Facilities, AquaRefining was malfunctioning, the Reno Plant was not operating, the critical modules could not run for any length of time and Aqua Metals had not commissioned its process or commercialized AquaRefining during the Class Period.

17.     The truth was eventually revealed at the end of the Class Period and described by former employees ("Confidential Witnesses" or "CWs") herein.  Indeed, former employees provide highly consistent accounts that (a) throughout the Class Period, the AquaRefining process continuously malfunctioned, including due to "sticky lead" and "hard lead" issues, whereby the lead would get stuck on the machines and have to be manually scraped or chiseled off  – at both the California Testing Facilities and the Reno Plant; (b) the technology was not ready to be scalable; (c) the Company opened the Reno Plant before AquaRefining had operated successfully at the California Testing Facilities and the Reno Plant effectively became another test site; (d) despite efforts to try to fix the various problems (including the "sticky" and "hard" lead issues), they remained unresolved throughout the Class Period; (e) the Reno Plant was not functioning during the Class Period – the machinery (including the modules and the breakers) was routinely breaking down and the modules could only run for a few hours or less a day; and (f) only a scant amount of lead had been produced and no AquaRefined lead was ever commercially produced, facts which were reflected in the Daily Production Reports (defined below) to which the Officer Defendants (defined below) had access.

18.     Even more significantly, the former employees confirm that the Officer Defendants knew about or were deliberately reckless in not knowing about the status of the AquaRefining technology.  These former employees explain that two co-founders, the Chief Executive Officer ("CEO") Clarke and Chief Operating Officer ("COO") Mould, personally witnessed and were informed of the problems, and attended meetings discussing the problems and how to fix them.  They also reveal that Clarke and Mould provided carefully orchestrated shows, which employees referred to as "dog and pony shows," to investors (including Aqua Metals' critical partners Interstate Batteries and Johnson Controls) and others who visited the Reno Plant designed to make the plant and the modules look like they were operational, when in fact, they were not.  Moreover, they describe how

the images Defendants touted of purportedly pure AquaRefined lead were not actually pure AquaRefined lead and that images of the AquaRefinery "continuously" producing AquaRefined lead were deceiving as the machines were not continuously producing any lead. Former employees further describe that images were staged and Clarke, Mould and Murphy were aware that they blocks and bars did not contain AquaRefined lead. The Confidential Witnesses also confirmed that Clarke lacked any basis for the statements about the Company's ability to produce the targeted tons of lead.

19.   When the Company eventually revealed, through a series of partial disclosures, that, *inter alia*, (a) the AquaRefining technology was unproven; (b) the technology was malfunctioning (in part because it suffered from the very sticky lead problems that had existed throughout the entire Class Period); and (c) the technology had not been commercialized, the stock price fell through a series of one-day drops, including one-day drops of approximately 26%, 23.6% and 18%. As a result, Lead Plaintiff and the Class suffered significant damages.

20.   At the end of the Class Period, shareholders expressed concern about management's credibility. For example, as one market player stated: "I can understand delays in building a facility. I can't, however, understand how a facility can be built based upon a process that is still undetermined. Wouldn't you think that the optimal operational parameters would be discovered in a lab prior to installation? And, how can you have 'certain conditions' in a controlled warehouse environment? I see this and get very scared."

21.   After the Class Period, there was a significant shake-up of both senior management and the Board of Directors (or "Board"), apparently in response to the actions of a large shareholder group. Most notably, the Board implemented a plan to transition Clarke out of his roles as President, CEO and Chairman of the Board and, in April 2018, Clarke resigned and the Company announced corporate governance enhancements. Further, in December 2018, Mould also resigned. Moreover, the Chief Financial Officer ("CFO"), who replaced Murphy when he left the Company in July 2017, abruptly resigned a few months later in March 2018.

## II.   JURISDICTION AND VENUE

22.   Lead Plaintiff's claims arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  This Court has jurisdiction over Defendants because each Defendant has sufficient minimum contacts with this District, particularly since Aqua Metals' principal place of business is located at 1010 Atlantic Avenue, Alameda, California 94105.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Many of Defendants' acts and practices that give rise to this Complaint substantially occurred in this District.

25.     In connection with the acts, conduct and other wrongs Lead Plaintiff alleges, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and national securities markets.

## III.    INTRADISTRICT ASSIGNMENT

26.     Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the Oakland Division of this District is proper, because a substantial part of the events or omissions, which give rise to the claims asserted herein, occurred in Alameda County, and Aqua Metals' principal place of business is located, in Alameda County, California.

## IV.    THE PARTIES

### A.    Lead Plaintiff – The Plymouth County Group

27.     Established in 1937, Plymouth County Retirement Association is the retirement system for the benefit of employees of cities, towns, districts and authorities within Plymouth County, Massachusetts.  As of December 31, 2018, the Plymouth County Retirement Association had assets under management with a market value of over $936 million.  As set forth in its Certification attached as **Exhibit 1**, the Plymouth County Retirement Association purchased Aqua Metals' common stock during the Class Period and was damaged as a result.

28.     Denis Taillefer is an individual.  He was the sole founder and operator of 1103371 Ontario Ltd. until he sold all physical assets owned by the company in March 2016.  Since then, he has operated 1103371 Ontario Ltd. as an investment company and serves as the company's president with

sole voting rights and sole responsibility for all decision-making on its behalf.  Mr. Taillefer has a 70% ownership interest in 1103371 Ontario Ltd. and his wife, Teresa Taillefer, has the remaining 30% ownership interest in the company.  Mrs. Taillefer has assigned her litigation rights as to her Aqua Metals' securities to Mr. Taillefer.  As set forth in their Certification attached as **Exhibit 2**, Mr. Taillefer, Mrs. Taillefer and 1103371 Ontario Ltd. purchased Aqua Metals' common stock during the Class Period and were damaged as a result.

### B.       Defendants

#### 1.       The Company

29.     Aqua Metals, Inc.   ("Aqua Metals") is a Delaware corporation with its principal executive offices located at 1010 Atlantic Avenue, Alameda, California.  Aqua Metals completed its IPO in August 2015 and its common stock trades on the NASDAQ under the ticker symbol "AQMS."  Aqua Metals touts itself as "reinventing lead recycling with its patented and patent-pending AquaRefining technology" that uses a water-based, non-polluting process to recycle LABs.

#### 2.       Officer Defendants

30.     Defendant Stephen R. Clarke ("Clarke") co-founded the Company in 2014.  He was the President, CEO and Chairman of the Board of the Company at all relevant times.  During the Class Period, he made materially false and misleading statements and omissions in press releases, quarterly conference calls, industry events and events for analysts, investors and industry leaders.  Clarke signed the Company's Form 10-K for the year ended December 31, 2016, filed on March 2, 2017 (the "2016 Form 10-K").  He also signed and certified all of the Company's quarterly reports on Form 10-Q filed with the SEC during the Class Period and all of the Form 8-Ks and Form 8-K/As Current Reports filed with the SEC during the Class Period, except for those filed on December 28, 2016, May 24, 2017, June 15, 2017, August 28, 2017 and September 6, 2017.  In addition, Clarke signed the Form S-3 Registration Statement for Aqua Metals' November 2016 Offering, that was filed on September 2, 2016 and which was subsequently amended on September 16 and 21, 2016.

31.     Defendant Thomas Murphy ("Murphy") co-founded the Company in 2014.  He was the CFO and a Director of the Company from the beginning of the Class Period to August 10, 2017.  During the Class Period, he made materially false and misleading statements and omissions in press

1   releases and quarterly conference calls.  Murphy signed the 2016 Form 10-K and signed and certified

2   all of the Form 10-Qs filed with the SEC during the Class Period, except for the one filed on

3   November 9, 2017.  In addition, Murphy signed the Registration Statement for Aqua Metals'

4   November 2016 Offering, that was filed on September 2, 2016.

5       32.    Defendant Selwyn Mould ("Mould") co-founded the Company in 2014.  He was the

6   COO during the Class Period.  During the Class Period, he made materially false and misleading

7   statements and omissions in press releases and events for analysts, investors and industry leaders.

8       33.    Defendants Clarke, Murphy and Mould are collectively referred to as the "Officer

9   Defendants."

10      34.    The Officer Defendants, by virtue of their high-level positions at Aqua Metals, directly

11  participated in the management of the Company, were directly involved in the day-to-day operations

12  of the Company at the highest levels and were privy to confidential proprietary information

13  concerning the Company and its business operations, growth and financial condition.  As set forth

14  below, the materially misstated information conveyed to the public was the result of the collective

15  actions of these individuals.

16      35.    As a co-founder, Clarke was closely involved in all aspects of the Company's

17  operations from its inception.  For example, he oversaw development of the AquaRefining process and

18  production of modules in both the California Testing Facilities.  He regularly visited the Reno Plant

19  and saw the machinery breaking down and attended production and operations meetings with plant

20  management.  During the production meetings, plant efficiency, materials, schedules and problems at

21  the plant, including machinery break downs, were discussed.  Clarke observed and was informed by

22  employees that the AquaRefining technology had significant issues, including the modules' sticky lead

23  problems.  Clarke also orchestrated and led demonstrations at the Reno Plant for analysts, investors

24  and potential partners in the battery industry.  Further, as a member of the Board of Directors, Clarke

25  was responsible for overseeing all purported risks of the Company: "[Aqua Metals'] Board has an

26  active role in overseeing [the Company's] areas of risk. . . . the full Board has overall responsibility for

27  risk oversight . . . "

28

36.    As a co-founder, Murphy was closely involved in all aspects of the Company's business and operations from its inception.  From May 2013 to June 2014, Mr. Murphy worked alongside Mr. Clarke and Mr. Mould in the development of the AquaRefining process and [Aqua Metals'] current business."[3] For example, he was aware of the development of the AquaRefining process and production of modules in both the California Testing Facilities.  He had access to Daily Production Reports from the Reno Plant, which included the number of batteries crushed, as well as the amount of lead paste and lead produced for each shift the Reno Plant operated. Further, as a member of the Board of Directors, Murphy was responsible for overseeing all purported risks of the Company: "[Aqua Metals'] Board has an active role in overseeing [the Company's] areas of risk. . . . the full Board has overall responsibility for risk oversight . . . "

37.    As a co-founder, Mould was closely involved in all aspects of the Company's business and operations from its inception.  In his role as COO, he was responsible for Aqua Metals' operations, including the Reno Plant, equipment manufacturing, manufacturing strategy, technology development, process development and product engineering throughout the Class Period.  Mould regularly visited the Reno Plant and saw the machinery breaking down, spoke with plant managers about operations and was aware of production issues.  Mould routinely attended production meetings and had access to Daily Production Reports.  The reports included the number of batteries crushed, as well as the amount of paste and lead produced for each shift the Reno Plant operated.  During the production meetings, plant efficiency, materials, schedules and problems at the plant, including machinery break downs, were discussed.  Mould, along with Clarke, orchestrated and led demonstrations at the Reno Plant for analysts, investors and potential partners in the battery industry.

38.    As senior executives at a publicly held company with common stock registered with the SEC and traded on the NASDAQ, the Officer Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Aqua Metals' publicly traded common

---

[3] Definitive Proxy Statement on Schedule 14A, filed with the SEC November 25, 2016; Definitive Proxy Statement on Schedule 14A, filed with the SEC April 24, 2017.

1   stock would be based on accurate information.  Officer Defendants Clarke, Murphy and Mould each

2   violated these requirements and obligations during the Class Period.

3        39.    As a result of their positions of control and authority as senior executives, the Officer

4   Defendants were able to and did control the content of SEC filings, press releases and other public

5   statements issued by Aqua Metals during the Class Period.  Each Officer Defendant was provided with

6   a copy of the statements at issue in this action before they were disseminated to the public, and each

7   Officer Defendant had the ability to correct the statements or prevent them from being released into

8   the public sphere.  Accordingly, Officer Defendants Clarke, Murphy and Mould are responsible for the

9   accuracy of the public statements detailed in this Complaint.

10        40.    As a result of their positions of control and authority as senior executives, the Officer

11   Defendants had access to the adverse undisclosed information about Aqua Metals' business,

12   operations, financial statements and internal controls through access to internal corporate documents,

13   conversations with other corporate officers and employees, visiting the Reno Plant, observing the

14   California Testing Facilities, attending management, production and board meetings, and viewing

15   production and other reports.  The Officer Defendants knew or recklessly disregarded that these

16   adverse undisclosed facts rendered the positive representations made by or about Aqua Metals

17   materially false and misleading.

18        41.    The Officer Defendants are liable as participants in a fraudulent scheme and course of

19   conduct that operated as a fraud or deceit on purchasers of Aqua Metals' common stock by

20   disseminating materially false and misleading statements and/or concealing adverse facts.  The scheme

21   deceived the investing public about the status of the AquaRefining technology as the modules

22   malfunctioned and were not producing ultra-pure AquaRefined lead, and the technology was not ready

23   to scale commercially or be licensed to third parties.  This deception caused Lead Plaintiff and

24   members of the Class to purchase Aqua Metals' common stock at artificially inflated prices.

25   **V.     BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

26        **A.    Traditional Lead-Acid Battery Recycling**

27        42.    LABs have been in use for nearly 160 years and they are the oldest type of rechargeable

28   battery.  They are a mainstay in the automotive battery industry.  There are four primary elements to a

LAB: (a) the positive plate which is covered with a paste of lead dioxide; (b) the negative plate which is made of sponge lead (pure lead); (c) the separator which is an insulating material between the positive and negative plates, and allows electrolyte and ions into it which enables conduction without the two plates touching; and (d) electrolyte which consists of water and sulphuric acid.  These four elements are contained in a plastic container.

43.     The lead in LABs is a valuable material.  Thus, rather than send used LABs to landfills at the end of their life, used LABs are sent to recycling centers.  The batteries are then recycled and lead is removed from the batteries.  Lead is one of the most effectively recycled materials in the world.  Today, the vast majority of lead is produced by recycling, rather than by mining.

44.     The current process for recycling LABs involves the breaking down of batteries and separation of the components such as metallic lead, lead paste, plastics and electrolyte (acid).  The lead components are then smelted and refined.  Smelting is a dirty process and has negative implications for the environment surrounding the recycling facility.  Smelting employs a high-temperature (1400°F), endothermic chemical reduction, making it inefficient, energy intensive and often a highly pollutive process.  Smelters are sources of significant emissions that have resulted in the contamination of hundreds of sites around the country.  As a result, there are very strict environmental regulations on smelting.

### B.     Aqua Metals And Its Purported AquaRefining Process

45.     Aqua Metals was incorporated in 2014 and was founded by Defendants Clarke, Murphy and Mould.  It is a small company that, at its Class Period peak, employed about 70 people.

46.     Aqua Metals claims that it has developed a "cutting edge" alternative to smelting, called AquaRefining.  Aqua Metals claims that the AquaRefining process produces ultra-pure lead at a high yield without the environmental impact and at a lower cost than smelting.  Thus, the Company contends, AquaRefining will revolutionize the $22 billion lead recycling industry.

47.     According to Aqua Metals, the AquaRefining process begins, similar to traditional LAB recycling, with the crushing of used LABs and the separation of the metallic lead, active materials (lead compounds), sulfuric acid and plastic for recycling.  Purportedly, the metallic lead from the breaker (not AquaRefined lead) is ingoted, *i.e.*, cast as a bar or plate and then sold.

48.      After that, AquaRefining differs from traditional LAB recycling through the use of its proprietary machines called modules to recycle the lead compounds.   Each module contains six electrolyzers.   The modules use "electroplating," which is intended to continuously remove lead as the modules operate.   The process, purportedly, lightly plates disk cathodes with soft lead, making the lead easier to harvest.   AquaRefining, purportedly, dissolves the lead compound in a biodegradable, non-toxic solvent, strips the primary lead from the solvent into a lead paste and then uses an electro-chemical process and electrolyzer to convert the dissolved lead compounds into pure, primary grade lead.   Each electrolyzer contains several rotating disks and scrapers that, purportedly, scrape the lead off the disks and onto chutes.   From there, the lead is intended to slide off the chute and onto a conveyor belt.   Then, purportedly, that "pure" lead is ingoted and sold at a premium as pure and ultra-pure lead.   This process is, purportedly, fully automated and does not release toxic emissions into the atmosphere and is less expensive than smelting because it does not require high heat.   The AquaRefining process is also completely wet, unlike smelting which is dry, and thus, does not produce lead dust.

49.      During an August 15, 2016 interview with Daniel Carlson of Tailwinds Research Group, LLC ("Tailwinds"), Clarke described the difference between AquaRefining and traditional LAB recycling as follows:

> The incumbent technology is called smelting and it traces back to about 6,000 years ago. It's a very high temperature thermal process in which lead and lead compounds are heated up to 2200 degrees Fahrenheit and then reacted with a series of chemicals to pull the compounds off the lead and convert lead sulfite, lead oxide back into metallic lead. Our process is a low temperature, water-based approach.   It uses a mild acid that is biodegradable and non-toxic.   So whereas smelting occurs at very high temperatures, our process occurs at essentially room temperature.   Whereas smelting requires the addition of quite nasty reducing agents, our technology is a very simple electro-chemical process. Overall, we use less than half the energy to make the transition from lead compounds to metallic lead.

50.      Aqua Metals has illustrated how the AquaRefining process purportedly produces pure lead in marketing materials as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    51.    In July 2015, the Company went public and stated that the IPO proceeds were to be

16 used for the construction of a recycling facility in McCarran, Nevada, near Reno, at the Tahoe Reno

17 Industrial Complex (the Reno Plant).  Aqua Metals broke ground on the Reno Plant construction on

18 August 17, 2015.  Roughly a year later, on July 28, 2016, the Company held an open house at the

19 Reno Plant and, shortly thereafter, on August 10, 2016, announced that the Reno Plant is "now

20 opening for business."

21    52.    Even prior to the Class Period, Aqua Metals had marketed that the AquaRefining

22 process was successfully tested in both of its California Testing Facilities.  *See, e.g.,* Q1 2016

23 Conference Call (defined below) (Clarke stated our "full-sized electrolyzed test facility," "allows us to

24 demonstrate our process to third-party license[e]s without having to take [them] into Reno to show the

25 process there").

26
27
28

1
2

### C.     The Process Was Malfunctioning And Not Commercially Viable Prior To And Throughout The Class Period

3
4
5
6

53.     Although the Company concealed this during the Class Period, in truth, the process was malfunctioning and faced a myriad of continuing issues beginning in 2015, well before the start of the Class Period, at the California Testing Facilities and continuing throughout the Class Period at the Reno Plant.  In fact, the modules barely ran throughout the Class Period.

7
8
9
10
11
12
13
14

54.     These problems included a "hard lead" issue, whereby the lead would get stuck and harden on the disks and had to be manually chiseled off, and a "sticky lead" issue whereby the lead would get stuck on the chutes and have to be manually scraped off.  These issues were the result of, *inter alia*, (a) the Company not getting the correct chemical ratios so the lead was the wrong consistency – it would not stay soft as the process required, and instead would re-solidify and compact upon itself; (b) design flaws with the modules; and (c) electrical voltage.  Moreover, all that had been tested in the California Testing Facilities was "laboratory" or "virgin" lead, not lead extracted from used batteries.

15
16
17

55.     These problems were apparent since 2015 and were expected to, and did, persist and worsen at the Reno Plant and were observed by and discussed with Defendants at the California Testing Facilities, as detailed below.

18
19
20
21
22

56.     Given these and other problems, the AquaRefining technology was not ready to scale. Yet, Defendants prematurely pushed ahead with the Reno Plant, publicly touting that operations would commence in no time.  Indeed, although chemists and engineers at the California Testing Facilities were scrambling to come up with solutions to the aforementioned problems, before the Reno Plant opened, they were not resolved, and the AquaRefining process continued to malfunction.

23
24
25
26
27

57.     Not surprisingly, the same sticky lead and hard lead problems, among others, experienced at the California Testing Facilities, occurred at the Reno Plant.  As former employees explained, once it opened, the Reno Plant was used as another testing facility, as a means to continue Aqua Metals' research and development to try to develop a functioning AquaRefining process and to make it commercially viable.  Moreover, additional problems were encountered during every step of

28

1    the AquaRefining process, including with the breakers, used in traditional lead recycling, which

2    repeatedly broke down.

3        58.    Moreover, as the accounts of former employees demonstrate, Defendants knew or

4    recklessly disregarded that the AquaRefining process was not working.  Indeed, Defendants regularly

5    visited the Reno Plant and witnessed the machines and the process malfunctioning first-hand.

6    Defendants spoke with former employees and plant managers about these problems and attended

7    meetings where the issues were discussed.

8        59.    Defendants also had access to Daily Production Reports, which reported the number of

9    batteries crushed, the amount of lead paste produced, the chemicals used and the amount of lead

10   produced.  Based on these report "everyone knew that the [lead production] numbers were not met."

11   In truth, the process never got far enough to produce commercially AquaRefined lead.

12       60.    Despite this, Defendants repeatedly touted that the process was successfully tested and

13   repeatedly insisted that the commercialization of AquaRefining was progressing during the Class

14   Period.  Moreover, Defendants invited investors, analyst, potential licensees, and potential strategic

15   partners to visit the Reno Plant and staged "dog and pony show[s]," whereby they would make the

16   process appear to be functional.   Similarly, Defendants touted pictures of blocks and bars as

17   purportedly ultra pure AquaRefined lead, when, in truth, they were not made of pure AquaRefined

18   lead.  As set forth in more detail below, former employees tell a compelling story that is in stark

19   contrast to Defendants' public statements throughout the Class Period.

20       **D.    Detailed Former Employee Accounts**

21   **Confidential Witness No. 1 ("CW 1")**

22       61.    CW 1 was an engineer at Aqua Metals from 2015 through January 2017.  CW 1's

23   responsibilities included creating designs that were used to build the modules.  CW 1 provided

24   guidance and design advice in an effort to make the machinery work.

25       62.    CW 1 first worked at the original Oakland location and then moved to the Company's

26   headquarters in Alameda, California after it opened.  CW 1 also visited the Reno Plant for the grand

27   opening.

28

63.   CW 1 said that the Company had several problems with the AquaRefining technology and was not able to use it commercially or get it to an operational state.  CW 1 said the process was tested before the Reno Plant was built, both in the lab unit and the full-scale test unit, which consisted of one electrolyzer at the California Testing Facilities.  CW 1 explained the Company had issues with the AquaRefining process in both of these testing environments.  CW 1 said that two of the big issues were "sticky lead" and "hard lead."  CW 1 relayed that these issues were present ever since CW 1 was at the Company and that CW 1 became aware of these issues within the first month of CW 1's employment.  CW 1 relayed that these issues were occurring prior to and at the time the Company was building the Reno Plant.  CW 1 also stated that these issues were present and persisted at the Reno Plant in addition to both of the California Test Facilities.  CW 1 is aware of the problems as a result of CW 1's role to provide guidance and design advice in an effort to make the machinery work.

64.   CW 1 said that rather than solve the issues first and then build the plant, the Company went ahead with building the Reno Plant and banked on being able to solve the issues before the Reno Plant was completed, which never happened during CW 1's time at the Company.  CW 1 is aware of this based on CW 1's role at the Company and CW 1's conversations with Clarke and Mould.

65.   CW 1 explained that, because lead is dense, it can compact upon itself and re-solidify so there is only a finite amount of time in which the lead remains soft enough to work in the process. According to CW 1, the "hard lead" issue occurs when the AquaRefining process is unable to scrape the lead off the disks in the electrolyzers before it hardens.  CW 1 said that, in the California Testing Facilities, the lead was hardening before getting scraped off and had to be chiseled off manually.  This was an issue throughout CW 1's time at the Company and was not resolved during that time.

66.   CW 1 further said the AquaRefining process always had a "sticky lead" issue, as well. CW 1 said that they did not call the problem a "sticky lead" issue while CW 1 was employed there, but stated that it is the same issue that the Company disclosed in late 2017 and called the "sticky lead" issue.  CW 1 stated that this issue was also related to the lead being dense and re-solidifying.  CW 1 described the sticky lead issue as one where the lead is not able to slide off the chute onto a conveyer belt.  CW 1 said that, even in the California Test Facilities, the lead had trouble coming off the chute

1   and they had to use a stick to scrape off lead from the chute.  CW 1 thought the issue would be even
2   worse at a full-scale plant.

3          67.    CW 1 suggested that the angle for the chute be adjustable so that the angle could be
4   changed based on the circumstances to aid the lead in sliding off the chute.  However, when CW 1
5   brought these and other suggestions to Clarke and Mould, they were ignored.

6          68.    CW 1 was aware of these issues because CW 1 worked on trying to solve the "sticky
7   lead" and "hard lead" issues both before and after the Reno Plant opened.  CW 1 relayed that there
8   were three variables that affected the Company's ability to resolve those issues.  CW 1 said the first is
9   chemistry – getting the correct chemical ratios so that the lead is at the right consistency.  CW 1 said
10  that the Company could not get the lead to be the correct consistency.  CW 1 said the chemists at the
11  California Testing Facilities worked on the consistency problem throughout the time CW 1 was at the
12  Company.  CW 1 said the second issue was the machinery, *i.e.*, the actual design of the equipment.
13  CW 1 said CW 1 tried to fix these design flaws in the mechanics throughout CW 1's tenure.  CW 1
14  said the third variable was electrical/voltage.  CW 1 said that because there is more voltage as the
15  process scales bigger, this can have an impact as well.  The amount of voltage used in the small test
16  lab was less than what was used in the full-sized test facility.  Moreover, the full voltage needed at the
17  Reno Plant was not used at the California Testing Facilities, as it was not permitted there.

18         69.    Indeed, CW 1 said that, "ever since I was there [2015] they knew about [these]
19  issue[s]," including Clarke and Mould.  CW 1 said that it was also known, including by Clarke and
20  Mould, that, as designed, the AquaRefining technology could not meet full scale capacity.

21         70.    CW 1 explained that because of all of the variables in the technology, including those
22  discussed above, as the process goes to large-scale, even just one change can impact everything and
23  make existing issues worse.  CW 1 explained, for example, that in the Reno Plant more power would
24  be needed, so even changing the voltage could impact the process and create different results and
25  issues and make existing issues worse.  CW 1 stated that the technology "didn't translate in the
26  factory."

27         71.    CW 1 said that Clarke and Mould were aware of the scaling issues as well because they
28  witnessed this on a smaller scale when taking the technology from the small test lab to the full-size test

1    facility.  CW 1 said, without fixing the scaling, sticky lead, or hard lead issues, Clarke and Mould
2    decided to "go big," even though the technology could not support it.

3           72.     CW 1 stated that the time leading up to the opening of the Reno Plant was very chaotic
4    because they were trying to solve the problems with the AquaRefining process before the plant
5    opened.  These problems included the sticky lead and hard lead issues, two of the biggest issues they
6    were facing.  Several different potential solutions were proposed and explored both before and after
7    the Reno Plant opened.  CW 1 stated that, after it was built, the Reno Plant became a testing factory as
8    they tested potential solutions to the issues there.  CW 1 said that, although the Company later
9    conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely
10   stated it was testing improvements in the context of licensing of the equipment, rather than the
11   underlying process), in truth, it was a test facility as soon as it opened.

12          73.     CW 1 also relayed that, during CW 1's time at the Company all that was fed into the
13   AquaRefining equipment at the California Testing Facilities was lead that Aqua Metals obtained from
14   an outside source.  This was not the raw, used lead that would be extracted from a battery, but purer,
15   unused lead.  CW 1 called this lead "virgin" or "laboratory" lead and it did not have all of the
16   impurities that would exist in lead that was extracted from used batteries.

17          74.     CW 1 further relayed that because Aqua Metals used this "virgin" lead that did not have
18   all of the impurities that would exist in lead extracted from a battery, even what little came out of the
19   AquaRefining process was much purer than what would come out if used battery lead was actually fed
20   into it.  Further, CW 1 said that, because it is more pure, the "virgin" lead is also easier to process than
21   lead extracted from a used battery.  CW 1 said that once the used battery lead is fed into the machines,
22   the process would have more issues because of these additional impurities.   CW 1 also said that the
23   "virgin" lead was also used as feed at the Reno Plant.

24          75.     CW 1 stated that when CW 1 left the Company in January 2017, the modules were
25   running only a few hours at a time.  CW 1 said the Company only received revenue from the
26   traditional breaking of batteries into alloys and plastics since the AquaRefining process was not
27   operational.

28

76.     CW 1 relayed that, while at the Alameda facility, several visitors came through for presentations – what CW 1 called a "dog and pony show."  CW 1 said these visitors included representatives from Interstate Batteries, Johnson Controls and Oppenheimer.  CW 1 stated that either Clarke or Mould, or both, were present during each of the visits.  CW 1 said that these visits occurred throughout CW 1's tenure at the Company.  CW 1 is aware of this because CW 1 was there when the visitors came through.

**Confidential Witness No.  2 ("CW 2")**

77.     CW 2 was an Environmental Systems Supervisor and ran the water treatment facility at the Reno Plant from right after the Reno Plant opened until the Fall of 2017.  CW 2 reported to the Vice President, Recycling Technology Battery and Lead Recycling Operation.  CW 2 said CW 2 also helped out in production if they needed someone to fill in for a bit.

78.     CW 2 said the Reno Plant had many problems.  CW 2 said, "they couldn't get the equipment to work" in the AquaRefining area.  Consistent with what CW 1 relayed, CW 2 stated that only one module worked for about an hour or so at a time before it would break down and need maintenance.  It would then be idle for two or three days.  CW 2 said that the AquaRefining technology "was not functional."  Similar to CW 1, CW 2 said that one of the problems the process was facing and was causing the modules to malfunction was a "sticky lead" problem.  CW 2 said that, although CW 2 did not run the modules, CW 2 was aware of the problems because the employees all talked about it and tried to solve it.  CW 2 said other employees would ask for help with the issues.  CW 2 further stated that, because CW 2 ran the water systems, CW 2 knew the machines were not running often because CW 2 was not running the water systems often.

79.     CW 2 said Clarke and Mould knew the plant was inoperable and had problems because CW 2 saw them at the plant regularly, including witnessing the problems.  CW 2 said they were on the Reno Plant floor whenever they were in town and could see what was happening.  CW 2 also said Clarke and Mould attended meetings at the plant where these problems were discussed.

80.     CW 2 stated that, after going through the module, the extracted lead is supposed to go into a kettle.  CW 2 said CW 2 saw the kettle, which had a 50-ton capacity, was not once filled to capacity with lead.  CW 2 said there was no revenue earned from AquaRefining, as no AquaRefined

1   lead was ever sold.  CW 2 said the only revenue was from selling by-products that were produced

2   from breaking the batteries in the breaker.  Although CW 2 did not see records regarding revenue,

3   CW 2 knows that Aqua Metals made no money from AquaRefining because CW 2 knows the industry

4   and what was actually produced at the Reno Plant.

5       81.   CW 2 oversaw air emissions in the plant and was required to test air quality.  However,

6   CW 2 said the plant was not operating; thus, while the air infiltration was turned on, it only pulled air

7   out of the room, as there was nothing to vent.

8       82.   CW 2 explained that the pictures of bars, or ingots, of lead in the pictures during the

9   Class Period, including those first released by the Company in November 2016, were not AquaRefined

10  lead, but refined lead the Company purchased and then melted and cast at the Reno Plant.  CW 2 also

11  stated that the lead in the blocks from the pictures, including those first released by the Company in

12  November 2016, was not pure AquaRefined lead.  CW said it was full of impurities and was not able

13  to be cast.  Instead, the Company just "dumped it."  CW 2 further stated that, throughout the time

14  CW 2 was at the Company,  as Aqua Metals never was able to get the AquaRefinery line to work, they

15  never used lead that came off it to make ingots.  Moreover, CW 2 relayed that the images of the

16  AquaRefining process running were staged as they captured only a short amount of time Aqua Metals

17  could get the equipment running before it broke down and employees would spend the next week

18  trying to fix the equipment and cleaning up.

19      83.   CW 2 described investor visits to the Reno Plant where management ensured that the

20  faulty modules would run when investors came to visit.  CW 2 said CW 2 and the other employees at

21  the plant were told, "don't run the machines until [the investors] show up" and to "make yourself look

22  busy."  CW 2 said they were told to "stage everything up."  CW 2 was told these things by CW 2's

23  manager and was told the message originated from Clarke.  Once the investors left, the plant

24  employees would clean up.  CW 2 said "we only ran the machines when investors came to the plant."

25      84.   CW 2 said that CW 2 believes the investor visits to the Reno Plant began in late 2016

26  or early 2017.  CW 2 said that visits with investors were happening on a regular basis, and these

27  included visits by Interstate Batteries and Johnson Controls.  CW 2 relayed that some of the other

28  employees, including one that had formerly worked at Johnson Controls, knew people from Interstate

Batteries and Johnson Controls, which is how CW 2 learned that these entities were the visitors on the days they were at the plant.  Specifically, CW 2 said that both Interstate Batteries and Johnson Controls visited and were given the same "dog and pony show" as the other investors.  CW 2 further said it was a "big deal" when Johnson Controls came through and that they prepared for three days prior to their arrival.  CW 2 said that Johnson Controls visited at least twice.

85.     CW 2 said the visitors were only on the plant floor for about five to ten minutes watching the machines run.  CW 2 said that the floor employees would get a call from the plant management to start the machines, and about five minutes later the visitors would come to the plant.

86.     CW 2 said that records were kept reflecting the problems and how long the machines would run.  CW 2 prepared reports for the Vice President, Recycling Technology Battery and Lead Recycling Operation on the lack of production and requests for maintenance.  The production reports were called "Daily Production Reports" (or "Production Reports").  There was also a log called the "Operations Log" in which employees would record how long the machines, including the modules, ran.

87.     CW 2 further relayed that, in addition to the modules, CW 2 saw, while on the production floor, other machinery that was non-functional, such as motors, pumps and tanks.  CW 2 saw that machines needed repair, but were not fixed.  CW 2 also said that repair requests were sent to maintenance, but repairs were not done.

**Confidential Witness No.  3 ("CW 3")**

88.     CW 3 was a Production Supervisor at the Reno Plant from fall 2016 to after the close of the Class Period.

89.     CW 3 stated that CW 3's responsibility was to set up the Reno Plant and get it running.  CW 3 relayed that this involved the breaking and refining process, but not the AquaRefining process.  CW 3 stated that CW 3's team worked on the traditional part of the process – the breaking and separating.  CW 3 said CW 3's team was responsible for meeting the numbers, but "no matter how hard production pushed, we couldn't make the numbers" that management wanted.  CW 3 said that the breaker would break down because it was run too hard, too much was put through it.

90.     CW 3 said the modules did not meet the production numbers the Company announced. Consistent with what CWs 1 and 2 relayed, CW 3 recalled that the modules would break down during the process. CW 3 said CW 3 was told that that modules were having problems and breaking down and all of the employees were aware of it.

91.     CW 3 also relayed that at the time of the photos that were published beginning in November 2016 and thereafter, the Company was not making an amount of AquaRefined lead that would be able to be cast into a bar. CW 3 further stated that during the time frame of the Class Period, the only lead that was cast was lead that did not go through the AquaRefining process.

92.     Like CW 2 relayed, CW 3 said CW 3 witnessed people visiting the Reno Plant often and CW 3 was told that they were investors. Similar to the other accounts, CW 3 said CW 3 witnessed Clarke, Mould and the plant director escorting the visitors and said Clarke and Mould "ran the show." CW 3 said that CW 3 personally ran the machinery during the visits. CW 3 would be told of an upcoming visit by the plant manager a day or two before the visits. It was CW 3's job to make sure the production area was clean and that the "machinery kept running" during the visits. CW 3 said these visits happened regularly the entire time CW 3 was at the Company.

93.     Like CW 2, CW 3 also stated that the Reno Plant used reports called Production Reports that reflected activity in the production process including the amount of batteries broken, chemicals used, and tons of lead produced. CW 3 said each shift supervisor was responsible for preparing Production Reports daily, after their shift ended. CW 3 prepared them for CW 3's shift. Based on the Production Reports, "everyone knew the numbers were not met." CW 3 said the Production Report was a "pre-made" one-page Excel spreadsheet with rows and columns on it and the numbers – what was produced during that shift – were entered into it daily. CW 3 said that, although CW 3 did not see what the reports reflected regarding AquaRefined lead, the process did not get far enough to produce any AquaRefined lead. CW 3 said that all managers were emailed the Production Reports daily. CW 3 believes Mould was on the email list and received the reports. CW 3 stated that "just by looking at the production records, management would know the estimates were not being met," and "you just had to compare the estimates to the production reports."

1    **Confidential Witness No. 4 ("CW 4")**

2         94.    CW 4 was a Production Manager, Battery Recycling at the Reno Plant from January

3    2017 to summer 2017.  CW 4 reported to the Vice President, Recycling Technology Battery and Lead

4    Recycling Operation.

5         95.    CW 4 said "I saw what was published and had a front row seat" at Aqua Metals.  CW 4

6    said the "promises" made by Aqua Metals were not true.  CW 4 said that by this CW 4 means that

7    Clarke was saying that a certain amount of AquaRefined lead would be produced, but no

8    AquaRefined lead was produced.  CW 4 said that CW 4 read the Company's publications and press

9    releases.  CW 4 said the releases included numbers for revenue and production, but they were

10   "nowhere near" those numbers and it was "absolutely impossible" to make the production numbers.

11   CW 4 said the Reno Plant could not produce anything more than a 5 gallon bucket of AquaRefined

12   lead – and this was based on multiple runs of the equipment which would run for a short time and

13   then break down and need days of maintenance.

14        96.    CW 4 also said that when Clarke spoke publicly about products being produced, Clarke

15   left it up to interpretation.  CW 4 said that, in fact, the only products being produced were the by-

16   products from the known technology (the breaker), not the AquaRefining process.  CW 4 said CW 4

17   knows this because CW 4 saw what was produced.  CW 4 further relayed that "no revenue came from

18   AquaRefining."  Any revenue came from by-products of the batteries being crushed in the breakers.

19   CW 4 said that the AquaRefining process "was not even close to be[ing] commercially operating."

20   CW 4 said that, as the Plant Superintendent, nothing went on at the Reno Plant that CW 4 did not

21   know about.  CW 4 said that because CW 4 ran the plant, CW 4 knew what was being produced and

22   the quantities.

23        97.    CW 4 said that the AquaRefining process did not work.  Like CWs 1, 2 and 3

24   described, CW 4 said the module could not operate for more than about an hour or it would break

25   down.  CW 4 said that the module "was still in R&D mode."  CW 4 said the modules only operated for

26   about one hour a day the whole time CW 4 was employed at the Company.  CW 4 further stated that,

27   while employed there, Aqua Metals had four modules but only ran two and would only run one at time

28   because they were trying to address why it was going into failure and why it only ran for a short period

1   of time.  CW 4 said the module would overheat and had to be shut down and maintenance performed.

2   Just as CWs 1 and 2 relayed, CW 4 also said the modules had a sticky lead issue and the Company

3   could not figure out how to fix it.  CW 4 said a lot of R&D was done on the sticky lead issue,

4   including scrapers removing the lead and many other potential solutions.

5          98.    CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling

6   Operation went to Clarke and Mould on several occasions and told them about the problems and that

7   the Company could not reach the revenue and production numbers the Company announced.

8          99.    CW 4 said Clarke would tell investors how much product they would produce and then,

9   after, go to the Vice President, Recycling Technology Battery and Lead Recycling Operation and say,

10  now that I have said that, how can we make that happen.  CW 4 said they could not make it happen

11  because of all of the problems.

12         100.   CW 4 stated that, after CW 4 started at the Company in January 2017 and saw that the

13  Company was still trying to get the Reno Plant and the AquaRefining process up and running and that

14  the AquaRefining equipment was barely running or producing any AquaRefined lead, CW 4 wanted to

15  know how the Company was able to make the lead that was in images released by Aqua Metals

16  beginning in November 2016 of the AquaRefining process purportedly in operation and of bars

17  (ingots) of purportedly AquaRefined lead with "AQMS" embossed on them.  CW 4 said that because

18  none of that was possible while CW 4 was there, including producing enough AquaRefined lead to

19  make up the bars that were shown, CW 4 wanted to know how it could have happened prior to that

20  time.

21         101.   Thus, CW 4 relayed, CW 4 asked the Vice President, Recycling Technology Battery

22  and Lead Recycling Operation, who was CW 4's friend and was in some of the images.  The Vice

23  President, Recycling Technology Battery and Lead Recycling Operation responded that they were

24  fake.  Specifically, CW 4 relayed that the Vice President, Recycling Technology Battery and Lead

25  Recycling Operation told him that the lead in the bars had not gone through the AquaRefining process

26  but was lead that Aqua Metals obtained from another source and then melted and cast.

27         102.   Further, as to the images of lead coming off the AquaRefining machines, CW 4 was

28  told the Vice President, Recycling Technology Battery and Lead Recycling Operation that they were

taken during the few minutes the machines would run, before they malfunctioned and would need maintenance the next several days.  CW 4 said the process was "never continuous;" the images were "very deceiving."

103.    CW 4 also relayed that the Vice President, Recycling Technology Battery and Lead Recycling Operation told CW 4 that when all of these images were made, Clarke, Murphy and Mould were there.  CW 4 was told by the Vice President, Recycling Technology Battery and Lead Recycling Operation that Defendants set it up and it was staged.  CW 4 was also told by the Vice President, Recycling Technology Battery and Lead Recycling Operation that Clarke, Murphy and Mould all knew that AquaRefined lead was not in the bars.

104.    Like CW 2, CW 4 said CW 4 witnessed that Clarke and Mould both visited the Reno Plant regularly.  Echoing CW 2, CW 4 said Clarke and Mould knew the plant was not operational and saw the problems for themselves, too.

105.    Just as CWs 2 and 3 relayed, CW 4 said that, on several occasions, investors came to the Reno Plant for a demonstration of the AquaRefining process.  CW 4 described how management put on a "show" for the investors, as similarly described by CWs 2 and 3.  CW 4 stated that Mould would email the Vice President, Recycling Technology Battery and Lead Recycling Operation and copy CW 4 to advise them of the visits so they could operate the module for the investors.  CW 4 said that a few days before the visit, employees would be reminded to "clean [the plant] up really nice" and would also be informed of the logistics of the demonstration.  CW 4 said that essentially this meant confirming the timing of the run to make sure that the modules were still operating while the investors were in the Reno Plant.  CW 4 said they would also "stage loads" of batteries by the hammermill (breaker).

106.    CW 4 said that Richard Clarke, Clarke's brother, would work with employees in the AquaRefining area over the next several days before the visit to get the equipment "rigged up" so it would be able to run for a few minutes while the visitors came through.  CW 4 said that they would not run the AquaRefining equipment until right before the visitors came through and then shut it off after they left.  CW 4 said the employees called the visits the "dog and pony show," because it was a "gyp."

107.    CW 4 said investors would meet with Clarke and Mould in the conference room at the Reno Plant while CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation "assembled a team to stage a show."   The team included some key people, including a project manager and some people from the maintenance department as well as a program engineer, to assist in restarting the process if anything shut down.   CW 4 said, because the module could not operate for more than about an hour before it would break down, CW 4 had to start it at a time where it would run during the investors' visit and not break down.   CW 4 said the visitors would spend about five to ten minutes on the plant floor watching the demonstration, and the rest of the time they were in a conference room with Clarke and Mould.   CW 4 said they would show the AquaRefining process as if this was continually how the plant was running, but this was not the case as it could only run for a short time before it would break down and the machines were actually barely running.   CW 4 knows this because CW 4 witnessed it.

108.    CW 4 did these presentations at least four or five times over a period of four or five months.   CW 4 said that these presentations were the same throughout the time CW 4 was there. CW 4 remembers doing them twice in May 2017 and once in January 2017.  Like CW 2 stated, CW 4 relayed that Johnson Controls was one such visitor.   CW 4 relayed that Johnson Controls visited the Reno Plant in January 2017.   Just as CW 2 relayed, CW 4 also said the representatives for Interstate Batteries were also one of the groups of visitors.

109.    CW 4 recounted that whenever a group came in for a visit "we had to prep the [factory] floor, clean the floors, turn on the lights, and start running the equipment and modules."   CW 4 further relayed that Clarke would leave his meetings with investors and come out to the floor first to ensure everything was running properly before a demonstration started.

110.    CW 4 also described production reports at the Reno Plant, similar to what CWs 2 and 3 described.   CW 4 stated CW 4 prepared a report called a Daily Production Report and saved it on a shared drive.   CW 4 said that all executive management had access to those reports and the drive.   In the beginning, CW 4 attached the report to an email and sent it to the Vice President, Recycling Technology Battery and Lead Recycling Operation, but it was decided to put it on the shared drive so everyone had access to it.   CW 4 said that the report identified everything production did.   CW 4 said

1   that these reports showed no AquaRefined lead was produced.  CW 4 said at the far-right side of the

2   report was the column for AquaRefined lead and it was blank because no AquaRefined lead was

3   produced.  CW 4 said that there was no production for AquaRefining because "it was still in the R&D

4   stage"; nothing was produced, and so no revenue could have been earned from the sale of

5   AquaRefined lead.  The report only showed the by-products produced.

6         111.    CW 4 said that the lead alloy is in the top part on a battery.  Inside the battery is powder

7   lead that is purer, but harder to get.  CW 4 said that to sell the lead alloy, which is less valuable, it is

8   melted down and cast.  However, CW 4 said, Aqua Metals was not able to get the lead alloy melted to

9   be pure enough to cast and sell, because the process required higher heat, such as that which would be

10   available in smelting, which uses a furnace.  Thus, CW 4 said, even this part of recycling was not

11   working as the kettles were not hot enough.  CW 4 said that, therefore, Aqua Metals just sold the lead

12   alloy right off the breaker.  CW 4 also said the hammermill (the breaker) often broke down because

13   they were putting too many batteries through it and its throughput was limited.

14         112.    CW 4 said that at the time CW 4 left Aqua Metals, the ladders were not even bolted to

15   the tanks as the Occupational Safety and Health Administration (OSHA) requires for an operating

16   factory, but held to the tank with twine.  CW 4 relayed that this shows that the Reno Plant was not

17   operational, but just in start-up phase.

18   **Confidential Witness No. 5 ("CW 5")**

19         113.    CW 5 was a Senior Process Engineer at the Reno Plant from summer 2017 until 2018.

20   CW 5 said CW 5 was on the plant floor most of the time working to develop the AquaRefining

21   process and modify the modules based on data collected.  CW 5 said, while CW 5 was at the

22   Company, the AquaRefining process was in the R&D stage.

23         114.    CW 5 said while CW 5 was at Aqua Metals the modules "weren't ready for full

24   production"; "they did not achieve its operational targets Aqua Metals wanted"; and the modules

25   were "not fully operational."

26         115.    Similar to CWs 1, 2 and 4, CW 5 said that a major issue with the modules was getting

27   the lead off the modules.  CW 5 said that this was called a "sticky lead" issue.  CW 5 explained that

28   the issue was that the lead was getting stuck in the chutes of the modules.  CW 5 said that the lead

was supposed to slide off the chutes onto the conveyer belt, but got stuck on the chutes.  CW 5 said that this prevented Aqua Metals from gathering the lead and shipping it out.  CW 5 said that the process wasn't working.  CW 5 said "I know I never saw that much lead coming off the modules."

116.   CW 5 attended production meetings at the Reno Plant.  CW 5 said that the meetings were also attended by Mould and Clarke, when they were at the Reno Plant.  As CWs 2 and 4 relayed, CW 5 said that Clarke came to the Reno Plant often.  CW 5 estimated that Clarke attended between five and ten of these meetings during the time CW 5 was employed at Aqua Metals.  CW 5 said that, in these meetings, they discussed problems with the modules and the whole production process as well as possible solutions.  CW 5 said that Clarke and Mould were in those meetings and heard of the problems.

117.   CW 5 said that, additionally, a general update and discussion meeting was held whenever Clarke and Mould came into town, and Clarke and Mould attended these meetings.  Topics discussed in these meetings were plant efficiency and problems at the plant, including with machinery, break downs, materials and scheduling.

118.   CW 5 said that, as CWs 2 and 4 stated, Clarke was fully aware of what was happening at the Reno Plant and the specific problems that were occurring with production because of what he saw at the Reno Plant and his attendance in various meetings.

119.   As likewise relayed by CWs 2 and 3, CW 5 said each shift supervisor prepared reports called Daily Production Reports.  CW 5 received the reports via email.  CW 5 said that the plant managers also received them as CW 5 was on an email list of people who received them.

120.   Just as CWs 2, 3 and 4 relayed, CW 5 said visitors came to the Reno Plant periodically.  CW 5 said the visitors were shown around by Mould, Clarke and the plant manager.

**E.   Defendants' Representations To The Market**

121.   Even before the Class Period began and in a January 25, 2016 press release issued by the Company titled "Aqua Metals Issues Annual Letter to Shareholders" ("January 25, 2016 Press Release"), Aqua Metals described itself as "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining."  Defendants touted that they had successfully tested AquaRefining and that the Reno Plant would produce 80 metric tons of lead per day by the end of

2016.  For example, in the January 25, 2016 Press Release, the Company announced, "We remain on track to begin lead production in the second quarter of 2016, with plans to increase production to 80 metric tons of lead per day by the fourth quarter of 2016."

       1.      **Defendants Tout The Interstate Batteries' Investment In Aqua Metals And The Purported Status Of The AquaRefining Technology As Of Q1 2016**

      122.    At the market open on May 19, 2016, the first day of the Class Period, Aqua Metals issued a press release titled "Interstate Battery and Aqua Metals Form Strategic Partnership" ("May 19, 2016 Press Release").[4]  The Company announced a partnership between Aqua Metals, "which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining" and Interstate Batteries, "the No. 1 replacement battery brand, the largest independent battery distribution system in North America and the country's leading battery recycler."  The May 19, 2016 Press Release further announced that, "[w]ith a nationwide network of more than 200,000 dealers returning battery cores, Interstate Batteries recycled more than 24.9 million automotive batteries in 2015, which is more than it sells."  The Company touted that Interstate Batteries agreed to supply more than a million automotive and other lead-acid batteries as feedstock for Aqua Metals' AquaRefineries and agreed to make a strategic investment of approximately $10 million into Aqua Metals ("Interstate Batteries Partnership").  The press release further stated:

    "Interstate Batteries seeks out innovation, pursues opportunities and invests in the technology we need to succeed not just today, but also tomorrow," said Scott Miller, president and CEO of Interstate Batteries. "Our focus is on the future of our industry and continued growth. Aqua Metals' breakthrough technology is a promising new way for recycling lead-acid batteries."

    Aqua Metals' patent-pending AquaRefining process is an environmentally friendly electrochemical process for recycling lead-acid batteries. AquaRefining is a closed-loop, room temperature, water-based recycling method that is fundamentally non-polluting, yet able to yield nearly 100 percent lead recovery.

    "With its forward-thinking environmental goals, broad distribution network and strong brand name, Interstate Batteries is an ideal partner for us as we scale our business," said Dr. Stephen Clarke, chairman and CEO of Aqua Metals.[5]

---

[4] Unless otherwise stated, the Form 8-Ks referenced herein were signed by defendant Clarke.

[5] All emphasis is added, unless otherwise noted.

123. Also, at the market open on May 19, 2016, Aqua Metals filed a Form 10-Q for its first quarter of 2016 ("Q1 2016") ended March 31, 2016 with the SEC ("Q1 2016 Form 10-Q"). The Company stated that "we have built and operated both a small-scale unit of our AquaRefining process and a full-size production prototype [and that] [t]hrough the operation of such units we have successfully produced 99.99% pure lead on a limited scale." The Company reported that the "testing of our AquaRefining process has been successful to date."

124. In the Q1 2016 Form 10-Q, the Company laid out its plan to produce 80 tons of recycled lead per day by Q4 2016 and to ramp that up to 160 tons per day:

> As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong. Consequently, we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day. Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.
>
> Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the second quarter of 2016. We expect to install our first AquaRefining modules in approximately the second quarter of 2016 and to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the third quarter of 2016. In keeping with our modular approach, we intend to commence commercial LAB recycling operations shortly after the first AquaRefining module is delivered.

125. The Q1 2016 Form 10-Q also reported that the Interstate Batteries Partnership would provide Aqua Metals with "working capital [] sufficient to fund … the completion of [its facility] and attainment of production at a rate of 80 tons of recycled lead per day."

126. The Q1 2016 Form 10-Q also included certifications signed by Defendants Clarke and Murphy, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that the Q1 2016 Form 10-Q did not contain material misstatements or omissions. In this regard, the Q1 2016 Form 10-Q contained a certification signed by Defendant Murphy stating:

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**

Section 302 Certification

I, Thomas Murphy, certify that:

1)      I have reviewed this quarterly report on Form 10-Q of Aqua Metals, Inc.;

2)      Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3)      Based on my knowledge, the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

5)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

6)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles

7)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

8)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fiscal quarter presented in this report that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

9)      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's

board of directors (or persons performing the equivalent functions):

10)        All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial data information; and

11)        Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 19, 2016

By:     /s/ Thomas Murphy
        Thomas Murphy, Chief Financial Officer

127.    The Q1 2016 Form 10-Q contained a separate certification signed by Clarke which contained a verbatim reproduction of Murphy's certification statements.

128.    The Q1 Form 10-Q also contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by Defendants Clarke and Murphy, which stated:

**CERTIFICATION PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Aqua Metals, Inc. (the "Company") on Form 10-Q for the quarterly period ended March 31, 2016, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Stephen R. Clarke, President and Chief Executive Officer, and Thomas Murphy, Chief Financial Officer, of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.                The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.                The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

By:     /s/ Stephen R. Clarke                    Dated: May 19, 2016
        Stephen R. Clarke
Title:  President and Chief Executive Officer

By:     /s/ Thomas Murphy                        Dated: May 19, 2016
        Thomas Murphy
Title:  Chief Financial Officer

129.    Following these statements, the price per share of Aqua Metals' stock increased $2.26, or roughly 29%, from a close of $7.80 on May 18, 2016, to a close of $10.06 on May 19, 2016, on heavy trading volume of 895,344 shares.

130.    Analysts reacted extremely positively to the Interstate Batteries Partnership.   For example, a May 19, 2016 Oppenheimer report stated that the partnership was a "big step forward" and, as Interstate Batteries is 49% owned by Johnson Controls, a "validation of its product quality from the global leader in lead acid batteries."   Oppenheimer further stated that it expects the funding to provide the capital to "double capacity at the [Reno Plant] to 160 tons/day" and estimated it would generate revenue of $32.5 million in 2017.   Likewise, on May 26, 2016, a Northland Capital Markets ("Northland") report stated that "this strategic relationship with a meaningful[] player in battery recycling helps de-risk and validate AQMS' business."

131.    On May 24, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides First Quarter 2016 Corporate Update" ("Q1 2016 Press Release") announcing its results for Q1 2016.   Murphy was identified as the "Company Contact" on this press release.   The Company stated it is "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining," and that the "modular systems allow the lead acid battery industry to simultaneously improve environmental impact and scale production to meet demand."   The Company again touted its "strategic relationship" with Interstate Batteries.

132.    In the Q1 2016 Press Release, Clarke told investors that the Interstate Batteries deal "validate[d]" Aqua Metals' technology and would allow the Company to begin production in Q3 2016 and attain production of "80 metric tons of recycled lead per day by the end of 2016":

> Over the last year, we have spent significant time deepening our strategic relationships and advancing discussions with major players throughout the lead industry.   These players include lead-acid battery recyclers, distributors, manufacturers and end users.   To this end, last week we announced a major strategic partnership with Interstate Batteries, the largest battery distributor and recycler in the U.S., which has agreed to invest $10 million in our Company and agreed to supply more than a million automotive and other lead-acid batteries as feedstock.
>
> We believe this serves as a strong validation of our technology and we continue to see a tremendous amount of interest in our environmentally friendly and economically efficient recycling equipment and processes to supplement, and in some cases, replace conventional recycling and smelting operations altogether.   Our goal for the remainder of

the year is to solidify a clear path for national expansion of our AquaRefineries, enabling us to rapidly gain market share after a successful commercial production launch. We also expect to be in a position to license our equipment and processes and related services to qualified third parties, with whom we are already advancing discussions, beginning in 2017.

With the additional capital from Interstate Batteries and other investors, we have decided to make certain enhancements to the AquaRefinery. As a result, we now expect to begin recycling lead-acid batteries early in the third quarter of 2016. Our plan remains to increase production to 80 metric tons of lead per day by the end of 2016. We expect to begin by taking feedstock supply from Battery Systems, Inc., our next-door neighbor in the TRIC, which will allow us to ramp the facility effectively in the commissioning and early growth period. We will then add to that supply with feedstock from Interstate Batteries and other sources, which we expect to begin receiving in the fourth quarter of 2016.

133.    Also, at the market open on May 24, 2016, Aqua Metals issued a press release titled "Aqua Metals Wins Platts Global Metals Rising Star Award for Innovations in Lead Industry" ("May 24, 2016 Press Release") announcing that it won a Platts Global Metals Rising Star Award for innovations in the metals industry. In the May 24, 2016 Press Release, Clarke remarked:

It is an honor to earn the accolades of such a highly respected organization for our work to revolutionize the lead industry. As we enter a "Battery Age," lead-acid technologies can experience continued market dominance with the development of a recycling method that is economically sustainable and environmentally responsible. This distinction affirms that Aqua Metals has developed just that.

134.    On May 24, 2016, while the market was open, Aqua Metals held its Q1 2016 earnings conference call ("Q1 2016 Conference Call") with Clarke and Murphy. During that call, Clarke touted that it had started assembling the "first commercial ready AquaRefining module … in January of this year" at the Company's AquaRefining module assembling test facility located at its corporate headquarters. Clarke stated that "[w]hat we've added to that [testing facility] is a new full-sized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there." Clarke further stated, "[w]e're ready to compete in the global $22 billion lead market. We're generating strong positive interest that's an understatement, we are generating massive interest in the market with supplies and customers as evidence[d] by our recent announcement…." Clarke further stated that the Reno Plant "remain[s] on track to achieve 80 metric tons of lead per day output by the end of 2016 and on track to expand that to

160 metric tons per day by 2018," and that the Reno Plant "will operate 24 hours a day, seven days a week."

135.    An analyst from Oppenheimer asked, "when do you expect the first startup to happen in the first test runs?" Clarke again minimized the risk of AquaRefining:

> [S]ome of them have already been completed.  So, there isn't a first test run.  It's a continuing operation.  So, in one sense, we've already done it.  In the sense of when will the first modules be running in their base in Reno, we're projecting late July, maybe early August.  The timing of the first run, that's critical, the more critical items are getting the much larger scale equipment installed and running [indiscernible] the battery breakers and all the various support equipment.  There's little risk associated with the actual AquaRefinery themselves.  The important point is just the scale of the operation.

136.    Clarke also touted the Interstate Batteries Partnership as a "pretty significant event and a pretty good endorsement of our business."  In discussing the significance of strategic partnerships to the growth and expansion of the Company, he further stated:

> I'm going to talk to the recently announced strategic partnership with Interstate Batteries and the whole point of this relationship is to accelerate our growth.  So those of you don't know, Interstate Batteries is the number one replacement battery brand in the U.S.  It's the largest independent battery distribution system in North America and the country's leading battery recycler.
>
> ***
>
> But the important thing is, this provides a path for us in which we can now plan in detail along with a high level of surety those additional recycling facilities.  And one of the big things it does for us is, it removes the sourcing risk that was inherent in expanding into an industry that is based on a number of pre-established relationships.  So, what Interstate brings to us, importantly, is a supply of these batteries.  And we believe it also brings a huge amounts of credibility to what we're trying to build.
>
> ***
>
> With the strategic relationships we have in place, we now believe we can expand quickly with relatively low risk whilst we control IP and quality.  And in parallel to that, we're working to develop our own LME brand for our process.  So the scope for that is to expand the Tahoe-Reno facility to 160 tons a day during 2017 and 2018.  We got the supply to do that now, and then move forward to build multiple additional facilities collocated with our strategic partners.… So right now, we are jointly evaluating multiple locations across the U.S. with our strategic partners.  We're not announcing where they are going to be yet, and it will be probably a few months before we do that, but it's a serious ongoing exercise with a great partner.

137.   In response to a question posed by an analyst from Northland regarding the Interstate Batteries Partnership, Clarke stated:

> We've focused on building our additional facilities with Interstate as the strategic partner…. [O]ur focus right now is that we have a strategic partner who is essentially looking towards to expanding rapidly so that they can take advantage of lead produced that isn't subject to a smelter.  So that's our entire focus and what it gives us is surety of not only supply of batteries, but of locations, so it allows us to accelerate.  And as I said earlier, we talked a lot about our desire to build 10 facilities a year, which is a great statement, but how do you validate and move towards the end, and this relationship provides us the pathway to do that.

138.   During the Q&A portion of the call, Clarke explained what types of lead the Reno Plant purportedly produces:

> [W]e make two types of lead.  We make specific grade alloys for specific battery customers and we make also pure lead, which is more typically used as an active material, although some modern batteries use relatively pure lead in one of the plates.  The amount of lead that we produce in terms of active material to plate lead will vary somewhat depending on the mix of batteries that come in.  But we specifically are making or we plan to make specific alloy grades for specific customers and ultra-pure lead for specific customers and for the auto market.  The ultra-pure side of what we are making is equivalent to virgin lead.

### 2.   Defendants' August And September 2016 Statements Regarding Aqua Metals' Open House At Its TRIC Facility And The Existing Status Of The AquaRefining Technology As Of Q2 2016

139.   On August 2, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Unveils World's First AquaRefinery" ("August 2, 2016 Press Release") announcing that it held an open house at its Reno Plant.  The Company announced in the August 2, 2016 Press Release that the Company is "commercializing" AquaRefining, and further explained the technology: "AquaRefining is the world's first environmentally friendly process to recycle lead-acid batteries (LABs)" and that "[t]he process produces lead that is as pure as – or purer than – mined lead, requiring no secondary processing."  The Company touted that these "modular systems are expected to allow the lead acid battery industry to simultaneously improve environmental impact and scale production to meet rapidly growing demand."  The Company stated that, in addition to its Reno Plant, it would "sell licenses to partners for AquaRefining technology and equipment, which can be co-located with battery manufacturers and distributors, as well as existing battery recycling facilities globally."

140.    In the August 2, 2016 Press Release, Clarke stated:

Lead-acid batteries are over 99% recyclable, but until now, there has been no way to recycle lead in an environmentally friendly fashion.  With this AquaRefinery and more expected to come, Aqua Metals is doing its part to create the most sustainable battery technology the world has ever seen, while also providing economic benefits to recyclers, manufacturers and distributors.

141.    In the August 2, 2016 Press Release, the Company again touted its partnership with Interstate Batteries, which "controls 20 percent of the lead-acid battery recycling market in the United States," and quoted Interstate Batteries' CEO as endorsing the Company: "Because Aqua Metals' breakthrough technology is so promising, Interstate Batteries is supplying more than a million automotive and other lead-acid batteries to the AquaRefinery over the next year.  We feel we're making a smart investment in our future, and in the future of our industry."

142.    On August 10, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides Second Quarter 2016 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC before the open ("Q2 2016 Press Release") announcing results for the second quarter of 2016 ("Q2 2016").  Murphy was identified as the "Company Contact."  The Company stated that it was "commercializing" AquaRefining and that "[c]ommissioning and testing for all key equipment [was] to be completed with initial production commencing in October."  The Company also said that "[l]ead production [was] projected to scale quickly during the fourth quarter, reaching 80 metric tons per day by the of 2016."

143.    Clarke also stated that production was "on track" to reach 80 tons per day by the end of the year:

Our key focus has remained on commercializing the world's first AquaRefinery, which is now largely complete….  We're quickly approaching a meaningful inflection as we bring our first facility online and begin producing lead early in the fourth quarter of 2016.  Most importantly, we remain on track to reach full scale capacity of 80 metric tons of lead output per day by the end of 2016.

144.    The Company stated in the Q2 2016 Press Release that six AquaRefining modules had been tested, four of which were in place at the Reno Plant, and that AquaRefining module deliveries to third-parties were expected to begin in third quarter of 2017 ("Q3 2017"), and that a second AquaRefinery was in the works:

The manufacturing facility [in Alameda, California] has already assembled and tested six modules, four of which are in place at the TRIC AquaRefinery.  The Company currently has the physical capacity to produce 160 modules annually, or enough to support 10 AquaRefineries the size of the TRIC AquaRefinery.  Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's duel (sic) business model, and the first module deliveries to third parties are expected in the third quarter of 2017.

Aqua Metals is also in advanced planning stages for a second facility, and is working on supply, offtake and financing options.  The Company plans to build additional regional AquaRefining facilities that will be strategically located near battery manufacturers and distributors, as well as existing battery recycling facilities globally, thereby significantly reducing logistics costs.  Subject to the availability of the required capital, the Company plans to operate facilities that will generate the equivalent of ~800 metric tons of lead output day.

145.    The Company touted that the Reno Plant "is largely complete and is now moving into the commissioning and testing phase to ensure the facility is able to rapidly and efficiently scale."  The Company stated that it held "a successful grand opening ceremony at its TRIC AquaRefinery which was attended by over 200 people, including investors, strategic partners, industry participants, key employees and government officials.  The tour highlighted the installed equipment and processing lines, while enabling discussions with key personnel about how the production facility and the supply chain will proceed."  The Company stated that a "substantial majority of U.S. battery producers have visited our facility and expressed interest in AquaRefining" and the Company was "[g]enerating strong interest from additional potential strategic partners."

146.    Clarke again touted its strategic partnerships as an endorsement of its business:

We have also concentrated on deepening our strategic relationships with key partners, such as Wirtz Manufacturing, Interstate Batteries and Battery Systems, Inc., while advancing discussions with other major players throughout the industry who have recognized our potential to revolutionize the $22 billion lead market.  These players include lead-acid battery recyclers, distributors, manufacturers and end users that are interested in supplementing, and in some cases, replacing conventional recycling and smelting operations altogether.  Taken together, we are well positioned to rapidly gain market share upon the successful launch of our first facility and look forward to driving further value for shareholders.

147.    On August 10, 2016, after the market close, Aqua Metals filed a Form 10-Q for Q2 2016 ended June 30, 2016 with the SEC ("Q2 2016 Form 10-Q"). The Q2 2016 Form 10-Q contained identical Sarbanes Oxley Section 302 and 906 certifications as those in the Q1 2016 Form 10-Q,

signed by Defendants Clarke and Murphy. In the filing, Aqua Metals reported "revenue-producing operations" were expected to commence in Q4 2016.  It represented that, although revenue-producing operations and completion of the Reno Plant had been postponed one quarter (as compared to what it stated in its prior 10-Q filing), the Company's expected production rate of 80 tons of recycled lead per day by Q4 2016, and ramping up to 160 tons per day, remained unchanged.  The Company also reiterated that the "testing of our AquaRefining process has been successful to date."

148.    The Q2 2016 Form 10-Q further stated:

> As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong.  Consequently, we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day.  Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.

> Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the third quarter of 2016.  We began installing our first AquaRefining modules in June 2016 and expect to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the fourth quarter of 2016.

149.    On August 10, 2016, while the market was open, Aqua Metals also hosted its Q2 2016 earnings conference call ("Q2 2016 Conference Call") with Clarke and Murphy.  During this call, Aqua Metals referred to the following commissioning and ramp up schedule, which was attached as Exhibit 99.2 to the Form 8-K filed with the SEC on August 10, 2016, and Clarke discussed this commissioning and ramp up schedule:[6]

---

[6] Murphy was identified as the "Aqua Metals Contact" in the presentation materials.



And so, in terms of the time line, we broke it out to August, September, October through the end of the year.

\*\*\*

The managers are on site. We've got a pretty extensive staff and subcontractors that help with the commissioning work, and we're recruiting dayshift supervisors and having them start in early September. We'll bring our dayshift operators on site and train them up in early October. So, by the beginning of November, we're targeting to be at somewhere around 20 tons a day of lead production, while the beginning of December to be at 40 tons a day of lead production and by the end of the year at 80 tons of lead production. And essentially, what we're doing is scaling by adding shifts. The facility will be a 24-hour day, 7 day a week, 52 weeks of the year operation running in four shifts, rotating. So, the scale [ph] of this about getting the process up and running and then adding shifts.

150.    When asked by an analyst, "to get up and running, which piece are you guys most concerned about or pieces that, as you turn on, this equipment may have some hiccups along the way?" Clarke reassured investors and analysts that "everything that we think we might have a problem with, we've got contingency plans in place for. So, I don't have a single thing that we're worried about. It's really about the commissioning process itself."

151.    Another query posed to Clarke during the Q2 2016 Conference Call was whether there was "any concern that the modules will encounter problems when employed on a mass scale." Clarke stated, "we have been operating a single full scale electrolyzer for 12 months now. That was pre-production prototype. Then, nearly four months ago now, we took a single electrolyzer off the production line and installed [it] in our full scale test facility and have been operating that ever since. And we don't anticipate any issues operating at full scale. Full scale is just essentially 96 of the same thing."

152.     During the Q2 2016 Conference Call, Clarke reiterated the Reno Plant was producing ultra pure lead:

> [I]f we're selling lead, we'll be selling it at a premium because we're producing ultra pure lead.  LME spot price is for secondary lead, which is kind of a mongrel lead that's – that needs a pure – ultra pure lead or a specific alloy.  So, secondary lead produced by smelters needs to be further refined and alloyed into usable product.  So, it is typically the lowest cost lead.  So, we're actually going to be selling at premium.

153.     On the Q2 2016 Conference Call, Clarke explained that the Company's open house was strategically timed in advance of commissioning the Reno Plant, and that a "vast majority of the North American lead-acid battery industry has been on site" and had not found any "problems":

> So, we held an open day on July 28, and we chose to do this because this is the latest week we could do it before we start commissioning.  And when you're commissioning a large chemical facility, which essentially what an AquaRefining facility is, there are all kinds of operations going on that you don't really want to have people wandering around you.
>
> ***
>
> It seemed what we've got the overwhelming response is wow, you guys really thought this through.  Yet, yet – and we ticked all the boxes and even some companies have visited the site, wanting to find a problem and went away smiling and shaking our hands.  So, basically, there is a real [audio gap] alternative to smelting.

154.     Clarke stated that the Company was "already pursuing debt financing options for our next facility, and we have in fact the potential to pre-sell similar all of its capacity before we even break ground.   We've got massively strong demand for AquaRefining modules and support equipment."

155.     Clarke also touted the Company's "strategic relationships":

> [S]ince we started with building strategic relationships and we talked before about strength of our relationship with Wirtz Manufacturing who supply the battery breaking systems and supplied rather the battery breaking, ingoting and sort of water treatment facilities.  Our ongoing and strong relationship with Battery Systems Inc., second largest distributor and collector of batteries in North America, they became our second strategic investor in our IPO in 2015.  And then, not coincidentally, they operate a 200,000 square foot warehouse, less than a 100 yards from our facility from which they can supply dead batteries to us.
>
> And then, I just need to speak to the fact that we brought on board Interstate Battery in May of this year.  They are the largest distributor and collector of batteries in the U.S.  Their initial [audio gap] to provide a million batteries a year to help with our scale up,

and they became our first strategic investor with a fairly significant $10 million investment structured as straight equity and convertible in May of this year.

What I can say is that what's happened since then is that – and I think down to the commitment of Battery Systems and, in particular, Interstate Batteries has driven a phenomenal level of credibility and interest in our technology.  So, we're now in pretty significant discussions with multiple additional strategic partners.

156.    Clarke stated that "[w]e don't see a major challenge in building, expanding the first facility and building the next one….  We're absolutely serious about a global rollout …."  Clarke said that the Company's "objective is to expand our own capacity to 800 tons a day from four to five facilities":

And the idea behind that is 800 tons a day, we'd be at about 2% of global lead.  And we think that gives us pretty serious commercial validation and credibility.  That also gives us distributed training facilities to support our licensing model.  In that, we plan to expand the Tahoe Reno facility to 160 tons a day by 2018,...

Providing AquaRefining equipment on a fully serviced licensing model [ph] is stage and that's going to run in parallel.  We're not planning to wait until we've built out all of our four to five facilities.  Initially, I thought we would have to just to gain the credibility.  But what we're finding is this massive support for an alternative to smelting.  So, we're at a point now where a substantial majority of North American battery manufacturers and lead smelters have [ph] visited the facility, and I mean a substantial majority.  And what the feedback we're getting is, as Selwyn said it loud, cost quality and environmental permits and advantaged is not lost on anybody, and we're getting really serious interest.  So, we've been approached by interested parties in not only America, but also in Europe, South America, China and India.

* * *

So, on that basis, with both the U.S. and non-U.S. licensing rollout, what we said to the interested parties is that we're not going to – we don't plan to ship any modules until quarter three of 2017 not because we can't, but we just think it's prudent to have got six to seven months of operating experience under our belt before we do that.  Right now, we have indicative interest.  That's equivalent to about two years of module production at full scale.  So, we've currently got the capacity to make 160 modules a year.  We've got indicative interest for about 320 modules and which we think is pretty fantastic considering the early stage that we're at.

157.    Analysts reacted positively to the statements.  For example, in an August 10, 2016 report, Oppenheimer raised its estimated revenue for Aqua Metals for 2017 to $37.8 million stating "[w]e expect strategic relationships with Wirtz Manufacturing, Battery Systems Inc, and Interstate Batteries to prove beneficial, as AQMS pursues discussions with other potential partners."  Northland

noted in an August 11, 2016 report that "AQMS provided a positive operational update that indicates to us that its longer-term business plans are progressing well.  The Company reiterated key production capacity targets of 80 tons per day by year-end 2016 and 160 tons per day by 2018 and also noted it is in advanced planning stages for its second facility."

**3.    Defendants' November 2016 Announcement Of The Production Of AquaRefined Lead At TRIC And The Purported Status Of The AquaRefining Technology As Of Q3 2016**

158.    On November 1, 2016, at the opening of the market, Aqua Metals issued a press release titled "Aqua Metals Produces First AquaRefined Lead at World's First AquaRefinery," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close ("November 1, 2016 Press Release"), announcing production of the "first-ever AquaRefined lead" at its Reno Plant.  In the November 1, 2016 Press Release, Clarke stated, "[t]his is the most critical step in the commissioning process of the Nevada AquaRefinery."

159.    The November 1, 2016 Press Release  included photographs (which were used repeatedly by Defendants thereafter throughout the Class Period) with captions of the AquaRefining process "continuously producing AquaRefined pure lead, flowing like a waterfall of lead infused electrolytes" "conveyer belt carries pure lead to ingot casting area" and "the first casted ingot":



AquaRefining module with six electrolyzer units

continuously producing AquaRefined pure lead, flowing

like a waterfall of lead infused electrolytes

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Conveyer belt carries pure lead to ingot casting area



The first casted ingot



Closeup of the first casted ingot

160.   The Company described its process in the November 1, 2016 Press Release:

AquaRefining uses an entirely reusable water-based technology to produce ingots of ultrapure lead.  Through its own on-site assay, Aqua Metals has verified that the lead produced in the AquaRefining module is over 99.99 percent pure.  The Company will send its initial production samples to several U.S.  battery manufacturing companies— which collectively represent over 50 percent of U.S.  battery production—to allow them to conduct their own assays.

Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer.  The Company has now produced high-quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada.

161.   The Company touted that it has "built and delivered a total of five modules to its Nevada AquaRefinery thus far and currently plans to install and commission a total of 16 modules for initial production capacity of 80 metric tons of lead per day.  The Company anticipates that the Nevada AquaRefinery will reach its initial production capacity within the coming months."

162.   Aqua Metals reiterated its "strategic partnerships" with Interstate Batteries and Battery Systems Inc. and stated that the Company "is in discussions with nearly every major U.S.  based battery manufacturer and recycler, as well as data center operators and household internet brands (which use lead-acid batteries for backup power)."

163.   Before the market open on November 7, 2016, Aqua Metals filed a Form 10-Q for Q3 2016 ended September 30, 2016, with the SEC ("Q3 2016 Form 10-Q"). The Q3 2016 Form 10-Q

1   contained identical Sarbanes Oxley Section 302 and 906 certifications as those in the Q1 2016 Form

2   10-Q and Q2 2016 Form 10-Q, signed by Defendants Clarke and Murphy. In the filing, the Company

3   again reported that "the testing of our AquaRefining process has been successful to date."  Aqua

4   Metals also stated that:

> On October 28, 2016, we commenced limited lead-producing operations at our TRIC
> facility through the processing of recycled lead through a single AquaRefining module.
> Through our own on-site assay, the Company has verified that the lead produced in the
> AquaRefining module is over 99.99 percent pure.  We expect to commence earning
> revenue through the commercial-scale recycling of LABs at our TRIC facility during the
> fourth quarter of 2016.   Additionally, we have implemented process and other
> improvements which have increased the capacity of the TRIC facility to 120 tonnes per
> day.  We expect to achieve a production rate of 120 tonnes per day early in 2017.

164.    Although the Company had not even come close to reaching the 80 ton per day

production it had been touting since earlier in the year, the Company reported that its "plan of

operations for the 12-month period following the date of this report [was] to expand operations at our

first recycling facility at TRIC to 120 tonnes of lead production per day" and "expand [its] business

with additional recycling facilities and licensing of our recycling technology and equipment to third

parties."  The Company claimed that, by 2018, it could expand production to 160 tons of lead per day:

"[o]ur TRIC facility is designed to accommodate additional AquaRefining modules and has battery

breaking and component separations equipment sufficient to support expansion to 160 tonnes of

recycled lead per day," and "[o]ur goal is to increase our production of lead at our TRIC facility to 160

tonnes per day by 2018."

165.    Also, at the market open on November 7, 2016, Aqua Metals issued a press release

titled "Aqua Metals Provides Third Quarter 2016 Corporate Update," which was attached as Exhibit

99.1 to a Form 8-K filed with the SEC after the market close ("Q3 2016 Press Release"), announcing

results for Q3 2016.  Murphy was identified as the "Company Contact."  The Company touted that it

was "commercializing" AquaRefining and expects its modular systems to "increase production to

meet rapidly growing demand."  The Company stated that it had, among other things:

- Produced the first-ever AquaRefined lead at its AquaRefinery in McCarran,
  Nevada at the Tahoe Reno Industrial Center (TRIC) and confirmed more than
  99.99% purity

- Commissioning activities at TRIC transitioning into lead production and first sales planned for Q4 2016

- Determined that when fully commissioned, the TRIC facility will have the capacity to produce 120 metric tons per day (T/day) of lead; a 50% improvement over the previously announced 80 T/day capacity

- Furthered discussions with interested parties regarding expansion opportunities, both for licensing and future facilities

- Hosted a successful grand opening ceremony at its TRIC AquaRefinery, which was attended by over 200 people, including investors, strategic partners, industry participants, key employees and government officials

- Initial sales of lead in the Q42016

- Expanding to provide AquaRefining technology and equipment on a serviced licensing model, which was expected to commence in 2017

166.  Clarke stated in the Q3 2016 Press Release that the Company had produced AquaRefined lead at TRIC and that they were transitioning into commercial lead production for sales to begin in Q4 2016:

The primary focus throughout the third quarter has been on testing of essential systems and equipment to begin commercial lead production at the world's first AquaRefinery. To that end, earlier this month we announced the first-ever AquaRefined lead produced at the facility after commissioning the first production module.  This is a major milestone and the most critical step in the commissioning process.  We are working to complete the integration of front-end battery-breaking and other supporting systems and are transitioning into commercial lead production.  We expect to begin selling lead in the fourth quarter of 2016.

While working to bring the AquaRefinery online, we incorporated several process and other improvements, and consequently, we now expect to ramp to a capacity of 120 T/day in early 2017, which will provide greater revenue and earnings potential.

We have also accelerated discussions with US based lead-acid battery manufacturers and distributors, who collectively represent a substantial majority of the US battery industry. Most have already visited our facility and expressed interest in our products and technology.  We are now sending our initial production samples to these companies, to allow them to conduct their own assays.

With the progress that we have made and with unprecedented interest in our revolutionary technology, we are positioned to ramp revenue in the coming year, which ultimately, will contribute meaningfully to growing shareholder value.

167.    The Company stated the "successful production of AquaRefined lead at the TRIC facility that is over 99.99% pure … confirms the Company's ability to produce premium lead."

168.    The Company further stated that "Aqua Metals will begin selling lead in the fourth quarter of 2016…. [T]he Company expects to reach initial capacity of 120T/day in early 2017, representing a 50% increase to the previously announced capacity of 80 T/day of lead output.  Aqua Metals plans to expand to 160 metric tons of lead per day at the TRIC AquaRefinery in 2018."

169.    The Company stated that it was expanding to provide its AquaRefining technology and equipment on a serviced licensing model, which would commence in 2017:

> Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's business strategy.  The first module deliveries to third parties are expected in 2017.  To expedite this roll out, the Company has already successfully tested 3ʳd party feed stocks from potential licensees in North America and expects to test others in the coming months.  Aqua Metals has engaged in substantive discussions with highly credible potential partners and developed a "master license" approach for China and other large markets.

170.    In addition to licensing, the Company touted that it had the capacity to produce 160 modules annually and that it intends to build additional regional AquaRefining facilities: "Aqua Metals is pursuing non-equity financing options for four to five facilities throughout North America which would bring lead output to ~800T/day and is currently evaluating sites for a second and third facility …."

171.    A slide presentation was filed with the SEC after the market close on November 7, 2016 (attached as Exhibit 99.2 to a Form 8-K filed with the SEC) ("November 7, 2016 Slide Presentation") in advance of the Q3 2016 earnings conference call and used during the call. Statements made on the earnings conference call (described below) were also made in the slide presentation.  The presentation also included images of commissioning module 1, which the Company touted as having "self cleaning rotating cathodes" that "produce lead without heat which is recovered continuously and compressed into blocks of ultra pure lead":

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





1

2

3

4

5

6

7

8

9

10



11

12

13

14

15

16

17

18

19

20



21

22

23

24

25

26

27

28



1

2

3

4

5

6

7

8

9

10



11    172.   Shortly after the market close on November 7, 2016, Aqua Metals held its earnings

12 conference call ("Q3 2016 Conference Call") with Clarke and Murphy, to provide a Q3 2016 update.

13 Clarke stated the Company was "transitioning into commercial operations now" and that "first lead

14 samples assayed at 99%, and potential customers and licensees have recognized this as a massive

15 achievement."  Clarke confirmed on the call that "[w]e plan to sell pure lead AquaRefined lead in

16 quarter four."

17    173.   On the Q3 2016 Conference Call, Clarke stated that "we've made lead now at first of

18 what would be several AquaRefining facilities" and that "[i]t's been a huge milestone for us to be able

19 to make AquaRefined lead ….  We built our first lab scale AquaRefining test nearly three years ago.

20 More than two years ago, we had a large scale pilot and then a single electrolyzer operating.  So we all

21 knew it works, but it doesn't mean anything until you put into a commercial operation and make some

22 lead and sell it, and we've been able to get to that point and it's hugely thrilling."

23    174.   Clarke stated that the Reno Plant has "a single six electrolyzer module installed and

24 commissioned, five more are being commissioned and, in total, we'll have 16 AquaRefining modules

25 on site" and is "now transitioning into production has the capacity to produce 120 tonnes of lead per

26 day, not the 80 tonnes a day that we initially gave guidance on them."  Clarke stated that the Company

27 would "expand our capacity to 120 tonnes a day in early 2017."  Clarke touted "I think we've more

28 than compensated [for its delay] with about 50% uplift in the capacity of the facility."

175.   Clarke stated that the Company planned to increase its lead production by building other facilities, "we want to build up to 800 tonnes a day of our own lead recycling capacity and with 120 under our belt, we're looking to expand into the remainder."

176.   On the Q3 2016 Conference Call, Clarke showed a video and explained the process:

[W]hat that video showed was a single module of six electrolyzers, each electrolyzer has a series of large rotating disk cathodes.  They rotate during the plating process and are continuously scraped.

What we plate is a very, very high surface area foam of lead that consists primarily of nano-structures of lead, very, very, very high surface area.  The cathodes are continuously stripped, the lead comes off, drops on to a conveyor, then it's taken off to a machine that we call [ph] applicator, that compresses that soft lead.  What it actually does is, it consolidates the lead into solid metallic lead at room temperature and it's quite a remarkable process.  Then we – we've taken the decision to then put that into an ingot machine and make a standard ingot of lead for sale.

177.   Clarke also stated, "[w]e figured out how to operate the facility in a more flexible way than we'd originally considered.  And we've developed some intermediate products, which allow us to accelerate revenue ramp up and accelerate into positive cash flow":

[T]he front-end where we break a battery and then we separate out the plastics and the metallics and what is referred to as lead paste.  And then there is a stream of production in which the lead paste is what's called desulphurized before its AquaRefined and then turn into ingots of high purity primary lead.

And there's a parallel stream that comes from the breaker in which the metallic lead that's the lead alloys that are used to make the lead grids is a separate stream, and that goes into an ingoting process and is sold either as secondary lead or as lead alloys.  And the most of our timing in building and planning this business, we viewed the process of commissioning is to be one in which we would have to get every single one of those processes fully commissioned in synchronization before we could turn on.  And we came to realize that quite so obviously maintaining that ideal situation is difficult and unrealistic in the real world of operating large scale plant that's going to consume hundreds of tonnes of batteries a day and produce hundreds of tonnes of lead a day.

So we put a lot of work into looking how we can de-link those processes from each other.  So, for example, running larger or lower quantities of metallic lead through the ingoting site and larger or lower quantities of lead paste through the desulfurization and ultimately into AquaRefining.  And what we'd been able to do is actually achieve the ability to de-link those processes.  That's given us a large degree of flexibility in how we operate the plant.  And it allows us to actually release additional capacity that gets us to that 120 tonnes a day.  In that process, there are a number of products that we can actually sell and sell into battery companies for direct use in battery production.

178.    Regarding licensing, Clarke stated that:

[W]e're generating very strong interest in licensing to third parties.  It's been our stated goal that we would expand this business through a fully serviced license business model in which we will provide equipment to third parties and we'll maintain it and provide spare parts and continue maintenance to third parties on the licensing base as well.

We have taken those conservations [sic] to the point that we have now tested feed stocks from third parties and already successfully taken in feed stocks from third who parties who have expressed interest in licensing on equipment and we've made lead from them.

179.    Clarke also stated that "we expect to start shipping licensed AquaRefining equipment during 2017.  What we want to do before that is actually operate our own facility, make sure we've learnt everything we can, and absolutely not falling to the trap of having our licensees be our beta testers.  We're not a software company, we're an equipment company, and we live or breathe on the reliability of the equipment and services that we provide through that."

180.    Regarding revenue, Clarke stated on the call that 160 tons of lead a day, with 32 AquaRefining modules, could generate "revenue between $100 million and $120 million a year of that scale."  Five AquaRefineries totaling 800 tons a day, with 160 modules, "would give us somewhere in the region of $500 million to $600 million a year in revenue."

181.    During the Q&A portion of the Q3 2016 Conference Call, Clarke was asked about the move from 80 tons to 120 tons.  Clarke responded that the Company "wanted to make sure we could do it, before we told anybody.  It is a theme here of make sure you can do it before you tell anybody is kind of key within the company ….  Is there an opportunity to expand beyond that, never say never, but we think 120 tonne to 160 tonne is optimal for that particular site."

182.    Again, analysts reacted positively to the announcements.  A November 8, 2016 Northland report stated "AQMS has reached several important near-term milestones including first lead production" and the Company "provided a positive surprise with an expansion in the near-term capacity at its first AquaRefinery from 80 tons per day to 120 tons per day … AQMS is also making positive progress with follow-on AquaRefineries and  3rd party licensing potential."  Likewise, on November 8, 2016, Oppenheimer issued a report stating the Company announced a "50% output improvement" at the Reno Plant which is "expected to be fully ramped in early 2017 … AQMS says better than expected flexibility in the NV facility will allow it to ramp to 120 tons a day, up from the

80 tons originally forecast.  It now targets 160 tons/day by 2018 in NV."  The report concluded, "AQMS is uniquely positioned to take share in the … lead recycling market …."

### 4.   Aqua Metals Closes Its November 2016 Public Offering

183.   On November 21, 2016, the Company completed a public offering of 2.3 million shares of common stock for $10.00 per share, for gross proceeds of $23 million and net proceeds of $21.5 million (the November 2016 Offering).  In connection with the offering, on September 2, 2016, Aqua Metals filed with the SEC a Registration Statement on Form S-3 for a proposed offering of shares of its common stock, which was subsequently amended on September 16 and 21, 2016 (collectively, the "Registration Statement").  The Registration Statement stated that the Company is "engaged in the business of recycling lead through a novel, proprietary patent-pending process that we developed and named 'AquaRefining'" which "uses an aqueous solvent and a novel electro-chemical process to produce pure lead (*i.e.*, higher than 99.99% purity)."  The Company also touted in the Registration Statement that the "modular nature of AquaRefining makes it possible to start LAB recycling at a much smaller scale than is possible with smelters, thereby significantly reducing the investment risk associated with building a lead production facility."

184.   Also, on November 15, 2016, Aqua Metals filed a Preliminary Prospectus on Form 424B5 ("November 15, 2016 Prospectus") with the SEC, and on November 17, 2016, Aqua Metals filed a Form 424B5 Prospectus Supplement with the SEC (collectively with the preliminary prospectus, "Prospectus").  The Preliminary Prospectus reiterated verbatim all of the same statements made in the Registration Statement (quoted in this paragraph, *supra*) regarding commercialization, lead purity, and the modules making it possible to start LAB recycling at a much smaller scale and reducing investment risk.

185.   In the Prospectus, Aqua Metals assured investors that the production process was successful to date, stating,  "the testing of our AquaRefining process has been successful to date" and "on October 28, 2016, we commenced limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module."

186.    The Prospectus similarly repeated that "[w]e have tested our AquaRefining process on a small scale, and on October 28, 2016 we commenced limited production of recycled lead at our TRIC facility."

187.    The Prospectus represented that the funds from the offering would be used to accelerate the production process of AquaRefining:

> We expect to use the net proceeds from this offering for working capital and general corporate purposes, including the acceleration of our AquaRefining product development and licensing efforts inclusive of pre-sales and post-sales support staff and infrastructure, enhancement of processes to further improve our operating margins and regulatory activities.

188.    The Prospectus further explained that, given that the necessary capital had been obtained, the AquaRefining process was ready and capable of producing 120 tons of recycled lead per day:

> As of the date of this prospectus supplement, we believe that we have working capital sufficient to fund our current business plan over the next 12 months, including attainment of production at the rate of 120 tons of recycled lead per day.

189.    The Prospectus repeated that commercial production was imminent:

> We expect to commence the commercial recycling of used LABs during the fourth quarter of 2016 and increase our production of lead to 120 tonnes per day in early 2017.

### 5.    Clarke's December 22, 2016 Interview Regarding The Purported Status Of The Company's Efforts

190.    During a December 22, 2016 interview with Tailwinds, Clarke discussed production volumes at the Reno Plaint, Clarke stated, "[w]e announced [on] the earnings call that we are able to get better use out of the equipment on site so that we are not starting at 80 tons a day.  We are starting actually starting at 120 tons and we are expecting to be able to quickly take that to 160 tons a day in the second half of next year."  Clarke stated that "we remain on track to be producing 800 tons a day from our own facilities" in five years.

191.    Clarke further stated during the interview that "we're confident that we'll be announcing some licensing deals within quarter 1 of next year and planning a very accelerated roll out."

6. **Defendants Tout A Strategic Partnership With Johnson Controls International plc**

192.    Before the market open on February 9, 2017, Aqua Metals issued a press release titled "Johnson Controls and Aqua Metals Sign Break-through Battery Recycling Technology Partnership," which was incorporated into a Form 8-K filed with the SEC on February 13, 2017 ("February 9, 2017 Press Release").  The February 9, 2017 Press Release announced a "battery recycling technology" partnership between the world's largest manufacturer of automotive batteries, Johnson Controls, and Aqua Metals ("Johnson Controls Partnership") covering North America, China and Europe.  Clarke touted that "[o]ur partnership with Johnson Controls is a tremendous step forward and is an opportunity for us to work with the global leader in automotive battery manufacturing and responsible recycling.  We will build on this exciting relationship in order to enable clean and efficient battery recycling around the world."

193.    The Company stated that:

We entered into an Equipment Supply Agreement dated February 7, 2017 with Johnson Controls pursuant to which we agreed to collaborate on the development of a program for the installation of new greenfield builds and conversion of existing Johnson Controls' and certain strategic partners of Johnson Controls existing lead smelters to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know how and services. We have agreed with Johnson Controls to develop an appropriate program blueprint, and enter into a definitive development program agreement reflecting that blueprint, pursuant to which we will provide to Johnson Controls and certain strategic partners of Johnson Controls, by way of licensing or sale, the following products and services in the regions of North America, Europe and China:

- AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations and/or the construction of new Johnson Controls and Johnson Controls strategic partners battery recycling facilities based on our AquaRefining technology;

- Training, evaluation and certification of Johnson Controls' operations personnel sufficient for such personnel to competently operate our AquaRefining technology and equipment; and

- Ongoing technical support, maintenance services and warranties.

194.    The Company touted that "[u]nder the agreement Johnson Controls will also":

- Become the first licensee for AquaRefining technology

- Supply Aqua Metals with batteries to recycle as a service, as part of the Johnson Controls closed-loop network
- Purchase AquaRefined metals produced from Aqua Metals' facilities
- Acquire just under 5 percent of Aqua Metals outstanding shares

195.    On February 9, 2017, before the market close, Bloomberg News issued an article titled "Aqua Metals CEO Says JCI Deal Is 'Massive Vote of Credibility'" ("February 9, 2017 Bloomberg News Article") reporting on a 2017 phone interview with Clarke.  The reporter quoted Clarke as stating that the new partnership with Johnson Controls is a "massive vote of credibility" in the Company's technology.  The article further quoted Clarke as stating that he expects to see a "dramatic transformation" in revenue in the next two or three years, and that the Company "can make a much better quality product with less capital equipment and so it is purely an economic driver for us." Clarke also stated that Aqua Metals may directly employ 800 people in the next four to five years, a ten-fold increase.

196.    Following the February 9, 2017 Press Release and in response to this purported positive news, the price per share of Aqua Metals increased $4.75, or approximately 41.6%, from a close of $11.41 on February 8, 2017, to a close of $16.16 on February 9, 2017, on highly unusual trading volume of roughly 3.5 million shares.  Bloomberg News also reported that "[s]hares of Aqua Metals jumped as much as 44 percent after Johnson Controls signed an agreement on battery recycling technology and took an almost 5 percent stake in the company."

197.    Analysts also reacted extremely positively to the Johnson Controls Partnership.  For example, a February 9, 2017 Oppenheimer report called the agreement "transformative" and a "demonstration of JCI's belief in the technology."  The report further stated, "we believe the purchase commitment from JCI is enough to support three new facilities for AQMS, the non-exclusive licensing of AQMS' technology, and the strategic investment in AQMS are a marquee validation of AQMS' technology and business model."  A February 10, 2017 report by Euro Pacific Capital noted that "[t]he deal with Johnson Controls puts AQMS on the map ….  For a multi-billion dollar company such as JCI to sign a partnership agreement with AQMS for its battery recycling technology should further strengthen investor confidence …."

198.    Similarly, Tailwinds issued a report on February 9, 2017, reacting to this "incredibly exciting news" and noting that it reflects "an independent voice sounding off on the success of [the AquaRefining] technology."

199.    The next day, on February 10, 2017, in an article titled "Aqua Metals Gets Major Battery Company Backing," Mould further touted the agreement with Johnson Controls.  In the article, Mould is quoted as saying, "Johnson Controls backing us is a great statement to the industry and the world that aqua refining is the future …. It is major for this facility.  It allows us to build out the facility to its full capacity."[7]

### 7.    Defendants' February And March 2017 Statements Regarding Q4 2016 And YE 2017

200.    At the market open on February 14, 2017, Aqua Metals issued a press release titled "Aqua Metals Provides Fourth Quarter and Year End Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC on the same day ("FY 2016 Press Release"), announcing the Company's financial and operating result for Q4 2016 and year ended December 31, 2016.  Murphy was identified as the "Company Contact."  The FY 2016 Press Release stated that Aqua Metals was "commercializing" its AquaRefining process and had "successfully commissioned and in the process of scaling up production of AquaRefined lead at AquaRefinery 1 at McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC)."

201.    In the FY 2016 Press Release, Clarke also touted that 2016 was a pivotal year for the Company:

> [W]e successfully built, commissioned and began producing products at the world's first AquaRefinery and deepened our strategic relationships with major players throughout the industry.  Our partnerships, most recently with Johnson Controls—the global leader in automotive battery manufacturing and responsible recycling— and Interstate Batteries— the largest independent battery distribution system in North America and the country's leading battery recycler. — and Battery Systems Inc. – one of the largest independent battery distributors in the U.S.  effectively rounds out a sustainable ecosystem for the

---

[7] *See* Colin Lygren, *Aqua Metals Gets Major Battery Company Backing*, KOLO TV (Feb. 10, 2017), http://www.kolotv.com/content/news/Aqua-Metals-gets-major-battery-company-backing-413473933.html ("February 10, 2017 KOLO News Article").

automotive lead acid battery industry and provides a level of supply and off-take to support our expansion of AquaRefinery 1 and the construction of additional facilities.

As we move through 2017, we will continue the expansion of AquaRefinery 1, look to build additional AquaRefineries and build out our licensing program.

202.    A slide presentation was filed and distributed on February 14, 2017 (attached as Exhibit 99.2 to a Form 8-K filed with the SEC) ("February 14, 2017 Slide Presentation") in advance of the Company's financial and operating results for Q4 2016 and year ended December 31, 2016 ("FY 2016 Conference Call") and used during the call.  In this presentation, the Company reiterated that "our first facility is running from breaker to AquaRefining," touting that it had, among other things:

- Expanded potential capacity to 120T/day
- Produced and validated 99.99% pure lead – working on 99.999% pure
- Had added second shift and scaling up to four shifts

203.    The Company further stated in the presentation that, in light of the Johnson Controls Partnership and the "relationships with Interstate Batteries and Battery Systems, Inc., we believe we have secured sufficient supply and off-take to underpin our growth from 160 to 800T/day in North America."

204.    The same day, on February 14, 2017, the Company held its FY 2016 Conference Call. Aqua Metals' Clarke stated that "[o]ne of the headlines today is that the first-ever AquaRefinery located at Tahoe-Reno Industrial Center, has moved from commissioning to operational.  That means that we are breaking batteries and making lead from the batteries that we've broken, both from – both metallic lead and Aqua-refined lead.  It's continuing to ramp-up."  Clarke stated the "first-ever AquaRefinery [is] up and running," and "we have product ready to ship."

205.    Clarke reiterated on the FY 2016 Conference Call, "let's talk about the Tahoe-Reno facility … it's now running.  We've transitioned out of a mostly start-up phase into a – and commissioning phase into an operational phase …."  Murphy also stated on the call that "we're starting to – beginning commercial operations."

206.    Clarke stated that the Company was expanding the AquaRefinery's capacity from producing 120 tons per day to 160 tons: "We've mentioned in the last earnings call that we have

expanded that potential capacity from 80 tonnes to 120 tonnes a day.  And we're now looking at expanding from 120 tonnes to 160 tonnes a day.  We're producing validated 99.99% pure lead."

207.    Clarke further stated that additional shifts were being added at the Reno Plant, "[a]nd we've moved from a single shift production to second shift.  And now, we're scaling up to four shifts."

208.    While he was touting the Company's increased capacity to produce 160 tons of lead per day and adding shifts to the Reno Plant, Clarke outlined – for the first time – certain challenges that the Company had faced, but assured investors that these challenges had been resolved.  He noted that, although the Company had "been able to run the AquaRefining systems because it's modular for several years now," the process faced "challenges" and "surprises."   These challenges included (a) jams on the conveyor belt leading up to the breaker; (b) pumps and materials issues transporting lead paste from the breaker through desulfurization; and (c) capacity problems with the desulfurization process.  In assuring investors that these issues had been resolved, Clarke stated that "the big news is that we've got that dialed in now and it's operating.  That means we can provide feedstock to the AquaRefiners and make AquaRefined lead."

209.    During the Q&A session of the FY 2016 Conference Call, an analyst from Oppenheimer specifically asked about current operations at the Reno Plant, including the number of shifts and the output per shift.  Clarke's answer was evasive, "what we're saying is that we're making lead from batteries that we've broken.  We're currently operating a single shift.  We got a stockpile of raw materials ready to ship.  We've got – not raw materials – products ready to ship.  As I said, we're operating on a single shift.  We brought on us a second shift."

210.    Analyst Bhakti Pavani from Euro-Pacific Capital, Inc. inquired about whether the Reno Plant was currently producing 120 tons of lead per day.  Clarke stated that "we figured out how to expand that to 120 tonnes a day with the equipment we had onsite."

211.    Clarke stated that the Johnson Controls Partnership would allow the Company to move forward with additional AquaRefineries as well as licensing: "it provides the feed and off take for the additional facilities that we've been talking about for the past two years.  It fills AquaRefinery long-term capacity and it moves us forward in the additional AquaRefineries that we want to build on and upgrade ourselves.  But more importantly, it transitions us to the start of a really exciting new phase of

the company, which is licensing." Clarke stated that Johnson Controls "has agreed to purchase pretty much all of the lead output from Aqua Metals…."

212.    During that call, Clarke stated that the supply, demand and off-take provided by the Company's "strategic relationships" would allow it to scale from 160 tons to 800 tons a day:

> Well, we have been working on this agreement with JCI for a number of months now. And looking at the tolling/lead purchase agreement, I alluded to this a moment ago, it pretty much gives us all the supply. If you take what we've got with Interstate Batteries and Battery Systems, Inc., and then layer on top the demand and supply and off-take with JCI, it gives us everything that we need scale from 160 tonnes to 800 tonnes a day.

213.    Clarke stated that with the announcement of the Johnson Controls Partnership, "we're contemplating a very significant roll out of AquaRefining equipment," and that the Reno Plant "is going to have two roles now. It's going to be running as an operational facility, but it's also going to be the cornerstone of where we[] test things and test improvements and implement improvements … of AquaRefining before we finalize the blueprint and start rolling out equipment to third parties…. [W]e've been talking since inception about building a single AquaRefinery and then building a total of 800 tonnes a day of capacity, and then rolling out with the licensing model":

> So, AquaRefinery, number one at Tahoe-Reno Industrial Complex is starting out with a plant capacity of 120 tonnes of lead per day. And we're expecting to expand that to 160 tonnes a day. To do that will require 32 AquaRefining modules. And when it's at full scale at 160 tonnes a day, that will represent just 0.2% of global lead production and generate revenue potential in the region of $100 million to $120 million a year.

> We chose and we believe it's important to grow the company to 800 tonnes a day. We believe that 800 tonnes a day is a credible global supplier of lead or represents a credible global supplier of lead, and we started out thinking maybe we do that, we tend – the current thinking is we'll do that with a total of five AquaRefineries, about 800 tonnes a day. That would require 160 AquaRefining modules. And when constructed, that would be just 2.1% of global lead production, representing $500 million to $600 million a year in revenue.

214.    Clarke touted the Company's three front expansion plan on the call: (a) "build additional facilities in North America … to get to 800 tonnes a day"; (b) "start providing AquaRefining equipment to third parties on a service license basis"; and (c) "move to higher value products and markets."

1    215.    After the market close on February 15, 2017, National Securities Corporation issued a

2    report initiating coverage of the Company.  In this report, it estimated that the facility would generate

3    $46 million in 2017 revenue and stated that it believed that Aqua Metals' "revenue projections … are

4    sufficiently conservative."   The report further stated, "[w]e believe that this facility has begun to

5    produce lead for commercial sales as of January 2017.  The facility has just been completed and has no

6    operating history but we believe that the equipment has been successfully tested."  National Securities

7    Corporation also stated: "Aqua Metals has two strategic stake holders Johnson Controls and Interstate

8    Battery, each owning 5% of the shares outstanding.  We believe that these two leading battery

9    companies' investment in Aqua Metals not only validates Aqua Metals' revolutionary technology but

10    also creates a vested and integral part of the battery recycling supply chain for the company."

11    216.    Following the February 15, 2017 National Securities Corporation' report, Aqua Metals

12    per share price increased $1.17, or approximately 6.9%, from a close of $16.94 on February 15, 2017,

13    to a close of $18.11 on February 16, 2017, on 469,819 shares traded.

14    217.    On March 2, 2017, Aqua Metals filed its 2016 Form 10-K with the SEC reporting the

15    Company's financial and operating results for Q4 2016 and year ended December 31, 2016.[8]   The

16    2016 Form 10-K contained nearly identical certifications to those cited in ¶ 126 above and those filed

17    with the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, and Q3 2016 Form 10-Q and were signed by

18    Defendants Murphy and Clarke.

19    218.    Further, both Murphy and Clarke signed a certification pursuant to Section 906 of the

20    Sarbanes-Oxley Act that was nearly identical to those filed to those cited in ¶ 128 above and those

21    filed with the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, and Q3 2016 Form 10-Q.

22    219.    The Company reiterated in the filing that "testing of our AquaRefining process has

23    been successful to date" and that:

24        We produced our first AquaRefined lead in October 2016 and we verified that the lead
         produced by AquaRefining is over 99.99 percent pure.

25

26        During late 2016, we implemented upgrades to the facility that have resulted in an initial
         production capacity of 120 metric tons per day of lead based products.  Our facility is

27    ─────────────────────

28    [8] The 2016 Form 10-K was signed by Clarke and Murphy.

designed to accommodate additional AquaRefining modules to support expansion to 160 tonnes of lead products per day.

We commenced initial battery breaking during December 2016 and progressed to regular single shift operation of the battery breaker in January 2017.

220.    The Company stated in the filing that AquaRefining "is deployed as a factory built modular system which allows the lead-acid battery industry to simultaneously improve impact and scale production to meet rapidly growing demand.… We believe that our proprietary AquaRefining process will provide for the recycling of LABs and the production of a pure grade lead with a significantly lower cost of production, and with fewer environmental and regulatory issues, than conventional methods of lead production."  The Company stated its plan of operations:

> Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day.  In the longer term, our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day.  Our 12-month plan of operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services.  Finally, our 12-month plan of operations includes our continued pursuit of the expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties.

221.    In the filing, the Company also stated, "We commenced the commercial scale production of recycled lead at our TRIC facility during January 2017."

222.    Further, in the 2016 Form 10-K, the Company also touted that, "[t]hrough our relationships with Battery Systems Inc., Interstate Batteries System International, Inc., and Johnson Controls, we believe we are now able to pursue our expansion of our directly-owned recycling facilities in the U.S.  subject to our receipt of necessary funding."  Regarding the agreements with Johnson Controls:

> [W]e agreed to work with Johnson Controls on the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services.

1

2

**8.    Defendants' March And April 2017 Statements Touting The Market's Reaction To AquaRefining**

3

4

223.    On April 19, 2017, before the market close, Bloomberg First Word issued an article titled "Aqua Metals is 'Just Getting Started' on Partnerships, CEO Says."  The article reported on a telephone interview with Clarke in which he stated that "we might do some acquisitions, but what we're pursing more aggressively is strategic relationships" and that more industry partnerships will help with scale.  The article also stated that "Johnson Controls signed agreement with Aqua Metals on battery-recycling technology and took almost 5% stake."

5

6

7

8

9

224.    On April 20, 2017, a short seller issued a report on SeekingAlpha.com titled "Aqua Metals: As Toxic As The Lead It Claims To Recycle."[9]  The report asserted that:

10

11

12

13

14

Aqua Metals claims to be in the business of designing and licensing the "technology" for lead recycling facilities that are more efficient and more environmentally friendly than the current process used to recycle lead known as smelting.  However, given management's background with a little-known UK penny stock called Applied Intellectual Capital, and AQMS's capital raising ties to former principals of the infamous MDB Capital, we believe that the company is actually in the business of telling tall tales…. AQMS is unlikely to ever be commercially viable....

15

16

17

The real exuberance in AQMS stock emerged after the company announced an investment and collaboration with Johnson Controls (NYSE:JCI) a few months ago. After announcing this to the market, AQMS stock went parabolic, with investors jumping for joy that AQMS was able to strike a partnership with a company of JCI's clout.

18

19

To investors who are excited about the AQMS/JCI partnership, we regretfully inform you that this is not the first time that Stephen Clarke has gotten investors excited about a brand name collaboration.

20

21

22

23

24

25

225.    In response, the Company announced in an April 24, 2017 press release titled "Aqua Metals Announces 'Visitor Days' Beginning in May" ("April 24, 2017 Press Release"), that it would arrange on-site visits for analysts and investors to see the AquaRefining operations at the Reno Plant. In the April 24, 2017 Press Release, Clarke stated: "We believe the best way to address this misinformation is to openly show analysts and investors our facility in operation as we continue to scale it up."  He reiterated that the Company "remains focused on our primary goal – to scale

26

27

28

---

[9] *See Aqua Metals: As Toxic As The Lead It Claims To Recycle,* Seeking Alpha (Apr. 20, 2017), https://seekingalpha.com/article/4063485-aqua-metals-toxic-lead-claims-recycle.

commercial operations at the first AquaRefinery to 120 metric tons per day by the end of the year, and to expand operations through our strategic relationships."

226.    As discussed in ¶¶ 243-250, below, the Company was successful in dispelling the negative short-seller report though its analyst visitor days.

**F.    While The Truth Slowly Begins To Emerge in Spring 2017, Defendants Continued To Mislead The Market**

**1.    Defendants' May 2017 Statements Regarding The Purported Status Of The AquaRefining Technology As Of Q1 2017**

227.    On May 9, 2017, after the market close, Aqua Metals issued a press release titled "Aqua Metals Provides First Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC on the same day after the market close ("Q1 2017 Press Release"), announcing results for the first quarter of 2017 ("Q1 2017").  Murphy was identified as the "Company Contact."  In the Q1 2017 Press Release, Clarke stated that the AquaRefinery is "now in commercial operation and generating revenue, we are aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017."

228.    As part of this purported ramp up, Clarke asserted shifts were being added to operations: "[w]e currently have shifts A and B completely staffed, and plan to complete our recruitment efforts for shifts C and D in the next month … which would allow us to rapidly expand our innovative lead recycling technology and deliver better quality solutions to our partners and the market as a whole."

229.    Clarke also continued to tout "the support provided by strategic partnerships with some of the largest players in the battery industry, we are taking the opportunity to implement the lessons learned during commissioning of AquaRefinery 1 which will accelerate our roll-out of additional facilities.  These improvements and our ongoing work with our strategic partners is creating a blueprint for future facilities – both for our own and for our partners.  Our goal is to roll-out facilities in the rest of North America, China, the European Union and elsewhere, based upon this blueprint."

230.    Clarke summarized by stating, "[f]or the remainder of 2017, we plan to ramp up production at AquaRefinery 1 and to prepare for accelerated build-out of additional facilities, while concurrently moving forward with our plans for additional AquaRefineries, securing non-dilutive

financing to accommodate our growth and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018."

231.    Yet, having touted that AquaRefining was "commerical[ly] operation[al]" and "scaling up," the Company faced a dilemma when it had to report its results for Q1 2017, which again showed that the Company had not yet generated any revenue.

232.    Accordingly, at the Q1 2017 earnings conference call after the close of the market on May 9, 2017 ("Q1 2017 Conference Call"), attended by Clarke and Murphy, Aqua Metals disclosed a series of "issues" and "challenges" at the Reno Plant. Some of these issues were the same as those it claimed it had resolved in February 2017, including issues with (a) breaking and separating the batteries; and (b) the input conveyor. Others had not been previously disclosed, including issues with (a) the holding tanks; (b) Aqua Preparation (described by Aqua Metals as where they take the lead compound and convert it to electrolyte that they then feed into the AquaRefining systems); (c) commissioning more than one AquaRefining module; and (d) commissioning the ingot casting process. However, Aqua Metals touted that it had overcome or was overcoming these issues and challenges:

> And what we can say is it took longer than we planned to get the breaking and separation up and running, but actually considerably shorter than industry norms. One of the challenges that was unique to us that we faced is that, because we don't have a smelter, we don't have a furnace, we needed to achieve much higher degree of separation than is normal in this industry. What I mean by that is, our plastic had to be clean plastic with no lead oxide, no lead dust on it. Our metallic lead had to be metallic lead with no plastic and no lead oxide, no lead sulfate on it. Our lead compounds had to be lead oxide, lead sulfate and other lead compounds with no plastic and no metallic lead in it. That's a really tough order and we achieved it.

> And we worked very closely with Wirtz Engineering, who have been tremendous in this operation. We asked them to do things that no other battery breaking company has ever been asked to do. It took us a while to get there, but we achieved it and we developed and implemented numerous, far too numerous to mention, upgrades to support what is essentially an industry-leading level of separation. And we think that's something that we are working actually on developing to knowhow and maybe even some IP down the line. But when we talk about breaking and separation, we are operating at levels of separation that we don't know of anybody else in the industry even close to.

> One of the other things that we have or a couple of other things that we have done in the breaking and separation areas, we figured out fairly early on that to be able to operate over 24 hours and match timing and phasing between breaking and the next stages down

the line, we needed to improve and upgrade our holding tanks, which we are doing, with higher capacity holding tanks with better mixing.

One of the other issues that we faced is, we needed to rethink and rework the input conveyor to the breaker to upgrade it, to support the higher feed rates that we want to achieve to manage 160 tonnes a day of lead production.  Initially, we undersized that, because we planned for 80 tonnes a day, and rather than stop when we are at scale we thought would upgrade it sooner rather than later.

Looking at the Aqua Preparation, which is where we make the electrolyte, we were [ph] a bit later, quite a bit later and slower in being able to bring this online, initially because of intermittent supply from the breaker, without consistent high quality lead compounds from the breaker is very difficult to commission the processes that turn that and turn it into electrolyte.

We weren't idle though, whilst we had this spare time and capacity, we actually used that to switch to an improved and lower cost chemistry for our desulfurization and [ph] separization technology which is a real big benefit down the line.  And we've learned some [ph] tough lessons on tank mixing and filtration, which needed to be changed and upgraded to improve reliability, but the Aqua Preparation now is up and running.

Similarly with AquaRefining, those of you who followed us knew that we had a module online in October and we were struggling with intermittent supply from both Aqua Preparation, which was struggling with intermittent supply from the breaker, to get sufficient electrolyte up and running to commission all of the modules.

So we were limited to only [Technical Difficulty] of electrolyte to run a single module. Until that opportunity, again to learn, to improve and to implement, so we used that delay in commissioning the additional AquaRefining modules to test and implement numerous upgrades that have improved potential liability, lifetime, reduced cost and improved consistency of operation.

And last but not least, again, same theme here, we were struggling to commission the ingot casting process, because, again, of intermittent supply of processed lead that – we've now got all of that and the ingot commissioning is underway.

233.    Further, while Clarke reiterated that the Reno Plant continued to be "on track to be at 120 metric tons a day by the end of the year," he conceded for the first time that Aqua Metals would be producing only "40 tonnes a day of [AquaRefined lead]" while the remaining 80 tons would be "lead alloys and metallics from the breaker" – contrary to the Company's repeated prior representations that the makeup would be 50% lead alloys and 50% AquaRefined lead.

234.    In a slide presentation attached as Exhibit 99.2 to the Company's May 9, 2017 Form 8-K filed with the SEC in advance of the Q1 2017 Conference Call ("May 9, 2017 Slide Presentation"),

1   and referred to during the call, the Company stated that "AquaRefinery 1 (McCarran, NV) [is]
2   operating and in revenue":

### Strategic relationships helped de-risk our start-up.......

- AquaRefinery 1 (McCarran, NV) operating and in revenue
  - Began production in Q1 – truckloads of feedstock crushed
  - Sales to strategic partner in Q2 – truckloads of product shipped
  - Ramping production to >120mT/day of lead by the end of 2017
  - Validating our economic projections and incorporating lessons learned
- Now planning AquaRefineries 2-5 and learning from chemical industry and datacenter operators
  - Moving away from opportunistic build-out of small stand-alone facilities and evaluating "clusters" centered on logistics nodes
- Equipment licensing has started
  - Working with JCI to plan the retrofit of an existing facility, as the blueprint for others
- Acquisition of Ebonex should accelerate development of higher value products

### ....and provide the stability to optimize our business expansion

NASDAQ: AQMS    3     AQUAMETALS

### Strategic partners brought scale and urgency

| Opportunity delivered through strategic relationships | Lead Capacity (mT/day) | AquaRefining Modules needed | Potential annual revenue | Start Date |
|---|---|---|---|---|
| AquaRefinery 1 | 120-160 | 16-32 | $100-120M/year | Operational |
| AquaRefinery 1-5 | ~800 | ~160 | $500-600M/year | 2017 |
| Licensing (JCI and beyond) | >8,000 | >1,600 | TBD | 2018 |

- The scale and demand for additional facilities and licensing means that we cannot wait until Facility 2 to start implementing advances and lessons learned
- Facility 1 is being used both for revenue generation, continuous improvement and to validate process upgrades
- Built a talent acquisition function, recruiting from role models and complementary industries

NASDAQ: AQMS    5    AQUAMETALS

## AquaRefinery 1 is running and we are scaling output

- Started production in Q1 and sales in Q2
- Status
    - Breaking and separation: commissioned and operating
    - Aqua Preparation: process operating – adding capacity and streamlining operations
    - Aqua Refining: Module 1 operational, Modules 2-4 in-start-up, Modules 5-16 being updated to latest specification
    - Ingot production: being commissioned
        - Metallic lead being shipped pre-ingot
    - Plant staffing
        - A & B shifts: fully staffed, C & D shifts: recruiting to full complement in next month
- The focus of process development has moved from Alameda to Reno
- Implementing next year's improvements now

NASDAQ: AQMS      6



235.    During the Q1 2017 Conference Call, Clarke stated, "every single one of the processes that we need to operate is operating" and "we've proven that the process overall works."  Clarke reassured investors that "[e]verything that we have done so far has validated our business model…"

236.    Clarke also stated that:

Sales to a strategic partner commenced in quarter two using materials that were made in both quarter one and quarter two.  And again, we're into the situation of truckloads of feedstock crushed and shipped now.  For remainder of this year, we're going to do ramping production to 120 metric tonnes a day of lead which we aim to achieve by the end of 2017 or sooner….

***

[W]e look at AquaRefinery 1, we're planning on having a production capacity of 120 metric tonnes a day by the end of the year, and then expanding it to 160 metric tonnes a day in 2018.  And that essentially means that we will have 16 AquaRefining modules on-site and operational at 120 tonnes a day and 32 modules on-site and operational 160 tonnes a day.  For the mathematicians among you that doesn't add up ....

But in terms of what does that mean, 120 tonnes to 160 tonnes a day of lead produced, that represents about $100 million to $120 million a year of revenue, and it is operational.  And we've been talking about [ph] a rollout to 800 tonnes a day for more than a year now, and initially that was going to be 10 to 15 smaller facilities.

Now, we're thinking, we can achieve that with 1-5 AquaRefineries, if we stop at 800 tonnes a day, and there is really no reason why we should specifically stop at 800 tonnes

a day.  But at 800 tonnes a day, that would mean, we have deployed 160 AquaRefining modules and we will be looking at a combined potential annual revenue of $500 million to $600 million a year and we're starting that process this year, that is we are starting that rollout this year.

\*\*\*

The headline is its running and we are scaling output.  We started production in Q1 and we have started actually moving those into sales in Q2…. [T]he breaking and separation is commissioned and operating.  The Aqua Preparation is the next step … so that process is now operating.   We are adding capacity to it and streamlining operations.  AquaRefining itself, module 1 is operating, modules 2 to 4 are on-site and in startup mode and modules 5 to 16 are being updated to latest specifications and will be installed over the coming weeks and months.

237.    Clarke stated that "AquaRefinery 1 is commissioned in revenue and on track.  It continues to be our primary focus and we are using it to prepare for accelerated growth."  Regarding "strategic partners" Clarke stated that "they de-risked our ramp up" and "provided stability for efficient scale up."

238.    Clarke touted the Company's "invitational site visits":

[W]e announced earlier on that we actually are doing some invitational site visits.  So we have arranged an invitational for sell-side analysts in May that will take place in May.  We have been asked not to give out when that date is.  I believe the analysts want some time to prepare and publish.  Similarly, we are arranging invitationals of buy-side analysts and investors which will occur in June and beyond.

239.    In response to analyst's question about whether the Company's ability to finance additional facilities would be hampered by the fact the Reno Plant was not producing 120 tons of lead a day, Clarke responded: "if we got the battery-breaking working, and we've got the ingot line running, and we'll be making electrolyte and we are producing electrolyte into lead, and they can see modules operating effectively, that's pretty much enough of a de-risk from the perspective of the people we're talking to."

240.    After this May 9, 2017 news, Aqua Metals' stock price declined $4.34 from a close of $16.65 per share on May 9, 2017, to a close of $12.31 per share on May 10, 2017, a drop of approximately 26%, on unusually heavy trading of 1,781,561 shares.

241.    Just after the market close on May 10, 2017, the Company filed a Form 10-Q for Q1 2017 with the SEC ("Q1 2017 Form 10-Q") reporting the Company's financial and operating

results for the period ended March 31, 2017.  The Q1 2017 Form 10-Q contained identical Sarbanes Oxley Section 302 and 906 certifications as those in the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, and Q3 2016 Form 10-Q, signed by Defendants Clarke and Murphy.  In that filing, the Company, while confirming what they had disclosed the day before – that they had sold only lead compounds and plastics rather than AquaRefined lead ("Lead compounds and plastic produced in the quarter were not shipped as details were still being worked out for delivery to customers.  Shipments began in April 2017."), they further stated, "[w]e expect TRIC to achieve a production rate of 120 metric tons of recycled lead per day by the end of 2017."

242.    The Company reiterated the same stated plan of operations in the Q1 2017 Form 10-Q as it had previously reported in its 2016 Form 10-K, including "[o]ur plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day by the end of 2017" and "[i]n the longer term, our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day."  The Company's 12-month plan of "operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services," and the Company's "continued pursuit of the expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties."

**2.      In May And June 2017 Defendants Continue To Tout The Market's Reaction To The AquaRefining Technology**

243.    On May 31, 2017, after the market close, the Company issued a press release titled "Aqua Metals Hosts First Analyst Visitor Day" ("May 31, 2017 Press Release") announcing that it had hosted analysts at its Reno Plant.  Aqua Metals expressly touted that:

The analysts were given a tour of AquaRefinery 1, located in the Tahoe-Reno Industrial Complex (TRIC), led by Aqua Metals' executive management team.  Analysts were able to view the critical processes at the AquaRefinery as they happened, including: battery feedstock deliveries; battery breaking and separation; desulfurization and pre-

AquaRefining digestion processes; AquaRefining on simultaneously running AquaRefining modules; and shipments of lead products to customers.

244.   Clarke stated in the May 31, 2017 Press Release:

It has been a busy few months for our team as we continue to pursue our production milestones and step ever closer to full output of AquaRefined lead at TRIC.   We aim to be as transparent as possible while protecting our IP, as we expand our operations and collaborate with new partners.   This was a valuable opportunity to open our doors to the analyst community, providing a behind-the-scenes look at our process.

245.   The May 31, 2017 Press Release further stated that the "Company expects all the analysts who attended the visitor day to update their coverage reports to reflect findings from the site visit in the coming days.   AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes of lead products per day by the end of 2017.   Aqua Metals is currently also working on plans to build a second AquaRefinery and integrating AquaRefining into a to-be-named existing lead smelter with its strategic partner, Johnson Controls."

246.   In response to the on-site visits at the Reno Plant and at the direct invitation of the Company to report on them, several analysts issued reports after their visits.

247.   Indeed, on June 1, 2017, Oppenheimer reported ("June 1, 2017 Oppenheimer Report") a favorable site visit stating:

- "We visited AQMS's Reno facility yesterday, seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational.   We believe the biggest issue facing AQMS shares is fundamentally whether the process can be balanced to deliver the cost numbers management has guided to.   Our visit suggests the company is tracking those estimates well.   We expect there is a significant amount of additional margin for higher purity lead and believe mix could drive upside to our expectations."

- "We observed six semi truckloads of material delivered and taken away during our four-hour visit.   We saw spent batteries loaded into the recycling line and being processed with fully recycled lead coming out of the end of the process flow.   There appeared to be a week or more of spent batteries as inputs and finished goods inventory."

- "We remain constructive on shares as we believe the company will systematically counter lingering short arguments over the course of the year."

248.   Also, on June 1, 2017, National Securities Corporation issued a report ("June 1, 2017 National Securities Corporation Report") after its site visit stating:

- We came away seeing the progress that the company has made in the ramp up of the facility and a clearer picture of the expansion plans. We believe that management plans to hold similar events in the coming months which we view as incrementally positive for transparency and for the sentiment on the shares.

- The Reno facility is ramping up, on track for 120 tonnes by year end
  On our facility tour we observed that 3 Aqua refining modules were up and running and producing recycled lead. There was work being done assembling the fourth module and also equipment ready for the next set of modules to be built. Improvements have already been made in the Aqua refining process that has been learned from the working of the first module and is being implemented in the fourth module from the start. We believe that the company is on track for all sixteen modules to be up and running by the end of 2017.

- Lead is being produced and revenues are being generated
  Given that Aqua Metals did not report any revenues in the March quarter, we view that fact that we observed trucks delivering used batteries for off-loading and recycling, and more importantly, finished recycled lead packaged and ready to be shipped out as highly encouraging. Given the amount of lead produced and our belief of what has already been sold, coupled with the throughput of the current modules for the month of June, we believe that our revenue estimate for the June quarter of $2 million is achievable.

249. On June 1, 2017, before the market close, Bloomberg News issued an article titled "Aqua Metals CEO Says New Plant May be Announced This Summer" ("June 1, 2017 Bloomberg News Article"). According to the article, Clarke stated during a phone interview that the Company was getting ready to announce its "next one, maybe two" facilities over the summer or even sooner and that there was a "reasonable chance" that the Company would reach 120 metric tons of capacity before the end of 2017.

250. On June 5, 2017, Euro Pacific Capital issued a report ("June 5, 2017 Euro Pacific Capital Report") after visiting the Reno Plant stating:

On May 31, 2017, we attended the Analyst Day hosted by Aqua Metals where we had an opportunity to see the facility and operations and meet with the management and operational team. During our visit, we saw the entire process of lead production starting from the feedstock/ lead acid batteries being loaded on the conveyor belt moving into the battery breaker system to the AquaRefining preparation process (desulphurization process) and to the AquaRefining modules, where the end product (AquaRefined lead) comes out at the end of the process. The key takeaway from the site visit was as the Company fixes the minor issues/modification to the equipment/process over the next few weeks, it should be able to produce guided quantities of lead by the end of this year…. We noted that the key bottleneck of the operation is the battery breaking system/equipment, which is having issues to appropriately separate/filter components

from the bigger load of the feedstock.  We believe with minor modifications that are expected to be implemented over the next few weeks, the Company should be able to resolve the issue and process targeted levels of feedstock.

### 3. Defendants' June And July 2017 Statements Regarding The Purported Status Of AquaRefining

251.   On June 1, 2017, before market close, Bloomberg First Word issued an article titled "Aqua Metals CEO says New Plant May Be Announced this Summer," which stated that "[p]lans for additional facilities will be announced this summer as lead acid battery recycler looks to expand."  The article quotes Clarke as stating that the Company is "getting ready" to announce "next one, maybe next two" facilities.

252.   Also in June 2017, Aqua Metals prepared a "Corporate Presentation" entitled "'Lead Reinvented' Facilitating a revolution in the lead acid battery industry," ("June 2017 Corporate Presentation") which stated that "[t]he World's first AquaRefinery is now in commercial production" and that "[w]e are ramping revenues, planning additional facilities of our own":



## Key Takeaways

- Preparation for large scale roll-out is our priority
- AquaRefinery 1, commissioned, in revenue and on track for 120mT/day
  – Continues to be our primary focus
  – Using it to prepare for accelerated growth
- Strategic partners brought scale and urgency
  – De-risked our ramp-up
  – Provided stability for efficient scale-up
  – Allows for more aggressive build-out
- Beginning early stage work on higher value products and services
  – Positioned to leverage existing and future strategic partners





NASDAQ: AQMS     20

**AQUA**METALS

253.    On July 25, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Announces Preliminary Q2 2017 Revenues" ("July 25, 2017 Press Release") announcing that the Company "expects total revenues for the second quarter of 2017 to be $603,000, which represents the commencement of commercial revenues."  Murphy was listed as a "Company Contact."  Clarke remarked in the July 25, 2017 Press Release that "[m]oving into revenue generation is another significant milestone of growth" and shows that "[w]hat we have accomplished to-date is truly unprecedented and represents [a] level of progress not generally seen in advanced materials technologies."  Clarke further explained that the Company had "worked hard to bring the front-end of our process into consistent operation and are now working to install the balance of our AquaRefining modules as we work towards our goal of achieving 120 metric tonnes per day of capacity by year end."

254.    The Company touted that "[w]e are working to expand the reach and scope of our technology with additional facilities of our own, the commencement of equipment licensing and the expansion of our product offerings to include advanced materials and methods to advance the capabilities of lead acid batteries."

### 4.    Defendants Continue To Tout Site Visits To The Reno Plant

255.    On August 2, 2017, when the market opened, the Company issued a press release titled "Aqua Metals Successfully Hosts First Investor Day" ("August 2, 2017 Press Release"), announcing that it had hosted institutional and accredited investors at its Reno Plant led by Aqua Metals' executive management team.  The August 2, 2017 Press Release stated that "[i]nvestors were able to view the full production process at the AquaRefinery as it happened, including battery breaking and separation, desulfurization, electrolyte production, and AquaRefining on four simultaneously running AquaRefining modules."

256.    Defendants also adopted an institutional investor's statement in its August 2, 2017 Press Release where it quoted Brett Conrad of Longboard Capital Advisors:

> Our Aqua Metals plant tour was a real eye opener.  The team has put in countless hours and expertise perfecting the first closed loop non-polluting lead refining process.  This is my third time visiting the plant and I'm very impressed with the accelerating progress in the commissioning process.

257.    Clarke touted the Company's purported belief in transparency:

> With the world's first clean lead recycling facility now in commercial operation, we have continued to scale our operations.  This investor day speaks to our belief in transparency while still protecting our IP, an important value for a company working with a technology as disruptive as AquaRefining.

258.    The August 2, 2017 Press Release also represented that it was working on plans to build a second AquaRefinery and "integrating AquaRefining into a to-be-named existing lead smelter with strategic partner, Johnson Controls."

259.    On August 14, 2017, H.C.  Wainwright & Co.  issued a report ("August 14, 2017 H.C. Wainwright & Co.  Report") after its site visit stating:

- We visited AQMS' TRIC facility on August 8, 2017, and were given a tour of the operations  by  the  company's  COO,  Selwyn  Mould.     We  observed:

1) infrastructure to recycle lead batteries using the company's proprietary process is in place; 2) four modules were operational, producing recycled lead paste; 3) room to deploy 12 additional modules has been carved out in the setup; 4) there is adjacent available space to add another line of 16 modules; 5) the operational crew appears to be scaling the learning curve; 6) facilities were quite clean for a place where lead is recycled; and 7) technology and infrastructure deployed were fairly straightforward and should be easy to bolt on to, or lined up with, licensee infrastructure.

- We believe volatility in the stock has been driven by high initial expectations set by management that have not been delivered in a timely manner.  Management's ambitions to put in place a larger facility than originally planned, fueled by investor interest, has caused a one year delay in achieving production goals, understandably creating skeptics.  However, after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18.

### 5.  Defendants' August 9, 2017 Statements And Partial Corrective Disclosures

260.  After the market close on August 9, 2017, Aqua Metals issued a press release titled "Aqua Metals Provides Second Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close on the same day ("Q2 2017 Press Release"), announcing the Company's financial and operating result for the second quarter ended June 30, 2017 ("Q2 2017").  The Q2 2017 Press Release stated:

As of July, the Company had four AquaRefining modules commissioned and in operation.  The Company is currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017…. [Aqua Metals] [s]uccessfully hosted several invitational investor and analyst days at AquaRefinery 1 in late May and early August.  These events showcased the production process at the AquaRefinery, including battery feedstock deliveries, battery breaking and separation, desulfurization and pre-AquaRefining digestion processes and AquaRefining on four running AquaRefining modules.

261.  After the market close on August 9, 2017, Aqua Metals held the Q2 2017 earnings conference call ("Q2 2017 Conference Call") with Clarke and Murphy.  During that call, although it had been nearly a year since the Company announced that the first module had supposedly produced the first AquaRefined lead, Clarke disclosed that, in fact, the modules were not operational, "Modules 1 to 4 are being used to validate operating parameters right now, and we plan to have modules 5 to 16 installed during October and then operational by the end of the year."

262.    The Company further revealed that the lead compounds that accounted for much of its small $603,000 Q2 2017 revenue derived from low value lead compounds and that its facility might run at less than 120 tons per day:

> [T]he lead compounds have a low value in the less established market than lead alloys. And moving forward, our focus is really about the AquaRefined products and the licensing of AquaRefining equipment.
>
> So it's all about AquaRefining but optimal product mix and profitability.  We're focused on running all of our AquaRefining modules to the maximum benefit.  And that means that we may choose to operate the overall facility with an output of less than 120 tons a day, but with maximized AquaRefining.  And we're looking to change our product mix to a higher level of AquaRefining product.

263.    Clarke stated: "And we have the option of producing and selling lead components from AquaRefining feedstock, and we've done this.  And as Tom will say shortly, that's where much of our revenue for the second quarter came from."

264.    Clarke further discussed the problems the Reno Plant was having and had been having for quite some time, including issues with (a) breaking and separating, (b) commissioning and scaling Aqua Preparation, and (c) commissioning modules 1-4.

265.    The same day, August 9, 2017, the Company filed a Form 10-Q for Q2 2017 with the SEC ("Q2 2017 Form 10-Q") reporting the Company's financial and operating result for the Q2 2017. The Q2 2017 Form 10-Q contained identical Sarbanes Oxley Section 302 and 906 certifications as those in the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, Q3 2016 Form 10-Q, and Q1 2017 Form 10-Q, signed by Defendants Clarke and Murphy.  The Company reported in that filing:

> We have implemented numerous process improvements and expect to be capable of producing significantly more than 120 metric tonnes of recycled lead per day by the end of 2017.  This is more battery processing capacity than we can utilize with 16 AquaRefining modules.  As such, until we have increased our AquaRefining capacity, we will have the option of producing lead compounds from unused AquaRefining feedstock. The lead compounds have a less established market and some demand uncertainty.  For this reason, following the commission of all 16 modules, we may choose to run TRIC at less than 120 tonnes per day, should this provide for a more optimal product mix.

266.    During the Q2 2017 Conference Call, Clarke assured investors, once again, that "AquaRefining works in capital letters with a lot of exclamation points.  We are now AquaRefining lead."  He stated that the Company had "four modules operating" and expected to have 16 operating

by the end of 2017 and that the facility was currently running "two shifts of ten hours each." Murphy elaborated that the shifts were running "for four days a week."

267.    During the Q&A portion of the call, in response to a question about Q3 revenues, Clarke stated "[o]ur expectation is quite modest for quarter three that will be largely flat in revenue but we're expecting to see a big growth in revenue until the backend of quarter four as we ramp the final modules and we really start cranking on them."

268.    On the call, Murphy stated:

The additional licensees coming from battery companies and lead companies, we see it as – the level of interest on multiple site visits and observing processes in operation and thinking around how they would integrate into their existing facilities where they have their own in-house recycling, or whether they are – if they are lead company or how would they go about building a facility if they are currently outsourcing to a third-party for battery recycling, and discussions around do they want to start off with a standalone AquaRefining facility or do they we want to go a hybrid route.

269.    Responding to a question about the short seller report, Clarke stated on the call:

One of the other strands was that AquaRefining just doesn't work.  Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work.

We've shown videos of it working and I don't know, maybe the shorts are so upside down and buried in their own bubble of misbelie[f] they just can't get out now, I don't know.  It makes no sense to me at all.

I would point out that there are probably one or two entities in this world who would be very upset if smelting was to go away and be replaced by something else.

                                                   ***

And as Tom said earlier it worked the first time we turned it on.  I mean you got to recognize that we actually – we put our second mortgages 401(k) and kids education for instance found in this business if this is a get rich quick scheme, please show me where I got rich.  I haven't monetized anything from this, I have not sold a single share.

And the reason we were happy to look our spouses in the eye and say, I am going to write another $100,000 check tomorrow darling because when we turned AquaRefining modules on they worked and they still do.

270.    Murphy also added to Clarke's statement regarding the short seller report, "just summarizing what Steve words said, the reason the search will eventually go away and it may not be

overnight unfortunately as this works.  And why I am comfort level and we never leave because this works."

271.    Continuing to tout its strategic partnerships, the Company's plan of operations remained largely unchanged from its prior 10-Q filing:

> Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to include 16 AquaRefining modules by the end of 2017.  In the longer term, our goal is to increase the number of AquaRefining modules and to move our product range to be more focused on AquaRefined lead.  Our 12-month plan of operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services.  Finally, our 12-month plan of operations includes our continued pursuit of the expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties.  Additional funding will be required to increase the production of AquaRefined lead at TRIC beyond that provided by the first 16 modules and to work with Johnson Controls on equipment integration and licensing to third parties.

272.    On August 9, 2017, after market close, Seeking Alpha issued an online post entitled "Aqua Metals misses by $.22, misses on revenue," which explained that "Aqua Metals (NASDAQ: AQMS) Q2 EPS of -$.42 misses by $.22" and that "Revenue of $0.6M misses by $0.63M."

273.    On the release of the news, Aqua Metals' stock price declined $2.56 from a close of $10.87 per share on August 9, 2017, to a close of $8.31 per share on August 10, 2017, a drop of approximately 23.6%, on heavy volume of 658,303 shares traded.

### 6.    Defendants' September 2017 Statements Regarding The Johnson Controls Partnership

274.    Before the market open on September 28, 2017, Aqua Metals filed a Form 8-K with the SEC announcing that the Company was progressing in its agreement with Johnson Controls ("September 28, 2017 Form 8-K").  The Form 8-K stated in relevant part:

> On September 15, 2017, Johnson Controls delivered to us written notice of the first Johnson Controls facility designated by it, on a preliminary basis, for conversion or retrofit.  On September 25, 2017, we delivered to Johnson Controls written notice our readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead.

During the week of September 25, 2017, we commenced meetings with Johnson Controls for purposes of furthering the discussions concerning the conversion or retrofit of the initial Johnson Controls facility and the negotiation of the definitive Development Program Agreement pursuant to which we will provide to Johnson Controls, and certain strategic partners of Johnson Controls, by way of licensing or sale, AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations.  Johnson Controls has reserved the right to definitively designate the initial facility upon the parties' execution of the definitive Development Program Agreement.

275.    Also, on September 28, 2017, before market open, the website thefly.com made an online post entitled "Aqua Metals commences talks with Johnson Controls over retrofit of facility," amplifying the statement Aqua Metals made in its 8-K from the following day that in which it "commenced meetings with Johnson Controls (JCI) for purposes of furthering the discussions concerning the conversion or retrofit of the initial Johnson Controls facility and the negotiation of the definitive Development Program Agreement pursuant to which we will provide to Johnson Controls, and certain strategic partners of Johnson Controls, by way of licensing or sale, AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations."   On September 15, Johnson Controls gave "written notice to Aqua Metals of the first Johnson Controls' facility designated by it, on a preliminary basis, for conversion or retrofit."   On September 25, Aqua Metals delivered to Johnson Controls written notice of its "'readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead.'"   TheFly reported that "[s]hares of Aqua Metals are up 29%, or $1.75, to $7.80."

276.    Following this September 28, 2017 news, Aqua Metals per share price increased $1.10, approximately 18%, from a close of $6.05 on September 27, 2017, to a close of $7.15 on September 28, 2017, on 2,094,755 shares traded.

**7.      The October 23, 2017 Partial Corrective Disclosure**

277.    On October 23, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides Update On Plant's Operations" ("October 23, 2017 Press Release").  In the October 23, 2017 Press Release, the Company admitted that it had only "produced small quantities of AquaRefined lead."

278.    Aqua Metals further disclosed that it was still attempting "to determine the optimal operating parameters, including electrolyte pH, lead concentration, operating temperature, electrolyte flow rate and free acid levels" and contrary to statements made starting in February 2017, it was still trying to commission AquaRefining:

> [A]n important part of the commissioning process is to operate the modules consistently at progressively higher electrical currents to determine the appropriate control parameters and operating procedures.  Once completed these parameters and procedures can be replicated across all modules.  During model commissioning, the Company also found that under certain conditions, the operators would need to periodically assist the lead removal.  Several solutions have now been tested and the Company is evaluating which options are best for long term use.

279.    The Company further revealed that it was still "in the process of synchronizing all of the[] stages" of its production process and was far from selling AquaRefined lead, despite its repeated statements otherwise:

> For over six months, Aqua Metals has been breaking batteries and selling lead compounds.  Aqua Metals is currently in the process of taking the next major step by transitioning to the production of lead ingots that are produced from battery grids and a small amount of AquaRefined lead.  These lead ingots will be sold as lead "bullion." The next step will be to produce and sell ingots of lead alloy, and the last step will be to produce and sell ingots of AquaRefined lead.

280.    On the release of the news, Aqua Metals' stock price declined $.96 per share, or 17.9%, from a close of $5.37 per share on October 20, 2017, to a close of $4.41 per share on October 23, 2017, on heavy trading of 647,901 shares.  The stock fell another 9.07% the next trading day on heavy trading of 735,301 shares.

**8.    The November 9, 2017 Class Period Ending Corrective Disclosure**

281.    On November 9, 2017, after the market close, Aqua Metals issued a press release titled "Aqua Metals Provides Third Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close on the same day ("Q3 2017 Press Release"), announcing the Company's financial and operating result for the third quarter of 2017 ("Q3 2017") ended September 30, 2017 and disclosing that it had only generated revenues of $600,000 for Q3 2017 (the same amount that it had generated in Q2 2017).

282.    Also, after market close on November 9, 2017, the Company filed a Form 10-Q for Q3 2017 with the SEC ("Q3 2017 Form 10-Q"), in which it admitted that AquaRefining technology is "unproven technology."  Further, the Company admitted that:

> While we have been successful in producing AquaRefined lead in small volumes, there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a commercial scale. As of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and we have not commenced the commercial production of AquaRefined lead."

283.    Clarke stated, "we still anticipate having all 16 AquaRefinery modules installed and operational by the end of the year and from there will transition them to continuous operation.  Ramp up of AquaRefined lead production is expected to continue through the fourth quarter of 2017 and into 2018 as modules are brought on-line and shifts are added.   We faced and overcame multiple challenges during the quarter, and should expect more as we work to scale production."

284.    Moreover, the Q3 2017 Form 10-Q also disclosed that the Company did not have any strategic alliances, contrary to Defendants repeatedly touting their "strategic partnerships" with Interstate Batteries and Johnson Controls throughout the Class Period.  Specifically, a risk factor was revised to disclose the following underlined language which was not present in the prior versions of the risk factor throughout the Class Period:

> Our business strategy includes licensing arrangements and entering into joint ventures and strategic alliances, however as of the date of this report we have no such agreements in place and there can be no assurance we will be able to do so. Failure to successfully integrate such licensing arrangements, joint ventures, or strategic alliances into our operations could adversely affect our business. We propose to commercially exploit our AquaRefining process, in part, by licensing our technology to third parties and entering into joint ventures and strategic relationships with parties involved in the manufacture and recycling of LABs, including Johnson Controls, among others. However, as of the date of this report, we have not entered into any such licensing, joint venture or strategic alliance agreements, apart from our equipment supply agreement with Johnson Controls, and there can be no assurance that we will be able to do so on terms that benefit us, if at all.

285.    To date, this remains true.

286.    After the market close on November 9, 2017, Aqua Metals held its earnings conference call for the Q3 2017 ("Q3 2017 Conference Call") with Clarke and then-CFO Mark Weinswig

("Weinswig").  During the call, Clarke admitted that "one of the key challenges we face" is a "sticky lead" issue, meaning that, in the AquaRefinery, the lead "plated and was easily removed from the rotating discs, but it slid more slowly [in] the exit shoot, and in some cases, needed manual assistance."  Clarke also admitted that a solution to the issue would need to be applied to all of the modules.  Further, in response to several analyst questions, the Company refused to provide information as to (a) "how many tons per day [Aqua Metals was] currently running through the battery breaking system and through the entire process"; (b) the "utilization rates with regards to those four modules" that were being used to test operational parameters, and (c) "how much time … it will take to go … to full AquaRefined lead."

287.    In response to the disclosures, the Company's stock price fell $.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017.  On Monday, November 13, the Company's stock fell $.13 per share, or 3.5%, to close at $3.58 per share.  By Tuesday, November 14, the Company's stock fell $.58 per share, or 16.2%, to close at $3.00.  Over the course of these three trading days, the stock price declined $0.79 from a close of $3.79 per share on November 9, 2017, to a close of $3.00 per share on November 14, 2017, a drop of approximately 20.8%.

### G.    Post Class Period Events

#### 1.    Following the Disclosure Of Sticky Lead Issues, The Company's Statements Effectively Confirmed That The AquaRefining Process Had Not Been Functioning.

288.    After the end of the Class Period, the Company made a series of disclosures that effectively admit that its AquaRefining process had ***not*** been operational, as previously touted.  For example:

(a)    As previously noted, on November 9, 2017, the Company admitted that it was facing a "sticky lead issue," the very issue that numerous CWs stated had been ongoing prior to and throughout the Class Period.

(b)    In its December 1, 2017 press release titled "Aqua Metals Provides Business Update," the Company further admitted that the AquaRefining modules could not operate continuously and announced that it had investigated possible solutions to address the sticky lead issue

and was going to test one which, if successful, would have to be applied to all 16 modules with the modules expected to continuously operate starting in January 2018.

(c)     Two months later, the Company was still testing this proposed fix.   On February 12, 2018, the Company issued a press release titled "Retro-Fit Package Successfully Installed on One Full Module; In Process of Implementing Retro-fit to Remaining Modules," where it announced it had completed testing of the solution on *one* module and had approved the fix for production which would then be applied to all 16 modules.

(d)     Then, on March 5, 2018, Aqua Metals advised that it had just completed the "*first* 24 hour run of continuous operation of an AquaRefining module," thereby conceding that such a run had not been effectuated before.   The Company was still in the process of retrofitting the other modules.

(e)     In the Company's 2017 annual report on Form 10-K for the year ended December 31, 2017 filed with the SEC on March 15, 2018 ("2017 Form 10-K), the Company stated that "we most recently had to develop special processes and equipment to deal with an unexpected development in the form of 'sticky lead,' whereby the AquaRefined lead produced by our electrolyzers sticks to the AquaRefining modules' exit chute and fails to exit without manual intervention.  We believe we have developed a process that will allow for the exit of the AquaRefined lead without manual intervention, however, ***this additional process will require a certain amount of retrofitting of our modules that will delay our planned commercial operation of all 16 modules***."   In other words, the Company was not yet commercializing its AquaRefining process.

(f)     In the 2017 Form 10-K the Company further stated that, "***we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale….***"   Indeed, the 2017 Form 10-K confirmed that all revenue the Company reported was derived from the sale of lead compounds and plastics, not AquaRefined lead.

(g)     Over a month later on April 24, 2018, the Company announced in a press release titled "Aqua Metals (AQMS) Reports Operational Progress" that three AquaRefining modules had been transferred into production, "where they are running consistently on a single shift."   Yet

1    again confirming that these modules had neither been in production nor operating continuously prior

2    to this announcement.

3           (h)    During the first quarter of 2018 ("Q1 2018") earnings conference call held on

4    May 9, 2018 ("Q1 2018 Conference Call"), Mould acknowledged that it wasn't until April or May

5    2018 that "we brought our first four modules online and transferred them one by one from the control

6    of the technical team into production" and they were "running on a single shift."  The Company had

7    yet to achieve 24-hour operations with those four modules, let alone bringing all 16 modules online.

8    Mould stated that the Company was "being realistic in knowing there will continue to be challenges in

9    scaling up …."

10          (i)    On June 11, 2018, the Company announced in a press release titled "High

11   Grade AquaRefined Lead Now in Production" that, on June 7, 2018, Aqua Metals cast its first block of

12   AquaRefined lead meeting the soft lead grade of 99.985%.  This confirms the Company's prior

13   statement that it had produced 99.99% pure AquaRefined lead, with images of lead ingots, beginning

14   in November 2016 was false.

15          (j)    On August 8, 2018, the Company announced in a press release regarding its Q2

16   2018 results: "***During the quarter, we took the first step to move beyond "proof of concept" and***

17   ***transitioned into commercialization*** of what we believe is truly a revolutionary and greener way to

18   recycle lead… We have also seen progress in the production of high purity AquaRefined lead and,

19   during the quarter, we made initial shipments of this material to Johnson Controls."  This confirms the

20   Defendants' Class Period statements regarding the commercialization of the process were false.

21          (k)    In an October 12, 2018 press release, the Company stated, "We have also made

22   considerable progress increasing the daily utilization and hourly production rate of or AquaRefining

23   process to near steady state levels while delivering what we believe to be the purest lead produced in

24   America. ***We have achieved production levels*** of 100 kg per hour on individual modules operating

25   20+ hours per day, ***resulting in daily production of 2+ metric tons of AquaRefined lead per day*** on

26   those individual modules…. We are ***currently operating one module at a time***."  This confirms the

27   Defendants' Class Period statements regarding the modules continually running and the production of

28   AquaRefined lead were false.

(l)     On April 29, 2019, the Company announced in a press release titled "Aqua Metals Achieves 24/7 Production on Modules One through Four and Weekly Production Records as Scaling Process Continues" that Aqua Metals completed an "electrical power upgrade that included installation of an additional transformer and electrical infrastructure to ensure all the equipment installed in both phases of the electrolyte recovery projects have the necessary power for operation," thereby corroborating CW 1's statements that Aqua Metals could not calibrate the correct voltage necessary for the Reno Plant to operate during the Class Period. *See* ¶ 65.

### 2.     Investors Express Serious Doubts About The Company's Statements And Leadership

289.     Following the Company's end of Class Period disclosures, investors lost confidence in Aqua Metals' management, with some even expressing concerns about being misled.

290.     On October 24, 2017, Tailwinds, which had been an early supporter of Aqua Metals, noted, "I know several people who bought this on the IPO, and continually added to their positions, who are now selling shares.  They believe that they have been deceived (lied to?) by management and don't want to stick around any longer."   Tailwinds further stated, "[b]asically, everything [Aqua Metals]  ha[s] said has been erroneous for various reasons" and that "Clarke is the 'boy who cried wolf', saying that things are on track for the umpteenth time, yet pushing back guidance simultaneously and giving investors zero confidence that anything he says will come to fruition." The author further noted that "I can understand delays in building a facility.  I can't however, understand how a facility can be built based upon a process that is still undetermined.  Wouldn't you think that the optimal operational parameters would be discovered in a lab prior to installation? And, how can you have 'certain conditions' in a controlled warehouse environment? I see this and get very scared."

291.     On November 10, 2017, H.C. Wainwright & Co., who had previously reported "after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18," issued a report "pushing out our assumptions and all related expectations by a period of 12-18 months" and significantly lowering their price target by 64%.  The report noted delays in setting up and scaling operations, a "lack of visibility on cadence of capacity utilization at the facility" and a "lack of clarity" about when the Company

would start selling AquaRefined lead ingots as no timeline was given.  The report further noted the "severe decline in the stock over the last 12 months due to heightened expectations put in place around scaling and utilization levels at the outset."

292.    On December 11, 2017, Tailwinds lamented that "the days of excitement around AQMS are clearly over" and shared its skepticism "of the Company's ability to execute in a timely manner, as well as the veracity of the CEO …."  Tailwinds stated that the "questions now center around whether or not the technology will ever work."

### 3.    Key Management "Resign"

293.    Since the end of the Class Period, Aqua Metals has undergone substantial changes to its management, including the abrupt "resignation" of its co-founder Clarke, the replacement of Murphy as CFO, the resignation of Mould, and the expansion of the Board.  Several of these changes occurred after a series of efforts by Kanen Wealth Management, LLC ("Kanen") to obtain changes to Aqua Metals' corporate governance practices, management and the Board.[10]

294.    On March 5, 2018, the Company issued a press release titled, "Aqua Metals Announces Change to Executive Management Team" announcing that Weinswig, who had only been at the Company since August 2017, had resigned as CFO.

295.    According to an April 11, 2018 preliminary proxy statement, on March 6, 2018, Kanen purportedly reached out to Aqua Metals' CEO Clarke and CFO Murphy to discuss transitioning CEO Clarke out of this role as CEO.  It further states that "Mr. Kanen mentioned Stephen Cotton, the Company's former CCO, as a potential successor to Dr. Clarke, and Dr. Clarke abruptly hung up on Mr. Kanen."

296.    The preliminary proxy statement filed on April 3, 2018 (the "Proxy") described additional discussions Mr. Kanen had with Aqua Metals in March 2018 regarding the Company's Board and management:

---

[10] On February 22, 2018, Kanen filed an initial statement on Schedule 13D with the SEC disclosing that Kanen and its affiliates had a beneficial ownership of approximately 6.5% of the Company's outstanding shares and that it intended to weigh in on Aqua Metals' operations, strategy, management and Board to maximize shareholder value. Since then, Kanen has filed additional Schedule 13Ds regarding changes in its beneficial ownership.

On March 7 and 8, 2018, Mr. Kanen telephoned Vincent L.  DiVito, one of our independent directors, to introduce himself and describe his views regarding the composition of the Board and of the Company's management team.  Mr. Kanen offered his beliefs, among other things, (i) that Mr. Clarke should not continue in his current capacity as the Company's President, Chief Executive Officer and Chairman, (ii) Mr. Kanen's views concerning a successor Chief Executive Officer and Mr. Kanen should be involved in a formal search process to identify Mr. Clarke's successor, and (iii) that the compensation of the Company's directors should be reduced.  Mr. Kanen also threatened that he was intending to nominate and seek the election of three insurgent directors to obtain control of the Board at the Annual Meeting.

On March 22, 2018, Mr. DiVito and Mark Slade, another of our independent directors, had a telephone conversation with Mr. Kanen, during which they discussed matters related to Kanen's threatened director nominations, including Kanen's views regarding the composition and compensation of the Board and the Company's management team.  During that conversation, Messrs.  DiVito and Slade discussed with Mr. Kanen the financial and operational challenges facing the Company and inquired whether Kanen had any specific views on how to accelerate the commercialization of the Company's AquaRefining™ technology, achieve full-scale operation and maximize profitability.  Mr. Kanen indicated that he was not prepared to discuss any specific business plan for the Company at that time, other than the plan to seek to take control of the Board and make changes to the senior management team.

On March 23, 2018, Kanen delivered to the Company a formal notice nominating its four insurgent director candidates for election to the Board at the Annual Meeting in opposition to the Board's director nominees.[11]  The Company's outside counsel acknowledged in a communication to Kanen's outside counsel receipt of such notice of nomination on behalf of the Company.  On the same day, Kanen filed with the SEC an amendment to its Schedule 13D, on behalf of Kanen, certain of its affiliates and its four insurgent director nominees as a "group" for the purposes of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (which we refer to as the "Exchange Act"), disclosing the delivery of its notice of nomination to the Company.

297.  On March 26, 2018, Kanen issued a press release titled, "Kanen Nominates Slate of 4 Highly Qualified Director Candidates for Election at Aqua Metals' 2018 Annual Meeting," explaining that "[w]e are incredibly disappointed by the prolonged and severe underperformance that has plagued Aqua Metals.  The Company's stock price has precipitously declined by more than 85% in the past year alone.… Forty percent of the Company's Board is composed of non-independent, management co-founders.  We have lost confidence in their ability to enhance or maximize stockholder value."

---

[11] According to Kanen, "The Reporting Persons believe that substantial change is required to the composition of the Issuer's Board to ensure that the best interests of shareholders are paramount in the board room."

1    Ultimately, a drawn out proxy fight was avoided when, on May 2, 2018, Kanen and Aqua Metals

2    reached an agreement to expand the Board to six.

3        298.   On March 27, 2018, Aqua Metals issued a press release titled "Aqua Metals Inc.

4    Announces Plans for CEO Succession and Process for Board Refreshment," announcing its plans to

5    transition CEO Clarke from his current position as President, CEO and Chairman of the Board.

6    According to the press release, these plans had been in the works since late 2017, unbeknownst to

7    investors.  At that time, Aqua Metals purportedly engaged an "executive search firm and corporate

8    governance consultant for advice and assistance on Board compositional matters and corporate

9    governance best practices.   In February 2018, Aqua Metals authorized such firm to conduct a

10   comprehensive search for a successor CEO …."  In a Form 8-K filed with the SEC on April 2, 2018,

11   the Company announced that on March 27 and 28, 2018, Clarke and Mould, respectively, informed the

12   Company that they declined to stand for re-election as directors at the 2018 Annual Meeting of

13   stockholders.

14       299.   On April 12, 2018, the Company announced in a press release titled "Aqua Metals

15   Announces Changes to Executive Management Team" that interim-CFO Murphy would be replaced

16   by Frank Knuettel II ("Knuettel"), which would take effect on April 16, 2018.  Knuettel would assume

17   CFO responsibilities after the Form 10-Q for second quarter of 2018 ("Q2 2018) with the SEC ("Q2

18   2018 Form 10-Q") was filed.  Knuettel would only serve as CFO for a few months until leaving the

19   Company in August 2018 and was eventually replaced by Judd Merrill on November 6, 2018.

20       300.   On April 23, 2018, the Company announced in a press release titled "Aqua Metals

21   Announces Executive Management Succession and Board Enhancement" that enhancements to the

22   structure of its corporate governance and the resignation of CEO Clarke.  On June 26, 2018, the

23   Company announced in a press release titled "Aqua Metals Issues Letter from Board" that it had

24   decided to defer the search for a new CEO and has asked Steve Cotton to lead the Company for the

25   time being.  On January 7, 2019, the Company announced that Cotton was formally appointed CEO.

26       301.   On June 28, 2018, the Company announced in a Form 8-K filed with the SEC that

27   Interstate Batteries had agreed to waive all payments under the key-man provisions in its prior

28   agreements with Aqua Metals with respect to the resignation of CEO Clarke.

302.    On December 6, 2018, the Company announced that COO Mould resigned from the Company.

### 4.    The "Strategic Partnership" With Johnson Controls Is Stalled Pending Development Of The AquaRefining Process

303.    It appears that Aqua Metals has not been able deliver on any of the promises it made to Johnson Controls because its AquaRefining modules and technology do not work.  During the Class Period, Aqua Metals touted its relationship with Johnson Controls as a "tremendous step forward," which would allow Aqua Metals to license its AquaRefining technology to a global leader in the industry and build additional AquaRefineries.  In April 2017, Aqua Metals announced that, through its deal with Johnson Controls, it planned to install AquaRefining in a to-be-named smelter site in 2018.  Several months later, in September 2017, the Company continued to make it appear that progress was being made with Johnson Controls regarding retrofitting a Johnson Controls' facility with AquaRefining technology and entering into a licensing agreement.

304.    However, by April 2018, Aqua Metals and Johnson Controls were no closer to rolling out a licensing program or retrofitting a facility with AquaRefining technology than they had been seven months before.  In an April 26, 2018 Press Release, the Company disclosed that Aqua Metals and Johnson Controls needed to postpone the deadline to conclude discussions and enter into a development program agreement regarding these agreements for another year, giving the parties until 2019.  In the April 26, 2018 Press Release, Mould stated that "[w]e appreciate Johnson Control's flexibility in this matter," indicating that it was Aqua Metals, and not Johnson Controls, that needed the additional time.

305.    In June 2019, having still not entered into an agreement regarding these items, Aqua Metals and Johnson Controls further pushed out the deadline to no later than the 90th day following Aqua Metals' "satisfaction of certain performance criteria."   The parties further agreed that the equipment supply agreement (the "partnership" Aqua Metals highly touted that the parties announced on February 7, 2017) may be terminated by either party upon 60 days' prior written notice if the parties have not entered into the development program agreement by June 30, 2021.

306.    To date, Aqua Metals and Johnson Controls have still not entered into a development program agreement.   Indeed, until Aqua Metals can commercially produce AquaRefined lead, its purported partnership with Johnson Controls is meaningless.

## VI.   DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD BY STAGING "DOG AND PONY" SHOWS IN VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(A) & (C).

307.    As the previous allegations illustrate, Defendants orchestrated, participated in and led on-site sham demonstrations for analysts, investors, potential business partners, potential licensees and others during the Class Period.   They then touted those visits with the purpose and effect of reassuring the market that the AquaRefining technology and the Reno Plant were operational, producing AquaRefined lead and scaling up.   *See, e.g.,* ¶¶ 76, 83-85, 92, 105-108, 225, 238, 243-244, 255, 257, 269.

308.    In reality, as detailed by CWs, during the Class Period, the AquaRefining technology (i) could not function for any length of time; (ii) was still in the R&D stage; (iii) was plagued with severe unresolved problems, including those which had existed and persisted since 2015, such as the "sticky lead" and "hard lead" issues; (iv) the Reno Plant and the critical modules were barely operating and routinely broke down; (v) little to no AquaRefined lead had been produced; and (vi) the process was not scalable or ready to be commercialized.   ¶¶ 61-75, 78-83, 86-87, 89-90, 93, 95-104, 107, 110-117.   These issues are further evidenced by the Company's end of and post-Class Period admissions.   *See e.g.,* ¶¶ 261, 277-278, 282, 286, 288.

309.    While the sham visits began prior to the first day of the Class Period, on May 19, 2019, Defendant Clarke explained that third-party visits to the Alameda facility, which contained "a new full-sized electrolyzed test facility," would purportedly "allow[] [Aqua Metals] to demonstrate [its] process to third-party licenses without having to take into Reno [*sic*] to show the process there."[12] According to CW 1, these visits occurred throughout CW 1's tenure at the Company and visitors included representatives from Interstate Batteries, Johnson Controls and Oppenheimer.   ¶76.   In July of 2016, Defendants similarly held tours at the opening day of the Reno Plant, "which was attended by

---

[12] May 19, 2016 Press Release.   Defendant Murphy was identified as the "Company Contact."

over 200 people, including investors, strategic partners, industry participants, key employees and government officials."[13]   The tours purportedly "highlighted the installed equipment and processing lines."[14]   These tours continued on a regular basis after opening day and were attended by investors such as Interstate Batteries and Johnson Controls.  ¶¶ 84, 92, 108, 120.

310.   These sham tours and facility visits were used by Aqua Metals to generate interest from third parties, including the Interstate Batteries and Johnson Controls, which Defendants touted as evidence that AquaRefining worked.  For example, during the August 10, 2016 Q2 2016 Conference Call, Defendant Clarke boasted that not a single company that visited the Reno Plant on opening day was able to find a problem with the process, thus validating AquaRefining:

> So, the last couple of points, the battery industry, I mentioned earlier a vast majority of the North American lead-acid battery industry has been on site now. It seemed what we've got the overwhelming response is wow, you guys really thought this through. Yet, yet – and we ticked all the boxes and even some companies have visited the site, wanting to find a problem and went away smiling and shaking our hands. So, basically, there is a real alternative to smelting.

311.   That same day, Aqua Metals issued a Press Release commenting on the level of interest that was generated as a result of the tours: "A substantial majority of U.S. battery producers have visited our facility and expressed interest in AquaRefining. . . .[t]he tour . . . enabl[ed] discussions with key personnel about how the production facility and the supply chain will proceed."

312.   In the November 7, 2016 Press Release, Defendant Clarke reaffirmed that third-party interest in AquaRefining was a result of the facility tours, stating:

> We have also accelerated discussions with U.S. based lead-acid battery manufacturers and distributors, who collectively represent a substantial majority of the U.S. battery industry. Most have already visited our facility and expressed interest in our products and technology. We are now sending our initial production samples to these companies, to allow them to conduct their own assays.

313.   While the Company started these visits for potential business partners and others at the Alameda facility and Reno Plant prior to 2017 (¶¶ 76, 145, 153, 156, 166), this fraudulent scheme

---

[13] August 10, 2016 Q2 2016 Press Release.  Defendant Murphy was identified as the "Company Contact."

[14] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy were participants on this call.

1    burgeoned when, on April 20, 2017, a short seller issued its report on SeekingAlpha.com titled "Aqua

2    Metals: As Toxic As The Lead It Claims To Recycle."  As described in ¶¶ 217-219, the report called

3    the process into doubt and asserted that the "Company is actually in the business of telling tall tales…

4    AQMS is unlikely to ever be commercially viable."

5        314.    In response to this report, the Company announced in the April 24, 2017 Press Release

6    that it would arrange on-site visits for analysts and investors to see the AquaRefining operations at the

7    Reno Plant.  Clarke stated: "We believe the best way to address this misinformation is to ***openly show***

8    ***analysts and investors our facility in operation as we continue to scale it up***."  He reiterated that the

9    Company "remains focused on our ***primary goal – to scale commercial operations at the first***

10   ***AquaRefinery to 120 metric tons per day by the end of the year, and to expand operations through***

11   ***our strategic relationships***."

12       315.    Thereafter, in the spring and summer of 2017, Defendants hosted a number of analysts

13   and investors for on-site visits.  Indeed, as CW 2, CW 3, CW 4 and CW 5 relayed, visits with

14   investors were happening on a regular basis – about four or five times over a period of four or five

15   months according to CW 4.

16       316.    For example, on May 31, 2017, the Company held its First Analyst Visitor Day.  In

17   Aqua Metal's May 31, 2017 Press Release, defendants touted that analysts purportedly observed every

18   aspect of the AquaRefining process:

19       The analysts were given a tour of AquaRefinery 1, located in the Tahoe-Reno Industrial
         Complex (TRIC), led by Aqua Metals' executive management team.  Analysts were able
20       to view the critical processes at the AquaRefinery as they happened, including: battery
         feedstock deliveries; battery breaking and separation; desulfurization and pre-
21       AquaRefining digestion processes; AquaRefining on simultaneously running
         AquaRefining modules; and shipments of lead products to customers.
22

23       317.    Clarke further stated in the May 31, 2017 Press Release that "[t]his was [a] valuable

24   opportunity to open our doors to the analyst community, providing a behind-the-scenes look at our

25   process"  and that the "***Company expects all the analysts who attended the visitor day to update their***

26   ***coverage reports to reflect findings from the site visit in the coming days***."

27       319.    Then, on August 2, 2017, Aqua Metals held what it touted as its First Investor Day.  In

28   its August 2, 2017 Press Release, Defendants touted that this event allowed investors "to view the full

production process at the AquaRefinery as it happened, including battery breaking and separation, desulfurization, electrolyte production, and AquaRefining on four simultaneously running AquaRefining modules," consistent with Aqua Metals' "belief in transparency."

320.    In the August 9, 2017 Q2 2017 Press Release, Defendants further touted that the Company "successfully hosted several invitational investor and analyst days at AquaRefinery I in late May and early August.   These events showcased the production process at the AquaRefinery, including battery feedstock deliveries, battery breaking and separation, desulfurization and pre-AquaRefining digestion processes and AquaRefining on four running AquaRefining modules."

321.    During the Q2 2017 Conference Call, Clarke again, dispelled the short-seller allegations that the AquaRefining process did not work, reiterating that:

> One of the other strands was that AquaRefining just doesn't work. ***Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work***.

322.    During the Q2 2017 Conference Call, Murphy also touted that the site visits had resulted in Aqua Metals receiving licensees and a heightened level of interest in the Company's AquaRefining process:

> The additional licensees coming from battery companies and lead companies, we see it as – the level of interest on multiple site visits and observing processes in operation and thinking around how they would integrate into their existing facilities where they have their own in-house recycling, or whether they are – if they are lead company or how would they go about building a facility if they are currently outsourcing to a third-party for battery recycling, and discussions around do they want to start off with a standalone AquaRefining facility or do they we want to go a hybrid route.

323.    Unbeknownst to analysts and investors, however, these site visits were a complete sham, consisting of staged operations designed to make the technology, modules and Reno Plant appear as though they were fully operational and commercially producing AquaRefined lead, which they were not.  As the CWs explained, these sham visits were commonly referred to as "dog and pony" shows by Company insiders (¶¶ 76, 84, 106) because, as CW 4 described, they were a "gyp." ¶ 106.  CW 2 described the investor visits to the Reno Plant as events where management ensured that the faulty modules would run for investors.  ¶¶ 83-85.

324.   As CWs explained, to conceal these problems and create the appearance that AquaRefining was working, operating, producing lead and scaling up, Defendants carefully orchestrated these visits and provided clear instructions to employees on how to orchestrate sham demonstrations.   *See* ¶¶ 83-87, 92, 104-109.

325.   Specifically, according to CW 2, Clarke directed that employees "don't run the machines until [the visitors] show up." ¶ 83.  Thus, as CW 2 explained, they "only ran the machines when investors came to the plant."   ¶ 83.  According to CW 3 and CW 4, plant employees would be alerted a day or two before the visits and CW 3 noted that it was his job to make sure that the area was clean and that the "machinery kept running" during the visits. ¶¶ 92, 105. CW 4 recounted that whenever a group came in for a visit "we had to prep the [factory] floor, clean the floors, turn on the lights, and start running the equipment and modules."   ¶ 109.  CW 4 said that a few days before the visit, employees would be reminded to "clean [the plant] up really nice" and would also be informed of the logistics of the demonstration.  ¶ 105.  CW 4 explained that essentially this meant confirming the timing of the run to make sure that the modules were still operating while the investors were in the Reno Plant.  ¶ 105.  Then, according to CW 2, on the day of a visit, floor employees would get a call from plant management to start the machines and, about five minutes later, the visitors would come to the plant.  ¶ 85.  As CW 2 noted, employees were told that Clarke wanted them to "stage everything up" and were told to "make yourself look busy."   ¶ 83.  CW 4 said, because the module could not operate for more than about an hour before it would break down, CW 4 had to start it at a time where it would run during the investors' visit and not break down.  ¶ 107.

326.   CW 4 said investors would meet with Clarke and Mould in the conference room at the Reno Plant while CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation "assembled a team to stage a show."  ¶ 107.  The team included some key people, including a project manager and some people from the maintenance department as well as a program engineer, to assist in restarting the process if anything shut down.  ¶ 107.

327.   CW 4 further relayed that Clarke would leave his meetings with investors and come out to the floor first to ensure everything was running properly before a demonstration started.  ¶ 109. CW 4 said the visitors would spend about five to ten minutes on the plant floor watching the

demonstration, and the rest of the time they were in a conference room with Clarke and Mould.  ¶ 107. CW 2 also confirmed that the visitors were only on the plant floor for about five to ten minutes watching the machines run.  ¶ 85.  Then, once the investors left, CW 2 explained that the plant employees would clean up.  ¶ 83.

328.    Moreover, as part of this scheme, Defendants also **expressly prompted** analysts and others to issue reports to the market describing the visits on several occasions, including in the May 31, 2017 Press Release and during the Q2 2017 Conference Call, as alleged above ¶¶ 238, 245, 269, 317, 321.

329.    Thus, that the purpose of these visits was to deceive visitors was clear – Defendants repeatedly touted to the market that these visits were designed to, and did, convince visitors into believing that AquaRefining was working and scaling up and that both the technology and the Reno Plant were operating, when, in fact, none of that was true.

330.    The Defendants' sham presentations achieved the desired effect, as evidenced from analysts and investors who toured the Reno Plant and reported on the visits.   Indeed, as prompted, analysts who visited the Reno Plant during that time issued favorable reports stating they observed the full AquaRefining process in operation, including the production of AquaRefined lead as alleged in further detail above:

- On June 1, 2017, Oppenheimer reported "seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process **all up and operational**… **Our visit suggests the company is tracking those estimates well**… We **observed six semi truckloads of material** delivered and taken away during our four-hour visit.  We saw spent batteries loaded into the recycling line and being processed **with fully recycled lead coming out of the end of the process flow**."

- On June 1, 2017, National Securities Corporation that the site visits are "**incrementally positive for transparency** and for the sentiment on the shares . . . . The Reno facility is ramping up, **on track for 120 tonnes by year end**:  On our facility tour we observed that **3 Aqua refining modules were up and running and producing recycled lead** . . . .We believe that the company is **on track for all sixteen modules to be up and running by the end of 2017** . . . .

  **Lead is being produced and revenues are being generated** – Given that Aqua Metals did not report any revenues in the March quarter, we view that fact that **we observed** trucks delivering used batteries for off-loading and recycling, and more importantly, **finished recycled lead packaged and ready to be shipped out** as

highly encouraging.  ***Given the amount of lead produced and our belief of what has already been sold***, coupled with the throughput of the current modules for the month of June, we believe that our revenue estimate for the June quarter of $2 million is achievable."

- On June 5, 2017,  Euro Pacific Capital reported that, "During our visit, ***we saw the entire process of lead production*** starting from the feedstock/ lead acid batteries being loaded on the conveyor belt moving into the battery breaker system to the AquaRefining preparation process (desulphurization process) and to the AquaRefining modules, where the end product (AquaRefined lead) comes out at the end of the process....***it should be able to produce guided quantities of lead by the end of this year***...."  (¶ 256). Following the June 5, 2017 report, the price per share of Aqua Metals increased $0.61, or roughly 5%, from a close of $12.13 on June 5, 2017, to a close of $12.74 on June 6, 2017, on heavy volume of 1,267,400 shares traded.

- On August 14, 2017, H.C. Wainwright & Co. reported that "We observed: . . . ***four modules were operational, producing recycled lead paste…after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18***."

331.    After the investor day, several attendees commented, including one investor whose comment that Aqua Metals had "expertise perfecting" the process, was adopted in Aqua Metal's August 2, 2017 Press Release:

Quoting Longboard Capital Advisors: "Our Aqua Metals plant tour ***was a real eye opener***.  The team has put in countless hours and ***expertise perfecting*** the first closed loop non-polluting lead refining process. ***This is my third time visiting the plant*** and I'm very impressed with the accelerating progress in the commissioning process."

332.    Defendants never corrected any analysts' statements.  To the contrary, as alleged in ¶¶ 260, 269 above, defendants touted the visits as a success – even after these reports.

333.    Lest there be any doubt that Defendants did, in fact, create a false appearance regarding the status of AquaRefining, once the truth about the AquaRefining process and the Reno Plant was disclosed, analysts and investors alike lamented the lack of clarity and felt that they had been deceived as alleged in Section V.G.2., above.

334.    In addition to orchestrating the scheme, each of the individual defendants engaged in several deceptive and manipulative acts in furtherance of the scheme.  For example, Clarke orchestrated, participated in and led the sham site visits, touted the visits to the market and invited analysts to report on them. *See, e.g.,* ¶¶ 35, 76, 83, 105-107, 109, 120, 225, 238, 243-244, 255, 257,

269.  Likewise, Mould orchestrated, participated in and led the sham site visits.  *See, e.g.,* ¶¶ 37, 76, 105-107, 120, 243, 255, 259.  Specifically, CW 3, who witnessed investors touring the plant and operated the machinery during the visits, stated that Clarke, Mould and the plant director escorted the visitors and Clarke and Mould "ran the show."  CW 5 also confirmed that the visitors were shown around by Mould, Clarke and the plant manager.  Murphy also led the sham site visits and touted them to the market.  *See, e.g.,* ¶¶ 31, 105, 243, 255, 268, 270.

335.  These acts were taken with the proper scienter as outlined in Section VIII, below.  Accordingly, Defendants are liable under Rule 10b-5(a) and (c).

## VII.  DEFENDANTS' MATERIAL MISREPRESENTATIONS

336.  Throughout the Class Period, Defendants coupled their sham "dog and pony" shows with false and misleading statements regarding milestones actually achieved, the significance of these dog and pony shows, the meaning of certain "strategic partnerships" and the status of Aqua Metals' licensing, expansion and lead production rates.  In so doing, Defendants are also liable to Class members under Rule 10b-5(b) for falsely portraying the then-existing facts regarding the success, capability and operations of the AquaRefining technology and the Reno Plant.

337.  Defendants were prolific in terms of both the volume and the scope of their misrepresentations during the Class Period, issuing false and misleading statements about present facts as well as utterly unsupportable forecasts that were both embedded within statements of fact and constituted unprotected projections that Defendants knew were unattainable.  Given the volume of the misrepresentations, Lead Plaintiff focuses on only certain categories of statements.

### A.  Defendants Issued False And Misleading Statements That Aqua Metals Had Achieved Certain Specific Key Milestones When It Had Not, All Of Which Are Actionable Affirmative Statements Of Fact

#### 1.  Defendants Misled Investors With Affirmative Statements That AquaRefining Had Been Successfully Tested And Proven

338.  Throughout the Class Period, Defendants touted that AquaRefining had achieved certain milestones because it had been both successfully tested and proven through all stages of the commissioning process into commercial production.

339.   The following are a series of false and misleading statements that Aqua Metals had successfully tested and proven that the technology worked at the California Testing Facilities and during the commissioning stage at the Reno Plant and could produce 99.99% pure lead:[15]

- Between May 19, 2016 and November 2016 (and beyond), defendants routinely reported that: "**the testing of our AquaRefining process has been successful to date**…. As of the date of this report, we have built and operated both a small-scale unit of our AquaRefining process and a full size production prototype."[16]

- With respect to the type of testing accomplished between May and August 2016, defendants also stated that, "[t]hrough the operations of such units [the small-scale unit and the full size production type], **we have successfully produced 99.99% pure lead on a limited scale…. [W]e believe that our development and testing to date has proven the concept of our AquaRefining process**…."[17]

- Then, in the Q3 2016 Form 10-Q and the Prospectus, Defendants touted that its success stemmed from the additional milestone of having successfully tested a full-sized AquaRefining module at the Reno facility: "**the testing of our AquaRefining process has been successful to date**, … As of the date of this report, we have built and operated both a small-scale unit of our AquaRefining process and a [full size/full-size] production prototype. **In addition, on October 28, 2016, we commenced limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module….. [W]e believe that our development, testing and limited production to date has proven the concept of our AquaRefining process**…."[18]

- In its Q3 2016 Form 10-Q, Defendants confirmed: "**On October 28, 2017, we commenced limited lead-producing operations at our TRIC facility through the processing of recycled lead through a single AquaRefining Module. Through our own on-site assay, the Company has verified that the lead produced in the AquaRefining module is over 99.99 percent pure**."[19]

---

[15] **Bolded** and <u>underlined</u> quoted statements are alleged to be false and misleading, while other statements are provided for context. While knowingly unsupportable projections of upcoming milestones were also interlaced throughout Defendants' statements, Lead Plaintiff focuses only on the statements of present facts here.

[16] May 19, 2016 Q1 2016 Form 10-Q; August 10, 2016 Q2 2016 Form 10-Q; March 2, 2017 Form 10-K. Each of these documents was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[17] May 19, 2016 Q1 2016 Form 10-Q; August 10, 2016 Q2 2016 Form 10-Q.

[18] November 15, 2016 Prospectus; November 7, 2016 Q3 2016 Form 10-Q. The November 7, 2016 Q3 2016 Form 10-Q was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[19] November 7, 2016 Q3 2016 Form 10-Q.

- In the Prospectus, Defendants also repeated that: "**We have tested our AquaRefining process on a small scale, and on October 28, 2016 we commenced limited production of recycled lead at our TRIC facility**…."[20]

340.    The bolded and underlined statements in ¶ 339, that the Company had successfully tested and proven that the AquaRefining process worked at these phases at the California Testing Facilities and during the commissioning process at the Reno Plant and was commencing limited lead production, were affirmative statements of present fact that were materially false and misleading when made because AquaRefining had not been successfully tested or proven at any stage during the Class Period.

341.    These misstatements were material because a reasonable investor would consider the fact that the Company had not successfully tested or proven that the AquaRefining process worked at these stages to be important because that meant that the Company had not, as of yet, developed its "core" AquaRefining technology and, as such, it was still a concept that was in the R&D phase, not a proven technology.

342.    The truth that Defendants had never achieved the milestone of successfully testing or proving that the AquaRefining process worked at these stages is evidenced by the following CW statements:

(i)    statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems, including issues with chemical ratios, the hard lead issue and the sticky lead issue, that persisted throughout the Class Period and into 2017 and were not resolved (¶¶ 63-75);

(ii)    statements by CW 1 that what was fed into the machines in the California Testing Facilities was "virgin" or "lab" lead and was, thus, already much purer than the used battery lead that is intended to go through the equipment and that, once used battery lead is fed in, the issues would get worse (¶¶ 66, 70, 73-74);

(iii)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(iv)    CW1's statement that the technology "didn't translate in the factory" (¶ 70);

---

[20] November 15, 2016 Prospectus.

(v)      statements by CW 1 that it was known, including by Clarke and Mould that, as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(vi)     CW1's statement that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶ 63-64, 71); CW1 further noted that Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(vii)    statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(viii)   statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

(ix)     CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72); and

(x)      statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

343.    The truth that Defendants had never successfully tested or proven that the AquaRefining process worked at these stages is further demonstrated by the Company's own later admissions, which concede the very problems that the CWs state existed prior to and throughout the Class Period:

(i)      the Company's admission at the end of and after the Class Period that the AquaRefining process was plagued with the on-going sticky lead problems and that the Company needed to find a solution to such problems and then test the solution.  Indeed, in March 15, 2018, it announced that it needed to retrofit its modules to solve the problems (¶¶ 278, 286, 288); and

(ii)     the Company's admissions at the end of and after the Class Period that the AquaRefining process was "unproven technology" (¶¶ 282, 288).

344.    Significantly, when questioned as to whether there were any problems that might impede the success of AquaRefining as operations ramp up in May and August 2016, Defendants denied the existence of any existing problems:

- Colin Rusch, Analyst from Oppenheimer: "Okay. And when do you expect the first startup to happen in the first test runs?"

  Defendant Clarke: "Well, some of them have already been completed. So, there isn't a first test run. It's a continuing operation. So, in one sense, we've already done it. In the sense of when will the first modules be running in their base in Reno, we're projecting late July, maybe early August. .... **There's little risk associated with the actual AquaRefinery themselves**. The important point is just the scale of the operation."[21]

- Colin Rusch, Analyst from Oppenheimer: "Yeah. That sounds great. And then, just in terms of the [] – that's to do as to get up and running, which piece are you guys most concerned about or pieces that, as you turn on, this equipment may have some hiccups along the way?"

  Defendant Clarke: "So, if I – everything that we think we might have a problem with, we've got contingency plans in place for. **So, I don't have a single thing that we're worried about.** It's really about the commissioning process itself."[22]

- Clarke repeating Analyst Question: "Then, the final question, is there any concern that the modules will encounter problems when employed on a mass scale? Have you done any testing?"

  Defendant Clarke: "But we have been operating a single full scale electrolyzer for 12 months now. That was pre-production prototype. Then, nearly four months ago now, we took a single electrolyzer off the production line and installed in our full scale test facility and have been operating that ever since. **And we don't anticipate any issues operating at full scale**. Full scale is just essentially 96 of the same thing."[23]

345.   The bolded and underlined statements in ¶ 344 representing that there were no existing problems in Aqua Metal's testing and operations and, thus, Defendants had no concerns about scaling up were affirmative statements of present fact that were materially false and misleading when made because the AquaRefining process was plagued with problems, including issues with chemical ratios, hard lead, sticky lead, the routine breaking down of the breaker and the failure of the modules to operate for more than a few hours at best before breaking down.

---

[21] May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy were participants on this call.

[22] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy were participants on this call.

[23] August 10, 2016 Q2 2016 Conference Call.

346.     These misstatements were material because, as evidenced by the question posed by the analyst, a reasonable investor would consider important the fact that the AquaRefining process was plagued by problems that were expected to persist and become worse at the Reno Plant meant the testing to date had not been successful, that the Company had not, as of yet, developed its "core" AquaRefining technology and there were myriad issues to be concerned about at the Reno Plant.

347.     The truth that these problems existed during this period are as demonstrated by:

(i)     statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017and were not resolved (¶¶ 63-75);

(ii)     statements by CW 1 that it was known, including by Clarke and Mould, that as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)     CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iv)     CW1's statement that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶64, 71); CW1 further noted that Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(v)     statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(vi)     statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(vii)     CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72);

(viii)     statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72); and

(iv)     statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

348.    The truth that these problems existed during this period as explained by the CWs is collaborated by the fact that the Company admitted to these same problems at the end of the Class Period:

(i)    the Company's admission at the end of and after the Class Period that the AquaRefining process was plagued with the on-going sticky lead problems and that the Company needed to find a solution to such problems and then test the solution, including its March 15, 2018 announcement that it needed to retrofit its modules to solve the problems (¶¶ 278, 286, 288);

(ii)    the company's end of Class Period admission that it had not yet solved the problem that operators needed to assist the lead removal during the commission process (¶¶ 278, 286); and

(iii)    the Company's admission at end of and after the Class Period that the AquaRefining process was "unproven technology" (¶¶ 282, 288).

**2.    Starting In November 2016, Defendants Misled Investors With Affirmative Statements That The Company's AquaRefining Technology Was Producing Ultra-Pure Lead At The Reno Plant That Was "Flowing Like A Waterfall", That It Had Completed The Commissioning Phase And Was Commencing The Transition To Commercial Operations**

349.    In November 2016, Aqua Metals announced having achieved another key milestone - its commissioning activities at the Reno Plant had transitioned into lead production with its "first-ever AquaRefined Lead" that was "flowing like a waterfall" and being cast into ingots.  Aqua Metals provided photographs allegedly capturing this achievement, several of which images Defendants continued to tout throughout the Class Period.

350.    The following are Defendants' false and misleading statements of present fact as well as visuals misrepresenting that Aqua Metals had achieved the critical milestone of producing 99.99% pure lead through the AquaRefining process and that AquaRefined lead was "flowing like a waterfall" at the Reno Plant, which Aqua Metals used for "its first casted ingot" during the commissioning phase, and that Aqua Metals was transitioning to commercial production:

- In its November 1, 2016 Press Release, Defendants touted: "Aqua Metals (NASDAQ:AQMS) today announced that **it has produced the first-ever AquaRefined lead at its flagship AquaRefinery in McCarran, Nevada**."[24]

- Defendants provided photos purporting to capture this, including photos with the titles "AquaRefining module with six electrolyzer units **continuously producing AquaRefined pure lead, flowing like a waterfall of lead infused electrolytes**," "**first casted ingot**" and "Close up of **first casted ingot**:"[25]



AquaRefining module with six electrolyzer units

continuously producing AquaRefined pure lead, flowing

like a waterfall of lead infused electrolytes

---

[24] November 1, 2016 Press Release, Exhibit 99.1 to Form 8-K. The Form 8-K was signed by Defendant Clarke.

[25] November 1, 2016 Press Release, *available at* Aqua Metals' website, https://ir.aquametals.com/press-releases/detail/70/aqua-metals-produces-first-aquarefined-lead-at-worlds and Global News Wire's website, https://www.globenewswire.com/news-release/2016/11/01/885160/0/en/Aqua-Metals-Produces-First-AquaRefined-Lead-at-World-s-First-AquaRefinery.html. Some of these, and similar, images also appeared in the November 7, 2016 Slide Presentation (Ex. 99.2 to Form 8-K, Defendant Clarke signed the Form 8-K) and the February 14, 2017 Slide Presentation (Ex. 99.2 to Form 8-K, Defendant Clarke signed the Form 8-K); the June 2017 Corporate Presentation. *See also* November 7, 2016 Q3 2016 Conference Call (Defendants Clarke and Murphy participated on the call); February 14, 2017 FY 2016 Conference Call (Defendants Clarke and Murphy were participants on the call).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Conveyer belt carries pure lead to ingot casting area



The first casted ingot



Closeup of the first casted ingot

- Clarke expressly described this achievement of "producing the first-ever AquaRefined lead at its flagship AquaRefinery" as: "**This is a major milestone - not just for our company, but for the entire industry,**" . . . **I am extremely proud of our entire team for making this dream a reality**."[26]

- The Press release continued: "AquaRefining uses an entirely reusable water-based technology to **produce ingots of ultrapure lead**. Through its own on-site assay, **Aqua Metals has verified that the lead produced in the AquaRefining module is over 99.99 percent pure**."[27]

- The Press release continued: "**Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer. The Company has now produced high quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada**."[28]

- And Defendant Clarke described this as: "**the most critical step in the commissioning process of the Nevada AquaRefinery** … Over the coming weeks we plan to fully integrate the front-end battery-breaking portion of the facility."[29]

- In the November 7, 2016 Press Release, Defendant Clarke reiterated: "The primary focus throughout the third quarter has been on testing of essential systems and equipment to begin commercial lead production at the world's first AquaRefinery.  **To that end, earlier this month we announced the first-ever**

---

[26] November 1, 2016 Press Release.

[27] November 1, 2016 Press Release.

[28] November 1, 2016 Press Release.

[29] November 1, 2016 Press Release.

**AquaRefined lead produced at the facility after commissioning the first production module.  This is a major milestone and the most critical step in the commissioning process**.  We are working to complete the integration of front-end battery-breaking and other supporting systems and are transitioning into commercial lead production. We expect to begin selling lead in the fourth quarter of 2016."[30]

- Aqua Metals: "**Produced the first-ever AquaRefined lead at its AquaRefinery in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC) and confirmed more than 99.99% purity**."[31]

- Aqua Metals: "Construction of the recycling facility, located on 11.7 acres in the [Reno Plant] TRIC in McCarran, Nevada, is now complete **and transitioning into production**."[32]

- Aqua Metals: "**Commissioning activities at TRIC transitioning into lead production** and first sales planned for Q4."[33]

- Aqua Metals: "In early November, the Company announced the successful production of AquaRefined lead at the TRIC facility that is over 99.99% pure. **This confirms the Company's ability to produce premium lead**."[34]

- During the Company's Q3 2016 Conference Call, held November 7, 2016, Defendant Clarke reiterated: "And the headline is that **we've now moved into or we're transitioning into commercial operations now**."[35]

- Defendant Clarke also walked through a slide presentation (which was also attached to the November 7, 2016 Press Release) purportedly showing how AquaRefining had accomplished this: "**Commissioning Module 1**… Self cleaning rotating cathodes… **produce lead without heat… which is recovered continuously… and compressed into blocks... of ultra pure lead**:[36]

---

[30] November 7, 2016 Q3 2016 Press Release. Defendant Murphy was identified as the "Company Contact" in the press release.

[31] November 7, 2016 Q3 2016 Press Release.

[32] November 7, 2016 Q3 2016 Press Release.

[33] November 7, 2016 Q3 2016 Press Release.

[34] November 7, 2016 Q3 2016 Press Release.

[35] November 7, 2016 Q3 2016 Conference Call, Exhibit 99.2 to Form 8-K. Defendants Clarke and Murphy were participants on the call.  Defendant Clarke signed the Form 8-K.

[36] November 7, 2016 Q3 2016 Conference Call; November 7, 2016 Slide Presentation.












[37]

- Defendant Clarke: "And part of that is an update that the facility that we've built and are now transitioning into production has the capacity to produce 120 tonnes of lead per day, not the 80 tonnes a day that we initially gave guidance on them, and I'll say a little bit about that. **Where we are right now is we have a single six electrolyzer module installed and commissioned**, five more are being commissioned and, in total, we'll have 16 AquaRefining modules on site."[38]

- Defendant Clarke: "**It's been a huge milestone for us to be able to make AquaRefined lead**.  For me personally, it's been hugely exciting, and I think I speak for all of the management team."[39]

- Defendant Clarke: "So, I'm just going to wrap up now with key takeaways. So, the first one is that after 18 months, and I need to say that again, after just 18 months and what was a 12-acre patch of dirt in the Nevada desert is now the world's first recycling facility or AquaRefining facility and **it's transitioned into**

---

[37] November 7, 2016 Q3 2016 Conference Call.

[38] November 7, 2016 Q3 2016 Conference Call.

[39] November 7, 2016 Q3 2016 Conference Call.

**commercial operations.**  As I mentioned before, **it's got 120 tonnes a day of installed capacity**."[40]

- Defendant Clarke: "We built our first lab scale AquaRefining test system nearly three years ago.  More than two years ago, we had a large scale pilot and then a single electrolyzer operating.  **So we all knew it works, but it doesn't mean anything until you put into a commercial operation and make some lead and sell it, and we've been able to get to that point and it's hugely thrilling**."[41]

- Later in the Class Period, Aqua Metals reiterated that they had hit these milestones: "**In addition, in connection with the commissioning of our TRIC facility, we conducted limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module, and through our own on-site assay, we verified that the lead produced in the AquaRefining module is over 99.99 percent pure**."[42]

- Aqua Metals: "The [TRIC] building phase was completed by August 2016 at which time, we started commissioning activities.  **We produced our first AquaRefined lead in October 2016 and we verified that the lead produced by AquaRefining is over 99.99 percent pure**."[43]

351.    The bolded and underlined statements in ¶ 350 of key milestones achieved were affirmative statements of present fact that were materially false and misleading when made because Aqua Metals (a) had not achieved the critical milestone of "producing" ultra pure or 99.99% pure or AquaRefined lead "flowing like a waterfall" at the Reno Plant; (b) had not produced ingots of pure AquaRefined lead at the Reno Plant; and (c) had not commissioned AquaRefining such that it could transition to commercial production.

352.    These misstatements were material because a reasonable investor would consider the fact that the Company had not successfully tested or proven that the AquaRefining process worked at this stage to be important because that meant that the Company had not, as of yet, developed its "core" AquaRefining technology and, as such, AquaRefining was still a concept that was in the R&D phase, not a proven technology.

---

[40] November 7, 2016 Q3 2016 Conference Call.

[41] November 7, 2016 Q3 2016 Conference Call.

[42] March 2, 2017 2016 Form 10-K.

[43] March 2, 2017 2016 Form 10-K.

353.    The truth that Aqua Metals had not achieved the critical milestones of producing ultra pure or 99.99% pure or AquaRefined lead "flowing like a waterfall" at the Reno Plant," producing ingots of pure AquaRefined lead at the Reno Plant and commissioning AquaRefining such that it could transition to commercial production are demonstrated by the following CWs' statements:

(i)     statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017, and were not resolved (¶¶ 63-75);

(ii)    statements by CW 1 that it was known, including by Clarke and Mould, that, as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71). Indeed, CW 1 explained that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶ 64, 71). CW 1 further noted that Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(iii)   statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(iv)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(v)     CW4's statement that the AquaRefining process was "never continuous" and the images were "very deceiving" (¶ 102);

(vi)    CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72);

(vii)   statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

(iv)    statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113);

(v)     statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115);

(vi)    statements by CW4 that the pictures were staged by Clarke, Mould and Murphy, specifically, the images of bars of purportedly AquaRefined lead, including those from November 2016, which were not AquaRefined lead and did not go through the AquaRefining process but was lead that Aqua Metals got from another source and then melted and cast at the Reno Plant (¶¶101-103);

(vii)   statements by CW2 that the lead in the blocks and bars in the pictures were not pure AquaRefined lead (¶ 82);

(viii)  statements by CW3 that Aqua Metals was not making an amount of AquaRefined lead that would be able to be cast into a bar at that time of the November 2016 photos and that the only thing that was being cast during the Class Period was lead that did not go through the AquaRefining process (¶ 91); and

(ix)    CW4's statement that Clarke, Murphy and Mould all knew that AquaRefined lead was not in the bars (¶ 103).

354.    The truth regarding the fact that Defendants had achieved these critical milestones are further demonstrated by the Company's own later admissions, which confirm much of what the CWs stated:

(i)    the Company's admission at the end of and after the Class Period that the AquaRefining process was plagued with the on-going sticky lead problems and that the Company need to find a solution to such problems and then test the solution, including its March 15, 2018 announcement that it needed to retrofit its modules to solve the problems (¶¶ 278, 286, 288). These admitted problems were the same problems that the CWs stated existed from the start of and throughout the Class Period;

(ii)    the Company's admissions at end of and after the Class Period that the AquaRefining process was "unproven technology" (¶¶ 282, 288);

(iii)   the Company's admission at end of the Class Period that it had only ever "produced small quantities of AquaRefined lead." (¶ 277).; and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 282);

(iv)   the Company's admission at end of and after the Class Period that it had not started commercial production of AquaRefining during the Class Period, including (a) its October 2017 statement that it was still in the commissioning process even in Fall 2017 (¶¶ 278, 282); (b) its November 9, 2017 admission that, "[a]s of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and we have not commenced the commercial production of AquaRefined lead" (¶ 282); and (c) its statement in its 2017 Form 10-K filed on March 15, 2018 that "we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale…." (¶288(f));

(v)    the Company's admission after the Class Period that it was still testing the modules (¶ 288);

(vi)    the Company's March 5, 2018 admission that it was only just then that Aqua Metals had ran its "first 24 hour run of continuous operation" (¶ 288(d));

(vii)    the Company's June 11, 2018 announcement that it had only just cast its first block of AquaRefined lead that month (¶ 288(i)); and

(viii)    the Company's August 8, 2018 admission that it was only "[d]uring the quarter [Q2 2018], we took the first step to move beyond 'proof of concept' and transitioned into commercialization" in Q2 2018" (¶ 288(j)).

### 3. In 2017, Defendants Misled Investors With Affirmative Statements That Aqua Metals Had Transitioned Into Full Commercial Operations And Had Commenced The Production Of Lead When It Had Not

355. After announcing that the Reno Plant had produced AquaRefined lead "flowing like a waterfall" in November 2016, Defendants represented that testing and commissioning had been completed and Aqua Metals was now transitioning to commercial operations, including the production of lead. Indeed, in February of 2017, Defendants represented that the transition was complete – that AquaRefining was in commercial operations and that it was producing products. Then, in June of 2017, Defendants represented the Reno Plant was now in full commercial production, thereby confirming that Aqua Metal had achieved the next important milestone.

356. The following bolded and underlined statements are a series of specific affirmative false and misleading statements of present fact between February 2017 and March 2017 all stating that Defendants had achieved the key milestone of completing the transition to commercial operations producing AquaRefined lead from breaker to AquaRefinery:

- Company highlights in 2017 FY Press Release: "**Successfully commissioned and in the process of scaling up production of AquaRefined lead at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC).**"[44]

- Looking back, Defendant Clarke stated: "2016 was a pivotal year for the company, as **we successfully built, commissioned and began producing products at the world's first AquaRefinery**…."[45]

---

[44] February 14, 2017 FY 2016 Press Release. Murphy was identified as the "Company Contact" in the press release.

[45] February 14, 2017 FY 2016 Press Release.

- During the FY 2016 Conference Call, Defendant Clarke highlighted the newest achievement: "**One of the headlines today is that the first ever AquaRefinery located at the Tahoe-Reno Industrial Center has moved from commissioning to operational.  That means that we are breaking batteries and making lead from the batteries that we've broken both from – both metallic lead and AquaRefined lead**.

  . . . .

  So, moving on. So, let's talk about the Tahoe-Reno facility.  As I mentioned at the start, **it's now running. We've transitioned out of a mostly start-up phase into a – and commissioning phase, into an operational phase**."[46]

- Defendant Murphy: "But now that **we're starting to – beginning commercial operations**, that should go down. . . ."[47]

- Defendant Clarke: "**We're producing validated 99.99% pure lead**.  By validated, that means [indiscernible] (17:18) the battery companies.  We assay everything before it leaves our facility. **We knew that we produced 99.99%, but that doesn't count until the battery company says, wow, you really did, and that happened. And as I mentioned, we're working on 99.999% pure** which has a real interest in very high lifecycle lead-acid batteries and some of the higher value applications."[48]

- Aqua Metals' slide presentation reprinting the same false image of the "AQMS" bar and image similar to the image above that was titled "six electrolyzers continuously producing AquaRefined pure lead, flowing like a waterfall": "**Our first facility is running from breaker to AquaRefining. . . .**"[49]

- Aqua Metals: "**We commenced initial battery breaking during December 2016 and progressed to regular single shift operation of the battery breaker in January 2017**."[50]

- Aqua Metals: 2016 Form 10-K reiterated the standard language about the successful testing of the AquaRefining process and added that this testing was based on the next step testing: "**In addition, in connection with the commissioning of our TRIC facility, we conducted limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module, and through our own on-site assay, we verified that the lead produced in the AquaRefining module is over 99.99 percent pure.**

---

[46] February 14, 2017 FY 2016 Conference Call. Defendants Clarke and Murphy were participants on the call.

[47] February 14, 2017 FY 2016 Conference Call.

[48] February 14, 2017 FY 2016 Conference Call.

[49] February 14, 2017 Slide Presentation.

[50] March 2, 2017 2016 Form 10-K.

---

**During January 2017, we commenced the commercial scale production of recycled lead at our TRIC facility…. [W]e believe that our development, testing and limited production to date has proven the concept of our AquaRefining process**…."[51]

357.     The following are affirmative false and misleading statements of present fact in Spring of 2017 confirming that Aqua Metals had achieved the key milestone of having completed the transition to commercial operations producing AquaRefined lead and specific steps purportedly taken:[52]

- At the Q1 2017 Conference call, Defendant Clarke reiterated: "**the world's first AquaRefining facility located in McCarran, Nevada is now operating** and in revenue."[53]

- In the Q1 2017 Press Release, Defendant Clarke reiterated: reiterated: "**With the world's first AquaRefinery now in commercial operation** and generating revenue, we are aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017."[54]

- Defendant Clarke: "**So the breaking and separation is commissioned and operating**."[55]

- Defendant Clarke: "**The Aqua Preparation is the next step…. So that process is now operating. We are adding capacity to it and streamlining operations. AquaRefining itself, module 1 is operating, modules 2 to 4 are on-site and in startup mode and modules 5 to 16 are being updated to latest specifications and will be installed over the coming weeks and months**…."[56]

- Defendant Clarke: "But essentially [ph] where we are at now (28:03) is modules 5 to 16 are being assembled to the latest engineering standard, ingoting is being commissioned, **samples of pure lead from AquaRefining are being delivered**

---

[51] March 2, 2017 2016 Form 10-K.

[52] **Bolded and underlined** quoted statements are alleged to be false and misleading, while other statements are provided for context. While knowingly unsupportable projections of upcoming milestones were also interlaced throughout, Lead Plaintiffs focus only on the statements of present facts here.

[53] May 9, 2017 Q1 2017 Press Release.  Defendant Murphy was identified as the "Company Contact."

[54] May 9, 2017 Q1 2017 Conference Call. Defendants Clarke and Murphy were participants on the call.

[56] May 9, 2017 Q1 2017 Conference Call.  *See also* May 9, 2017 Slide Presentation (Exhibit 99.2 to Form 8-K). The Form 8-K was signed by Defendant Clarke.

[56] May 9, 2017 Q1 2017 Conference Call.  *See also* May 9, 2017 Slide Presentation (Exhibit 99.2 to Form 8-K). The Form 8-K was signed by Defendant Clarke.

for acceptance testing to customers, ramp up and timing and retrofits of the delays and additional work have all been built into our cash flow planning, and we still contemplate to expand to 160 metric tonnes a day in 2018 and we're evaluating methods for doing that…."[57]

- Aqua Metals' Q1 2017 and Q2 Forms 10-Q highlighted: "**We have completed the development of our [initial/first] LAB recycling facility at TRIC and commenced the commercial scale production of recycled lead during January 2017**."[58]

- Then in June 2017, the Company highlighted that it is focused on commercial production as noted in its Company's Presentation: "**samples of pure lead delivered for testing.**"[59]

- Company's Presentation reprinting the same false image of the "AQMS" bar and image similar to the image above showing "six electrolyzers continuously producing AquaRefined pure lead, flowing like a waterfall": "**The World's first AquaRefinery is now in commercial production.**"[60]

- Aqua Metals: "**As of July, the Company had four AquaRefining modules commissioned and in operation.** The Company is currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017."[61]

358. The bolded and underlined statements in ¶¶ 356-357, that Defendants had completing the transition to commercial operations and produced AquaRefined lead from breaker to AquaRefinery, were affirmative statements of present fact that were materially false and misleading when made because Aqua Metals (a) had not completed the commissioning of AquaRefining process; (b) had not started the commercialization of AquaRefining; (c) had not commenced commercial production of AquaRefined lead; or (d) was not producing pure lead from breaker to AquaRefining.

359. These misstatements were material because a reasonable investor would consider the fact that the Company had not successfully tested or proven that the AquaRefining process worked at

---

[57] May 9, 2017 Q1 2017 Conference Call.

[58] May 10, 2017 Q1 2017 Form 10-Q. *See also* August 9, 2017 Q2 2017 Form 10-Q. Both the Q1 2017 Form 10-Q and Q2 2017 Form 10-Q were signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[59] June 2017 Corporate Presentation at 10.

[60] June 2017 Corporate Presentation at 4, 8, 20.

[61] August 9, 2017 Q2 2017 Press Release. *See also* August 9, 2017 Q2 Conference Call. Defendants Clarke and Murphy were participants on the Q2 Conference Call.

1  this stage to be important because that meant that the Company had not, as of yet, developed its "core"

2  AquaRefining technology and, as such, it was still a concept that was in the R&D phase, not a proven

3  technology.

4      360.    The truth that Aqua Metals had not (a) completed the commissioning of AquaRefining

5  process; (b) started the commercialization of AquaRefining; (c) commenced commercially producing

6  AquaRefined lead; or (d) was not producing pure lead from breaker to AquaRefining are demonstrated

7  by the following CWs' statements:

> (i)    statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017 and were not resolved (¶¶ 63-75);
>
> (ii)    statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);
>
> (iii)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);
>
> (iv)    statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);
>
> (v)    statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113);
>
> (vi)    CW4's statement that the AquaRefining process "was not even close to be[ing] commercially operating" (¶ 96);
>
> (vii)    Statements by CW 3 and 4 explaining that the breaker often broke down because it could not support the volume of batteries being fed through it (¶¶ 89, 111);
>
> (viii)    statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115);
>
> (ix)    statements by CW4 that the pictures were staged by Clarke, Mould and Murphy, specifically, the images of bars of purportedly AquaRefined lead, including those from November 2016, were not AquaRefined lead and did not go through the AquaRefining process but was lead that Aqua Metals got from another source and then melted and cast at the Reno Plant (¶¶ 101-103);

(x)     statements by CW2 that the lead in the blocks and bars in the pictures were not pure AquaRefined lead (¶ 82); and

(xi)    statements by CW3 that Aqua Metals was not making an amount of AquaRefined lead that would be able to be cast into a bar at that time of the November 2016 photos and that the only thing that was being cast during the Class Period was lead that did not go through the AquaRefining process (¶ 91).

361.    The truth that Defendants had not achieved these critical milestones is further demonstrated by the Company's own later admissions, which concede the very problems that the CWs state existed prior to and throughout the Class Period:

(i)     the Company's admission at the end of and after the Class Period that the AquaRefining process was plagued with the on-going sticky lead problems and that the Company needed to find a solution to such problems and then test the solution, including its March 15, 2018 announcement that it needed to retrofit its modules to solve the problems (¶¶ 278, 286, 288). These admitted problems were the same problems that the CWs stated existed from the start of and throughout the Class Period;

(ii)    the Company's admissions at the end of and after the Class Period that the AquaRefining process was "unproven technology" (¶¶ 282, 288);

(iii)   the Company's admissions at the end of and after the class period that it had only ever "produced small quantities of AquaRefined lead" (¶ 277); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 282);

(iv)    the Company's admission at the end of and after the Class Period that it had not started commercial production of AquaRefining during the Class Period, including (a) its October 2017 statement that it was still in the commissioning process even in Fall 2017 (¶¶ 278, 282); (b) its November 9, 2017 admission that, "[a]s of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and we have not commenced the commercial production of AquaRefined lead" (¶ 282); and (c) its statement in its 2017 Form 10-K filed on March 15, 2018 that "we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale...." (¶288(f));

(v)     the company's end of Class Period admission that it had not yet solved the problem that operators needed to assist the lead removal during the commission process (¶¶ 278, 286);

(vi)    the Company's admission after the Class Period that it was still testing the modules (¶ 288);

(vii)   the Company's March 5, 2018 admission that it was only just then that Aqua Metals had run its "first 24 hour run of continuous operation" (¶ 288(d));

(viii)   the Company's June 11, 2018 announcement that it had only just cast its first block of AquaRefined lead that month (¶ 288(i)); and

(ix)   the Company's August 8, 2018 admission that it was only "[d]uring the quarter [Q2 2018], we took the first step to move beyond 'proof of concept' and transitioned into commercialization" in Q2 2018" (¶ 288(j)).

### 4.   Having Touted Aqua Metals' Commercial Operations, Defendants Issued False And Misleading Statements In May 2017 To Justify The Company's Failure To Generate Revenues

362.   As highlighted in Section V.F., Defendants admitted to *some* past operational problems in May 2017, presumably to justify why the Company had not produced or sold any AquaRefined Lead as projected that quarter.   However, they falsely stated that these problems were resolved and maintained that the AquaRefining process was successful and proven to date.   The following are the affirmative false and misleading statements that the Company had resolved these problems:

- Defendant Clarke: "So I'm just going to up now with some key takeaways.   So I think you've got the theme now that preparation for large scale rollout is our priority. We believe that we have broken the back of the commissioning process. We have got some kinks to iron out, but **every single one of the processes that we need to operate is operating**. **Improvements that need to be in place are simple engineering improvements.  We have proven that the process overall works**."[62]

   Defendant Clarke: "**The headline is its running and we are scaling output.**  We started production in Q1 and we have started actually moving those into sales in Q2….  **[T]he breaking and separation is commissioned and operating.**  The Aqua Preparation is the next step … so that process is now operating.  We are adding capacity to it and streamlining operations.  AquaRefining itself, module 1 is operating, modules 2 to 4 are on-site and in startup mode and modules 5 to 16 are being updated to latest specifications and will be installed over the coming weeks and months."[63]

- During the Q2 2017 Conference call, Defendant Clarke responded to a question about the short seller report: "And **as Tom said earlier it worked the first time we turn it on.**  I mean you got to recognize that we actually - we put our second mortgages 401(k) and kids education for instance found in this business if this is a get rich quick scheme, please show me where I got rich. I haven't monetized anything from this, I have not sold a single share.  And the reason we were happy to look our spouses in the eye and say, I am going to write another $100,000

---

[62] May 9, 2017 Q1 2017 Conference Call.

[63] May 9, 2017 Q1 2017 Conference Call

check tomorrow darling **because when we turned AquaRefining modules on they worked and they still do**."[64]

- Defendant Clarke: "Going back to that point I made earlier, **AquaRefining works**. We've **got four modules operating** now. We expect to have 16 operating by the end of 2017. And before I go on, I want to just talk about that point that **we are now AquaRefining lead**…."[65]

- Defendant Clarke: "Then moving on last but certainly not least, **we now have AquaRefineries or four AquaRefining modules in operation**. And I think actually a better title for this slide would be **AquaRefining works in capital letters with a lot of exclamation marks. We are now AquaRefining lead**. **It's a first for our facility and it's a first for the world**."[66]

- Defendant Murphy [in response to question asking why the short seller article doubting AquaRefining was "wrong"]: "Adding on to that Ben is, and just summarizing what Steve words said, **the reason the search will eventually go away and it may not be overnight unfortunately as this works. And why I am comfort level and we never leave because this works**."[67]

363.    The bolded and underlined statements in ¶ 362 that, despite some issues disclosed in May 2017, they had resolved the issues and the AquaRefining process works and had worked from the time they turned the modules on, and that the breaking and separation process is operating, were affirmative statements of a present fact that were materially false and misleading because neither the AquaRefining process nor the breaking and separation process worked and the problems identified above were not resolved.

364.    These misstatements were material because a reasonable investor would consider the fact that the Company had not successfully tested or proven that the AquaRefining process or the breaking and separation process worked at this stage because of ongoing problems to be important because that meant that the Company had not, as of yet, developed its "core" AquaRefining technology and, as such, it was still a concept that was in the R&D phase and not a proven technology.

---

[64] August 9, 2017 Q2 2017 Conference Call.

[65] August 9, 2017 Q2 2017 Conference Call.

[66] August 9, 2017 Q2 2017 Conference Call.

[67] August 9, 2017 Q2 2017 Conference Call.

365.    The truth of the facts that the AquaRefining process was not operating and still plagued by the ongoing problems are demonstrated by the following CWs' statements:

(i)      statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017 and were not resolved (¶¶ 63-75);

(ii)     statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(iii)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(iv)     statements by CW 3 and 4 explaining that the breaker often broke down because it could not support the volume of batteries being fed through it (¶¶ 89, 111);

(v)      statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

(xii)    statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113); and

(xiii)   statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115).

366.    The truth that these problems persisted are further demonstrated by the Company's own later admissions, which concede the very problems that the CWs state existed prior to and throughout the Class Period:

(i)      the Company's admission at the end of and after the Class Period that the AquaRefining process was plagued with the on-going sticky lead problems and that the Company needed to find a solution to such problems and then test the solution, including its March 15, 2018 announcement that it needed to retrofit its modules to solve the problems (¶¶ 278, 286, 288).  These admitted problems were the same problems that the CWs stated existed from the starts of and throughout the Class Period;

(ii)     the Company's admissions at the end of and after the Class Period that the AquaRefining process was "unproven technology" (¶¶ 282, 288);

(iii)     the Company's admissions at the end of and after the Class Period that it had only ever "produced small quantities of AquaRefined lead" (¶ 277); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 282);

(iv)     the Company's admission at the end of and after the Class Period that it had not started commercial production of AquaRefining during the Class Period, including (a) its October 2017 statement that it was still in the commissioning process even in Fall 2017 (¶¶ 278, 282); (b) its November 9, 2017 admission that, "[a]s of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and we have not commenced the commercial production of AquaRefined lead" (¶ 282); and (c) its statement in its 2017 Form 10-K filed on March 15, 2018 that "we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale…." (¶288(f));

(v)     the Company's end of Class Period admission that it had not yet solved the problem that operators needed to assist the lead removal during the commission process (¶¶ 278, 286);

(vi)     the Company's admission after the Class Period that it was still testing the modules. ¶288);

(vii)     the Company's March 5, 2018 admission that it was only just then that Aqua Metals had run its "first 24 hour run of continuous operation" (¶ 288(d));

(viii)     the Company's June 11, 2018 announcement that it had only just cast its first block of AquaRefined lead that month (¶ 288(i)); and

(ix)     the Company's August 8, 2018 admission that it was only "[d]uring the quarter [Q2 2018], we took the first step to move beyond 'proof of concept' and transitioned into commercialization" in Q2 2018" (¶ 288(j)).

**B.      Defendants Issued False And Misleading Statements Regarding Site Visits, All Of Which Are Actionable Statements Of Fact**

**1.      Defendants Issued Affirmative Material Misrepresentations Regarding Analyst And Investor Visits**

367.     As noted above, after the April 20, 2017 short seller report, Defendants denounced the report and publicly invited investors and analysts to the Reno Plant to purportedly show them a behind-the-scenes look at the full production process of AquaRefining and thereby dispel the concerns raised in the report.  The Company also encouraged analysts and investors to report on their site visits. While these sham demonstrations are themselves actionable schemes under Rule 10b-5(a) and (c), Defendants also issued numerous affirmative false and misleading statements stating that Defendants

were providing transparent and open visits to allow analysts and investors to view the AquaRefining process and the Reno Plant in operation:

- Defendant Clarke: "We believe the best way to address this misinformation is to **openly show analysts and investors our facility in operation as we continue to scale it up**."[68]

- Aqua Metals: "The analysts were given a tour of AquaRefinery 1, located in the Tahoe-Reno Industrial Complex (TRIC), led by Aqua Metals' executive management team. **Analysts were able to view the critical processes at the AquaRefinery as they happened, including: battery feedstock deliveries; battery breaking and separation; desulfurization and pre-AquaRefining digestion processes; AquaRefining on simultaneously running AquaRefining modules; and shipments of lead products to customers**."[69]

- Defendant Clarke: "**We aim to be as transparent as possible** while protecting our IP, as we expand our operations and collaborate with new partners. **This was a valuable opportunity to open our doors to the analyst community, providing a behind-the-scenes look at our process**."[70]

- Aqua Metals: "The investors in attendance were given a tour of AquaRefinery 1, located in the Tahoe Reno Industrial Complex (TRIC), led by Aqua Metals' executive management team. **Investors were able to view the full production process at the AquaRefinery as it happened, including battery breaking and separation, desulfurization, electrolyte production, and AquaRefining on four simultaneously running AquaRefining modules**."[71]

- Defendant Clarke: "**This investor day speaks to our belief in transparency…**"[72]

- Aqua Metals: "**[Aqua Metals] [s]uccessfully hosted several invitational investor and analyst days at AquaRefinery 1** in late May and early August. **These events showcased the production process at the AquaRefinery, including battery feedstock deliveries, battery breaking and separation, desulfurization and pre-AquaRefining digestion processes and AquaRefining on four running AquaRefining modules**."[73]

---

[68] April 24, 2017 Press Release.

[69] May 31, 2017 Press Release.

[70] May 31, 2017 Press Release.

[71] August 2, 2017 Press Release.

[72] August 2, 2017 Press Release.

[73] August 9, 2017 Q2 2017 Press Release.

- Defendant Clarke (in response to a question regarding the short-seller article): "**One of the other strands was that AquaRefining just doesn't work. Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work. We've shown videos of it working and I don't know, maybe the shorts are so upside down and buried in their own bubble of misbelieve they just can't get out now, I don't know. It makes no sense to me at all.**"[74]

368.    The bolded and underlined statements in ¶ 367 were affirmative statements of present fact that were materially false and misleading when made because Defendants were not showing visitors what was actually going on with AquaRefining or at the Reno Plant because the AquaRefining process was malfunctioning and not operational and the site visits were sham demonstrations carefully orchestrated to conceal these pervasive problems.

369.    These misstatements were material because a reasonable investor would consider the fact that the Company would stage sham demonstrations for analysts and investors to be important because it undermines management's credibility and the reliability of statements that AquaRefining is operating.   Moreover, investors would consider the true facts regarding the AquaRefining process to be important because it meant that the Company's core technology did not work and had not met the milestones already touted.

370.    The truth regarding the operations of AquaRefining and what actually was occurring at the Reno Plant is demonstrated by:

(i)      statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(ii)     CW4's statement that the AquaRefining process "was not even close to be[ing] commercially operating" (¶ 96);

(iii)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

---

[74] August 9, 2017 Q2 2017 Conference Call. Defendants Clarke and Murphy participated on the call.

(iv)     statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

(v)      statements by CWs  4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113);

(vi)     statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and into 2017 and were not resolved (¶¶ 63-75); and

(vii)    statements by CW 3 and 4 explaining that the breaker often broke down because it could not support the volume of batteries being fed through it (¶¶ 89, 111).

371.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is further demonstrated by:

(i)      Defendants' end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288); and

(ii)     Defendants' end of and post-Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282, 288).

372.    In fact, rather than what Defendants deceptively portrayed during the sham site visits, even by the end of the Class Period, Aqua Metals had barely produced any pure lead. This fact is evidenced by:

(i)      the Company's disclosures beginning on May 9, 2017, including that it had only "produced small quantities of AquaRefined lead" (¶ 277); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 282);

(ii)     statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115); and

(iii)    the Company's admissions that, as of October 2017, the  Company was still in the commissioning process even in Fall 2017 (¶¶ 278, 282); as of March, 2017, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 288(f)); that it was not until June 11, 2018, well after the end of the Class Period, that the Company cast its first block of AquaRefined lead (¶ 288(i)); and it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶288(j)).

373.     The fact that the Class Period site visits were carefully orchestrated to conceal all the problems plaguing the AquaRefining process are demonstrated by statements by CWs 2, 3 and 4 that regular visitors to the Reno Plant were subjected to "dog and pony shows" by Clarke and Mould carefully orchestrated to conceal the problems and that the process was not functioning (¶¶ 83-85, 92, 105-109).  For example:

(i)      CW 2 said that the floor employees would get a call from the plant management to start the machines and about five minutes later the visitors would come to the plant (¶ 85); CW 2 said employees at the plant were told by CW 2's manager, with the directive coming from Clarke, "don't run the machines until [the investors] show up" and to "make yourself look busy" and to "stage everything up" and "we only ran the machines when investors came to the plant" (¶ 83); CW 2 further stated that the visitors were only on the plant floor for about five to ten minutes watching the machines run (¶ 85);

(ii)     CW 4 stated that they would prepare several days in advance of a visit to make sure the equipment was "rigged up" so that it could run for the few minutes the visitors were on the floor (¶ 106);

(iii)    CW 4 stated that, because the module could not operate for more than about an hour before it would break down, CW 4 had to start it at a time where it would run during the site visits and not break down and that visitors would only spend about five to ten minutes on the plant floor watching the demonstration (¶ 107);

(iv)    CW4's statement that they would also "stage loads" of batteries by the hammermill (breaker) during the visits (¶ 105); and

(v)     the employees called the site visits a "dog and pony show" because, as CW 4 described, it was a "gyp," meaning a scam, as the true state of affairs was covered up by Defendants (¶¶ 76, 84, 106).

### 2.     Defendants Endorsed And Adopted Affirmative Material Misrepresentations By Analysts And Investors

374.     After attending the sham site visits and being encouraged by Defendants to publicly report on them, analysts and investors issued the following affirmative statements which, because they were based on Defendants' sham dog and pony shows, were false and misleading:

- Aqua Metals, quoting Brett Conrad of Longboard Capital Advisors LLC: "**Our Aqua Metals plant tour was a real eye opener. The team has put in countless hours and expertise perfecting the first closed loop non-polluting lead**

**refining process. This is my third time visiting the plant and I'm very impressed with the accelerating progress in the commissioning process**."[75]

- Oppenheimer: "We visited AQMS's Reno facility yesterday, **seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational**....We observed six semi truckloads of material delivered and taken away during our four-hour visit. **We saw spent batteries loaded into the recycling line and being processed with fully recycled lead coming out of the end of the process flow. There appeared to be a week or more of spent batteries as inputs and finished goods inventory**."[76]

- National Securities Corporation: "**We came away seeing the progress that the company has made in the ramp up of the facility** and a clearer picture of the expansion plans.  We believe that management plans to hold similar events in the coming months which we view as **incrementally positive for transparency** and for the sentiment on the shares.

  **The Reno facility is ramping up, on track for 120 tonnes by year end.**

  **On our facility tour we observed that 3 Aqua refining modules were up and running and producing recycled lead.  There was work being done assembling the fourth module and also equipment ready for the next set of modules to be built.**  Improvements have already been made in the Aqua refining process that has been learned from the working of the first module and is being implemented in the fourth module from the start.  **We believe that the company is on track for all sixteen modules to be up and running by the end of 2017.**

  **Lead is being produced and revenues are being generated**

  Given that Aqua Metals did not report any revenues in the March quarter, **we view that fact that we observed trucks delivering used batteries for off-loading and recycling, and more importantly, finished recycled lead packaged and ready to be shipped out as highly encouraging.  Given the amount of lead produced and our belief of what has already been sold, coupled with the throughput of the current modules for the month of June, we believe that our revenue estimate for the June quarter of $2 million is achievable**."[77]

- Euro Pacific Capital: "On May 31, 2017, we attended the Analyst Day hosted by Aqua Metals where we had an opportunity to see the facility and operations and meet with the management and operational team.  **During our visit, we saw the entire process of lead production starting from the feedstock/lead acid**

---

[75] August 2, 2017 Press Release.

[76] June 1, 2017 Oppenheimer Report.

[77] June 1, 2017 National Securities Corporation Report.

**batteries being loaded on the conveyor belt moving into the battery breaker system to the AquaRefining preparation process (desulphurization process) and to the AquaRefining modules, where the end product (AquaRefined lead) comes out at the end of the process.  The key takeaway from the site visit was as the Company fixes the minor issues/modification to the equipment/process over the next few weeks, it should be able to produce guided quantities of lead by the end of this year**."[78]

- H.C. Wainwright & Co.: "We visited AQMS' TRIC facility on August 8, 2017, and were given a tour of the operations by the company's COO, Selwyn Mould. **We observed: 1) infrastructure to recycle lead batteries using the company's proprietary process is in place; 2) four modules were operational, producing recycled lead paste; 3) room to deploy 12 additional modules has been carved out in the setup; 4) there is adjacent available space to add another line of 16 modules; 5) the operational crew appears to be scaling the learning curve; 6) facilities were quite clean for a place where lead is recycled; and 7) technology and infrastructure deployed were fairly straightforward and should be easy to bolt on to, or lined up with, licensee infrastructure**….**after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18**."[79]

375.    Defendants are liable for these materially false and misleading statements because they endorsed and adopted these misrepresentations.  As to the statement by Longboard Capital Advisors LLC, this is demonstrated by their express incorporation of the statement into the Aqua Metals press release.  Further, as to that statement and all of the analyst statements above, Defendants' endorsement and adoption are demonstrated by (a) Defendants' public invitation to analysts and investors to the site visits, *see, e.g.,* ¶¶ 225, 367 ("We believe the best way to address this misinformation is to openly show analysts and investors our facility in operation"); ¶¶ 238, 367 ("[W]e announced earlier on that we actually are doing some invitational site visits.  So we have arranged an invitational for sell-side analysts in May that will take place in May….we are arranging invitationals of buy-side analysts and investors which will occur in June and beyond"); (b) Defendants' orchestration of sham demonstrations that misled the visitors as alleged above; (c) Defendants' misrepresentations about the site visits detailed above; (d) Defendants' request and encouragement of analysts and others to publish reports on what the saw, *see, e.g.*, ¶¶ 238, 367 ("I believe the analysts want some time to prepare and

---

[78] June 5, 2017 Euro Pacific Capital Report.

[79] August 14, 2017 H.C. Wainwright & Co. Report.

publish"); ¶ 245 ("The Company expects all the analysts who attended the visitor day to update their coverage reports to reflect findings from the site visit in the coming days"); ¶¶ 238, 367 ("Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work"); and (e) Defendants' failure to correct any of the false and misleading statements.

376.    The bolded and underlined adopted and endorsed statements in ¶ 374 were affirmative statements of present fact that were materially false and misleading when made because Defendants were not showing visitors what was actually going on with AquaRefining or at the Reno Plant as the AquaRefining process was malfunctioning and not operational, and the site visits were sham demonstrations carefully orchestrated to conceal these pervasive problems.

377.    These misstatements were material because a reasonable investor would consider the fact that the Company would stage sham demonstrations for analysts and investors to be important because it undermines management's credibility and reliability of the statements that AquaRefining is operating.  Moreover, investors would consider the true facts regarding the AquaRefining process to be important because it meant that the Company's core technology did not work and had not met the milestones already touted.

378.    The truth regarding the operations of AquaRefining and what actually occurring at the Reno Plant is demonstrated by:

(i)     statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(ii)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(iii)   CW4's statement that the AquaRefining process "was not even close to be[ing] commercially operating" (¶ 96);

(iv)    statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

(v)    statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113); and

(vi)    statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and into 2017 and were not resolved (¶¶ 63-75).

379.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is further demonstrated by:

(i)    the Company's end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288); and

(ii)    the Company's end of and post-Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282, 288).

380.    In fact, rather than what Defendants deceptively portrayed during the sham site visits, even by the end of the Class Period, Aqua Metals had barely produced any pure lead. This fact is evidenced by:

(i)    the Company's disclosures beginning on May 9, 2017, including that it had only "produced small quantities of AquaRefined lead" (¶ 277); and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 282);

(ii)    statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115);

(iii)    CWs 1, 2 and 4's statements that the only products Aqua Metals sold during the Class Period were by-products (unrefined lead compounds and plastics) right off the breaker (¶¶ 75, 80, 96); and

(iv)    the Company's admissions that, as of October 2017, the Company was still in the commissioning process even in Fall 2017 (¶¶ 278, 282); as of March, 2017, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 288(f)); that it was not until June 11, 2018, well after the end of the Class Period, that the Company cast its first block of AquaRefined lead (¶ 288(i)); and it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶288(j)).

381.    The fact that the Class Period site visits were carefully orchestrated to conceal these problems are demonstrated by statements by CWs 2, 3 and 4 that regular visitors to the Reno Plant

were subjected to "dog and pony shows" carefully orchestrated to conceal the problems and that the AquaRefining process was not functioning (¶¶ 83-85, 92, 105-109). For example:

(i)     CW 2 said that the floor employees would get a call from the plant management to start the machines and about five minutes later the visitors would come to the plant. (¶ 85). CW 2 said employees at the plant were told by CW 2's manager, with the directive coming from Clarke, "don't run the machines until [the investors] show up" and to "make yourself look busy" and to "stage everything up" and "we only ran the machines when investors came to the plant" (¶ 83); CW 2 further stated that the visitors were only on the plant floor for about five to ten minutes watching the machines run (¶ 85);

(ii)    CW 4 stated that they would prepare several days in advance of a visit to make sure the equipment was "rigged up" so that it could run for the few minutes the visitors were on the floor (¶ 106);

(iii)   CW 4 stated that, because the module could not operate for more than about an hour before it would break down, CW 4 had to start it at a time where it would run during the site visits and not break down and that visitors would only spend about five to ten minutes on the plant floor watching the demonstration (¶ 107);

(vi)    CW4's statement that they would also "stage loads" of batteries by the hammermill (breaker) during the visits (¶ 105); and

(iv)    the employees called the site visits a "dog and pony show" because, as CW 4 described, it was a "gyp," meaning a scam, as the true state of affairs was covered up by Defendants (¶¶ 76, 84, 106).

### 3.     Defendants Issued Additional Affirmative Material Misrepresentations Regarding Site Visits

382.    Moreover, even beginning prior to the statements issued above, from the start of the Class Period through August 2017, Defendants issued additional false and misleading statements regarding site visits to both the California Testing Facilities and the Reno Plant as a way to show the AquaRefining process to industry participants, third-party licensees, investors and strategic partners:

• Defendant Clarke: "What we've added to that is a new **full-sized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there**."[80]

• Defendant Clarke: "So, the last couple of points, the battery industry, I mentioned earlier a **vast majority of the North American lead-acid battery industry has been on site now. It seemed what we've got the overwhelming response is**

---

[80] May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

**wow, you guys really thought this through. Yet, yet – and we ticked all the boxes and even some companies have visited the site, wanting to find a problem and went away smiling and shaking our hands. So, basically, there is a real alternative to smelting**."[81]

- Aqua Metals: "**A substantial majority of U.S. battery producers have visited our facility and expressed interest in AquaRefining. …** In July, **the Company held a successful grand opening ceremony at its TRIC AquaRefinery which was attended by** over 200 people, including investors, strategic partners, industry participants, key employees and government officials. **The tour highlighted the installed equipment and processing lines**, while enabling discussions with key personnel about how the production facility and the supply chain will proceed."[82]

- Defendant Clarke: "We have also accelerated discussions with U.S. based lead-acid battery manufacturers and distributors, who collectively represent a substantial majority of the U.S. battery industry. **Most have already visited our facility and expressed interest in our products and technology.** We are now sending our initial production samples to these companies, to allow them to conduct their own assays."[83]

- Defendants Murphy: The additional licensees coming from battery companies and lead companies, we see it as – **the level of interest on multiple site visits and observing processes in operation**….[84]

383.    The bolded and underlined statements in ¶ 382 were affirmative statements of present fact that were materially false and misleading when made because Defendants were not showing visitors what was actually going on with AquaRefining, at the California Testing Facilities or at the Reno Plant, and that the AquaRefining process was malfunctioning and not operational and the issues at the test sites were expected to and did persist and worsen at the Reno Plant. These statements were also materially false and misleading when made because the site visits were sham demonstrations carefully orchestrated to conceal these pervasive problems.

384.    These misstatements were material because a reasonable investor would consider the fact that the Company would stage sham demonstrations for visitors to be important because it

---

[81] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[82] August 10, 2016 Q2 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[83] November 7, 2016 Q3 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[84] August 9, 2017 Q2 2017 Conference Call.

1    undermines management's credibility and the reliability of the statements that AquaRefining is

2    operating.  Moreover, investors would consider the true facts regarding the AquaRefining process to

3    be important because it meant that the Company's core technology did not work and had not met the

4    milestones already touted.

5           385.   The truth regarding the operations of AquaRefining and what was actually occurring at

6    the California Testing Facilities and Reno Plant is demonstrated by:

7           (i)     statements by CW 1, including that the AquaRefining technology was
                   malfunctioning and plagued with continuing problems at both California Testing
8                  Facilities since 2015, including issues with chemical ratios, the hard lead issue
                   and the sticky lead issue that were expected to be worse as the Company scaled
9                  and did persist throughout the Class Period and into 2017 and were not resolved
                   (¶¶ 63-75);
10

11          (ii)    statements by CW 1 that what was fed into the machines in the California Testing
                   Facilities was "virgin" or "lab" lead and, thus, already much purer than the used
12                 battery lead that is intended to go through the equipment and that, once used
                   battery lead is fed in, the issues would get worse (¶¶ 66, 70, 73-74);
13

14          (iii)   statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period,
                   AquaRefining did not work and suffered from significant issues, including the
15                 sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-
                   112, 114-15);
16

17          (iv)    CW4's statement that the AquaRefining process "was not even close to be[ing]
                   commercially operating" (¶ 96);
18

19          (v)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules
                   could not operate for more than a few hours or less without malfunctioning and
20                 became idle for two or three days (¶¶ 75, 78, 90, 97);

21          (vi)    statements by CWs 3 and 4 explaining that the breaker often broke down because
                   it could not support the volume of batteries being fed through it (¶¶ 89, 111);
22

23          (vii)   statements by CW 1 that, from the time the Reno Plant opened and throughout the
                   Class Period, the Reno Plant was a testing facility (¶ 72); and
24

25          (viii)  statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant
                   were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

26          386.   The truth regarding the operations of AquaRefining and what was actually occurring at

27    the Reno Plant is further demonstrated by:

28

     (i)      Defendants' end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288); and

     (ii)    Defendants' end of and post-Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282, 288).

387.    In fact, rather than what Defendants deceptively portrayed during the sham site visits, even by the end of the Class Period, Aqua Metals had barely produced any pure lead. This fact is evidenced by:

     (i)      the Company's disclosures beginning on May 9, 2017, including that it had only "produced small quantities of AquaRefined lead" (¶ 277) and the Company had "not commenced the commercial production of AquaRefined lead" (¶ 282);

     (ii)    statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115);

     (iii)   the Company's February 14, 2017 admission that the Reno Plant was, in part, a testing facility (¶ 72); and

     (iv)   the Company's admissions that, as of October 2017, the  Company was still in the commissioning process even in Fall 2017 (¶¶ 278, 282); as of March, 2017, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 288(f)); that it was not until June 11, 2018, well after the end of the Class Period, that the Company cast its first block of AquaRefined lead (¶ 288(i)) and it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶288(j)).

388.    The fact that the Class Period site visits were carefully orchestrated to conceal these problems are demonstrated by statements by CWs 1, 2, 3 and 4 that regular visitors to the Reno Plant and the California Testing Facilities were subjected to "dog and pony shows," by Clarke and Mould including that they were carefully orchestrated to conceal the problems and that the AquaRefining process was not functioning (¶¶ 83-85, 92, 105-109).  For example:

     (i)      CW 2 said that the floor employees would get a call from the plant management to start the machines and about five minutes later the visitors would come to the plant. (¶ 85); CW 2 said employees at the plant were told by CW 2's manager, with the directive coming from Clarke, "don't run the machines until [the investors] show up" and to "make yourself look busy" and to "stage everything up"  and "we only ran the machines when investors came to the plant" (¶ 83);

CW 2 further stated that the visitors were only on the plant floor for about five to ten minutes watching the machines run (¶ 85);

(ii)     CW 4 stated that they would prepare several days in advance of a visit to make sure the equipment was "rigged up" so that it could run for the few minutes the visitors were on the floor (¶ 106);

(iii)    CW 4 stated that, because the module could not operate for more than about an hour before it would break down, CW 4 had to start it at a time where it would run during the site visits and not break down and that visitors would only spend about five to ten minutes on the plant floor watching the demonstration (¶ 107); and

(iv)    the employees called the site visits a "dog and pony show" because, as CW 4 described, it was a "gyp," meaning a scam, as the true state of affairs was covered up by Defendants (¶¶ 76, 84, 106);

(v)     CW4's statement that they would also "stage loads" of batteries by the hammermill (breaker) during the visits (¶ 105); and

(vi)    CW 1 relayed that while at the Alameda facility, several visitors, including industry representatives and analysts, came through for demonstrations that CW 1 called "dog and pony shows" and either Clarke or Mould, or both, were present during the visits (¶ 76).

**C.     Defendants' Issued False and Misleading Statements Concerning The "Strategic Partnerships" With Interstate Batteries And Johnson Controls**

389.    Throughout the Class Period, Defendants issued materially false and misleading statements[85] announcing and touting "strategic partnerships" with Interstate Batteries and Johnson Controls, key players in the lead battery industry, and that these strategic partnerships validated that AquaRefining works and provided the Company what it needs to expand and to scale up.

**1.     Defendants' Statements Touting That The Partnerships With Interstate Batteries And Johnson Controls Validate The AquaRefining Technology Were Materially False And Misleading**

390.    Throughout the Class Period, Defendants issued materially false and misleading statements that the Interstate Batteries and Johnson Controls partnerships validated the AquaRefining technology:

---

[85] **Bolded and underlined** statements are alleged to be false and misleading, while other statements are provided for context.   To the extent the other statements are also alleged to be false and misleading, they will be included in the relevant falsity section herein.

- Defendant Clarke: "We believe this **[Interstate Batteries Partnership] serves as a strong validation of our technology**…."[86]

- Aqua Metals: "Aqua Metals, which is commercializing a non-polluting electrochemical lead recycling technology called AquaRefining™, today announced the signing of definitive agreements with Interstate Batteries….

  'Interstate Batteries seeks out innovation, pursues opportunities and invests in the technology we need to succeed not just today, but also tomorrow,' said Scott Miller, president and CEO of Interstate Batteries. 'Our focus is on the future of our industry and continued growth. **Aqua Metals' breakthrough technology** is a promising new way for recycling lead-acid batteries.'

  Aqua Metals' patent-pending AquaRefining process is an environmentally friendly electrochemical process for recycling lead-acid batteries. AquaRefining is a closed-loop, room temperature, water-based recycling method that is fundamentally non-polluting, yet able to yield nearly 100 percent lead recovery.

  'With its forward-thinking environmental goals, broad distribution network and strong brand name, Interstate Batteries is an ideal partner for us as we scale our business,' said Dr. Stephen Clarke, chairman and CEO of Aqua Metals."[87]

- Defendant Clarke: "And as you'll be aware, we made an announcement last week covering the **strategic relationship with Interstate Batteries**. . . . . we see that as a **pretty significant event and a pretty good endorsement of our business and what we're trying to achieve here**."[88]

- Defendant Clarke: "So Interstate have agreed to supply more than a million automotive another lead-acid batteries as feedstock for our AquaRefining. They are making a strategic investment of approximately $10 million into the company and the details of that have been provided in the press release and in our filings.... And we believe it also **brings a huge amounts [*sic*] of credibility to what we're trying to build**."[89]

- Defendant Clarke: "What I can say is that what's happened since then is that – and I think down to the commitment of Battery Systems **and, in particular, Interstate Batteries has driven a phenomenal level of credibility and interest in our technology.** So, we're now in pretty significant discussions with multiple additional strategic partners."[90]

---

[86] May 24, 2016 Q1 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[87] May 19, 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[88] May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[89] May 24, 2016 Q1 2016 Conference Call.

[90] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

- "Aqua Metals Inc. CEO and co-founder Stephen Clarke sees a new partnership with **Johnson Controls International Plc as a 'massive vote of credibility'** in his company's technology.... Clarke said 'he expects to see a 'dramatic transformation' in revenue in the next two or three years.'"[91]

- Defendant Mould: "I think **Johnson Controls backing us is a great statement to the industry and to the world that aqua refining [*sic*] is the future**."[92]

391.    The bolded and underlined statements in ¶ 390 were affirmative statements of present fact that were materially false and misleading when made because the partnerships were not a strong validation of Aqua Metals' technology or endorsement of Aqua Metals' business and did not did bring credibility to AquaRefining because the "partnerships" were based on Defendants' sham demonstrations that made the technology appear to be working, when in fact the technology was malfunctioning.

392.    The truth of the fact that the technology was malfunctioning is demonstrated by:

(i)    statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017and were not resolved (¶¶ 63-75);

(ii)    statements by CW 1 that it was known, including by Clarke and Mould, that as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)    CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iv)    CW1's statement that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶64, 71); CW1 further noted that Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(v)    statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

---

[91] February 9, 2017 Bloomberg News Article.

[92] February 10, 2017 KOLO News Article.

(vi)     statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(vii)    CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72);

(viii)   statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72); and

(ix)     statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

393.    The fact that Interstate Batteries and Johnson Controls were subjected to sham demonstrations is demonstrated by:

(i)      statements by CWs 2, 3 and 4 that regular visitors to the Reno Plant were subjected to "dog and pony shows" carefully orchestrated to conceal the problems and that the process was not functioning (¶¶ 83-85, 92, 105-109);

(ii)     Clarke's May 24, 2016 statement that, "What we've added to that is a new full-sized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there" (¶ 134), suggesting that the demonstrations at the California Testing Facilities before the Reno Plant opened were also shams (¶ 76); and

(iii)    statements by CWs 1, 2 and 4 that representatives from Interstate Batteries and Johnson Controls were subjected to Defendants' "dog and pony shows" at the Alameda facility and the Reno Plant (¶¶ 76, 84, 108).

394.    Further, despite repeatedly touting the relationships as a "strategic partnership," on the last day of the Class Period, the Company admitted that it had not entered into any licensing, joint venture or strategic alliance agreements.  ¶ 284.  To date, the Company still has not entered into any licensing, joint venture or strategic alliance agreements. ¶ 285.

395.    All of the above statements were also misleading by omission as they failed to disclose that the "partnerships" were the result of representatives from Interstate Batteries and Johnson Controls being subjected to Defendants' sham dog and pony shows at both the California Testing Facility and the Reno Plant that concealed the pervasive issues with the AquaRefining technology and

further failed to disclose that AquaRefining was not operational.  Thus, without a working technology, the partnerships were meaningless.

396.    These misstatements and omissions are material because a reasonable investor would consider the total mix of information significantly altered if investors knew that Aqua Metals' technology, its "core" business, was malfunctioning and not operational and that Aqua Metals had obtained the partnerships through a sham designed to conceal known and pervasive problems.

              2.     **Defendants' Statements Touting That The Partnerships With Interstate Batteries And Johnson Controls De-Risking Aqua Metals Ramp Up And Providing It What It Needs To Scale And Grow Were Materially False And Misleading**

397.    In addition to touting the strategic partnerships as validating the AquaRefining technology, throughout the Class Period, Defendants also issued materially false and misleading statements that the strategic partnerships de-risked Aqua Metals' ramp up and provided Aqua Metals with what they need to expand and scale up:

- Aqua Metals: "'With its forward-thinking environmental goals, broad distribution network and strong brand name, **Interstate Batteries is an ideal partner for us as we scale our business**,' said Dr. Stephen Clarke, chairman and CEO of Aqua Metals."[93]

- Aqua Metals: "Johnson Controls and Aqua Metals Sign **Break-through Battery Recycling Technology** Partnership… '**Our partnership with Johnson Controls is a tremendous step forward and is an opportunity for us to work with the global leader in automotive battery manufacturing and responsible recycling**,' said Dr. Stephen Clarke, Chairman and CEO of Aqua Metals.  'We will build on this exciting relationship in order to enable clean and efficient battery recycling around the world.'"[94]

- Defendant Clarke: "our focus right now is that we have a strategic partner [Interstate Batteries] who is essentially looking towards to expand rapidly so that they can take advantage of lead produced that isn't subject to a smelter. So that's our entire focus and what it gives us is surety of not only supply of batteries, but of locations, **so it allows us to accelerate.** And as I said earlier, we talked a lot about our desire to build 10 facilities a year, which is a great statement, **but how**

---

[93] May 19, 2016 Press Release.

[94] February 9, 2017 Press Release.

**do you validate and move towards the end, and this relationship provides us the pathway to do that**."[95]

- Defendant Clarke: "So now I'll talk to – address some of our first strategic relationships and I'm going to talk to the recently announced **strategic partnership with Interstate Batteries, and the whole point of this relationship is to accelerate growth**."[96]

- Defendant Clarke: "**With the strategic relationships we have in place, we now believe we can expand quickly with relatively low risk** whilst we control IP and quality...."[97]

- Defendant Clarke: "**We're generating strong positive interest that's an understatement, we are generating massive interest in the market with supplies and customers as evidenced by our recent announcement [referring to the Interstate Batteries partnership]**...."[98]

- Defendant Clarke: "**[Interstate Batteries] initial [audio gap] to provide a million batteries a year to help with our scale up**…."[99]

- Defendant Mould: "**Johnson Controls...is major for this facility. It allows us to build out the facility to its full capacity**."[100]

- Defendant Clarke: "**Our partnerships, most recently with Johnson Controls** – the global leader in automotive battery manufacturing and responsible recycling – **and Interstate Batteries** – the largest independent battery distribution system in North America and the country's leading battery recycler. – and Battery Systems Inc. – one of the largest independent battery distributors in the U.S. **effectively rounds out a sustainable ecosystem for the automotive lead acid battery industry and provides a level of supply and off-take to support our expansion of AquaRefinery 1 and the construction of additional facilities**."[101]

- Defendant Clarke: "If you take what we've got with Interstate Batteries and Battery Systems, Inc., and then layer on top the demand and supply and off-take

---

[95] May 24, 2016 Q1 2016 Conference Call.

[96] May 24, 2016 Q1 2016 Conference Call.

[97] May 24, 2016 Q1 2016 Conference Call.

[98] May 24, 2016 Q1 2016 Conference Call.

[99] August 10, 2016 Q2 2016 Conference Call.

[100] February 10, 2017 KOLO News Article.

[101] February 14, 2017 FY 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

with JCI, **it gives us everything that we need scale from 160 tonnes to 800 tonnes a day**."[102]

- Defendant Clarke: "Well, we have been working on this agreement with JCI for a number of months now.  And looking at the tolling/lead purchase agreement, I alluded to this a moment ago, it pretty much gives us all the supply.  **Together with our relationships with Interstate Batteries and Battery Systems Inc., we believe we have secured sufficient supply and off-take to underpin our growth from 160 to 800T/day in North America**."[103]

- Defendant Clarke: "**But more importantly, [the JCI partnership] it transitions us to the start of a really exciting new phase of the company, which is licensing**…."[104]

- Defendant Clarke: "Another headline that I'm going to talk about is obviously our agreement with Johnson Control. And that really has two key aspects for us that we want to talk about. The first one is that **it provides the feed and off take for the additional facilities that we've been talking about for the past two years. It fills AquaRefinery long-term capacity and it moves us forward in the additional AquaRefineries that we want to build on and upgrade ourselves**."[105]

- Aqua Metals: "Through our relationships with Battery Systems Inc., Interstate Battery System International, Inc., and Johnson Controls, we believe **we are now able to pursue our expansion of our directly-owned recycling facilities in the U.S. subject to our receipt of necessary funding**."[106]

- Defendant Clarke: "**Strategic partners [Interstate Batteries and Johnson Controls] brought scale and urgency. They de-risked our ramp up, they provided stability for efficient scale up and the planning of efficient scale up, and allowed for a more aggressive build-out**."[107]

- Aqua Metals: "**Strategic relationships helped de-risk our start-up**…"[108]

- Aqua Metals:  "**Strategic partners brought scale and urgency**:

---

[102] February 14, 2017 FY 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[103] February 14, 2017 FY 2016 Conference Call.

[104] February 14, 2017 FY 2016 Conference Call.

[105] February 14, 2017 FY 2016 Conference Call.

[106] March 2, 2017 2016 Form 10-K. The 2016 Form 10-K was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[107] May 9, 2017 Q1 2017 Conference Call. Defendants Clarke and Murphy participated on the call.

[108] May 9, 2017 Slide Presentation, attached as Exhibit 99.2 to the Company's May 9, 2017 Form 8-K. The Form 8-K was signed by Defendant Clarke.

- **De-risked our ramp-up**
- **Provided stability for efficient scale-up**
- **Allows for more aggressive build out**"[109]

398.   The bolded and underlined affirmative statements in ¶ 397 were affirmative statements of present fact that were materially false and misleading when made because neither "partnership" had the ability to accelerate or support Aqua Metals' growth, scale up, build out or expansion, allow Aqua Metals to build out to full capacity; transition the Company to licensing; or de-risk its ramp-up because the technology was malfunctioning and not operational.  Without a working technology none of this could happen.

399.   The truth of the fact that the technology was malfunctioning is demonstrated by:

(i)    statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017and were not resolved (¶¶ 63-75);

(ii)   statements by CW 1 that it was known, including by Clarke and Mould, that as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)  CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iv)   CW1's statement that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶64, 71); CW1 further noted that Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(v)    statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(vi)   statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(vii)  CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was

---

[109] June 2017 Corporate Presentation.

testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72);

(viii)   statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72); and

(ix)   statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

400.   The truth of the fact that the technology was malfunctioning is further demonstrated by Defendants' end of and post-Class Period admissions:

(i)   regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288);

(ii)   that the AquaRefining process was "unproven technology" (¶¶ 282, 288); and

(iii)   even as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 288(f)); and   (iv) not until August 8, 2018 had they "t[aken] the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶288(j)).

401.   All of the above statements were also misleading by omission as they failed to disclose that the "partnerships" were the result of representatives from Interstate Batteries and Johnson Controls being subjected to Defendants' sham dog and pony shows at both the California Testing Facility and the Reno Plant that concealed the pervasive issues with the AquaRefining technology and further failed to disclose that AquaRefining was not operational.  Thus, without a working technology, the partnerships were meaningless.

402.   The fact that Interstate Batteries and Johnson Controls were subjected to sham demonstrations is demonstrated by:

(i)   statements by CWs 2, 3 and 4 that regular visitors to the Reno Plant were subjected to "dog and pony shows" carefully orchestrated to conceal the problems and that the process was not functioning (¶¶ 83-85, 92, 105-109);

(ii)   Clarke's May 24, 2016 statement that, "What we've added to that is a new full-sized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there" (¶ 134), suggesting that the demonstrations at the California Testing Facilities before the Reno Plant opened were also shams (¶ 76); and

(iii)  statements by CWs 1, 2 and 4 that representatives from Interstate Batteries and Johnson Controls were subjected to Defendants' "dog and pony shows" at the Alameda facility and the Reno Plant (¶¶ 76, 84, 108).

403.  These misstatements and omissions are material because a reasonable investor would consider the total mix of information significantly altered if investors knew that Aqua Metals' technology, its "core" business, was malfunctioning and not operational and that Aqua Metals had obtained the partnerships through a sham designed to conceal known and pervasive problems because that meant that the Company could not currently accelerate growth or commercial production.

### 3.   Defendants' Statements Regarding The Retrofitting Of A Johnson Controls Facility Were Materially False And Misleading

404.  Defendants also issued materially false and misleading statements concerning the development program agreement with Johnson Controls and retrofitting of a Johnson Controls' facility:

- Aqua Metals: "**Equipment licensing has started: Working with JCI to plan the retrofit of an existing facility, as the blueprint for others**."[110]

- Defendant Clarke: "…securing non-dilutive financing to accommodate our growth **and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018.**"[111]

- Aqua Metals: "AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes of lead products per day by the end of 2017. **Aqua Metals is currently also working on… integrating AquaRefining into a to-be-named existing lead smelter with its strategic partner, Johnson Controls**."[112]

- Aqua Metals: "Aqua Metals is currently also working on plans to . . . **integrat[e] AquaRefining into a 'to-be-named' existing lead smelter with its strategic partner, Johnson Controls**."[113]

- Aqua Metals: "**[W]e delivered to Johnson Controls written notice our readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead**."[114]

---

[110] May 9, 2017 Slide Presentation.

[111] May 9, 2017 Q1 2017 Press Release. Defendant Murphy was identified as the "Company Contact."

[112] May 31, 2017 Press Release.

[113] August 2, 2017 Press Release.

405.     The bolded and underlined statements in ¶ 404 were affirmative statements of present fact that were materially false and misleading when made because the AquaRefining technology was malfunctioning and Aqua Metals could not get AquaRefining or the Reno Plant to function; thus, Aqua Metals was not in a position to retrofit or convert third-party facilities throughout the Class Period.

406.     The truth of the fact that the technology was malfunctioning is demonstrated by:

(i)      statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017and were not resolved (¶¶ 63-75);

(ii)     statements by CW 1 that it was known, including by Clarke and Mould, that as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)    CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iv)    CW1's statement that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶64, 71); CW1 further noted that Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(v)     statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(vi)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(vii)   CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72);

(viii)  statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72); and

---

[114] September 28, 2017 Form 8-K. The Form 8-K was signed by Defendant Clarke.

    (ix)      statements by CWs  4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

407.    The truth of the fact that the technology was malfunctioning is further demonstrated by Defendants' end of and post-Class Period admissions:

    (i)       regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288);

    (ii)      that the AquaRefining process was "unproven technology" (¶¶ 282, 288); and

    (iii)    even as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 288(f)); and  (iv) not until August 8, 2018 had they "t[aken] the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶288(j)).

408.    All of the above statements were also misleading by omission as they failed to disclose that the "partnership" was the result of representatives from Johnson Controls being subjected to Defendants' sham dog and pony shows at both the California Testing Facility and the Reno Plant that concealed the pervasive issues with the AquaRefining technology and further failed to disclose that AquaRefining was not operational.  Thus, without a working technology, the partnership was meaningless.

409.    The fact that Johnson Controls were subjected to sham demonstrations is demonstrated by:

    (i)       statements by CWs 2, 3 and 4 that regular visitors to the Reno Plant were subjected to "dog and pony shows" carefully orchestrated to conceal the problems and that the process was not functioning (¶¶ 83-85, 92, 105-109);

    (ii)      Clarke's May 24, 2016 statement that, "What we've added to that is a new full-sized electrolyzed test facility, which allows us to demonstrate our process to third-party licenses without having to take into Reno [*sic*] to show the process there" (¶ 134), suggesting that the demonstrations at the California Testing Facilities before the Reno Plant opened were also shams (¶ 78); and

    (iii)    statements by CWs 1, 2 and 4 that representatives from Johnson Controls were subjected to Defendants' "dog and pony shows" at the Alameda facility and the Reno Plant (¶¶ 76, 84, 108).

410.    These misstatements and omissions are material because a reasonable investor would consider the total mix of information significantly altered if investors knew that Aqua Metals'

technology, its "core" business, was malfunctioning and not operational and that Aqua Metals had

obtained the partnerships through a sham designed to conceal known and pervasive problems.

**D.   Defendants Issued Materially False And Misleading Statements Concerning Licensing**

411.   Throughout the Class Period, Defendants issued materially false and misleading

statements[115] representing that they were working on the licensing of AquaRefining technology to

third parties despite the fact that the Company was not in a position to do so as the technology did not

work:

**1.   Mixed Statements**

412.   The following are mixed statements, containing both present facts and forward-looking

portions, regarding Defendants' licensing efforts:

- Defendant Clarke: "So, on that basis, with both the U.S. and non-U.S. licensing rollout, what we said to the interested parties is that we're not going to – **we don't plan to ship any modules until quarter three of 2017 not because we can't, but we just think it's prudent to have got six to seven months of operating experience under our belt before we do that**."[116]

- Aqua Metals: "**Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's business strategy. The first module deliveries to third parties are expected in 2017.**"[117]

- Defendant Clarke: "**we expect to start shipping licensed AquaRefining equipment during 2017.** "[118]

- Tailwinds Question: "[S]ince in 2017 you only have the one facility up and running. Now you have the opportunity to revolutionize a whole industry that is $22 billion in size. **Now that you've got one facility running** I'm guessing your licensing partners must be highly interested in what's going on. Can you give us a little update on where you stand on the licensing side right now?"

---

[115] **Bolded and underlined** statements are alleged to be false and misleading, while other statements are provided for context.

[116] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[117] November 7, 2016 Q3 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[118] November 7, 2016 Q3 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

Defendant Clarke's Response: "So looking forward, one of the things that we expected was that **we'd need to be running for six months to maybe even twelve months before we moved ahead** . . . broke out into licensing our equipment to third parties. You know **we're confident that we'll be announcing some licensing deals within quarter 1 of next year and planning a very accelerated roll out**."[119]

413.    The bolded and underlined mixed statements in ¶ 412 contained misstatements of present fact.  The present facts contained in these statements are that: (a) that Aqua Metals did not plan to ship until Q3 2017 "not because we can't"; (b) Tailwind's uncorrected statement that Aqua Metals has "got one facility running;" and (c) that Clarke was "confident that we'll be announcing some licensing deals within quarter 1 of next year."  The forward-looking portions of the bolded and underlined statements are those that state Aqua Metals plans and expects to begin licensing and shipping licensed equipment in 2017.

414.    Both the statements of present fact and the forward looking portions of the statements were materially false and misleading when made because Aqua Metals was never in a position to license AquaRefining to third parties during the Class Period because AquaRefining was malfunctioning and not operational throughout the Class Period and the interest from potential licensees was generated through Defendants' dog and pony shows.

415.    The misstatements are material because a reasonable investor would consider important the fact that the Company was not in a position to license the AquaRefining technology due to the fact that it had not resolved the issues causing the technology to malfunction because this meant the Company's "core" AquaRefining technology did not work.  Moreover, the fact that interest from licensees was generated through a sham designed to conceal known and pervasive problems because it would have been important to a reasonable investor because it meant the interest was meaningless.

416.    The truth of the fact that Aqua Metals' technology was not functioning and Defendants were not in a position to start licensing AquaRefining equipment is demonstrated by:

(i)     statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue

---

[119] December 22, 2016 Clarke Interview With Tailwinds.

that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017and were not resolved (¶¶ 63-75);

(ii)   statements by CW 1 that it was known, including by Clarke and Mould, that as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)   CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iv)   CW1's statement that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶64, 71); CW1 further noted that Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(v)   statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(vi)   statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(vii)   CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72);

(viii)   statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72); and

(ix)   statements by CWs  4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

417.   The truth of the fact that licensee interest was generated through the sham demonstrations is demonstrated by CWs 1, 2, 3 and 4's statements that regular visitors to the Reno Plant and the California Testing Facilities were subjected to "dog and pony shows," including that they were carefully orchestrated to conceal the problems and that the process was not functioning (¶¶ 83-85, 92, 105-109).  For example:

(i)   CW 2 said that the floor employees would get a call from the plant management to start the machines and about five minutes later the visitors would come to the plant (¶ 85); CW 2 said employees at the plant were told by CW 2's manager, with the directive coming from Clarke, "don't run the machines until [the

investors] show up" and to "make yourself look busy" and to "stage everything up" and "we only ran the machines when investors came to the plant." (¶ 83); CW 2 further stated that the visitors were only on the plant floor for about five to ten minutes watching the machines run (¶ 85);

(ii)   CW 4 stated that, because the module could not operate for more than about an hour before it would break down, CW 4 had to start it at a time where it would run during the site visits and not break down and that visitors would only spend about five to ten minutes on the plant floor watching the demonstration (¶ 107);

(iii)  The employees called the site visits a "dog and pony show" because, as CW 4 described, it was a "gyp," meaning a scam, as the true state of affairs was covered up by Defendants (¶¶ 76, 84, 106); and

(iv)   CW 1 relayed that while at the Alameda facility, several visitors, including industry representatives and analysts, came through for demonstrations that CW 1 called "dog and pony shows."  (¶ 76).

418.   Further, the forward-looking portions of the bolded and underlined statements in ¶ 412 are actionable misrepresentations because Defendants knew these statements were false when made as is demonstrated by:

(i)    the statement by CW 1 that significant issues with the technology, including the sticky lead issue, hard lead issue and issues with chemical ratios, as well as the fact that the technology would have issues scaling, were known, including by Clarke and Mould, at the time the statements were made (¶¶ 61-75);

(ii)   statements by CWs 2, 4 and 5 that Defendants regularly visited the Reno Plant and witnessed the problems with the AquaRefining process and knew the Reno Plant was not operational (¶¶ 79, 98, 104, 110-11, 116-118);

(iii)  statements by CWs 2, 3, 4 and 5 that Defendants had access to Daily Production Reports which showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of any AquaRefined lead (¶¶ 86, 93, 110, 119) and statements by CWs 2 and 5 that Clarke and Mould periodically attended production meetings at the plant at which these problems were discussed (¶¶ 79, 116);

(iv)   CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(v)    according to CW 4, CW 4 spoke directly with Defendants about the process, production and equipment failures (¶¶ 98-99);

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(vi)   CW 2's statement that the Company kept an Operations Log which reflected how long the machines at the Reno Plant, including the modules, ran each day (¶ 86); and

(vii)   that, according to multiple CW accounts, Defendants Clarke and Mould ran the "dog and pony shows" with third parties and ensured that visitors left with the incorrect impression that AquaRefining worked (¶¶ 76, 83-85, 92, 105-109).

419.   The forward-looking portions of the bolded and underlined statements in ¶ 412 are also actionable misrepresentations because they are not protected by meaningful cautionary language. Clarke's statement above in the Tailwinds interview was not accompanied by any cautionary statements.  As to the other statements, none of Aqua Metal's risk disclosures warn against or disclose the known and pervasive issues with the AquaRefining technology that rendered it incapable of working and therefore it was not capable of being licensed to third parties.  While Aqua Metals did have a risk factor that its "business strategy includes licensing arrangements and entering into joint ventures and strategic alliances. Failure to successfully integrate such licensing arrangements, joint ventures, or strategic alliances into our operations could adversely affect our business….," this is no way discloses the actual known risk and issues to licensing – that AquaRefining was not working.

**2.     Forward Looking**

420.   The following are actionable forward looking statements regarding Defendants' licensing efforts:

- Aqua Metals: "Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's duel business model**, and the first module deliveries to third parties are expected in the third quarter of 2017**."[120]

- Aqua Metals:  "Company Highlights: ….

  - **Providing AquaRefining technology and equipment on a serviced licensing model, which is expected to commence in 2017**"[121]

- Aqua Metals issued nearly identical statements between November 7, 2016 through August 9, 2017:  "Our **plan of operations for the 12-month period**

---

[120] August 10, 2016 Q2 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[121] November 7, 2016 Q3 2016 Press Release.

**following the date of this report is to . . . [begin to expand/expansion of] our business with . . . licensing of our recycling technology and equipment to third parties**. [122]

421.    These forward looking statements were materially false and misleading when made because Aqua Metals was never in a position to license AquaRefining to third parties throughout the Class Period, because AquaRefining was malfunctioning and not operational throughout the Class Period and the interest from potential licensees was generated through Defendants' dog and pony shows.

422.    The misstatements are material because a reasonable investor would consider important the fact that the Company was not in a position to license the AquaRefining technology due to the fact that it had not resolved the issues causing the technology to malfunction because this meant the Company's "core" AquaRefining technology did not work.  Moreover, the fact that interest from licensees was generated through a sham designed to conceal known and pervasive problems because it would have been important to a reasonable investor because it meant the interest was meaningless.

423.    The truth of the fact that Aqua Metals' technology was not functioning and Defendants were not in a position to start licensing AquaRefining equipment is demonstrated by:

(i)    statements by CW 1 that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that were expected to be worse as the Company scaled and did persist throughout the Class Period and into 2017and were not resolved (¶¶ 63-75);

(ii)    statements by CW 1 that it was known, including by Clarke and Mould, that as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)    CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iv)    CW1's statement that, while the sticky lead and hard lead issues were pervasive at the California Testing Facilities, Defendants decided to build the Reno Plant anyways and "go big" before resolving these issues (¶¶ 64, 71); CW1 further noted that Defendants were aware of scaling issues because the Defendants

---

[122] November 7, 2016 Q3 2016 Form 10-Q; March 2, 2017 2016 Form 10-K; August 9, 2017 Q2 2017 Form 10-Q. The Form 10-Qs were signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(v)     statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶ 63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(vi)    statements by CWs 1, 2, 3 and 4 that, throughout the Class Period, the modules could not operate for more than a few hours or less without malfunctioning and became idle for two or three days (¶¶ 75, 78, 90, 97);

(vii)   CW1's statement that, although the Company later conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened (¶ 72);

(viii)  statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72); and

(ix)    statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113).

424.    The truth that the licensee interest was generated through the sham demonstrations is demonstrated by CWs 1, 2, 3 and 4's statements that regular visitors to the Reno Plant and the California Testing Facilities were subjected to "dog and pony shows," including that they were carefully orchestrated to conceal the problems and that the process was not functioning (¶¶ 83-85, 92, 105-109).  For example:

(i)     CW 2 said that the floor employees would get a call from the plant management to start the machines and about five minutes later the visitors would come to the plant (¶ 85); CW 2 said employees at the plant were told by CW 2's manager, with the directive coming from Clarke, "don't run the machines until [the investors] show up" and to "make yourself look busy" and to "stage everything up" and "we only ran the machines when investors came to the plant." (¶ 83); CW 2 further stated that the visitors were only on the plant floor for about five to ten minutes watching the machines run (¶ 85);

(ii)    CW 4 stated that, because the module could not operate for more than about an hour before it would break down, CW 4 had to start it at a time where it would run during the site visits and not break down and that visitors would only spend about five to ten minutes on the plant floor watching the demonstration (¶ 107);

(iii)   the employees called the site visits a "dog and pony show" because, as CW 4 described, it was a "gyp," meaning a scam, as the true state of affairs was covered up by Defendants (¶¶ 76, 84, 106); and

(iv)    CW 1 relayed that while at the Alameda facility, several visitors, including industry representatives and analysts, came through for demonstrations that CW 1 called "dog and pony shows" (¶ 76).

425.    Further, these forward-looking statements are actionable misrepresentations because Defendants knew these statements were false when made as is demonstrated by:

(i)     the statement by CW 1 that significant issues with the technology, including the sticky lead issue, hard lead issue and issues with chemical ratios, were known, including by Clarke and Mould, at the time the statements were made (¶¶ 61-75);

(ii)    statements by CWs 2, 4 and 5 that Defendants regularly visited the Reno Plant and witnessed the problems with the AquaRefining process and knew the Reno Plant was not operational (¶¶ 79, 104, 117-118);

(iii)   statements by CWs 2, 3, 4 and 5 that Defendants had access to Daily Production Reports which showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of any AquaRefined lead (¶¶ 86, 93, 110, 119) and statements by CWs 2 and 5 that Clarke and Mould periodically attended production meetings at the plant at which these problems were discussed (¶¶ 79, 116-18);

(iv)    CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(v)     according to CW 4, CW 4 spoke directly with Defendants about the process, production and equipment failures (¶¶ 98-99);

(vi)    CW 2's statement that the Company kept an Operations Log which reflected how long the machines at the Reno Plant, including the modules, ran each day (¶ 86); and

(vii)   that, according to multiple CW accounts, Defendants Clarke and Mould ran the "dog and pony shows" with third parties and ensured that visitors left with the incorrect impression that AquaRefining worked (¶¶ 76, 83-85, 92, 105-109).

426.    These forward-looking statements are also actionable misrepresentations because they are not protected by meaningful cautionary language. None of Aqua Metal's risk disclosures warn against or disclose the known and pervasive issues with the AquaRefining technology that rendered it incapable of working and therefore it was not capable of being licensed to third parties. While Aqua Metals did have a risk factor that its "business strategy includes licensing arrangements and entering

into joint ventures and strategic alliances. Failure to successfully integrate such licensing arrangements, joint ventures, or strategic alliances into our operations could adversely affect our business….," this in no way discloses the actual known risk and issues to licensing – that AquaRefining was not working.

### E. Defendants Issued Materially False And Misleading Statements Concerning Lead Production Rates

427. Throughout the Class Period, Defendants made numerous false and misleading statements touting Aqua Metals' recycled lead production capacity and projected production rates.[123]

#### 1. Affirmative Material Misrepresentations

428. Beginning in November 2016, Defendants repeatedly issued affirmative false and misleading statements that they had the current capacity to produce at least 120 tons of AquaRefined lead per day:

- Defendant Clarke: "The second bullet point here is that and I've mentioned before, we want to build up to 800 tonnes a day of our own lead recycling capacity and **with 120 under our belt,** we're looking to expand into the remainder. . . . **To put that in perspective, the AquaRefinery that we've built at Tahoe Reno Industrial Complex has currently got a capacity of 120 tonnes a day…**"[124]

- Aqua Metals: "Additionally, **we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day.**"[125]

- Defendant Clarke [responding to analyst question about increase from 80 tons to 120 tons]: "So, first question. Yes, it's something that we considered might be possible early on. **We wanted to make sure we could do it, before we told anybody. It is a theme here of make sure you can do it before you tell anybody is kind of key within the company**. So, we thought we might be able

---

[123] **Bolded and underlined** statements are alleged to be false and misleading, while other statements are provided for context. To the extent the other statements are also alleged to be false and misleading, they will be included in the relevant falsity section herein.

[124] November 7, 2016 Q3 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[125] November 7, 2016 Q3 2016 Form 10-Q. The November 7, 2016 Q3 2016 Form 10-Q was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

do it. As we built the facility, as we bought staff on with expertise in operating the various systems, **we started to test that idea and found out we could, then we validated it and then we did**. So, it was kind of a gradual process, but there is a thought that we might be able to do it from the beginning."[126]

- Aqua Metals: "During late 2016, we implemented upgrades to the facility that have **resulted in an initial production capacity of 120 metric tons per day** of lead based products."[127]

- Defendant Clarke: "So, the – in it – what we're saying is, and we mentioned this at the last earnings call, the original four-shift capacity of the plant was 80 tonnes a day, and **we figured out how to expand that to 120 tonnes a day with the equipment we had onsite. 120 tonnes a day is our four-shift capacity**."[128]

- Defendant Clarke: "**So, AquaRefinery, number one at Tahoe-Reno Industrial Complex is starting out with a plant capacity of 120 tonnes of lead per day.**"[129]

- Aqua Metals: "We have implemented numerous process improvements and expect to be capable of producing significantly more than 120 metric tonnes of recycled lead per day by the end of 2017. This is more battery processing capacity than we can utilize with 16 AquaRefining modules. As such, until we have increased our AquaRefining capacity, we will have the option of producing lead compounds from un-used AquaRefining feedstock. The lead compounds have a less established market and some demand uncertainty. **For this reason, following the commission of all 16 modules, we may choose to run TRIC at less than 120 tonnes per day, should this provide for a more optimal product mix.**"[130]

- Defendant Clarke: "**So it's all about AquaRefining but optimal product mix and profitability. We're focused on running all of our AquaRefining modules to the maximum benefit. And that means that we may choose to operate the overall facility with an output of less than 120 tons a day, but with**

---

[126] November 7, 2016 Q3 Conference Call. The 2016 Form 10-K was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[127] March 2, 2017 Form 10-K.

[128] February 14, 2017 FY 2016 Conference Call. Defendants Clarke and Murphy were participants on the call.

[129] February 14, 2017 FY 2016 Conference Call.

[130] August 9, 2017 Q2 2017 Form 10-Q. The Q2 2017 Form 10-Q was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

1

2

**maximized AquaRefining. And we're looking to change our product mix to a higher level of AquaRefining product.**"[131]

3

429.    The bolded and underlined statements in ¶ 428 were affirmative statements of present fact that were materially false and misleading when made because at no point during the Class Period did Aqua Metals have the capacity to produce "120 tons a day" of AquaRefined lead as AquaRefining was malfunctioning and not operational and these problems remained unresolved throughout the Class Period and AquaRefining could barely produce *any* AquaRefined lead during the Class Period.  Thus, the Company did not have 120 tons of production per day "under [its] belt" or the capacity to produce 120 tons, nor did Defendants ever "choose" to operate the Reno Plant at less than 120 tons of lead production per day.

430.    These statements were material because a reasonable investor would consider important that Aqua Metals did not actually have the capacity to produce 120 tons per day of AquaRefined lead due to the perpetually malfunctioning AquaRefining process and could produce very little, if any, AquaRefined lead and, thus, the Company was nowhere close to commercially producing the its core product.

431.    The truth that the AquaRefining technology was malfunctioning and regarding what was actually occurring at the Reno Plant is demonstrated by:

> (i)    statements by CW 1, including that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and into 2017 and was not resolved (¶¶ 63-75);

> (ii)    statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

> (iii)    statements by CWs 1, 2, 3, and 4 that the modules could not operate for more than a few hours or less without malfunctioning and becoming idle for two or three more days (¶¶ 75, 78, 90, 97);

---

[131] August 9, 2017 Q2 2017 Conference Call. Defendants Clarke and Murphy participated on the call.

    (iv)    statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

    (v)    statements by CWs  4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113);

    (vi)    statements by CW3 that Aqua Metals was not making an amount of AquaRefined lead that would be able to be cast into a bar at that time of the November 2016 photos and that that the only thing that was being cast during the Class Period was lead that did not go through the AquaRefining process (¶ 91);

    (vii)    CW1's statement that the technology "didn't translate in the factory" (¶ 70); and

    (viii)    statements by CW 3 and 4 explaining that the breaker often broke down because it could not support the volume of batteries being fed through it (¶¶ 89, 111).

432.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is further demonstrated by:

    (i)    the end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288);

    (ii)    the end of and post-Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282); and

    (iii)    the end of and post-Class Period admissions that it was still in the commissioning process even in Fall 2017 (¶¶ 278-279); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 288(f)); and that it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 288(j)).

433.    The truth that Aqua Metals had not met the touted capacity and barely produced any AquaRefined lead throughout the Class Period is demonstrated by:

    (i)    the Company's disclosure at the end of the Class Period that it had only "produced small quantities of AquaRefined lead" (¶ 277);

    (ii)    statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead was produced (¶¶ 80, 82, 91, 93, 95, 115) and that the Daily Production Reports reflected this fact ((¶¶ 86, 93, 110);

    (iii)    CW4's statement that the AquaRefining process "was not even close to be[ing] commercially operating" (¶ 96);

(iv)    CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(v)    CW 4's statement that the Company was "nowhere near" their stated production numbers and it was "absolutely impossible" to make the production numbers, and that the Reno Plant could not produce anything more than a 5 gallon bucket of AquaRefined lead – and this was based on multiple runs of the equipment which would run for a short time and then break down and need days of maintenance before they could run again. (¶ 95)

(vi)    statements by CW 1 that it was known, including by Clarke and Mould, that, as designed, the AquaRefining technology could not meet full-scale capacity (¶¶ 64, 68-71); and

(vii)    the end of and post-Class Period admissions that it was not until June 11, 2018, well after the end of the Class Period, that the Company cast its first block of AquaRefined lead (¶ 288(i)) and that as of October 12, 2018, Aqua Metals was only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules" (¶ 288(k))

## 2.    Mixed Statements

434.    Before the Reno Plant opened, Defendants made the following similar statements regarding production rates of 80 tons per day by the end of 2016 and expanding to 160 tons per day thereafter:

- Aqua Metals: "Consequently, **we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day. Our TRIC facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day."**[132]

- Aqua Metals: "[Aqua Metals expected to install modules at the Reno Plant] to support **an initial lead production capacity of 80 tons per day by the close of the third quarter of 2016."**[133]

---

[132] May 19, 2016 Q1 2016 Form 10-Q. The Q1 2016 Form 10-Q was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[133] May 19, 2016 Q1 2016 Form 10-Q.

- Defendant Clarke: "**Our plan remains to increase production to 80 metric tons of lead per day by the end of 2016.**"[134]

- Defendant Clarke: "So **we still remain on track to achieve 80 metric tons of lead per day output by the end of 2016 and on track to expand that to 160 metric tons per day by 2018**."[135]

435.    These bolded and underlined mixed statements in ¶ 434 contained affirmative misstatements of present fact. The present facts contained in the statements include that they "have implemented a plan," "have a plan," and were "on track" to achieve 80 tons and 160 tons of production and that the equipment is "sufficient to support" such production levels.  These were statements of current existing conditions and focus of the Company.  The forward-looking portion of these bolded and underlined statements above are those that refer to producing 80 tons of lead by fourth quarter/end of 2016 and to expanding production to 160 tons.

436.     Both the statements of actual fact and the forward looking portions were materially false and misleading when made because no number of modules would support these production numbers and there was no plan or reasonable basis for production of 80 tons, let alone 160 tons, because AquaRefining could not produce such levels of AquaRefined lead and, in fact, AquaRefining was malfunctioning throughout the Class Period and could barely produce *any* AquaRefined lead during the Class Period.

437.    These statements were material because a reasonable investor would consider important that Aqua Metals did not actually have the capacity to produce 80, let alone 160, tons per day of AquaRefined lead, nor would it when it was projected to due to the unresolved perpetually malfunctioning AquaRefining process, which could produce very little, if any, AquaRefined lead and, thus, the Company was nowhere close to commercially producing its core product.

438.    The truth that the AquaRefining technology was malfunctioning and never proven is demonstrated by:

---

[134] May 24, 2016 Q1 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[135] May 24, 2016 Q1 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

(i)    statements by CW 1, including that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and into 2017 and was not resolved (¶¶ 63-75);

(ii)   CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iii)  the end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288);

(iv)   the end of and post-Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282); and

(v)    the end of and post-Class Period admissions that it was still in the commissioning process even in Fall 2017 (¶¶ 278-279); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 288(f)); and that it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" ( ¶ 288(j)).

439.   Further, the forward-looking portions of the bolded and underlined statements in ¶ 434 are actionable misrepresentations because Defendants knew these statements were false and misleading when made and had no reasonable basis is demonstrated by:

(i)    the statement by CW 1 that significant issues with the technology, including the sticky lead issue, hard lead issue and issues with chemical ratios, as well as the fact that the technology would have issues scaling, were known, including by Clarke and Mould, and apparent at the California Testing Facilities since 2015 and that Clarke and Mould ignored potential solutions to the issues (¶¶ 63-75). According to CW 1, despite the sticky lead and hard lead issues, the Company went ahead with building the Reno Plant and banked on being able to solve the issues before the Reno Plant was completed, which never happened. (¶ 64). Defendants were aware of scaling issues because the Defendants witnessed these issues on a smaller scale when taking the technology from the small test lab to the full-size test facility (¶ 71);

(ii)   statements by CW 1 that it was known, including by Clarke and Mould that, as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71); and

(iii)  even when CW 4 joined the Company in 2017, CW 4 said Clarke would tell investors how much product they would produce and then, after, go to the Vice President, Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can we make that happen (¶ 99).

440.   The forward-looking portions of these bolded and underlined statements are also actionable misrepresentations because they are not protected by meaningful cautionary language. None of Aqua Metal's risk disclosures mention production rates nor do they warn against or disclose the known and pervasive issues with the AquaRefining technology that rendered it incapable of the touted production rates.

441.   After the Reno Plant opened, Defendants continued to make statements regarding production rates of 80 tons per day by the end of 2016 and expanding to 160 tons per day:

- Defendant Clarke: "So, basically, the world's first AquaRefinery is now opening for business. **As we've said before, it's planned to be 160 tons of lead produced per day. It's going to start with 80 tons a day of lead output by Q4 2016 and then have a 160 tons of lead output by 2018."**[136]

- Aqua Metals: **"Lead production projected to scale quickly during the fourth quarter, reaching 80 metric tons per day by the end of 2016."**[137]

- Defendant Clarke: "We're quickly approaching a meaningful inflection as we bring our first facility online and **begin producing lead** early in the fourth quarter of 2016. **Most importantly, we remain on track to reach full scale capacity of 80 metric tons of lead output per day by the end of 2016.**"[138]

- Aqua Metals: **"[W]e have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day."**[139]

- Aqua Metals: "We began installing our first AquaRefining modules in June 2016 and **expect** to install a total of 16 AquaRefining modules **to support an initial lead production capacity of 80 tons per day by the close of the fourth quarter of 2016.**"[140]

- Defendant Clarke [referring to presentation slide below]: "And so, in terms of the time line, we broke it out to August, September, October through the end of the year…. **But that's our plan, and we're on schedule for it**. We are – we've got

---

[136] August 10, 2016 Q2 2016 Conference Call. Defendants Clarke and Murphy participated on the call.

[137] August 10, 2016 Q2 2016 Press Release. Defendant Murphy was identified as the "Company Contact."

[138] August 10, 2016 Q2 2016 Press Release.

[139] August 10, 2016 Q2 2016 Form 10-Q. The Q2 2016 Form 10-Q was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[140] August 10, 2016 Q2 2016 Form 10-Q.

most of – well, **we've got all of it. . . . .So, by the beginning of November, we're targeting to be at somewhere around 20 tons a day of lead production, while the beginning of December to be at 40 tons a day of lead production and by the end of the year at 80 tons of lead production.**" [141]



- Defendant Clarke: "**In that, we plan to expand the Tahoe Reno facility to 160 tons a day by 2018**."[142]

- Aqua Metals: "The Company has built and delivered a total of five modules to its Nevada AquaRefinery thus far and currently plans to install and commission a total of 16 modules **for initial production capacity of 80 metric tons of lead per day. The Company anticipates that the Nevada AquaRefinery will reach its initial production capacity within the coming months**."[143]

442.    The bolded and underlined mixed statements in ¶ 441 contained affirmative statements of present fact.  The present facts contained in this statement are that they "have implemented a plan," are "on schedule" for their plan, were currently "on track," to reach full scale capacity of 80 tons and then 160 tons, and that the modules can "support" those levels of production and "expect to scale quickly."   These were statements of current existing conditions and focus of the Company.   The forward-looking portion of this statement refers to producing 20 tons in November, 40 tons by the end of the year, 80 tons of lead per day by the end of 2016, and expanding to 120 tons, and then 160 tons.

443.    Both the statements of actual fact and the forward looking statements were materially false and misleading when made because there was no plan or basis for production of even 20 tons, let alone an expansion of production because AquaRefining could not produce such levels of

---

[141] August 10, 2016 Q2 2016 Conference Call.

[142] August 10, 2016 Q2 2016 Conference Call.

[143] November 1, 2016 Press Release. Exhibit 99.1 to Form 8-K. The Form 8-K was signed by Defendant Clarke.

AquaRefined lead and, in fact, AquaRefining was malfunctioning throughout the Class Period and could barely produce **any** AquaRefined lead during the Class Period.

444.    These statements were material because a reasonable investor would consider important that Aqua Metals did not actually have the capacity to produce 80, let alone 160, tons per day of AquaRefined lead, nor would it when it was projected to due to the unresolved perpetually malfunctioning AquaRefining process, which could produce very little, if any, AquaRefined lead and, thus, the Company was nowhere close to commercially producing the its core product.

445.    The truth that the AquaRefining technology was malfunctioning and regarding what was actually occurring at the Reno Plant is demonstrated by:

(i)      statements by CW 1, including that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and into 2017 and was not resolved (¶¶ 63-75);

(ii)     CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iii)    statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(iv)     statements by CWs 1, 2, 3, and 4 that the modules could not operate for more than a few hours or less without malfunctioning and becoming idle for two or three more days (¶¶ 75, 78, 90, 97);

(v)      statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

(vi)     statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113); and

(vii)    statements by CW 3 and 4 explaining that the breaker often broke down because it could not support the volume of batteries being fed through it (¶¶ 89, 111).

446.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is further demonstrated by:

(i)      the end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288);

(ii)    the end of -Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282); and

(iii)   the end of and post-Class Period admissions that it was still in the commissioning process even in Fall 2017 (¶¶ 278-279); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶ 288(f)); and that it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 288(j)).

447.   The truth that Aqua Metals barely produced any AquaRefined lead throughout the Class Period is demonstrated by:

(i)    the Company's disclosure at the end of the Class Period that it had only "produced small quantities of AquaRefined lead" (¶ 277);

(ii)    CW4's statement that the AquaRefining process "was not even close to be[ing] commercially operating" (¶ 96);

(iii)   statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115); and that the Daily Production Reports reflected that (¶¶ 86, 93, 110);

(iv)   CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(v)    CW 4's statement that, the Company was "nowhere near" their stated production numbers and it was "absolutely impossible" to make the production numbers, and that the Reno Plant could not produce anything more than a 5 gallon bucket of AquaRefined lead – and this was based on multiple runs of the equipment which would run for a short time and then break down and need days of maintenance before they could run again (¶ 95); and

(vi)   the end of and post-Class Period admissions that it was not until June 11, 2018, well after the end of the Class Period that the Company cast its first block of AquaRefined lead (¶ 288(i)) and as of October 12, 2018, Aqua Metals was only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules" (¶ 288(k)).

448.   Further, the forward-looking portions of the bolded and underlined statements in ¶ 441 are actionable misrepresentations because Defendants knew these statements were false and misleading when made and had no reasonable basis as is demonstrated by:

(i)     the statement by CW 1 that Clarke and Mould were aware of the significant issues with the technology, including the sticky lead issue, hard lead issue and issues with chemical ratios, as well as the fact that the technology would have issues scaling, that were known, including by Clarke and Mould, and apparent at the California Testing Facilities since 2015 and persisted at the Reno Plant throughout the Class Period (¶¶ 63-75).

(ii)    statements by CW 1 that it was known, including by Clarke and Mould that, as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)   the statement by CW 4 that Clarke would tell investors how much product they would produce and then, after, go to the Vice President, Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can we make that happen  and that CW 4 said they could not make it happen because of all of the problems (¶ 99);

(iv)    statements by CW 2, 3, 4, and 5 that Clarke and Mould regularly went to the Reno Plant and witnessed first-hand that the AquaRefining process was malfunctioning and the machines were not operating (¶¶ 79, 92, 104, 116);

(v)     CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(vi)    according to CW 4, CW 4 spoke directly with Defendants about the AquaRefining process, production and equipment failures (¶¶ 98-99);

(vii)   statements by CWs 2, 3, 4 and 5 that Daily Production Reports, to which the Officer Defendants had access to, showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of AquaRefined lead (¶¶ 86, 93, 110, 119);

(viii)  CW 2's statement that the Company kept an Operations Log which reflected how long the machines at the Reno Plant, including the modules, ran each day (¶ 86); and

(ix)    statements by CWs 2 and 5 that Clarke and Mould attended production meetings at which the problems were discussed.  (¶¶ 79, 116).

449.    The forward-looking portions of bolded and underlined statements in ¶ 441 are also actionable misrepresentations because they are not protected by meaningful cautionary language. None of Aqua Metal's risk disclosures mention production rates nor do they warn against or disclose

the known and pervasive issues with the AquaRefining technology that rendered it incapable of the touted production rates.

450.   At the end of 2016 and early 2017, having not achieved 1 ton of AquaRefined lead, much less the 80 tons, per day of AquaRefined lead that had been touted would be produced by the end of 2016, Defendants *increased* their production rates to 120 tons per day in early 2017 and 160 tons per day in 2018.  In addition to their affirmative statements above that they had the capacity for 120 tons per day, Defendants also stated:

- Aqua Metals: "Additionally, we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day. **We expect to achieve a production rate of 120 tonnes per day early in 2017**."[144]

- Aqua Metals: "Our **plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day**. . . ."[145]

- Aqua Metals: "Our TRIC facility is designed to accommodate additional AquaRefining modules and has battery breaking and component separations equipment **sufficient to support expansion to 160 tonnes of recycled lead per day**."[146]

- Aqua Metals: **"Our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day by 2018**."[147]

- Aqua Metals: "While working to bring the AquaRefinery online, we incorporated several process and other improvements, and consequently**, we now expect to ramp to a capacity of 120 T/day in early 2017,** which will provide greater revenue and earnings potential."[148]

- Aqua Metals: "Due to process and other improvements, **the Company expects to reach initial capacity of 120 T/day in early 2017, representing a 50% increase to the previously announced capacity of 80 T/day of lead output. Aqua Metals plans to expand to 160 metric tons of lead per day at the TRIC**

---

[144] November 7, 2016 Q3 2016 Form 10-Q.

[145] November 7, 2016 Q3 2016 Form 10-Q.

[146] November 7, 2016 Q3 2016 Form 10-Q.

[147] November 7, 2016 Q3 2016 Form 10-Q.

[148] November 7, 2016 Q3 2016 Press Release.

1

2

**AquaRefinery in 2018**. The facility was specifically designed to enable this expansion."[149]

3

4

- Aqua Metals: **"Determined that when fully commissioned, the TRIC facility will have the capacity to produce 120 metric tons per day (T/day) of lead; a 50% improvement over the previously announced 80 T/day capacity**…"[150]

5

6

- Defendant Clarke: "And **we expect to expand our capacity to 120 tonnes a day in early 2017**."[151]

7

- Defendant Clarke: "**[W]e're going to expand [production] to 160 tonnes a day**."[152]

8

9

10

- Defendant Clarke: "And what we'd been able to do is actually achieve the ability to de-link those processes. That's given us a large degree of flexibility in how we operate the plant. **And it allows us to actually release additional capacity that gets us to that 120 tonnes a day**."[153]

11

12

- Defendant Clarke [responding to analyst question about increase from 80 tons to 120 tons]: "**Is there an opportunity to expand beyond that, never say never, but we think 120 tonne to 160 tonne is optimal for that particular site**."[154]

13

14

15

- Danial Carlson of Tailwinds: "So it appears your on pace to be running at full volume in the not too distant future and you've recently announced that volumes from your Tahoe facility will be greater than originally anticipated. Can you provide us with a little more details around the volumes here?"

16

17

18

  Defendant Clarke: **We announced the earnings call that we are able to get better use out of the equipment on site so that we are not starting at 80 tons a day. We are starting actually starting at 120 tons and we are expecting to be able to quickly take that to 160 tons a day in the second half of next year**.[155]

19

- Aqua Metals: **"Expanded potential capacity to 120T/day."**[156]

20

21

[149] November 7, 2016 Q3 2016 Press Release.

22

[150] November 7, 2016 Q3 2016 Press Release.

23

[151] November 7, 2016 Q3 2016 Conference Call.

24

[152] November 7, 2016 Q3 2016 Conference Call.

25

[153] November 7, 2016 Q3 2016 Conference Call.

26

[154] November 7, 2016 Q3 2016 Conference Call.

[155] Interview by Daniel Carlson with Stephen Clarke, Chairman and CEO of Aqua Metals, Tailwinds Research Group (Dec. 22, 2016), https://tailwindsresearch.com/2016/12/aqua-metals-ceo-interview/.

27

[156] February 14, 2017 Slide Presentation (Ex. 99.2 to Form 8-K). Defendant Clarke signed the Form 8-K.

28

- Defendant Clarke: "**We've mentioned in the last earnings call that we have expanded that potential capacity from 80 tonnes to 120 tonnes a day. And we're now looking at expanding from 120 tonnes to 160 tonnes a day.**"[157]

- Defendant Clarke: **"And we're expecting to expand that to 160 tonnes a day.** To do that will require 32 AquaRefining modules."[158]

- Aqua Metals: **"Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day. In the longer term, our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day."**[159]

- Aqua Metals: **"Our facility is designed to accommodate additional AquaRefining modules to support expansion to 160 tonnes of lead products per day**."[160]

451.    The bolded and underlined mixed statements in ¶ 450 contained affirmative statements of present fact.  The present facts contained in this statement are that they have a "plan" and a "goal," are "on track," can "expand" their capacity and that the modules are sufficient to "support" production of 120 tons per day and then 160 tons, and were able to "ramp[ ] production."  These were statements of current existing conditions and focus of the Company.  The forward-looking portion of these statements refers to producing 20 tons in November, 40 tons by the end of the year, 80 tons of lead per day by the end of 2016, and expanding to 120 tons in early 2017, and then 160 tons.

452.    Both the statements of actual fact and the forward looking statements were materially false and misleading when made because there was no plan or basis for production of even 20 tons, let alone an expansion of production because AquaRefining could not produce such levels of AquaRefined lead, and, in fact, AquaRefining was malfunctioning throughout the Class Period and could barely produce *any* AquaRefined lead during the Class Period.

453.    These statements were material because a reasonable investor would consider important that Aqua Metals did not actually have the capacity to produce 120, let alone 160, tons per day of

---

[157] February 14, 2017 FY 2016 Conference Call.

[158] February 14, 2017 FY 2016 Conference Call.

[159] March 2, 2017 Form 10-K.

[160] March 2, 2017 Form 10-K.

AquaRefined lead nor would it when it was projected to due to the unresolved perpetually malfunctioning AquaRefining process, which could produce very little, if any, AquaRefined lead and, thus, the Company was nowhere close to commercially producing its core product.

454.    The truth that the AquaRefining technology was malfunctioning and regarding what was actually occurring at the Reno Plant is demonstrated by:

(i)     statements by CW 1, including that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and into 2017 and was not resolved (¶¶ 63-75);

(ii)    CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iii)   statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(iv)    statements by CWs 1, 2, 3, and 4 that the modules could not operate for more than a few hours or less without malfunctioning and becoming idle for two or three more days (¶¶ 75, 78, 90, 97);

(v)     statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72);

(vi)    statements by CWs  4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113); and

(vii)   statements by CW 3 and 4 explaining that the breaker often broke down because it could not support the volume of batteries being fed through it (¶¶ 89, 111).

455.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is further demonstrated by:

(i)     the end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288);

(ii)    the end of -Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282); and

(iii)   the end of and post-Class Period admissions that it was still in the commissioning process even in Fall 2017 (¶¶ 290-291); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production

of AquaRefined lead on a commercial scale" (¶ 288(f)); and that it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 288(j)).

456.    The truth that Aqua Metals barely produced any AquaRefined lead throughout the Class Period is demonstrated by:

(i)     the Company's disclosure at the end of the Class Period that it had only "produced small quantities of AquaRefined lead" (¶ 277);

(ii)    CW4's statement that the AquaRefining process "was not even close to be[ing] commercially operating" (¶ 96);

(iii)   statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115) and that the Daily Production Reports reflected that (¶¶ 86, 93, 110);

(iv)    CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(v)     CW 4 statement that the Company was "nowhere near" their stated production numbers and it was "absolutely impossible" to make the production numbers, and that the Reno Plant could not produce anything more than a 5 gallon bucket of AquaRefined lead – and this was based on multiple runs of the equipment which would run for a short time and then break down and need days of maintenance before they could run again (¶ 95); and

(vi)    the end of and post-Class Period admissions that it was not until June 11, 2018, well after the end of the Class Period that the Company cast its first block of AquaRefined lead (¶ 288(i)) and October 12, 2018, Defendants were only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules." (¶ 288(k)).

457.    Further, the forward-looking portions of the bolded and underlined statements in ¶ 450 are actionable misrepresentations because Defendants knew these statements were false and misleading when made and had no reasonable basis as is demonstrated by:

(i)     the statement by CW 1 that Clarke and that Mould were aware of the significant issues with the technology, including the sticky lead issue, hard lead issue and issues with chemical ratios, as well as the fact that the technology would have issues scaling, were known, including by Clarke and Mould, and apparent at the California Testing Facilities since 2015 and persisted at the Reno Plant throughout the Class Period (¶¶ 63-75);

(ii)  statements by CW 1 that it was known, including by Clarke and Mould that, as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)  the statement by CW 4 Clarke that would tell investors how much product they would produce and then, after, go to the Vice President, Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can we make that happen and that CW 4 said they could not make it happen because of all of the problems (¶ 99);

(iv)  CW statements that Clarke and Mould regularly went to the Reno Plant and witnessed first-hand that the AquaRefining process was malfunctioning and the machines were not operating (¶¶ 79, 92, 104, 116);

(v)  CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(vi)  according to CW 4, CW 4 spoke directly with Defendants about the AquaRefining process, production and equipment failures (¶¶ 98-99);

(vii)  statements by CWs 2, 3, 4 and 5 that Daily Production Reports, to which the Officer Defendants had access to, showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of AquaRefined lead (¶¶ 86, 93, 110, 119);

(viii)  CW 2's statement that the Company kept an Operations Log which reflected how long the machines at the Reno Plant, including the modules, ran each day (¶ 86); and

(ix)  statements by CWs 2 and 5 that Clarke and Mould attended production meeting at which the problems were discussed (¶¶ 79, 116).

458.  The forward-looking portions of the bolded and underlined statements in ¶ 450 are also actionable misrepresentations because they are not protected by meaningful cautionary language. None of Aqua Metal's risk disclosures mention production rates nor do they warn against or disclose the known and pervasive issues with the AquaRefining technology that rendered it incapable of the touted production rates.

459.  In mid-2017, having not achieved 1 ton of AquaRefined lead, much less the touted 120 tons per day of AquaRefined lead that had been touted would be produced by early 2017, Defendants

then pushed the projection of 120 tons per day to be achieved by the end of 2017 and 160 tons per day thereafter:

- Defendant Clarke: "In the meantime, the entire Aqua Metals team **remains focused on our primary goal – to scale commercial operations at the first AquaRefinery to 120 metric tons per day by the end of the year.**"[161]

- Defendant Clarke: "**For remainder of this year, we're going to do ramping production to 120 metric tonnes a day of lead which we aim to achieve by the end of 2017 or sooner. And we'll be going through how that's validating our economic projections and incorporating lessons learned into the operation of our first AquaRefinery….**"[162]

- Defendant Clarke: "So moving on, the AquaRefinery that we are working towards and **we are on track to be at 120 metric tonnes a day by the end of the year, I want to say by the end of the year, we are hoping to be there sooner than that.**"[163]

- Defendant Clarke: "And then on looking at potential annual revenue and then looking at the timing of that. So, if **we look at AquaRefinery 1, we're planning on having a production capacity of 120 metric tonnes a day by the end of the year, and then expanding it to 160 metric tonnes a day in 2018. And that essentially means that we will have 16 AquaRefining modules on-site and operational at 120 tonnes a day and 32 modules on-site and operational 160 tonnes a day.**"[164]

- Aqua Metals: "**We expect TRIC to achieve a production rate of 120 metric tons of recycled lead per day by the end of 2017**."[165]

- Aqua Metals: "**Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day by the end of 2017. In the longer term, our goal is to increase our production of lead at our TRIC facility to 160 tonnes per day**."[166]

---

[161] April 24, 2017 Press Release.

[162] May 9, 2017 Q1 2017 Conference Call. Defendants Clarke and Murphy were participants on the call.

[163] May 9, 2017 Q1 2017 Conference Call.

[164] May 9, 2017 Q1 2017 Conference Call.

[165] May 10, 2017 Q1 2017 Form 10-Q. The Q1 2017 Form 10-Q was signed by Defendants Clarke and Murphy and contained Sarbanes-Oxley Certifications signed by Clarke and Murphy.

[166] May 10, 2017 Q1 2017 Form 10-Q.

- Aqua Metals: **"AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes of lead products per day by the end of 2017."**[167]

- Defendant Clarke: "[T]here's a **'reasonable chance' company will reach 120 tons of capacity before end of year**…."[168]

- Aqua Metals: "AquaRefinery 1: **On Track for 120mT/Day by Dec 2017 . . . . Expansion to 160mT/day in 2018 being evaluated**."[169]

- Defendant Clarke: "[We] are now working to install the balance of our AquaRefining modules **as we work towards our goal of achieving 120 metric tonnes per day of capacity by year end**."[170]

460.   The bolded and underlined mixed statements in ¶ 459 contained present affirmative statements of fact.  The present facts contained in this statement are that they have a "plan," a "goal" and "expect" and were currently "on track" to reach and "ramp up production" to capacity of 120 tons and then 160 tons, and were able produce "significantly more" lead.  These were statements of current existing conditions and focus of the Company.  The forward-looking portion of these statements refers to producing 120 tons per day by the end of 2017, and then expanding to 160 tons per day.

461.   Both the statements of actual fact and the forward looking statements were materially false and misleading when made because there was no plan or basis for production of even 20 tons, let alone an expansion of production because AquaRefining could not produce such levels of AquaRefined lead and, in fact, AquaRefining was malfunctioning and could barely produce *any* AquaRefined lead throughout the Class Period.

462.   These misstatements were material because a reasonable investor would consider important that Aqua Metals did not actually have the capacity to produce 160 tons per day of AquaRefined lead, nor would it when it was projected to due to the perpetually malfunctioning AquaRefining process, which could produce very little, if any, AquaRefined lead and, thus, the Company was nowhere close to commercially producing its core product.

---

[167] May 31, 2017 Press Release.

[168] June 1, 2017 Bloomberg News Article.  Not accompanied by any cautionary language.

[169] June 2017 Corporate Presentation.

[170] July 25, 2017 Press Release. Defendant Murphy was identified as the "Company Contact."

463.    The truth that the AquaRefining technology was malfunctioning and regarding what was actually occurring at the Reno Plant is demonstrated by:

(i)     statements by CW 1, including that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and into 2017 and was not resolved (¶¶ 63-75);

(ii)    CW1's statement that the technology "didn't translate in the factory" (¶ 70);

(iii)   statements by CWs 1, 2, 3, 4 and 5 that, throughout the Class Period, AquaRefining did not work and suffered from significant issues, including the sticky lead, hard lead and other problems (¶¶63-72, 78-82, 87, 89-91, 97, 110-112, 114-15);

(iv)    statements by CWs 1, 2, 3, and 4 that the modules could not operate for more than a few hours or less without malfunctioning and becoming idle for two or three more days (¶¶ 75, 78, 90, 97);

(v)     statements by CW 1 that, from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility (¶ 72); statements by CWs 4 and 5 that the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 97, 110, 113)); and

(vi)    statements by CWs 3 and 4 explaining that the breaker often broke down because it could not support the volume of batteries being fed through it (¶¶ 89, 111).

464.    The truth regarding the operations of AquaRefining and what was actually occurring at the Reno Plant is further demonstrated by:

(i)     the end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 278, 286, 288);

(ii)    the end of -Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 282); and

(iii)   the end of and post-Class Period admissions that it was still in the commissioning process even in Fall 2017 (¶¶ 278-279); as of March 15, 2018, the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶ 288(f)); and that it was not until August 8, 2018 that Defendants admitted they "took the first step to move beyond 'proof of concept' and transitioned into commercialization" (¶ 288(j)).

465.    The truth that Aqua Metals barely produced any AquaRefined lead throughout the Class Period is demonstrated by:

(i)    the Company's disclosure at the end of the Class Period that it had only "produced small quantities of AquaRefined lead" (¶ 277);

(ii)   CW4's statement that the AquaRefining process "was not even close to be[ing] commercially operating" (¶ 96);

(iii)  statements by CWs 2, 3, 4 and 5 that very limited amounts of lead were produced during the Class Period, and particularly a lack of AquaRefined lead (¶¶ 80, 82, 91, 93, 95, 115) and that the Daily Production Reports reflected that (¶¶ 86, 93, 110);

(iv)   CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(v)    CW 4 statement that, the Company was "nowhere near" their stated production numbers and it was "absolutely impossible" to make the production numbers and that the Reno Plant could not produce anything more than a 5 gallon bucket of AquaRefined lead – and this was based on multiple runs of the equipment which would run for a short time and then break down and need days of maintenance before they could run again (¶ 95); and

(vi)   the end of and post-Class Period admissions that it was not until June 11, 2018, well after the end of the Class Period that the Company cast its first block of AquaRefined lead (¶ 288(i)) and as of October 12, 2018, AquaMetals was only generating "daily production of 2+ metric tons of AquaRefined lead per day on those individual modules" (¶ 288(k)).

466.   Further, the forward-looking portions of the bolded and underlined statements in ¶ 459 are actionable misrepresentations because Defendants knew these statements were false and misleading when made and had no reasonable basis as is demonstrated by:

(i)    the statement by CW 1 that Clarke and Mould were aware of the significant issues with the technology, including the sticky lead issue, hard lead issue and issues with chemical ratios, as well as the fact that the technology would have issues scaling, that were known, including by Clarke and Mould, and apparent at the California Testing Facilities since 2015 and persisted at the Reno Plant throughout the Class Period (¶¶ 63-75);

(ii)   statements by CW 1 that it was known, including by Clarke and Mould that, as designed, the AquaRefining technology could not meet full scale capacity (¶¶ 64, 68-71);

(iii)  the statement by CW 4 that Clarke would tell investors how much product they would produce and then, after, go to the Vice President, Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can

we make that happen; and that CW 4 said they could not make it happen because of all of the problems (¶ 99);

(iv)     statements by CWs 2, 3, 4, and 5 that Clarke and Mould regularly went to the Reno Plant and witnessed first-hand that the AquaRefining process was malfunctioning and the machines were not operating; (¶¶ 79, 92, 104, 116);

(v)     CW 4's statement that CW 4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced (¶ 98);

(vi)     according to CW 4, CW 4 spoke directly with Defendants about the AquaRefining process, production and equipment failures (¶¶ 98-99);

(vii)     statements by CWs 2, 3, 4 and 5 that Daily Production Reports, to which the Officer Defendants had access to, showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of AquaRefined lead (¶¶ 86, 93, 110, 119);

(viii)     CW 2's statement that the Company kept an Operations Log which reflected how long the machines at the Reno Plant, including the modules, ran each day (¶ 86); and

(ix)     statements by CWs 2 and 5 that Clarke and Mould attended production meetings at which the problems were discussed (¶¶ 79, 116).

467.     The forward-looking portions of the bolded and underlined statements in ¶ 459 are also actionable misrepresentations because they are not protected by meaningful cautionary language. None of Aqua Metal's risk disclosures mention production rates nor do they warn against or disclose the known and pervasive issues with the AquaRefining technology that rendered it incapable of the touted production rates.

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

### A.   The Consistent Accounts By Former Employees That The AquaRefining Process Was Malfunctioning And Defendants' Knowledge Of And/Or Reckless Disregard Of The Problems Evidences Scienter

468.     As the consistent accounts of former employees demonstrate, throughout the Class Period, Defendants, who are also co-founders, were aware of or recklessly disregarded that the AquaRefining process had significant malfunctions, including the sticky lead issue disclosed at the end of the Class Period, and that Aqua Metals had problems scaling the technology. Defendants Clarke,

Murphy and Mould had access to Daily Production Reports showing scant amounts of lead was being produced and no AquaRefined lead was ever commercially produced during the Class Period. Thereafter, Defendants Clarke and Mould were regularly at the Reno Plant and saw that the process was not functioning, that the modules could only run a few hours or less before malfunctioning and that the plant was not operational.  Indeed, Defendants Clarke and Mould staged carefully orchestrated shows for investors and other visitors to make it look like the process was fully functioning and producing AquaRefined lead, while touting site visits as an aim to be "transparent."

1.    **The Defendants Knew Of And/Or Recklessly Disregarded That The AquaRefining Technology Was Malfunctioning Even Before The Reno Plant Was Built**

469.    Former employee accounts demonstrate that Defendants were aware of or recklessly disregarded ongoing and significant problems with the AquaRefining process well before the Reno Plant was built.  These problems continued throughout the Class Period, despite Defendants' statements to the contrary.

470.    As CW 1 relayed, even before the Reno Plant was built, there were problems with the AquaRefining technology when it was tested in California.  Specifically, CW 1 relayed that the modules had both "sticky lead" and "hard lead" issues the entire time CW 1 worked there – from 2015 until January 2017.  CW 1 stated that both issues, including the "sticky lead" issue, which was not disclosed until the end of the Class Period, were known, including by Clarke and Mould, since 2015.

471.    Moreover, CW 1 stated that it was also known, including by Clarke and Mould, that the technology would have issues scaling.  CW 1 said, without fixing the scaling, sticky lead or hard lead issues, Clarke and Mould decided to "go big" even though the technology could not support it. Indeed, CW 1 stated that, after the Reno Plant was built, it became a testing facility to experiment with potential solutions to the issues.  The Defendants' scienter is further evidenced by their reckless disregard of issues and problems.  As CW 1 described, the issues and potential solutions to some of the problems that CW 1 witnessed well before the Reno Plant was built were communicated to Clarke and Mould, but they ignored the suggestions.

2.     **The Defendants Knew of And/Or Recklessly Disregarded The Failures At The Reno Plant And With The AquaRefining Process**

472.     The Defendants' scienter is further evidenced by their reckless disregard of issues and problems at the Reno Plant.  Former employee accounts demonstrate that Defendants were aware of and/or recklessly disregarded serious problems at the Reno Plant and with the AquaRefining process, and the lack of AquaRefined lead produced, in direct contradiction to Defendants' Class Period statements.  As set forth below, Defendants knew and/or recklessly disregarded these failures because: (a) Defendants went to the Reno Plant and witnessed first-hand that the process was malfunctioning and the machines were not operating; (b) Defendants had access to Daily Production Reports and Operations Logs which showed production numbers and how long machines ran; (c) Defendants attended production meetings where these issues were discussed; and (d) according to CW 4, CW 4 spoke directly with Defendants about the process,  production and equipment failures (¶¶ 98-99).

473.     CWs 1, 2, 3 and 4 provided consistent accounts that, throughout the Class Period, the modules – the critical, proprietary machinery for the AquaRefining process – were routinely malfunctioning and could only run for a few hours or less before malfunctioning.  As CW 2 stated, the AquaRefining process was not operational; "they couldn't get the [AquaRefining] equipment to work."  CW 4 said that the module "was still in R&D mode" and the AquaRefining Process was not working.  CW 5 echoed that the process was still in the R&D stage, even at the end, and after the Class Period.  CWs 2, 4 and 5 also said that a major issue with the modules was a sticky lead issue – the same issue described by CW 1 that was known since 2015.  As CW 2 relayed, the Reno Plant was not operating; "the plant never ran."

474.     CWs 2, 4 and 5 provided consistent accounts that Defendants visited the Reno Plant and witnessed these problems.  For example, CW 2 said Clarke and other executives knew the Reno Plant was inoperable because they were at the plant regularly and "they saw it."  Echoing CW 5, CW 4 said Clarke and Mould knew the Reno Plant was not operational.

475.     Former employee accounts, including CWs 2, 3, 4 and 5, also consistently detail Daily Production Reports, to which Defendants had access, which showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of AquaRefined lead.

Furthermore, as CW 2 relayed, the Company kept an Operations Log, which reflected how long the machines at the Reno Plant, including the modules, ran each day. Moreover, former employees, including CWs 2 and 5 describe production meetings, which Clarke and Mould periodically attended, at which the problems were discussed.

476. CWs 2, 3, 4 and 5 relayed that not much lead, and particularly AquaRefined lead, was produced.

477. As CW 4, a production manager at the Reno Plant, relayed, CW 4 and the Vice President of Recycling Technology Battery and Lead Recycling Operation at the Reno Plant went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production goals that the Company publicly announced. Indeed, CW 4 said Clarke would tell investors how much product they would produce and then, after, go to the Vice President of Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can we make that happen. CW4 said Aqua Metals could not make the numbers because of all of the problems.

### 3. The Consistent Accounts Ty Former Employees Of Defendants' Direct Involvement In Fraudulent Visitor Presentations And Images Evidences Scienter

478. Defendants' knowledge is also evident from their direct involvement in the staged investor shows and issuance of images purporting to show the AquaRefining process in continuous operation.

479. Former employee CWs 2, 3 and 4 provide consistent accounts of how, knowing the problems discussed above, Clarke and Mould would stage sham "dog and pony shows" for investors (including Interstate Batteries and Johnson Controls) and others, to make it appear that the Reno Plant was operational and producing AquaRefined lead.

480. CW 2 described how management ensured that the faulty modules would run when investors came to visit. For example, CW 2 was told "don't run the machines until [the investors] show up" and "make yourself look busy." CW 2 was specifically told that these instructions originated from Clarke. Once the investors left, the plant employees would clean up. CW 2 said "we only ran the machines when investors came to visit."

481.    CW 2 said that both Interstate Batteries and Johnson Controls visited and were given the same "dog and pony show" as the other investors.  CW 2 further said it was a "big deal" when Johnson Controls came through and that they prepared for three days prior to their arrival and that Johnson Controls came at least twice.  CW 2 also related that the dog and pony shows began at a time prior to the consummation of this partnership.

482.    Similar to the other former employee accounts, CW 3 said Clarke and Mould, who knew about the problems with the machinery, escorted the visitors and they "ran the show."  CW 3 would be told of an upcoming visit by the plant manager a day or two before the visits.  It was CW 3's job to make sure the production area was clean and that the "machinery kept running" during the visits.

483.    CW 4 also said that, on several occasions, investors came into the plant for a demonstration of the AquaRefining process.  Like CW 2 stated, CW 4 relayed that Johnson Controls was one such visitor.  CW 4 said that Johnson Controls visited in January 2017, which is the month before the Company announced the partnership with Johnson Controls.

484.    CW 4 stated that Mould would email the Vice President of Recycling Technology Battery and Lead Recycling Operation and copy CW 4 advising them of the visits so they could operate the module for the investors.  CW 4 said that a few days before the visit, employees would be reminded to "clean [the plant] up really nice" and would be informed of the logistics of the demonstration.  CW 4 said that essentially this meant confirming the timing of the run to make sure that the modules were operating while the investors were in the plant.

485.    CW 4 said investors would meet with Clarke and Mould in the conference room at the Reno Plant while CW 4 and the Vice President of Recycling Technology Battery and Lead Recycling Operation "assembled a team to stage a show."  CW 4 said, because the module couldn't operate for more than a few hours or it would breakdown, CW 4 had to start it at a time where it would run during the investors' visit and not breakdown.  CW 4 further relayed that Clarke would leave his meetings with investors and come out to the floor first to ensure everything was running properly before a demonstration started.

486.    CW 4 did these presentations for investors at least four or five times over a period of four or five months.  CW 4 remembers doing them twice in May 2017 and once in January 2017 – which was just before the announcement of the Johnson Controls Partnership.

487.    Moreover, CW 1 said that "dog and pony shows" put on by Clarke and/or Mould were a regular occurrence in the California Testing Facilities beginning well before the start of the Class Period.  The visitors who came for these presentations included Johnson Controls, Interstate Batteries and Oppenheimer.

488.    Further, CW 4's account that images were staged by Clarke, Mould and Murphy also supports scienter.  Specifically, CW 4 relayed that the images of bars of purportedly AquaRefined lead, including those first released in November 2016, were not of AquaRefined lead and did not go through the AquaRefining process but were made of lead that Aqua Metals got from another source and then melted and cast at the Reno Plant.  Further, CW 4 relayed that Clarke, Mould and Murphy were there when the images were taken and set them up knowing bars were not AquaRefined lead.

### 4.    The Nature And Significance Of The Problems With AquaRefining, Which Is The Company's Core Business, Further Support Allegations Of Scienter

489.    The Company's sole business is the commercialization of AquaRefining and its revenues, strategic partnerships and plans for growth depended on the technology working.  Thus, AquaRefining was of crucial importance to the Company.  Furthermore, Aqua Metals is a relatively small company, with only about 70 employees during the Class Period, and only three locations.

490.    Facts that are critical to AquaRefining are, thus, presumably known by its executive officers, including the Officer Defendants who were also co-founders of the Company.  Indeed, the Company had one of its testing facilities at the Alameda headquarters, where the Officer Defendants had offices.  The Officer Defendants directly participated in the management of Aqua Metals, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning Aqua Metals, its business and operations and the AquaRefining process.   Furthermore, the Confidential Witnesses confirmed that the Officer Defendants regularly visited the California Testing Facilities and the Reno Plant.

491.     Moreover, as the Confidential Witnesses explained, the Officer Defendants had access to internal reports that support the fact that they knew or recklessly disregarded the true facts.  First, the Officer Defendants had access to Daily Production Reports, which according to CWs 2, 3, 4 and 5 showed the problems at the Reno Plant, including with the AquaRefining process, and that little to no AquaRefined lead was produced.  Moreover, as CWs 2 and 5 relayed, Clarke and Mould often attended production meetings at the Reno Plants at which problems with the machinery and the AquaRefining process were discussed.

492.     Thus, given the extreme importance of the AquaRefining process to the Company, the size of the Company, the Officer Defendants' access to reports and information about the problems with the AquaRefining process and its inability to function and the control that the Officer Defendants exhibited, the Officer Defendants knew or were deliberately reckless in ignoring the true facts that rendered the statements false and misleading when made.

### 5.     The Insider Selling Supports Scienter

#### a.     Murphy And Mould Profited From The Fraud By Selling Off Large Blocks Of Personal Holdings Of Aqua Metals Common Stock At Inflated Prices

493.     Aqua Metals' insiders were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omitted material facts in order to inflate Aqua Metals' common stock price and maximize their individual profits through insider trading.

494.     Pursuant to the IPO, Aqua Metals' insiders were subject to a one-year lock-up agreement whereby no director or officer was permitted to sell Aqua Metals' securities until August 1, 2016.  On August 1, 2016, however, Aqua Metals' common stock was only trading at $8.81 per share.  By the time the November 2016 Offering was completed two months later, on November 21, 2016, Defendants' fraudulent statements had artificially inflated Aqua Metals' common stock to $12.66 per share.  As the stock price continued to climb, Defendants Murphy and Mould were motivated to, and did in fact, capitalize and profit from the artificially inflated prices, collectively disposing of over $2 million worth of common stock in a mere three months.  These trades were highly unusual in timing, correlating with market-moving events on dates on which Defendants were in possession of material non-public information.  Indeed, the timing of the sales is highly suspicious, as they were made when

the stock was trading at highly inflated prices due to Defendants' false and misleading statements and in close proximity, but in advance of, when the Company began to disclose the truth regarding its AquaRefining technology and the Reno Plant.  The following chart summarizes their profits from Class Period sales.

| Insider | Class Period Shares Sold 5/19/2016-11/9/2017 (539 Days) | Class Period Gross Proceeds 5/19/2016-11/9/2017 (539 Days) | Pre-Class Period Shares Sold 11/26/2014-5/18/2016 (539 Days) | Pre-Class Period Gross Proceeds 11/26/2014-5/18/2016 (539 Days) |
|---|---|---|---|---|
| Mould, Selwyn (Chief Operating Officer) | (60,000) | $1,049,632.00 | 0 | $0.00 |
| Murphy, Thomas Michael (Chief Financial Officer, Director) | (60,000) | $1,040,192.00 | 0 | $0.00 |
| Totals: | (120,000) | $2,089,824.00 | 0 | $0.00 |

495.    Specifically, beginning in March 2017, Murphy disposed of 60,000 shares of common stock for gross proceeds of $1,040,192.  Murphy's first sale occurred on March 8, 2017, when he sold 20,000 shares of Aqua Metals' common stock for $17.2387 per share, amounting to gross proceeds of $344,774.  With the exception of only eight trading days in February and March 2017, Murphy's sale occurred when Aqua Metals stock closed at a higher price than any other day in its history.  In fact, from August 1, 2016 until February 2017, Aqua Metals' common stock traded well below $17 per share, closing at an average of only $10.44 per share, and reaching an all-time intraday trading high of $14.13 per share on December 28, 2016.

496.    Murphy was able to take advantage of this all-time high by strategically timing his sale to occur less than one week after the Company filed its 2016 Form 10-K with the SEC on March 2, 2017, which touted, *inter alia*, the "complet[ion] [of Aqua Metals'] initial LAB recycling facility at TRIC and commence[ment] [of] the commercial scale production of recycled lead during January 2017."  The 2016 Form 10-K hyped that the Reno Plant was expected to "achieve a production rate of

120 metric tons of recycled lead per day during 2017." This announcement also came just weeks after the Company's February 9, 2017 announcement touting the strategic relationship with Johnson Controls and that it was "a tremendous step forward." Following the February 9, 2017 Press Release and in response to this purported positive news, the price per share of Aqua Metals increased $4.75, or approximately 41.6%, from a close of $11.41 on February 8, 2017, to a close of $16.16 on February 9, 2017. Murphy's sale was not made pursuant to a 10b-5 trading plan, further allowing him to take advantage of this opportunistic timing.

497. Murphy also sold 20,000 shares of Aqua Metals' common stock for $17.2524 per share on April 10, 2017, amounting to gross proceeds of $345,048, and 20,000 shares for $17.5185 per share on May 5, 2017, amounting to gross proceeds of $350,370. Murphy's May 2017 sale was strategically timed to occur *only two trading days before* Aqua Metals revealed that, *inter alia*, contrary to prior representations, the Company was actually facing issues and "challenges," including that the Company was "limited to only ... run[ning] a single module," that it had not yet sold AquaRefined lead, was lowering its production rate for AquaRefined lead to 40 metric tons per day and that it may need to temporarily suspend operations. Upon this news, Aqua Metals' stock plummeted from a closing price of $16.65 per share on May 9, 2017 to $12.31 per share on May 10, 2017, a drop of approximately 26%. Since this revelation, Aqua Metals' stock has never closed above $13.69 per share.

498. Although Murphy's April 10 and May 5, 2017 stock sales were pursuant to 10b-5 trading plans, these plans were suspiciously created just one or two months prior, on March 3, 2017, and only one day after Defendant Murphy engaged in his first sale. During this time Aqua Metals' common stock was artificially inflated due to Defendants' fraudulent misrepresentations. Indeed, since the May 9, 2017 disclosure, Defendant Murphy has not engaged in a single sale.

499. Mould also profited from Defendants' fraudulent scheme, dumping a total of 60,000 shares of common stock for gross proceeds of $1.05 million. Similar to Murphy, Mould's first sale occurred on March 7, 2017, less than one week after the 2016 Form 10-K was filed and just weeks after the Johnson Controls announcement. During this time, Aqua Metals' stock price was artificially inflated, and Mould disposed of 20,000 shares at $17.0291 per share for gross proceeds of $340,582. Mould also sold 20,000 shares on April 3, 2017 at $18.9179 per share for gross proceeds of $378,358,

and 20,000 shares of common stock on May 1, 2017 at $16.5346 per share for gross proceeds of $330,692.  As with Murphy, Mould's May 1, 2017 sale was meticulously timed to occur *just days* before Aqua Metals began to disclose the truth and the stock began its precipitous decline to its lowest trading price ever.  Mould has not engaged in single sale since the May 9, 2017 disclosures.

### b. Interstate Batteries Sold Significant Shares Of Aqua Metals Stock Just Before The Truth Began To Be Revealed

500.   As reported in Aqua Metals' Schedule 13D, Amendment Number 2, filed with the SEC on May 16, 2017, Aqua Metals' strategic partner Interstate Batteries sold 228,420 shares of its Aqua Metals stock for proceeds of $ 3,861,308.55 between April 24, 2017 and May 9, 2017 – the day the truth began to be revealed after the market closed.   Specifically, the sales are as follows:

| Date of Transaction | Number of Shares Sold | Average Price per Share | Price Range |
|---|---|---|---|
| April 24, 2017 | 2,200 | $16.4795 | $16.36 - $16.55 |
| April 25, 2017 | 31,600 | $16.6257 | $16.52 - $16.70 |
| April 27, 2017 | 17,900 | $16.9536 | $16.86 - $17.01 |
| April 28, 2017 | 8,610 | $16.6735 | $16.59 - $17.07 |
| May 2, 2017 | 42,500 | $16.7885 | $16.74 - $16.83 |
| May 3, 2017 | 48,327 | $17.0930 | $16.97 - $17.30 |
| May 4, 2017 | 4,500 | $17.6178 | $17.61 - $17.62 |
| May 8, 2017 | 40,283 | $17.0945 | $16.76 - $17.75 |
| May 9, 2017 | 32,500 | $16.7751 | $16.51 - $16.93 |

501.   While Interstate Batteries appears to have been initially misled by the same "dog and pony" shows made to the investing public, Interstate Batteries negotiated to have an observer on Aqua Metals' Board of Directors, who may have become privy to the undisclosed truth during the Class Period.  These sales by a strategic partner with an observer on the Board are highly suspicious given that these were the first sales by Interstate Batteries and they were suspiciously timed immediately *before* Aqua Metals revealed, after the market closed on May 9, 2017, that, *inter alia*, contrary to prior representations, the Company was actually facing issues and "challenges," including that the Company was "limited to only ...  run[ning] a single module," that it had not yet sold AquaRefined lead, was lowering its production rate for AquaRefined lead to 40 metric tons per day and that it may need to temporarily suspend operations.  Upon this news, Aqua Metals' stock plummeted from a closing price

of $16.65 per share on May 9, 2017 to $12.31 per share on May 10, 2017, a drop of approximately 26%. Yet, all of Interstate Batteries' sales were made when the stock was trading at $16.36 or above.

502.     Since these sales, Interstate Batteries has not sold any additional Aqua Metals' stock. This is not surprising, given that the stock price continued to decline after the additional corrective disclosures and the price has not recovered.

503.     The current relationship between the parties consists of Interstate Batteries selling batteries to Aqua Metals. In fact, in June 2018, Aqua Metals extended and re-priced Interstate Batteries' warrants by *decreasing the exercise price from $7.12 to $3.33* and extending the expiration date from June 24, 2018 to June 23, 2020 in exchange for Interstate Batteries decreasing the price Aqua Metals pays Interstate Batteries for its batteries by roughly 10% and loosened payment terms.

> **c.      The Defendants Consummated The November 2016 Offering In Order To Exploit The Artificial Inflation In The Company's Common Stock**

504.     The Defendants' false and misleading statements concerning the success of AquaRefining and its acceleration to commence commercial production enabled Aqua Metals to artificially inflate the price of its shares of common stock in the November 2016 Offering.

505.     After the Reno Plant opened, and unknown to investors, the Company was nowhere near commencing revenue-producing operations from AquaRefining. The AquaRefining technology was not functioning despite Defendants' repeated assurances that the AquaRefinery would produce 80 metric tons of lead by the end of 2016 and that its AquaRefining technology was successfully tested and proven. Aqua Metals' issues were so fundamental that the Company was still in the R&D stage trying to determine why the process and the modules were malfunctioning and attempting to resolve the "sticky lead" and other problems that were known, but undisclosed, since 2015. Without any sales, the Company incurred an operating loss of $3.3 million during the Q3 2016, and a net loss of $3.5 million.

506.     In order to fund the much needed yet undisclosed R&D to try to remediate the fundamental deficiencies in the touted AquaRefining process, on September 2, 2016, the Company announced the November 2016 Offering, which was for the sale of 2,000,000 shares of common stock at an offering price of $10 per share. Consequently, Defendants were motivated to continue to

misrepresent the current and future operating capabilities of AquaRefining at this time in order to keep Aqua Metals' stock price artificially inflated and to generate sufficient funds in the offering. The November 2016 Offering was completed on November 21, 2016, generating gross proceeds of $23 million and net proceeds of $21.5 million.

## IX.   LOSS CAUSATION

507.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price and operated as a fraud or deceit on purchasers of the Company's common stock. At all relevant times, Defendants issued materially false and misleading statements or omissions regarding the feasibility, scalability, implementation and operations of the AquaRefining technology and the Reno Plant. These materially false and misleading statements caused Aqua Metals' common stock price to be artificially inflated during the Class Period. Lead Plaintiff and Class members purchased Aqua Metals' common stock at those artificially inflated prices.

508.   As detailed above, as the truth about Aqua Metals' AquaRefining technology and the Reno Plant was partially revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. The timing and magnitude of the common stock price decline negates any inference that the losses suffered by Lead Plaintiff and other members of the Class was caused solely by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. Accordingly, these false and misleading statements directly or proximately caused Lead Plaintiff and other Class members to suffer damages.

509.   The truth about Aqua Metals and the feasibility, scalability, implementation and operations of the AquaRefining technology and the Reno Plant were revealed to the market in a series of disclosures. Each disclosure only partially revealed the truth and Defendants continued to misrepresent the AquaRefining technology and the operations at the Reno Plant until the end of the Class Period:

(a)   On May 9, 2017, after the market closed, Aqua Metals disclosed that the AquaRefining process had "issues" and "challenges," including that the Company was limited to only running a single module. Clarke further revealed that, although it had not yet generated revenue, it

1   had started to ship product, but that "we are selling and shipping metallic lead, we are selling and

2   shipping plastics, we are selling and shipping lead compounds, and we are selling and shipping

3   metallics from the AquaRefining" – essentially conceding they still were not selling AquaRefined

4   lead.  Clarke further disclosed that, while still falsely touting that the Reno Plant was on track to

5   produce 120 metric tons a day by the end of the year, only 40 tons of that production would be

6   AquaRefined lead, despite repeated prior representations that the makeup would be 50% lead alloys

7   and 50% AquaRefined lead.  Clarke further revealed, "[w]hat we are not going to be doing this year is

8   providing forward guidance on ramp up of revenue, products or capacity" and that as the Company

9   tests "improvements" it "may choose to temporarily suspend production."  Following this news, Aqua

10   Metals' stock price declined $4.34 from a close of $16.65 per share of Aqua Metals stock on May 9,

11   2017, to a close of $12.31 per share on May 10, 2017, a drop of approximately 26%, on unusual

12   trading volume of roughly 1.8 million shares.

13          (b)     After the market closed on August 9, 2017, the Company announced that, while

14   it was running four modules, those modules were not operational and were still in a testing mode only

15   "being used to validate operating parameters."  The Company further revealed that the product that

16   accounted for much of its small Q2 2017 revenue was not AquaRefined lead, but rather lead

17   compounds.  The Company stated that product has a "low value in the less established market than

18   lead alloys," and there is "demand uncertainty" related to lead compounds.  Aqua Metals also revealed

19   that it "may choose to operate [the Reno Plant] with an output of less than 120 tons a day."  On this

20   news, Aqua Metals' stock price declined from a close of $10.87 per share on August 9, 2017, to a

21   close of $8.31 per share on August 10, 2017, a drop of approximately 23.6%, on unusual trading

22   volume of 658,303 shares.

23          (c)     Before the market opened on October 23, 2017, the Company admitted that it

24   had only "produced small quantities of AquaRefined lead."  Aqua Metals further disclosed that it was

25   still testing "electrical currents to determine the appropriate control parameters and operation

26   procedures."  Aqua Metals further revealed that, "under certain conditions, "the operators would need

27   to periodically assist the lead removal."  The Company also disclosed that it was still "in the process

28

of synchronizing all of the[] stages" of its production process and was far from selling AquaRefined lead, despite its repeated statements otherwise:

> For over six months, Aqua Metals has been breaking batteries and selling lead compounds.  Aqua Metals is currently in the process of taking the next major step by transitioning to the production of lead ingots that are produced from battery grids and a small amount of AquaRefined lead.  These lead ingots will be sold as lead "bullion".  The next step will be to produce and sell ingots of lead alloy, and the last step will be to produce and sell ingots of AquaRefined lead.

Following this news, Aqua Metals' stock price declined $.96 per share, or 17.9%, from a close of $5.37 per share on October 20, 2017, to a close of $4.41 per share on October 23, 2017, on a volume of 647,901.

(d)     Finally, on November 9, 2017, after the market closed, expanding on the October 23 disclosure, the Company admitted to and finally named "sticky lead" as "one of the key challenges" the Company was facing.  The Company described the sticky lead problem with the modules: when the lead was plated and being removed from the rotating discs, it slid more slowly in the exit chute and, in some cases, needed manual assistance.  The Company also admitted that it had not entered into any licensing, joint venture or strategic alliance agreements.  The Company further admitted that a solution to the issue would need to be applied to all of the modules.  Further, in response to analyst questions, the Company refused to provide information as to (i) "how many tons per day [Aqua Metals was] currently running through the battery breaking system and through the entire process"; (ii) the utilization rates for the modules; or (iii) when it would be producing full AquaRefined lead.  Finally, Aqua Metal admitted that its highly touted technology that would purportedly revolutionize the lead battery recycling industry was, in truth, "an unproven technology" and that it "ha[d] not commenced the commercial production of AquaRefined lead."  In response, the Company's stock price fell $.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017.  On Monday, November 13, the Company's stock fell $.13 per share, or 3.5%, to close at $3.58 per share.  By Tuesday, November 14, the Company's stock fell $.58 per share, or 16.2%, to close at $3.00.  Over the course of the next three trading days, Aqua Metals' stock price declined $0.79 from a close of $3.79 per share on November 9, 2017, to a close of $3.00 per share on November 14, 2017, a drop of approximately 20.8%.

510.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' false and misleading statements and fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the true facts started to be revealed.

## X.    PRESUMPTION OF RELIANCE

511.    Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine.  At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  Throughout the Class Period:

(a)    Aqua Metals' common stock was actively traded on the NASDAQ;

(b)    The market price of Aqua Metals' common stock reacted promptly to the determination of public information regarding the Company;

(c)    The Company's stock was followed by financial analysts, including those cited in this Complaint.

(d)    The average weekly trading volume for Aqua Metals stock during the Class Period was approximately 1.268 million shares;

(e)    As a regulated issuer, Aqua Metals filed with the SEC periodic public reports during the Class Period;

(f)    Aqua Metals regularly communicated with public investors via established market communication mechanisms; and

(g)    During the Class Period, the Company's market capitalization was as high as $423 million and the Company had over 20.4 million shares outstanding.

512.    Throughout the Class Period, the Company was consistently followed by the market, including securities analysts.  The market relies upon the Company's financial results and management to accurately present the Company's financial results.  During this period, Aqua Metals and the Officer Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and the status of the AquaRefining technology, process and

1   operations.   This information was promptly reviewed and analyzed by analysts and institutional

2   investors, and assimilated into the price of the Company's securities.

3       513.   As a result of the misconduct alleged herein (including Defendants' false and

4   misleading statements and omissions), the market for Aqua Metals' common stock was artificially

5   inflated.   Under such circumstances, the presumption of reliance available under the "fraud-on-the-

6   market" theory applies.   Thus, Class members are presumed to have indirectly relied upon the

7   misrepresentations and omissions for which Defendants are each responsible.

8       514.   Lead Plaintiff and other Class members justifiably relied on the integrity of the market

9   price for the Company's securities and were substantially damaged as a direct and proximate result of

10  their purchases of Aqua Metals' common stock at artificially inflated prices and the subsequent

11  decline in the price of those securities when the truth was disclosed.

12      515.   Lead Plaintiff and the other Class Members are also entitled to a presumption of

13  reliance under *Affiliated Ute Citizens v.   United States*, 406 U.S. 128 (1972), because claims asserted

14  in this Complaint against Defendants are predicated upon omissions of material fact for which there

15  was a duty to disclose.

16      516.   Had Lead Plaintiff and other members of the Class known of the material adverse

17  information not disclosed by Defendants or been aware of the truth behind Defendants' material

18  misstatements, they would not have purchased Aqua Metals' common stock at artificially inflated

19  prices.

20  **XI.   CLASS ALLEGATIONS**

21      517.   Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of

22  the Federal Rules of Civil procedure on behalf of a class consisting of all persons and entities who

23  purchased or otherwise acquired Aqua Metals' common stock during the Class Period, including

24  shares sold in the Secondary Offering, and were damaged as a result (the "Class").   Excluded from the

25  Class are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries

26  and affiliates of Defendants; (d) any person who is an officer, director or controlling person of Aqua

27  Metals; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and

28

1  officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal

2  representatives, heirs, successors or assigns of any such excluded party.

3       518.   The members of the Class are so numerous that joinder of all members is impracticable.

4  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be

5  ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members

6  in the proposed Class.  Indeed, as of November 6, 2017, Aqua Metals had 20,402,454 outstanding

7  shares of common stock.

8       519.   Members of the Class may be identified from records maintained by Aqua Metals or its

9  transfer agent and may be notified of the pendency of this action by mail, using a form of notice

10  customarily used in securities class actions.

11       520.   Common questions of law and fact exist as to all members of the Class and

12  predominate over any questions affecting solely individual members of the Class, including:

13              (a)     whether the federal securities laws were violated by Defendants' respective acts

14  as alleged herein;

15              (b)     whether the statements made were materially false or misleading, or omitted

16  material facts.

17              (c)     whether Defendants acted knowingly or with deliberate recklessness in issuing

18  false and misleading financial statements;

19              (d)     whether Defendants engaged in a scheme to defraud investors;

20              (e)     whether the prices of Aqua Metals' securities during the Class Period were

21  artificially inflated because of Defendants' conduct complained of herein; and

22              (f)     whether the members of the Class have sustained damages and, if so, what is the

23  proper measure of damages.

24       521.   Lead Plaintiff's claims are typical of the claims of other members of the Class and the

25  other members of the Class sustained damages arising out of Defendants' wrongful conduct in

26  violation of federal law as alleged in this Complaint.

27

28

522. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

523. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

524. Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Aqua Metals' securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices. A presumption of reliance therefore applies.

## XII.    NO SAFE HARBOR

525. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. The statements alleged to be false and misleading all relate to historical or then-existing facts and conditions.

526. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

527. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive

1  officer of Aqua Metals who knew that those statements were false, misleading or omitted necessary

2  information when they were made.  In addition, to the extent any of the statements set forth above

3  were accurate when made, they became inaccurate or misleading because of subsequent events, and

4  Defendants failed to update those statements, which later became inaccurate

5  **XIII.   COUNTS**

6  

**COUNT ONE**
**Violations of Section 10(b) and Rule 10b-5(b)**
**(Against Aqua Metals and the Officer Defendants)**

8  528.    Lead Plaintiff repeats and realleges each and every allegation contained above as if

9  fully set forth herein.

10  529.    Throughout the Class Period, the Defendants (*i.e.*, Aqua Metals and the Officer

11  Defendants), directly or indirectly, by the use of means or instrumentalities of interstate commerce, the

12  United States mails, interstate telephone communications and a national securities exchange, made

13  untrue statements of material facts and omitted to state material facts necessary in order to make the

14  statements made, in light of the circumstances under which they were made, not misleading, and

15  engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead

16  Plaintiff and the other members of the Class in connection with their purchases of the common stock

17  of Aqua Metals during the Class Period, all in violation of Section 10(b) of the Exchange Act,

18  15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R.  § 240.10b-5(b).

19  530.    The Company and Officer Defendants, as the most senior officers of Aqua Metals

20  during the Class Period, are liable as direct participants in all of the wrongs complained of through the

21  date they left the Company.

22  531.    As detailed above, Defendants had actual knowledge of the misrepresentations and

23  omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they

24  failed to ascertain and disclose such facts even though such facts were available to them.

25  532.    Lead Plaintiff and other members of the Class relied upon Defendants' statements

26  and/or on the integrity of the market in purchasing shares of Aqua Metals' common stock during the

27  Class Period.

28

533.    As a direct and proximate cause of the wrongful conduct described herein, Lead Plaintiff and the Class suffered damages in connection with their purchases of Aqua Metals' common stock at artificially inflated prices during the Class Period.  Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' materially false and misleading statements, they would not have purchased Aqua Metals' common stock at artificially inflated prices during the Class Period.

534.    In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's business operations, growth and financial condition, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

535.    By virtue of the foregoing, Defendants violated 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

## COUNT TWO
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)
### (Against Aqua Metals and the Officer Defendants)

536.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

537.    During the Class Period, Defendants named in this count carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period: (a) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (b) caused Lead Plaintiff and other members of the Class to purchase Aqua Metals' securities at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants made the false statements and engaged in other unlawful acts as alleged herein.

538.    The Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

1  course of conduct to conceal adverse material information about the business, operations and future

2  prospects of Aqua Metals as specified herein.

3       539.    The Defendants named in this count employed devices, schemes and artifices to

4  defraud while in possession of material adverse non-public information and engaged in acts, practices

5  and a course of conduct, as alleged herein, in an effort to reassure investors of Aqua Metals that the

6  Company's commercial operations and technology did not have problems.   As set forth more

7  particularly herein, these acts included orchestrating on-site visits and demonstrations for investors,

8  analysts and other industry participants, which deliberately concealed problems concerning the

9  commercialization of the Company's AquaRefining process.  Such orchestrated visits resulted in the

10  dissemination of analyst reports containing untrue statements of material facts and/or omitting to state

11  material facts necessary in order to make the statements made about Aqua Metals' operations not

12  misleading.  These practices and course of business operated as a fraud and deceit upon the purchasers

13  of Aqua Metals' securities during the Class Period.

14       540.    As a result of Defendants' fraudulent scheme and failure to disclose material facts, as

15  set forth above, the market price for Aqua Metals' securities was artificially inflated during the Class

16  Period.

17       541.    In ignorance of the fact that market prices of Aqua Metals' publicly traded securities

18  were artificially inflated or distorted, and relying directly or indirectly on the false and misleading

19  statements disseminated by analysts following Aqua Metals, or upon the integrity of the market in

20  which the Company's securities trade, and/or on the absence of material adverse information that was

21  known to or recklessly disregarded by Defendants named in this count but not disclosed in public

22  statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class

23  acquired Aqua Metals' securities during the Class Period at artificially high prices and were damaged

24  thereby.

25       542.    At the time these misrepresentations and omissions were made as part of Defendants'

26  fraudulent scheme, Lead Plaintiff and other members of the Class were ignorant of their falsity and

27  believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace

28  known the truth regarding Aqua Metals, Lead Plaintiff and other members of the Class would not have

purchased or otherwise acquired Aqua Metals' securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

543.     As a direct and proximate result of the wrongful conduct of Defendants named in this count, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

544.     By virtue of the foregoing, Defendants named in this count have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

## COUNT THREE
### Violations of Section 20(a) of the Exchange Act
### (Against the Officer Defendants)

545.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

546.     The Officer Defendants acted as control persons of Aqua Metals within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, agency and their ownership and contractual rights, participation in and/or awareness of Aqua Metals' operations and/or intimate knowledge of the false statements filed by Aqua Metals with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Aqua Metals, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading, and the acts in furtherance of the fraudulent scheme.  The Officer Defendants were provided with or had unlimited access to copies of Aqua Metals' reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading and used in furtherance of the fraudulent scheme prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected as well as to prevent the acts in furtherance of the fraudulent scheme.  Further, each of the Officer Defendants knew pictures of the blocks and bars of purportedly AquaRefined lead were not, in fact, AquaRefined lead.

547.    In particular, each Officer Defendant had direct and supervisory involvement in the day-to-day operations of Aqua Metals and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged and exercised that power.

548.    As a direct and proximate result of the Officer Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Aqua Metals' common stock during the Class Period.

549.    As set forth above, Aqua Metals and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

550.    By reason of the conduct of Aqua Metals alleged in this Complaint, and by virtue of their positions as control persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Federal Rule of Civil Procedure 23 and appointing Lead Plaintiff's counsel as Class Counsel;

(b)    Awarding compensatory and/or rescissionary damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

(c)    Granting equitable and/or injunctive relief as permitted by law, equity and federal law;

(d)    Awarding Lead Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees; and

(e)    Awarding such other and further relief as the Court may deem just and proper.

1

## XV.    DEMAND FOR TRIAL BY JURY

2

3

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff hereby demands a trial by jury.

4

DATED:  September 20, 2019                         Respectfully submitted,

5

**BERMAN TABACCO**

6

By:  ___*/s/ Nicole Lavallee*___

7

Nicole Lavallee

8

Kristin J. Moody

9

A. Chowning Poppler
44 Montgomery Street, Suite 650

10

San Francisco, CA 94104
Telephone: (415) 433-3200

11

Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com

12

kmoody@bermantabacco.com

13

cpoppler@bermantabacco.com

14

Leslie R. Stern

15

**BERMAN TABACCO**
One Liberty Square

16

Boston, MA 02109
Telephone: (617) 542-8300

17

Facsimile: (617) 542-1194
Email: lstern@bermantabacco.com

18

19

Shannon L. Hopkins

20

Nancy A. Kulesa
Stephanie A. Bartone

21

**LEVI & KORSINSKY, LLP**
1111 Summer Street, Suite 403

22

Stamford, CT 06901
Telephone: (203) 992-4523

23

Facsimile: (212) 363-7171
Email:  shopkins@zlk.com

24

nkulesa@zlk.com

25

sbartone@zlk.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rosemary M. Rivas
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294
Email: rrivas@zlk.com

*Counsel for the Plymouth County Group and*
*Co-Lead Counsel for the Class*

# Exhibit 1

**CERTIFICATION OF MOVANT PLYMOUTH COUNTY RETIREMENT ASSOCIATION PURSUANT TO FEDERAL SECURITIES LAW**

I, David Sullivan, Executive Director of the Plymouth County Retirement Association ("Plymouth County"), hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.     I have reviewed the first-filed class action complaint filed in the United States District Court for the Northern District of California in this matter captioned *Hampton v. Aqua Metals, Inc., et al.*, No. 4:17-cv-07142-HSG.  At this time, I generally adopt the key substantive allegations of that complaint.

2.     Plymouth County has authorized Berman Tabacco to file a motion for consolidation, appointment as lead plaintiff and appointment of counsel on its behalf in this litigation.

3.     Plymouth County did not engage in transactions in the securities that are the subject of this action at the direction of counsel or in order to participate in this or any other litigation under the securities laws of the United States.

4.     Plymouth County is willing to serve as a representative party on behalf of the class and to provide testimony at deposition and trial, if necessary.

5.     Plymouth County's transactions in the securities of Aqua Metals, Inc. between May 19, 2016 and November 9, 2017, inclusive, (the "Class Period") are set forth in Exhibit A, attached hereto.

6.     Other than those transactions set forth in Exhibit A attached hereto, Plymouth County has engaged in no transactions during the Class Period in the securities that are the subject of this action.

7.     During the three-year period preceding the date of this certification, Plymouth County has sought to serve, or served, as a representative party on behalf of a

1

class under the federal securities laws in the following matters:

- *Plymouth Country Retirement Association* v. *Advisory Board Co.*, No. 17-cv-01940 (D.D.C.) (not appointed);

- *In re Envision Healthcare Corp. Sec. Litig.*, No. 17-cv-01112 (M.D. Tenn.) (not appointed);

- *Kinzler v. First NBC Bank Holding Co.*, No. 16-cv-04243 (E.D. La.) (currently serving as a member of a lead plaintiff group);

- *North Collier Fire Control & Rescue District Firefighter Pension Plan v. MDC Partners Inc*., No. 15-cv-06034 (S.D.N.Y.) (previously served as co-lead plaintiff; matter dismissed in October 2016);

- *Harrington v. Tetraphase Pharmaceuticals Inc.*, No. 16-cv-10133 (D. Mass.) (currently serving as co-lead plaintiff);

- *Van Noppen v. Innerworkings Inc.*, No. 14-cv-01416 (N.D. Ill.) (previously served as lead plaintiff; matter settled in November 2016);

- *Norfolk County Retirement System v. Tempur-Pedic Int'l Inc.*, No. 12-cv-00195 (E.D. Ky.) (previously served as member lead plaintiff group; matter dismissed in May 2014, affirmed on appeal in June 2015); and

- *Medoff v. CVS Caremark Corp.*, No. 09-cv-00554 (D.R.I.) (previously served as a member of a lead plaintiff group; matter settled in February 2016).

8.     Plymouth County will not accept any payment for serving as class representative on behalf of the class beyond Plymouth County's *pro rata* share of any recovery, except for an award, as ordered or approved by the Court in compliance with the federal laws, directly relating to the representation of the class.

9.     As Executive Director for Plymouth County, I am duly authorized to sign this Certification on behalf of Plymouth County.

I certify under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on February 12, 2018.

David Sullivan

*Executive Director*
*Plymouth County Retirement*
*Association*

# EXHIBIT A

**AQUA METALS INC.**
**Common Stock (CUSIP 03837J101)**
**Exhibit A**

**Class Period:**    05/19/16 - 11/09/17
**Shareholder:**    Plymouth County Retirement Association

| Trade Date | Transaction Type | Shares Bought | Shares Sold | Base Unit Price |
|---|---|---|---|---|
| 02/21/17 | BUY | 3,184 | | $17.5150 |
| 02/21/17 | BUY | 35 | | $17.6350 |
| 02/22/17 | BUY | 844 | | $17.5735 |
| 02/22/17 | BUY | 10,321 | | $17.3882 |
| 02/23/17 | BUY | 4,398 | | $17.1967 |
| 04/20/17 | BUY | 3,698 | | $16.0575 |
| 06/07/17 | BUY | 3,175 | | $12.8290 |
| 06/08/17 | BUY | 1,150 | | $13.1775 |

# Exhibit 2

**CERTIFICATION OF DENIS TAILLEFER AND 1103371 ONTARIO LTD.
PURSUANT TO THE FEDERAL SECURITIES LAW**

I, Denis Taillefer, individually and on behalf of my wife, Theresa Taillefer, who has assigned to me all of her rights in any federal securities claims arising from her Aqua Metals securities, and 1103371 Ontario Ltd., of which I am majority owner and duly authorized to act, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the class action complaint filed in the United States District Court for the Northern District of California in this matter captioned *Hampton v. Aqua Metals, Inc., et al*, No. 4:17-cv-07142-HSG.   At this time, I generally adopt the key substantive allegations of that complaint.

2.      I have authorized Levi & Korsinsky, LLP to file a motion for consolidation, appointment as lead plaintiff and appointment of co-lead counsel on my and 1103371 Ontario Ltd.'s behalf in this litigation.

3.      Neither 1103371 Ontario Ltd., Mrs., Taillefer nor I engaged in transactions in the securities that are the subject of this action at the direction of counsel or in order to participate in this or any other litigation under the securities laws of the United States.

4.      1103371 Ontario Ltd. and I are willing to serve as representative parties on behalf of the class and to provide testimony at deposition and trial, if necessary.

5.      My transactions as well as the transactions of Mrs. Taillefer and 1103371 Ontario Ltd. in the securities of Aqua Metals, Inc. between May 19, 2016 and November 9, 2017, inclusive, (the "Class Period") are set forth in Exhibit A, attached hereto.

6.      Other than those transactions set forth in Exhibit A attached hereto, neither Mrs. Taillefer, 1103371 Ontario Ltd., nor I have engaged in any other transactions during the Class Period in the securities that are the subject of this action.

7.      During the three-year period preceding the date of this certification, neither 1103371 Ontario Ltd. nor I have sought to serve, or served, as a representative party on behalf of a class under the federal securities laws.

8.      1103371 Ontario Ltd. and I will not accept any payment for serving as class representative on behalf of the class beyond a pro rata share of any recovery, except for an award, as ordered or approved by the Court in compliance with the federal laws, directly relating to the representation of the class.

9.      As assignee of Theresa Taillefer's rights arising from this litigation, and as majority owner of 1103371 Ontario Ltd., I am duly authorized to sign this Certification.


I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 12, 2018.

_____

Denis Taillefer

*Individually and on Behalf of Theresa Taillefer and 1103371 Ontario Ltd.*

# EXHIBIT A

**Exhibit A**

Transactions of Denis Taillefer Individually, as Assignee of Theresa Taillefer, and on Behalf of 1103371 Ontario Ltd.

| | | |
|---|---|---|
| **Company Name** | Aqua Metals, Inc. | |
| **Ticker Symbol** | AQMS | |
| **Class Period Start** | 5/19/2016 | |
| **Class Period End** | 11/9/2017 | |

**Account 1 (Theresa Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 9/28/2016 Purchase | | 425 | $ 8.6600 | $3,680.50 |
| 12/8/2016 Purchase | | 1,250 | $ 11.8500 | $14,812.50 |
| 9/14/2017 Purchase | | 1,325 | $ 6.6630 | $8,828.48 |
| 9/26/2017 Purchase | | 1,500 | $ 5.6700 | $8,505.00 |
| 10/6/2017 Purchase | | 1,500 | $ 6.9500 | $10,425.00 |
| 10/10/2017 Purchase | | 500 | $ 6.5620 | $3,281.00 |
| 11/6/2017 Sale | | (4,500) | $ 3.7500 | ($16,875.00) |
| 11/9/2017 Purchase | | 3,000 | $ 3.8340 | $11,502.00 |
| 11/16/2017 Sale | | (5,000) | $ 3.0520 | ($15,260.00) |

**Account 2 (Denis Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 9/28/2016 Purchase | | 425 | $ 8.6600 | $3,680.50 |
| 12/9/2016 Purchase | | 1,250 | $ 11.8500 | $14,812.50 |
| 9/14/2017 Purchase | | 1,325 | $ 6.6700 | $8,837.75 |
| 9/26/2017 Purchase | | 1,500 | $ 5.6700 | $8,505.00 |
| 10/6/2017 Purchase | | 1,500 | $ 6.9500 | $10,425.00 |
| 10/10/2017 Purchase | | 500 | $ 6.6000 | $3,300.00 |
| 10/24/2017 Purchase | | 1,200 | $ 4.3680 | $5,241.60 |
| 11/6/2017 Sale | | (5,700) | $ 3.7500 | ($21,375.00) |
| 11/9/2017 Purchase | | 3,000 | $ 3.8770 | $11,631.00 |
| 11/16/2017 Sale | | (5,000) | $ 3.0500 | ($15,250.00) |

**Account 3 (Denis Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 8/10/2016 Purchase | | 500 | $ 8.9000 | $4,450.00 |
| 11/2/2016 Purchase | | 500 | $ 8.9000 | $4,450.00 |
| 8/11/2017 Purchase | | 1,000 | $ 8.1980 | $8,198.00 |
| 9/14/2017 Purchase | | 2,000 | $ 6.6850 | $13,370.00 |
| 9/21/2017 Purchase | | 2,000 | $ 5.6390 | $11,278.00 |
| 10/11/2017 Sale | | (4,000) | $ 6.3120 | ($25,248.00) |
| 10/11/2017 Purchase | | 8,000 | $ 6.4610 | $51,688.00 |
| 10/13/2017 Purchase | | 2,000 | $ 5.9500 | $11,900.00 |

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 10/23/2017 Purchase | | 2,000 | $ | 4.6800 | $9,360.00 |
| 11/6/2017 Sale | | (14,000) | $ | 3.6550 | ($51,170.00) |

**Account 4 (Theresa Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 8/10/2016 Purchase | | 500 | $ | 8.9000 | $4,450.00 |
| 11/2/2016 Purchase | | 500 | $ | 8.9100 | $4,455.00 |
| 8/11/2017 Purchase | | 500 | $ | 8.2500 | $4,125.00 |
| 9/14/2017 Purchase | | 2,500 | $ | 6.6760 | $16,690.00 |
| 9/21/2017 Purchase | | 2,000 | $ | 5.6030 | $11,206.00 |
| 10/11/2017 Purchase | | 4,000 | $ | 6.4180 | $25,672.00 |
| 10/13/2017 Purchase | | 2,000 | $ | 5.9500 | $11,900.00 |
| 10/23/2017 Purchase | | 2,000 | $ | 4.7310 | $9,462.00 |
| 11/6/2017 Sale | | (14,000) | $ | 3.6920 | ($51,688.00) |

**Account 5 (Denis Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 6/1/2016 Purchase | | 390 | $ | 11.4100 | $4,449.90 |
| 11/16/2017 Purchase | | 390 | $ | 3.0500 | $1,189.50 |

**Account 6 (Theresa Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 6/1/2016 Purchase | | 500 | $ | 11.4100 | $5,705.00 |
| 11/16/2017 Purchase | | 500 | $ | 3.0500 | $1,525.00 |

**Account 7 (1103371 Ontario Ltd.)**

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 6/27/2016 Purchase | | 2,000 | $ | 10.2500 | $20,500.00 |
| 7/28/2016 Purchase | | 1,200 | $ | 9.1700 | $11,004.00 |
| 8/3/2016 Purchase | | 1,000 | $ | 8.5000 | $8,500.00 |
| 9/9/2016 Purchase | | 1,000 | $ | 8.7800 | $8,780.00 |
| 9/21/2016 Purchase | | 1,000 | $ | 9.0000 | $9,000.00 |
| 9/30/2016 Purchase | | 1,000 | $ | 8.7000 | $8,700.00 |
| 10/20/2016 Purchase | | 1,000 | $ | 9.2000 | $9,200.00 |
| 11/2/2016 Purchase | | 800 | $ | 8.4800 | $6,784.00 |
| 1/24/2017 Purchase | | 1,000 | $ | 11.8840 | $11,884.00 |
| 1/25/2017 Purchase | | 1,000 | $ | 11.4000 | $11,400.00 |
| 3/14/2017 Sale | | 1,000 | $ | 19.0000 | $19,000.00 |
| 3/23/2017 Purchase | | (5,000) | $ | 17.9780 | ($89,890.00) |
| 3/23/2017 Purchase | | 5,000 | $ | 18.0810 | $90,405.00 |
| 4/10/2017 Purchase | | 5,000 | $ | 17.0610 | $85,305.00 |

| | | | | |
|---|---|---|---|---|
| 5/10/2017 Purchase | 5,000 | $ | 12.4990 | $62,495.00 |
| 8/11/2017 Purchase | 5,000 | $ | 8.0380 | $40,190.00 |
| 9/1/2017 Purchase | 4,000 | $ | 7.5220 | $30,088.00 |
| 9/7/2017 Purchase | 5,000 | $ | 6.0000 | $30,000.00 |
| 10/10/2017 Purchase | 4,000 | $ | 6.6000 | $26,400.00 |
| 11/3/2017 Sale | (32,000) | $ | 3.7120 | ($118,784.00) |
| 11/3/2017 Sale | (8,000) | $ | 3.7070 | ($29,656.00) |