Nicole Lavallee (SBN 165755)
Kristin J. Moody (SBN 206326)
A. Chowning Poppler (SBN 272870)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com
            kmoody@bermantabacco.com
            cpoppler@bermantabacco.com

*Counsel for the Lead Plaintiff Plymouth County Group*
*and Co-Lead Counsel for the Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE AQUA METALS, INC. SECURITIES LITIGATION<br><br>This document Relates to:<br>All Actions. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Lead Case No.: 4:17-cv-07142-HSG<br><br>**CLASS ACTION**<br><br>**LEAD PLAINTIFF THE PLYMOUTH COUNTY GROUP'S OPPOSITION TO DEFENDANTS AQUA METALS, INC., STEPHEN R. CLARKE, THOMAS MURPHY, AND SELWYN MOULD'S MOTION FOR PARTIAL DISMISSAL OF AMENDED COMPLAINT**<br><br>DATE:      January 30, 2020<br>TIME:      2:00 p.m.<br>CTRM:    2, 4th Floor<br>JUDGE:    Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 2

I.     THE COMPLAINT ADEQUATELY PLEADS FALSITY ................................................. 9

     A.     Misrepresentations Regarding Visitor Day and Site Visits ......................................... 10

     B.     Misrepresentations Regarding Milestones Currently Achieved .................................... 12

          1.     Misrepresentations That The AquaRefining Technology Was Successfully Tested And Proven .................................................................................................. 12

          2.     Misrepresentations that Aqua Metals Had Produced Pure AquaRefined Lead Flowing Like A Waterfall And Was Transitioning To Commercial Operations ............ 14

          3.     Misrepresentations That The Reno Plant Was Commissioned And Had Commenced Commercial Operations to Produce AquaRefined Lead ................................................. 17

     C.     Misrepresentations Concerning Partnerships With IB and JCI .................................... 20

     D.     Misrepresentations Concerning Lead Production Rates ........................................... 22

     E.     Misrepresentations Concerning Licensing ...................................................... 24

     F.     The Safe Harbor Does Not Protect Any of Defendants' Statements .......................... 24

          1.     Most of Defendants Statements Were Not Forward-Looking ...................................... 25

          2.     The statements were not accompanied by meaningful cautionary language .................. 25

     G.     Defendants' Remaining Arguments Specific To Murphy and Mould Fail .............................. 29

II.     PLAINTIFF PLEADS FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER .......... 30

     A.     By Conceding Knowledge of the Problems With The AquaRefining Process, The Company's Core Product, Defendants Concede Scienter ...................................... 31

     B.     The CWs Provide Corroborating Accounts Of Defendants' Knowledge And Deliberate Recklessness Through Defendants' Observations, Discussions, Participation In Meetings and Reports ........................................................................... 32

     C.     Plaintiff Sufficiently Alleges That All Defendants Intentionally Engaged In Fraudulent Acts To Deliberately Conceal The Pervasive Problems With The AquaRefining Process ................. 36

     D.     Although Not Required, The Additional Allegations Of Motive Further Support an Inference of Scienter ...................................................................................... 37

III.     THE COMPLAINT STATES CLAIMS FOR CONTROL PERSON LIABILITY ............................... 40

CONCLUSION ....................................................................................................................... 40

1

## TABLE OF AUTHORITIES

2

PAGE(S)

3

**Cases**

4

*Anderson v. Peregrine Pharms. Inc.,*
   2013 WL 4780059 (C.D. Cal. Aug. 23, 2013) ............................................................. 31

5

*Applestein v. Medivation, Inc.,*
   2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ............................................................. 39

6

*Barrie v. Intervoice-Brite, Inc.,*
   409 F.3d 653 (5th Cir. 2005) ...................................................................................... 29

7

8

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008) ...................................................................... 13, 25, 27

9

10

*Browning v. Amyris, Inc.,*
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ............................................................. 28

11

*Bruce v. Suntech Power Holdings Co.,*
   64 F. Supp. 3d 1365 (N.D. Cal. 2014) ........................................................................... 9

12

13

*Buttonwood Tree Value Partners, LP v. Sweeney,*
   2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) ........................................................... 37

14

*Carlton v. Cannon,*
   184 F. Supp. 3d 428, 446 (S.D. Tex. 2016),
   *amended on other grounds*, 2016 WL 3959164 (S.D. Tex. July 22, 2016) ................. 19

15

16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
   856 F.3d 605 (9th Cir. 2017) ................................................................................ 14, 21

17

18

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,*
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................................ 30

19

*Curran v. Freshpet, Inc.,*
   2018 WL 394878 (D.N.J. Jan. 12, 2018) ...................................................................... 24

20

21

*Cutler v. Kirchner,*
   696 Fed. App'x 809 (9th Cir. 2017) .................................................................. 19, 27, 29

22

23

*Eclectic Properties E., LLC v. Marcus & Millichap Co.,*
   751 F.3d 990 (9th Cir. 2014) ........................................................................................ 30

24

*Fecht v. Price Co.,*
   70 F.3d 1078 (9th Cir. 1995) ........................................................................................ 27

25

26

*Flynn v. Sientra, Inc.,*
   2016 WL 3360676 (C.D. Cal. June 9, 2016) ................................................................ 39

27

*Fosbre v. Las Vegas Sands Corp.,*
   2013 WL 5970250 (D. Nev. Nov. 7, 2013) ................................................................... 12

28

*Gammel v. Hewlett-Packard Co.*,
    905 F. Supp. 2d 1052 (C.D. Cal. 2012) ............................................................ 28

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ........................................................................... 27

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ............................................................ 28

*Hefler v. Wells Fargo & Co.*,
    2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ................................................. 30

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ......................................................................... 29

*In re Adaptive Broadband Sec. Litig.*,
    2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ..................................................... 39

*In re Allaire Corp. Secs. Litig.*,
    224 F. Supp. 2d 319 (D. Mass. 2002) .................................................. 13, 19, 20, 23

*In re Allied Nev. Gold Corp.*,
    2016 WL 4191017 (D. Nev. Aug. 8, 2016) ...................................................... 36

*In re Apple Computer, Inc. Sec Litig.*,
    243 F. Supp. 2d 1012 (N.D. Cal. 2002) ................................................... 26, 28

*In re Atmel Corp. Sec. Litig.*,
    2016 U.S. Dist. LEXIS 104090 (N.D. Cal. Jan. 29, 2004) .............................. 40

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ........................................................................... 27

*In re BankAtlantic Bancorp, Inc.*,
    2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ................................................. 26

*In re BP Prudhoe Bay Royalty Trust Secs. Litig.*,
    2007 WL 3171435 (W.D. Wash. Oct. 26, 2007) ............................................. 28

*In re Celera Corp. Sec. Litig.*,
    2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ............................................ 20, 25

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ........................................................................... 27

In re Copper Mountain Sec. Litig.,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................................ 24

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................... 32

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ......................................................................... 17

*In re DDi Corp. Sec. Litig.*,
   2005 WL 3090882 (C.D. Cal. July 21, 2005)...................................................................9

*In re Diamond Foods, Inc. Sec. Litig.*,
   2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ...............................................................36

*In re DSP Grp. Sec. Litig.*,
   1997 WL 678151 (N.D. Cal. Mar. 5, 1997) ....................................................................11

*In re ECOtality, Inc. Sec. Litig.*,
   2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ...............................................................23

*In re Energy Recovery Sec. Litig.*,
   2016 WL 324150 (N.D. Cal. Jan. 27, 2016).....................................................................27

*In re Facebook, Inc. Sec. Litig.*,
   2019 WL 4674347 (N.D. Cal. Sept. 25, 2019) ...............................................................10

*In re Gilead Sci. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) .........................................................................................20

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................................27

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) .........................................................................38, 40

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) .....................................................................24, 27

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010) ............................................................................37

*In re Medicis Pharm. Corp. Sec. Litig.*,
   689 F. Supp. 2d 1192 (D. Ariz. 2009) ............................................................................34

*In re Metawave Commc'ns Corp. Sec. Litig.*,
   298 F. Supp. 2d 1056, (W.D. Wash. 2003) ....................................................................36

*In re Nash Finch Co. Sec. Litig.*,
   502 F. Supp. 2d 861 (D. Minn. 2007) .............................................................................31

*In re Nuvelo, Inc., Sec. Litig.*,
   2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) ..................................................................28

*In re OmniVision Techs., Inc. Sec. Litig.*,
   937 F. Supp. 2d 1090 (N.D. Cal. 2013) ..........................................................................11

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   2006 WL 6829623 (S.D. Cal. Aug. 1, 2006)...................................................................38

*In re Portal Software, Inc. Sec. Litig.*,
   2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ...........................................................39, 40

*In re Quality Sys. Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................. passim

*In re Rackable Sys. Inc. Sec. Litig.*,
   2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ................................................................ 25

*In re Read-Rite Corp. Sec. Litig.*,
   335 F.3d 843 (9th Cir. 2003),
   *abrogated on other grounds as recognized by*
   *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ........................................ 13

*In re Solv-Ex Corp. Sec. Litig.*,
   210 F. Supp. 2d 276 (S.D.N.Y. 2000) ........................................................................... 15

*In re Surebeam Corp. Sec. Litig.*,
   2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ................................................................... 27

*In re Valence Tech. Sec. Litig.*,
   1995 WL 274343 (N.D. Cal. May 8, 1995) ................................................................... 13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ...................................................................................... 32

*In re Verifone Sec. Litig.*,
   2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) ............................................................... 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............................................................... 16, 39

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir.1994) ...................................................................................... 24

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...................................................................................... 23

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
   2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ............................................................... 17

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ................................................................................................. 30

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988, (9th Cir. 2018) ................................................................................... 40

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ............................................................................... 20, 25

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ................................................................................... 36

*Manavazian v. Atec Grp., Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) ......................................................................... 21

*Maverick Fund L.D.C. v. First Solar, Inc.*,
   2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ........................................................... 32, 33

*McGuire v. Dendreon Corp.*,
    2008 WL 5130042 (W.D. Wash. Dec. 6, 2008) ................................................................. 29

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ....................................................................................... 39

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................................ 38

*Miller v. Thane Int'l*,
    519 F.3d 879 (9th Cir. 2008) ................................................................................. 10, 20

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................ 23, 35

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................................. 38, 39

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
    2018 WL 3126393 (N.D. Cal. June 26, 2018) ............................................................ 19, 23

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...................................................................................... 38

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 Fed. App'x 480 (9th Cir. 2019) ...................................................................... 9, 27, 36

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ......................................................................................... 14, 21

*Petrie v. Elec. Game Card, Inc.*,
    761 F.3d 959 (9th Cir. 2014) ....................................................................................... 37

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,
    717 F. Supp. 2d 1170 (E.D. Wash. 2010) ..................................................................... 29

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ................................................................................. 27, 29

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014),
    *overruled on other grounds*,
    *Align Tech.*, 856 F.3d 605 (9th Cir. 2017) ................................................................. 32

*Resh v. China Agritech, Inc.*,
    2019 WL 1055240 (C.D. Cal. Jan. 8, 2019) ................................................................. 37

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ...................................................................................... 17

*Rihn v. Acadia Pharms. Inc.*,
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ............................................................. 23

*Rosen v. Textron, Inc.*,
    321 F. Supp. 2d 308 (D.R.I. 2004) ............................................................................... 9

*S. Ferry LP No. 2 v. Killinger,*
   399 F. Supp. 2d 1121 (W.D. Wash. 2005),
   *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008) ................................. 16

*Scheuneman v. Arena Pharm., Inc.,*
   840 F.3d 698 (9th Cir. 2016) ................................................................................. 30

*Seaman v. Cal. Bus. Bank,*
   2013 WL 5890726 (N.D. Cal. Oct. 30, 2013) ...................................................... 40

*Siracusano v. Matrixx Initiatives, Inc.,*
   585 F.3d 1167 (9th Cir. 2008), *aff'd*, 563 U.S. 27 (2011) ............................. 10, 37

*Smilovits v. First Solar, Inc.,*
   2012 WL 6574410 (D. Ariz. Dec. 17, 2012) ......................................................... 9

*Stocke v. Shuffle Master, Inc.,*
   615 F. Supp. 2d 1180 (D. Nev. 2009) ................................................................. 39

*Szymborski v. Ormat Techs., Inc.,*
   776 F. Supp. 2d 1191 (D. Nev. 2011) ............................................................ 23, 28

*Tellabs Inc. v. Makor Issues & Rights Ltd.,*
   551 U.S. 308 (2007) ............................................................................... 30, 31, 37

*Van Dongen v. CNinsure, Inc.,*
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................. 40

*Vrakas v. U.S. Steel Corp.,*
   2018 WL 4680314 (W.D. Pa. Sept. 29, 2018) ................................................ 22, 31

*Washtenaw Cty. Emps.' Ret. Sys. v. Talbots, Inc.,*
   2013 WL 5348569 (D. Mass. Sept. 23, 2013) ..................................................... 21

*Westley v. Oclaro, Inc.,*
   897 F. Supp. 2d 902 (N.D. Cal. 2012) ................................................................ 29

*Zaghian v. Farrell,*
   675 Fed. App'x 718 (9th Cir. 2017) ............................................................... 26, 27

*Zucco Partners, LLC v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009) ............................................................................ 34, 39

**Statutes**

15 U.S.C. §78u-4(b)(1)(B) ........................................................................................ 9

15 U.S.C. §78u-4(b)(2)(A) ...................................................................................... 30

15 U.S.C. §78u-5(c)(1) ........................................................................................... 24

1

**STATEMENT OF ISSUES TO BE DECIDED**

2        1.        Whether Defendants'[1] Motion[2] establishes a basis for the Court to dismiss Count Two of Lead

3 Plaintiff The Plymouth County Group's ("Plaintiff") Complaint[3] alleging liability under Section 10(b) of the

4 Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) promulgated thereunder for false and

5 misleading statements at the pleading stage.

6        2.        Whether Defendants establish a basis for the Court to dismiss Count Three alleging liability

7 against the Individual Defendants as control persons as it relates to Count One (the Section 10(b) and Rule 10b-5(b)

8 claims) under Section 20(a) of the Exchange Act at the pleading stage.

9

10

11

12

13

14

15

16

17

18

19

---

20 [1] "Defendants" include Aqua Metals, Inc. ("Aqua Metals" or the "Company"), Stephen R. Clarke ("Clarke"), Thomas Murphy ("Murphy") and Selwyn Mould ("Mould"). Defendants Clarke, Murphy and Mould are collectively referred to herein as the "Individual Defendants."

21

22 [2] "Motion" refers to Defendants Aqua Metals, Inc., Stephen R. Clarke, Thomas Murphy, and Selwyn Mould's Notice of Motion and Motion For An Order Dismissing Plaintiff The Plymouth County Group's Second Amended Complaint Titled "Consolidated Complaint For Violation of Securities Laws," filed on November 1, 2019 (ECF No. 128), which is supported by (1) Defendants' Memorandum of Points and Authorities (ECF No. 128), which is cited herein as "DB"; (2) Defendant Stephen R. Clarke's Supplemental Memorandum In Support of Motion To Dismiss Amended Consolidated Complaint For Violation of Securities Laws, filed on November 1, 2019 (ECF No. 129), which is cited herein as "CB"; (3) Declaration of Michael R. Hogue In Support of Request For Judicial Notice In Support of Defendant's Motion To Dismiss ("Hogue Declaration"), filed November 1, 2019 (ECF 128-2); and (4) Defendants Aqua Metals, Inc., Stephen R. Clarke, Thomas Murphy, and Selwyn Mould's Notice of Request For Judicial Notice, filed November 1, 2019 (ECF 128-1). Citations to "RJN Ex." are to the exhibits attached to the Hogue Declaration.

23

24

25

26

27 [3] The "Complaint" (also cited herein as "Compl.") is Lead Plaintiff Plymouth County Group's Amended and Consolidated Complaint for Violation of Securities Laws, filed on September 20, 2019 (ECF No. 119), which is cited herein as "¶__." Unless otherwise stated all emphasis in the Complaint is omitted.

28

**PRELIMINARY STATEMENT**

In ruling on the Defendants' first motion to dismiss, the Court upheld both Plaintiff's Count Two claim for scheme liability and its Count Three claim for control person liability against all Defendants.  Order [on Motion to Dismiss] (Aug. 14, 2019), ECF No. 113 ("Op.") at 15, 17, 18.  The Court granted the motion to dismiss the Count One misrepresentation claim with leave to amend finding it was "puzzle pleading."  Op. at 11.  In response to the Court's ruling, Plaintiff's Complaint contains a new section which identifies each false and misleading statement and provides detailed evidence demonstrating the falsity of each statement.  Compl. § VII.A-E.  Defendants' current Motion does not challenge the claims the Court already upheld.  DB 1 n.1, 33.  Defendants only challenge the Count One misrepresentation claim and the Count Three control person claim "as it relates to Count One."  *Id*.[4]  The Motion should be denied in its entirety.

This case is about Defendants' widespread fraud to mislead investors regarding Aqua Metals' purportedly proven AquaRefining technology that would supposedly revolutionize the $22 billion lead acid battery ("LAB") recycling business.  Between May 19, 2016 and November 9, 2017 (the "Class Period"), Defendants painted a vivid picture of consecutive key milestones being achieved – notably having first successfully tested then commissioned and finally commenced commercial operations of AquaRefining.  For example, they touted that the "testing of our AquaRefining process has been successful" and touted images of the process and the Reno Plant in "continuous[]" operation with AquaRefined lead "flowing like a waterfall" and being cast into ingots.  Defendants also hosted site visits for analysts and investors to purportedly demonstrate "the full production process of AquaRefining on simultaneously running modules" and urged analysts to issue reports on what they observed.

However, as former employees ("CWs") explain, Defendants had not achieved the reported milestones because AquaRefining's design was fundamentally flawed such that it severely malfunctioned throughout the Class Period.  Indeed, the modules were incapable of running for any length of time, were constantly breaking down and produced little to no pure AquaRefined lead because of significant unresolved and pervasive fundamental problems (including sticky lead and hard lead problems) that existed as of at least 2015 and persisted at the Reno Plant throughout the Class Period.  ¶¶61-120.  As CWs explain, the images Defendants issued were fake and the site visits were orchestrated by Defendants to actively conceal the pervasive problems.  Indeed, at the end of the Class

---

[4] Thus, their Proposed Order (ECF No. 128-37), and Clarke's conclusion to his Supplemental Memo (CB 6:5-26), that generally seek dismissal of the Complaint, are improper and do not reflect the relief sought.

Period, Defendants conceded that the technology was unproven and malfunctioning, suffered from a sticky lead problem and that the modules were only being run in test mode. It is no surprise then that, after the truth was revealed, an investor research group questioned "the veracity of the CEO" and relayed that investors "believe that they have been deceived (lied to?) by management." ¶¶290, 292. It is equally unsurprising that the stock price fell from a high of $21.89 to $3.00 right after the Class Period – never to recover. ¶¶4, 5, 509.

To be clear, this case is not about the fact that AquaRefining did not become profitable as quickly as hoped, that AquaRefining did not generate revenue during the Class Period or that there existed risks to commercializing the technology. Nor is this a case where problems first surfaced while scaling production. Rather, Defendants are liable to Class members because they falsely portrayed the then-existing facts regarding the success, capability and operations of the AquaRefining technology, which artificially inflated the stock price.

Defendants do not dispute the existence of the problems plaguing the AquaRefining process but mischaracterize them as readily soluble or hiccups first encountered when attempting to scale. But the assertion that the fundamental problems with the AquaRefining technology were not anticipated or were readily soluble is belied by the first-hand accounts of CWs and Defendants' own admissions. The AquaRefining technology was fundamentally flawed as designed and those same known flaws existed and persisted prior to and throughout the Class Period leaving the technology and the Reno Plant inoperable.

**FACTUAL BACKGROUND**

Aqua Metals claims that it is "reinventing" LAB recycling through its proprietary "AquaRefining" technology. AquaRefining purportedly produces pure and ultra-pure lead through a less costly and more environmentally friendly process than smelting, the traditional means of recycling LABs. ¶¶46, 48-50.

As described by Defendants, the AquaRefining process starts similarly to traditional smelting: a breaker crushes used LABs and then the metallic lead, lead compounds and plastic are separated for recycling. ¶¶47, 50. After that, the AquaRefining technology comes into play to recycle the lead compounds. Purportedly, AquaRefining converts the lead compounds into pure or ultra pure lead using an electrochemical process and an "AquaRefining module." ¶¶48-50. A module consists of six electrolyzers and uses "electroplating," which is intended to continuously remove lead as the module operates. ¶48. The process purportedly lightly plates disk cathodes with soft lead to harvest before it re-solidifies. *Id.* Each electrolyzer contains several rotating disks and scrapers that are intended to automatically scrape the lead off the disks and onto chutes where it is to slide off onto a

1  conveyor belt to be compressed and then ingoted. *Id.*

2  The Class Period begins in May 2016 when Aqua Metals announced that it had nearly completed the

3  construction of its first-ever AquaRefinery (the "Reno Plant"), where it would commence the commercial

4  production of AquaRefined lead.  Defendants touted that the technology had been successfully tested its test lab and

5  full-scale test site (the "Testing Sites"), and that they had successfully produced 99.99% pure lead at the Testing

6  Sites.  ¶¶123-24, 131-37, 339, 344.  Defendants further touted that they were "on track" to achieve 80 metric tons of

7  recycled lead per day by the end of 2016. *See, e.g.*, ¶¶123, 134, 434.  When questioned about whether there existed

8  any problems that might impede the success of AquaRefining as operations ramp up, Clarke assured investors that

9  "[t]here's little risk associated with the actual AquaRefinery themselves."  ¶¶135, 344.  At that same time, the

10  Company also announced a partnership with Interstate Battery System International, Inc. ("IB"), the country's

11  leading battery recycler, stating that the partnership constituted a "strong validation of [the AquaRefining]

12  technology," which allowed it to accelerate its growth and licensing of the technology.  ¶¶122-24, 131-37, 390,

13  397.  Analysts reacted positively to the partnership, accepting Defendants' statement that this constituted a "strong

14  validation" of the technology.  ¶130.

15  Shortly thereafter, in August 2016, Defendants announced that the Reno Plant was open for business and

16  reiterated that they remained "on track" to produce 80 tons of recycled lead per day by Q4 2016. *See, e.g.*, ¶¶142-

17  44, 441.  When asked about concerns with getting production "up and running" or at "mass scale," Clarke assured

18  investors that "everything that we think we might have a problem with, we've got contingency plans in place for.

19  So, I don't have a single thing that we're worried about" and "we have been operating a single full scale

20  electrolyzer for 12 months now.  That was pre-production prototype.  Then, nearly four months ago now, we took a

21  single electrolyzer off the production line and installed [it] in our full scale test facility and have been operating that

22  ever since.  And we don't anticipate any issues operating at full scale."  ¶¶150-51, 344.

23  In November 2016, the Company announced that it had achieved the "critical" "milestone" of production

24  of the "first-ever AquaRefined lead" that was over 99.99% pure at the Reno Plant. *See, e.g.*, ¶¶158-76, 350.  For

25  example, the November 1, 2016 Press Release stated "Aqua Metals previously demonstrated the effectiveness of

26  its technology at bench scale, pilot scale and with a single, full-size electrolyzer.  The Company has now produced

27  high-quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno

28  Industrial Center in Nevada."  ¶¶160, 350.  The press release included vivid images portraying a smoothly

operating process from the module through the casting of lead ingots, with titles reading "AquaRefining module with six electrolyzer units continuously producing AquaRefined pure lead, flowing like a waterfall of lead infused electrolytes," with a "[c]onveyer belt carr[ying] pure lead to ingot casting area" and then showing an image of an "AQMS" bar titled "[t]he first casted ingot."   ¶¶159, 350.   Defendants also touted photos captioned: "Commissioning Module 1"; "produc[ing] lead without heat"; "which is recovered continuously"; "and compressed into blocks" "of ultra pure lead." ¶¶171, 350.  Defendants further represented that the Company had "commission[ed] the first production module" and was "transitioning" into "lead production" and "commercial operations" with expected sales of "AquaRefined lead in quarter four" of 2016.  ¶¶165-66, 168, 172-74, 350.  The Company also announced that it had capacity to produce 120 tons per day by early 2017, a 50% improvement over the previously announced 80 tons per day. *See, e.g.*, ¶¶163-68, 174, 182, 428, 450.  When questioned about this increase in production capacity, Murphy touted that "[w]e wanted to make sure we could it, before we told anybody. . . . we started to test that idea and found out we could, then we validated it and then we did." ¶¶181, 428.

On February 9, 2017, the Company announced a partnership with Johnson Controls International plc ("JCI"), the world's largest manufacturer of automotive batteries, touting this relationship as further validation of the technology and enabling the Company to move forward with additional AquaRefineries and transition to licensing of the technology in 2017.  ¶¶192-95, 199, 390, 397.  Again, analysts reacted positively, accepting the representations that the partnership both validated the technology and provided all that was needed for additional facilities and licensing opportunities. ¶¶196-98, 215.

Just one week later, Defendants touted that they had "successfully built, commissioned and beg[un] producing products at the world's first AquaRefinery." ¶¶200-02, 355-56.  Even more significantly, that same day, Clarke stated that the Reno Plant hit the next major milestone – it "has moved from commissioning to operational. That means that we are breaking batteries and making lead from the batteries that we've broken, both from – both metallic lead and Aqua-refined lead" and that the "first-ever AquaRefinery [is] up and running." ¶¶204, 209, 355-56.  Murphy stated that they were "beginning commercial operations."  ¶¶205, 356.  Moreover, Clarke stated that the Company was "now looking at expanding from 120 tonnes to 160 tonnes a day." ¶¶206, 450.  Thereafter, the Company confirmed that "[d]uring January 2017 we commenced the commercial scale production of recycled lead at our TRIC facility." ¶¶221, 356.

In May 2017, Defendants reconfirmed that the Reno Plant was "in commercial operation and generating

revenue [as well as] aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017." ¶¶227, 241-42, 357, 459. Clarke insisted that "every single one of the processes that we need to operate is operating." ¶¶235, 362. He further stated that "[t]he headline is its running and we are scaling output. We started production in Q1 and we have started actually moving those into sales in Q2." ¶¶236, 362. Thereafter, the Company stated that, "[a]s of July, the Company had four AquaRefining modules commissioned and in operation." ¶¶260, 357.

The truth was starkly different – as explained by CWs and revealed by Defendants at the end of and after the Class Period. None of the purported milestones had been met as the technology had not been successfully proven at any stage – the testing phase, the commissioning phase, the operational phase or the commercialization phase. *See, e.g.*, ¶¶340-43, 345-48, 351-54, 358-61, 363-66. The fundamental problems that existed with the technology at the testing phase were never resolved and persisted, preventing its ability to function at every purported phase. The CWs consistently describe that the AquaRefining technology was not proven, not scalable as designed, "not functional" or "operational" and faced myriad issues beginning in 2015 at the Testing Sites and continuing at the Reno Plant. ¶¶61-120. An engineer who worked on the flaws since 2015 relayed that, despite the fact that the process was malfunctioning at the Testing Sites, Defendants decided to "go big" by building and opening the Reno Plant, even though the technology could not support it, banking that they could fix the problems to get the process functioning by the time the plant opened – which they did not. ¶¶63-75. The Reno Plant, once open, became another test site where the Company tested potential solutions to the problems, and the technology remained in the research and development ("R&D") phase. ¶¶72, 97, 110, 113.

The problems that plagued the process included a "hard lead" issue, whereby the lead would get stuck and harden on the disks and have to be manually chiseled off, and a "sticky lead" issue, whereby the lead would prematurely harden and get stuck on the chutes (rather than flowing off onto the conveyor belt) and have to be manually scraped off. ¶¶63-72, 78-82, 87, 89-91, 97, 110-12, 114-15. These issues were the result of, *inter alia*, not getting the correct chemical ratios for the necessary consistency of the lead (*i.e.*, it could not stay soft in order to work in the process and instead would harden and get stuck), design flaws with the modules and changes in electrical voltage. ¶¶65-71; *see also* ¶¶73-74. These major flaws existed since 2015 and were never resolved – and are the same problems that the Company admitted existed at the end of the Class Period. ¶¶61-120, 277-78, 282, 288. Even the "traditional" part of the operation at the Reno Plant was malfunctioning. *See, e.g.*, ¶111.

The CWs also confirm that Defendants were fully aware of all these problems during the Class Period. *See* ¶¶63-76, 78-86, 89-93, 95-110, 115-120, 468-88.  As CWs relay, Clarke and Mould repeatedly personally witnessed and discussed the problems at both the Testing Sites and the Reno Plant, including the sticky lead and hard lead issues, that the process was not scalable as designed and the fact that the Reno Plant was not functioning such that little to no AquaRefined lead was produced.  ¶¶64, 67, 69, 71, 79, 95, 98-104, 116-18.  The problems and the lack of production were also reflected in reports to which Murphy, Clarke and Mould had access.  ¶¶86, 93, 110, 119.  In fact, as a former Plant Manager stated, the Plant Manager and the Vice President of Recycling Technology Battery and Lead Recycling Operation ("VP of Recycling") told Clarke and Mould on several occasions about the problems and that the Company could not reach the revenue and production numbers it had announced.  ¶98.  Clarke would tout production numbers and then, ***after***, go to the VP of Recycling and say, "now that I have said that, how can we make that happen" – but it could not happen.  ¶99.

Given these problems, the Company was never able to run the AquaRefining process to "continuously" produce "AquaRefined pure lead, flowing like a waterfall" during the Class Period. *See, e.g.*, ¶¶159, 349-54.  As the CWs consistently recount, the modules could barely run for more than one hour before breaking down and then sit idle for days.  ¶¶61-120.  As CWs relayed, the images that Defendants touted of the AquaRefining process running were staged as they captured only a short amount of time that the equipment could run before it broke down. *See, e.g.*, ¶¶82, 100-03.  Likewise, the images of casted ingots were not AquaRefined lead as the captions read, but rather of refined lead obtained from another source and then melted and cast at the Reno Plant and the images of blocks were not of " ultra pure" AquaRefined lead as touted, but blocks full of impurities such that they had to be discarded. *Id.*; *see also* ¶91.  Defendants staged all of these images and knew they were fake.  ¶103.

In the face of all this, in April 2017, after a short seller questioned whether AquaRefining could "ever be commercially viable," stating it "believe[s] that the company is actually in the business of telling tall tales" (¶224), the Company denounced the report and publicly invited investors and analysts to the Reno Plant to purportedly "address this misinformation [and] to openly show analysts and investors [the] facility in operation as we continue to scale it up" (¶¶225, 367).  In fact, it had been hosting site visits at the Reno Plant throughout the Class Period. *See, e.g.*, ¶¶145, 153, 156, 166, 382.  Defendants described such analyst visits as a "behind-the-scenes look at our process," including the full production process of AquaRefining on "simultaneously running AquaRefining modules" and shipment of the product.  ¶¶243-44, 317, 367.  And the Company stated that it expected analysts to

update their coverage reports to reflect findings from the site visits.   ¶¶238, 245, 317, 328, 367.   As prompted, analysts who visited the Reno Plant in the spring and summer of 2017 issued favorable reports stating they observed the full AquaRefining process in operation, including the production of AquaRefined lead.   ¶¶247-50, 259, 328-31, 374.   For example, Oppenheimer reported "seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational," that the Company was "tracking [its] estimates well," and that they saw "fully recycled lead coming out of the end of the process flow."   ¶¶247, 330, 374.   On August 2, 2017, Aqua Metals held an investor day to allow investors "to view the full production process at the AquaRefinery as it happened, including … AquaRefining on four simultaneously running AquaRefining modules," consistent with its "belief in transparency."   ¶¶255, 257, 319, 367.   After the investor day, several attendees commented, including one investor whose comment that Aqua Metals had "expertise perfecting" the process, was adopted in Defendants' press release.   ¶¶256, 331, 374.

In reality, Defendants offered these visits as further evidence of their false narrative that the AquaRefining process was successful from the testing phase, to commissioning phase, to operational phase, to commercialization phrase.   As Clarke stated,

> One of the other strands was that AquaRefining just doesn't work.   Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work.   (¶¶269, 321, 367.)

Contrary to Defendants' representations, these visits were shams.   The demonstrations during site visits to analysts, investors and others (including Aqua Metals' critical partners IB and JCI) were designed by Defendants to make the technology, the modules and the Reno Plant look like they were fully operational and commercially producing AquaRefined lead when they were not.   ¶¶76, 83-85, 92, 105-09, 120.   Several days prior to a visit, the equipment would be "rigged up" so that it could operate for a few minutes while the visitors were present.   ¶106. Employees were instructed "don't run the machines until [the investors] show up" (¶83) and to "stage everything up" (¶83).   Employees would receive a call from the plant management to start the machines five to ten minutes before the visitors arrived.   ¶85; *see also* ¶105.   The employees called the visits a "dog and pony show" because, as one former employee described, it was a "gyp," meaning a scam to cover up the true state of affairs.   ¶¶76, 84, 106.

Indeed, this Court previously found that "these staged glimpses of the Company's facilities and processes presented a different picture than what the CWs describe as the true state of affairs."   Op. 14:24-25.   Thus, as this Court held, "[t]hese alleged sham visits purportedly led analysts, with the encouragement of Defendants, to

disseminate reports containing misleading information about the process, when in truth the visits concealed 'problems' with the viability of the AquaRefining process. . . ." *Id.* at 15:11-15.

Defendants' fraud was exposed when the Company admitted, through a series of partial disclosures from May 9, 2017 to November 9, 2017, that, *inter alia*, (i) the AquaRefining technology was "unproven" (¶282); (ii) the technology was malfunctioning, including due to the "sticky lead" problem (the same problem that existed in 2015), for which a solution would need to be developed and applied to all modules (¶¶278, 286); (iii) the "operators would need to periodically assist the lead removal" from the modules due to sticky lead and hard lead issues (¶278); (iv) the commissioning process was not complete and the modules that were being run were only in testing mode (¶¶260, 278); (v) the Company had only "produced small quantities of AquaRefined lead" (¶277); (vi) the only "products" being sold were those which had nothing to do with AquaRefining (¶241); and (vii) the Company had "not commenced the commercial production of AquaRefined lead" (¶282). Upon the partial disclosures, Aqua Metals' stock price fell sharply, including one day drops of 26%, 23.6% and 17.9%, causing significant losses to Plaintiff and the Class.  ¶509(a)-(c).  Indeed, although Aqua Metals' stock artificially traded as high as $21.89 per share during the Class Period, it closed at $3.00 right after the Class Period and has not recovered.  ¶¶4, 509(d). Shareholders also expressed concern that they had been lied to by Defendants. *See* ¶¶290, 292.

The Company also made several post-Class Period admissions that were contrary to the Class Period statements.  On March 5, 2018 Aqua Metals admitted it "only recently completed, and [has] not put into operation" the process for producing AquaRefined lead.  ¶288(f).  The Company also admitted that it did not put any modules into production until April or May 2018 (¶288(h)) and did not cast its first block of AquaRefined lead until June 2018 (¶288(i)).  On August 8, 2018, the Company admitted that they had just taken "the first step to move beyond 'proof of concept' and transitioned into commercialization" of AquaRefined lead.  ¶288(j).  On October 12, 2018, the Company admitted it was only running one module at a time and had achieved a daily production of 2 metric tons of AquaRefined lead.  ¶288(k).  After the Class Period, there was a significant shake-up of both senior management and the Board of Directors ("Board").  The Board implemented a plan to transition Clarke out of his roles as President, CEO and Chairman and, in April 2018, Clarke resigned and the Company announced corporate governance enhancements.  ¶¶293-302.

## ARGUMENT

Defendants move to dismiss the misrepresentation claims (Count Two) solely on falsity and scienter

1    grounds and the control person claim (Count Three) "as it relates to" the misrepresentation claim solely on the

2    ground that a misrepresentation claim is not adequately plead.  As the Complaint more than adequately alleges both

3    falsity and scienter, Defendants' Motion should be denied in its entirety.

4    **I.      THE COMPLAINT ADEQUATELY PLEADS FALSITY**

5             Falsity is adequately alleged as the Complaint "specif[ies] each statement alleged to have been misleading"

6    and the "reasons why the statement is misleading."   15 U.S.C. §78u-4(b)(1)(B).   *See* Compl. § VII.A-E.   In

7    response, Defendants' Motion is itself akin to the puzzle pleading they previously argued against as it is often

8    unclear what statements Defendants challenge.   Defendants also ignore many false statements and, thus, those are

9    presumed actionable. *See Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 318 n.7 (D.R.I. 2004) ("[t]hose statements

10   that have not been challenged will be presumed actionable for purposes of this Motion").   In any event, even if just

11   one misstatement is sufficiently alleged, the Court "need not parse through each and every alleged misstatement

12   contained in the complaint to determine if it is actionable."   *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *13

13   (C.D. Cal. July 21, 2005); *see also Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1376 & n.11 (N.D.

14   Cal. 2014); *Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *4 (D. Ariz. Dec. 17, 2012) ("the Court need only

15   find that some of the claims within that count are sufficiently pled to deny the motion to dismiss")

16            At its core, this case alleges that, throughout the Class Period, Defendants lied about the fact the

17   AquaRefining technology was not successfully tested and suffered from severe known defects which existed and

18   persisted since its testing in 2015 rendering it incapable of producing much, if any, pure AquaRefined lead

19   throughout the Class Period.   Indeed, as the Ninth Circuit recently held, "companies mislead investors when they

20   tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities." *Okla. Police*

21   *Pension & Ret. Sys. v. LifeLock, Inc.*, 780 Fed. App'x 480, 483 (9th Cir. 2019) ("[O]nce defendants choose to tout

22   positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including

23   disclosing adverse information that cuts against the positive information").

24            And Defendants concede they are aware of the problems with AquaRefining.   DB 27.   Yet they contend

25   that their statements were nevertheless accurate by mischaracterizing the fundamental problems that existed from

26   the start of the Class Period as unexpected "hiccups" or problems first encountered when scaling up production.

27   This contention is belied by CW accounts and Defendants' end of Class Period admissions.   Moreover, the

28   Complaint alleges in great detail how Defendants engaged in a widespread charade to conceal these very problems

1   through sham "dog and pony" shows and faked images intended to make the technology and the Reno Plant look

2   like they were functioning when, in fact, they were not.  In any event, even if Defendants' statements were true

3   (they are not), the Ninth Circuit recognizes that "[s]ome statements, although literally accurate, can become,

4   through their context and manner of presentation, devices which mislead investors."  *Miller v. Thane Int'l*, 519 F.3d

5   879, 886 (9th Cir. 2008).

6        Defendants also challenge swaths of (often unidentified) statements as forward-looking.  However, most of

7   the statements were not forwarding looking and, even if they were, they were not accompanied by anything close to

8   the requisite meaningful cautionary language and were made with actual knowledge of their falsity.  Indeed,

9   Defendants never disclosed the admittedly known pervasive problems plaguing the AquaRefining technology.

10       **A.       Misrepresentations Regarding Visitor Day and Site Visits**

11       Defendants made material misrepresentations regarding analyst, investor and other industry participant

12   visits.  Compl. § VII.B.  As this Court held in sustaining Plaintiff's scheme liability claims related to these site

13   visits, "Plaintiff has sufficiently alleged that Defendants intentionally engaged in a fraudulent scheme to conceal

14   material facts, ***thereby leading to the dissemination of untrue statements***."  Op. 15:16-17 (and referring to both

15   Defendants' affirmative statements and analyst statements).  Given Defendants' failure to challenge the majority of

16   these site visit statements, the Motion should be denied for this reason alone.

17       Defendants' express statements regarding site visits in response to the short seller report include touting

18   (i) the visits as "a way to address this misinformation [and] to openly show analysts and investors [the] facility in

19   operation"; (ii) "[i]nvestors were able to view the full production as it happened, including … AquaRefining on

20   four simultaneously running AquaRefining modules"; and (iii) "we aim to be as transparent as possible …

21   providing a behind-the-scenes look at our process."  ¶367.  Even earlier, Defendants falsely touted site visits,

22   including Defendant Murphy stating that visitors were "observing processes in operation." ¶382.[5]

23       Moreover, as urged, analysts and investors issued statements regarding what they were led to believe

24

25   ---
    [5] Defendants argue that Murphy's statement is immaterial because Murphy also stated that "providing material for
26   people to test, that's a little bit low priority for us at the moment."  DB 32:16; RJN Ex. 24.  But that does not detract
    from the materiality of statements boasting that site visits allowed people to view the process in operation.  Further,
27   materiality is evidenced by the fact that this statement was in response to an analyst question.  ¶362.  In any event,
    materiality is a fact intensive inquiry not appropriate at this stage. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d
    1167, 1178 (9th Cir. 2008) ("Questions of materiality ... involv[e] assessments peculiarly within the province of the
28   trier of fact."), *aff'd*, 563 U.S. 27 (2011); *In re Facebook, Inc. Sec. Litig.*, 2019 WL 4674347, at *15 (N.D. Cal.
    Sept. 25, 2019) ("materiality arguments often are 'inappropriate for resolution on a motion to dismiss'").

1  during their visits including: (i) "seeing the battery breaker, the separation process, sulfurization engaged, and the

2  AquaRefining process all up and operational"; (ii) "modules were up and running and producing recycled lead"; 

3  (iii) "that fact that we observed trucks delivering used batteries for off-loading and recycling, and more importantly, 

4  finished recycled lead packaged and ready to be shipped out [i]s highly encouraging"; and (iv) "we observed 3 

5  Aqua Refining modules up and running and producing recycled lead." ¶374.[6]

6        These and the other statements identified at ¶¶367, 374 and 382 were false and misleading because the 

7  AquaRefining process and the Reno Plant were not operational, were plagued with defects and the modules were 

8  barely running nor producing AquaRefined lead "ready to ship." *See, e.g.,* ¶¶368-72; 376-80; 383-87.  The visits 

9  were sham shows orchestrated to make the AquaRefining process and the Reno Plant appear fully operational 

10 while concealing known, severe problems.  *See, e.g.,* ¶¶373, 381, 388.  The employees called the visits a "dog and 

11 pony show" because, as one former employee described, it was a "gyp," meaning a scam to cover up the truth.  *Id.* 

12 As this Court held, "these staged glimpses of the Company's facilities and processes presented a different picture 

13 than what the CWs describe as the true state of affairs."  Op. 14:24-25.[7]

14       Although analysts and investors made several of the above statements, a "defendant may be held liable for 

15 'mak[ing] false and misleading statements to securities analysts with the intent that the analysts communicate those 

16 statements to the market.'"  *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1105 (N.D. Cal. 2013); 

17

18 [6] Defendants' reference to a portion of one analyst statement after a site visit, to suggest they cautioned against the
19 very conclusion that this analyst drew after the site visit, is misguided.  DB 22:3-8.  Defendants ignore that the
   actionable statements in that report, including that the analyst saw "four modules were operational, producing
20 recycled lead," were about what the Company demonstrated at the visits, not what conclusions were to be drawn
   from the visits.  ¶374.  Further, the conclusion drawn actually illustrates how analysts were misled.  Similarly, in
21 Defendants' argument regarding production level statements that were made without any cautionary language, they
   include statements by "analysts after site visits," followed by string of ¶ cites.  DB 16:18-23.  Yet most of the
22 analyst statements cited do not relate to site visits, are not challenged analyst statements and appear only in the
   background section of the Complaint.  ¶¶130, 15, 182, 197, 199.  Of the two that are challenged analyst statements
23 after site visits (¶¶247, 248), only one mentions production rates among other statements.  Moreover, the statements
   are not forward-looking as they describe what analysts witnessed at the site visits.  ¶383.  In any event, the safe
   harbor does not protect this, nor any other analyst statement, as discussed at § I.F, *infra*.

24 [7] In their factual background section, Defendants assert that the Complaint does not allege what analysts were told
25 about the process they observed.  DB 7:18-21.  But this level of specificity is not required, particularly where
   multiple CWs relay witnessing false information being conveyed to visitors.  *See In re DSP Grp. Sec. Litig.*,
26 1997 WL 678151, at *9 (N.D. Cal. Mar. 5, 1997) (defendants' argument that "plaintiffs fail 'to specifically allege
   what information was communicated by DSP to the analysts during those conversations.' . . . set[s] too high a
27 hurdle.").  The analysts' and investors' statements also lay bare the fact the employees' accounts were not mere
   "speculation."  Moreover, Defendants' own statements touting the site visits evidence the fraudulent picture they
28 intended to convey.  And Defendants never corrected the analysts' misguided false statements but instead touted
   the visits as a success and, in fact, quoted one in an Aqua Metals, press release.

*see also Fosbre v. Las Vegas Sands Corp.*, 2013 WL 5970250, at *8 (D. Nev. Nov. 7, 2013) (a company is liable for false or misleading statements by a third party where the company either expressly or impliedly adopts or endorses the statements or provides the third party with false or misleading information with the intent that the third party will communicate that information to the market). Defendants do not dispute this or that they specifically asked analysts to communicate what they saw during the site visits. ¶¶238, 245, 367, 375. Accordingly, in addition to their own statements, Defendants are also liable for false and misleading statements made by visiting analysts and investors. ¶375.

### B.      Misrepresentations Regarding Milestones Currently Achieved

The Complaint categorizes specific statements touting important milestones achieved regarding the current status of AquaRefining and the Reno Plant and why each statement was misleading. Compl. § VIII.A.[8] Defendants' Motion also ignores many of these statements.

#### 1.      Misrepresentations That The AquaRefining Technology Was Successfully Tested And Proven

At the beginning of the Class Period and thereafter, Defendants touted that the AquaRefining technology had been successfully tested and proven at the Testing Sites and produced pure AquaRefined lead, and that Aqua Metals needed only to scale up the process. ¶¶339, 344. For example, Defendants repeatedly touted that "testing of our AquaRefining process has been successful to date." ¶339. When pointedly asked whether there were any hiccups or concerns with the modules or if there problems expected as they scaled up, Clarke denied there were any existing problems, stating "we don't anticipate any issues operating at full scale"; "There's little risk associated with the actual AquaRefinery themselves"; and "I don't have a single thing that we're worried about." ¶344.

These and the other statements identified at ¶¶339 and 344 were false and misleading because the AquaRefining process had been riddled with severe and persistent problems since 2015 and the problems had not been fixed, rendering AquaRefining unproven and unsuccessful. ¶¶61-120; 340-343, 345-48. These problems were first encountered and persisted in the Testing Sites, where Aqua Metals could not get the process to an operational state. ¶¶342, 346. The problems included issues with chemical ratios, a hard lead issue and the sticky

---

[8] Milestones is the word repeatedly used by Defendants in statements that they affirmatively achieved a significant event or stage in development. Merriam-Webster defines "milestone" as "a significant point in development." *See* https://www.merriam-webster.com/dictionary/milestone.

lead issue that persisted throughout the Class Period at the Reno Plant.[9]  *Id*.  The modules were barely able to run before breaking down and sitting idle for days, producing little to no pure AquaRefined lead.  *Id*.  *See, e.g., In re Allaire Corp. Secs. Litig.*, 224 F. Supp. 2d 319, 323, 327-29, 334 (D. Mass. 2002) (representations that product is "proven," "successful," or implying the product "worked wonderfully" were false given the "known product deficiencies" and "substantial problems" found at the testing stage).

Indeed, after the end of the Class Period, Defendants admitted for the first time that the AquaRefining process was "unproven technology" (¶¶343, 348),[10] directly contradicting their prior statements.  *See, e.g., In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) ("later statement[s]" support falsity as they "directly contradict[] or [are] inconsistent with" Defendants' earlier statements), *abrogated on other grounds as recognized by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783-84 (9th Cir. 2008).  Even in their Motion, Defendants do not dispute the existence of these problems throughout the Class Period.  DB 27:3-5.  Defendants' admission alone renders statements such as, *inter alia*, they don't anticipate any issues, false and misleading when made.

Without authority, Clarke suggests his affirmative statements that there is "little risk associated with the actual AquaRefinery themselves," and "we don't anticipate any issues operating at full scale" (¶344) are forward-looking.  CB 3.  However, denying there were any issues in the face of known current and pervasive material problems is a statement of present fact.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008) ("descriptions of the present aren't forward-looking").  In any event, as discussed below, none of the purported cautionary disclosures protect any of Defendants' statements.  *See* § I.F., *infra*.

Defendants' assertion (DB 24-25) that the statement, "I don't have a single thing that we're worried about" when directly asked by an analyst, "to get up and running, which piece are you guys most concerned about…" (¶344), is an inactionable opinion is ludicrous.  This is a statement of objective fact that there were no concerns,

---

[9] *See In re Valence Tech. Sec. Litig.*, 1995 WL 274343, at *4, 11-12, 16 (N.D. Cal. May 8, 1995) (statements that "[t]he Company has completed basic research for its batteries, has manufactured limited quantities of working prototypes and is presently developing the enhancements necessary to support commercial introduction of its products" misleading where there were "fundamental flaws in the battery's technology" and defendant was not "close to capable of commercial production").

[10] Defendants' assertion about this admission again misconstrues the theory of Plaintiff's case.  DB 23:10-11.  Plaintiff does not rely on an admission regarding whether Aqua Metals' business model is proven.  The relevant disclosure cited in the Complaint states, "We are engaged in the business of producing recycled lead through *a novel and unproven technology*."  ¶282; DB 23:14-16.  Thus, the word unproven clearly relates to the technology, not its commercial success or business model.  This post-Class Period admission stands in contrast to prior statements that the technology was successful, but that commercialization on a broader scale was, as yet, unproven.

1  when, in fact there were known fundamental defects.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*

2  *Pension Fund*, 135 S. Ct. 1318, 1321 (2015).[11]

3

4  **2.  Misrepresentations that Aqua Metals Had Produced Pure AquaRefined Lead Flowing Like A Waterfall And Was Transitioning To Commercial Operations**

5  In November 2016, the Company stated that it achieved the critical milestone of producing ultra-pure lead

6  at the Reno Plant with its AquaRefining technology producing ingots of pure AquaRefined lead.  ¶350.  For

7  example, Defendants touted a series of images purportedly depicting the process of pure AquaRefined lead coming

8  out of an AquaRefining module, then being brought to be cast and then the finished product of the casted ingot with

9  the titles "AquaRefining module with six electrolyzer units continuously producing AquaRefined pure lead,

10  flowing like a waterfall of lead infused electrolytes"; "[c]onveyer belt carries pure lead to ingot casting area"; "first

11  casted ingot"; and "[c]lose up of first casted ingot."  ¶350.  These images were touted repeatedly throughout the

12  Class Period.  *Id.* at 108 n.25; ¶357.  Another series of images were captioned: "Commissioning Module 1";

13  "produc[ing] lead without heat"; "which is recovered continuously"; "and compressed into blocks" "of ultra pure

14  lead."  ¶¶171, 350.  Defendants also stated that the Company was "transitioning into commercial operations now"

15  and "we built our first lab scale AquaRefining test system nearly three years ago.  More than two years ago, we had

16  a large scale pilot and then a single electrolyzer operating.  So we all knew it works, but it doesn't mean anything

17  until you put into a commercial operation and make some lead and sell it, and we've been able to get to that point

18  and it's hugely thrilling."  ¶350.

19  These and the other statements and images identified at ¶350 were false and misleading when made

20  because the AquaRefining technology was not producing pure AquaRefined lead that was "continuously …

21  flowing like a waterfall"; had not produced ingots of pure AquaRefined lead; had not commissioned AquaRefining

22  or a single module such that it could transition to commercial production; and the images supporting these

23  statements were fake.  ¶¶351-54.  The AquaRefining process, now at the Reno Plant, continued to be plagued with

24  the same problems that existed in 2015 and was not operational.  ¶353.  When the Reno Plant opened, the process

25  and the plant were not "functional" or "operational" as touted, and the plant became another testing site that

---

[11] Even if it was an opinion (it is not), Plaintiff has sufficiently pled falsity given that Clarke knew the technology was riddled with fundamental issues that would persist and worsen as the Company attempted to scale.  *See* § II, *infra*.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).  And Defendants do not deny knowledge of the problems.  DB 27.

1   remained in the R&D phase throughout the Class Period.  *Id.*  As Defendants later admitted, the Company "ha[d]

2   not commenced the commercial production of AquaRefined lead" even months after the Class Period ended; had

3   "only recently [as of March 15 2018] completed, and [had] not put into operation, the processes that we believe will

4   support the production of AquaRefined lead on a commercial scale"; and, over two years after some of these

5   misrepresentations, that it only just took "the first step to move beyond 'proof of concept' and transitioned into

6   commercialization."  ¶354.  As such, Defendants' statements are demonstrably false.  *See, e.g., In re Solv-Ex Corp.*

7   *Sec. Litig.*, 210 F. Supp. 2d 276, 280, 284 (S.D.N.Y. 2000) (representations regarding the start of commercial

8   operations misleading when the plant was constructed and used as an "experimental facility").[12]

9        As CWs explain, the images of purportedly pure AquaRefined lead were ***not*** pure AquaRefined lead.

10   Indeed, as CWs 2 and 4 relayed, the lead in the bars (ingots) had not gone through the AquaRefining process but

11   was lead that Aqua Metals obtained from another source and then just melted and cast at the Reno Plant.  ¶¶82,

12   101-03, 353; *see also* ¶91 (CW3 relayed that the Company was not making enough AquaRefined lead to be cast

13   into a bar and the only lead that was cast had not gone through the AquaRefining process).  Likewise, the images of

14   blocks did not contain pure AquaRefined lead and were full of impurities.  ¶¶82, 353.  The images of the

15   AquaRefinery "continuously" producing AquaRefined lead were deceiving as the images were taken during the

16   short time the machines they ran.  ¶¶101-03, 353.  Moreover, Defendants admitted that it was not until June 2018

17   that Aqua Metals produced its first block of pure AquaRefined lead.  ¶¶288, 354.

18        Ignoring many of these alleged misstatements, Defendants respond that they disclosed elsewhere that they

19   were not using LABs broken at the Reno Plant to make the AquaRefined lead at the time of the faked images "so it

20   obviously obtained the recycled lead elsewhere before processing it through the AquaRefinery."  DB 20:3-4; *see*

---

[12] Defendants argue that, in November 2016, the Company "***pushed back*** the expected date of commercial production [from the close of the fourth quarter] to 'early in 2017.'"  DB 20:12-13 (quoting ¶163).  But the quoted statements state the opposite: "We ***expect to commence earning revenue through the commercial-scale recycling of LABs at our TRIC facility during the fourth quarter of 2016***.  Additionally, we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day.  We expect to achieve a production rate of 120 tonnes per day early in 2017."  ¶163; *see also* ¶¶339, 428.  Far from pushing commercial production to early 2017, what they actually said is that they were commencing production in 4Q 2016 and ***increasing*** the targeted amount of production (by 50%) by early 2017.  Similarly, Defendants wrongly assert that the Company "kept pushing back the date it projected to reach commercial scale from Q4 2016 (*id.* at ¶163) to early 2017 (*id.* at ¶168) to the first half of 2017 (Form 10-K filed March 2, 2017) and then to the end of 2017 (April 24, 2017 press release)."  DB 18:24-27.  But paragraphs ¶¶163 and 168 both relay that the Company would begin selling lead in Q4 2016 and the March 2, 2017 Form 10-K affirmatively and falsely states "***[d]uring January 2017, we commenced the commercial scale production of recycled lead*** at our TRIC facility."  ¶356.

1   *also* DB 5:19-22.[13]  But that completely misses the point.  The allegation is that the lead in the bars (ingots) ***did not***

2   ***go through the AquaRefining*** machines and the lead in the blocks ***was also not pure AquaRefined lead***, contrary

3   to Defendants' representations.

4          Defendants' argument, that touting that the Company had achieved the "major milestone" of the

5   production of pure AquaRefined lead flowing like a waterfall is puffery, is specious.  DB 24:4-9.  The statement is

6   an affirmation that the Company had achieved something so important that Defendants themselves referred to it as

7   a "milestone" when it, in fact, it had not been achieved.  ¶¶350-54.  This statement was contained in the Company's

8   Nov. 1, 2016 Press Release ***directly following and referring to*** the faked images with statements describing the

9   images as "AquaRefining module with six electrolyzer units continuously producing AquaRefined pure lead,

10  flowing like a waterfall" of lead infused electrolytes," with a "[c]onveyer belt carr[ying] pure lead to ingot casting

11  area" and then showing an AQMS bar titled "[t]he first casted ingot."  ¶350; *see* Declaration of Nicole Lavallee

12  ("Lavallee Decl."), filed herewith, Ex. A.[14]  Tellingly, Exhibit 99.1 attached to the Nov. 1, 2016 8-K ("Ex. 99.1")

13  that was submitted to the U.S. Securities and Exchange Commission ("SEC") as the Nov. 1, 2016 Press Release

14  did ***not*** include these images and the text that described them.  *Compare* Lavallee Decl. Ex. A *with* RJN Ex. 7.

15  Also tellingly, while Defendants submitted an abundance of documents to the Court in support of their Motion,

16  Defendants did not submit the Nov. 1, 2016 Press Release that was directly cited in the Complaint (¶350 nn.25-29;

17  *see also* ¶¶158-162), but only Ex. 99.1, which failed to include the descriptive images.  RJN Ex. 7.

18         In any event, claiming to have achieved this specific "major milestone" when it had not, was objectively

19  false and "went beyond 'feel good' optimistic statements" and "subjective or emotive" descriptions constituting

20  puffery.  *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017) (statements that the company's

21  pipeline was "very robust," "deep," at "record levels," and "keeps growing" not puffery).  These are affirmative

22  statements of fact that can "be determined either true or false on an objective standard."  *In re Verifone Sec. Litig.*,

---

[13] Defendants' attacks on the CWs' basis for their knowledge that the images were faked (DB 20), are specious as discussed below.  *See* § II.B, *infra*.

[14] *See also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) ("the Court may not assess the statements listed in the [complaint] in a vacuum, 'plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery,' but rather will examine the entire statement and its circumstances to determine if it is actionable"); *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1130 (W.D. Wash. 2005) (optimistic statements are not puffery where "immediately preceded or followed by very specific statements of fact that supposedly justify or supply a foundation for the optimism"), *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008).

1   2016 WL 1213666, at *4 (N.D. Cal. Mar. 29, 2016).[15]

2

3          **3.     Misrepresentations That The Reno Plant Was Commissioned And Had Commenced Commercial Operations to Produce AquaRefined Lead**

4          Beginning in February 2017, Defendants touted that they had "successfully commissioned" the Reno

5   Plant, were beginning commercial operations and producing Aqua Refined lead.  ¶¶356, 357.  On February 14,

6   2017, Clarke stated that the Reno Plant "has moved from commissioning to operational.  That means that we are

7   breaking batteries and making lead from the batteries that we've broken, both from – both metallic lead and Aqua-

8   refined lead" and that "[w]e've transitioned out of a mostly start-up phase into a [sic] and commission phase, into

9   an operational phase."  ¶356.  Murphy said they were "beginning commercial operations."  *Id.*[16]  On March 2,

10  2017, the Company stated that, "[d]uring January 2017, we commenced the commercial scale production of

11  recycled lead at our TRIC facility."  *Id.; see also* ¶357.  Thus, Defendants' assertions that, *inter alia*, there was "no

12  representation that TRIC was operating to produce lead on a commercial scale" (DB 21:7-8; *see also* DB 22:7-13)

13  is belied by Defendants' actual Class Period statements.[17]   Thereafter, Defendants touted that "we now have

14  AquaRefineries or four AquaRefining modules in operation.  And I think actually a better title for this slide would

15  be AquaRefining works in capital letters with a lot of exclamation marks.  We are now AquaRefining lead."  ¶362;

16  *see also* ¶357.  Defendants not only repeatedly touted that they were in commercial production of AquaRefined

17  lead but doubled down on their prior statements that the AquaRefining technology worked from the start.  When

18  questioned as to why the short seller report was purportedly "wrong," Murphy responded that it was because the

19  technology "works" and Clarke said "as Tom said earlier it worked the first time we turn [sic] it on."  ¶362.

20

---

21  [15]  Defendants' cases (DB 24), are inapposite as in each case, plaintiffs there could not point to any concrete,
22  objectively false facts that were embedded or omitted from the challenged statements such as "we want to be a
    company known for its ethical leadership," "we believe our employee relations are good,"  or "our business
23  remains healthy and resilient." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard
    Co.*, 845 F.3d 1268, 1275-78 (9th Cir. 2017); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL
24  4181954, at *5 (N.D. Cal. Aug. 31, 2018); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

25  [16]  While Defendants assert that Clarke made this statement (DB at 32:5-7), Bloomberg transcripts of the call
    Plaintiff reviewed for the preparation of the Complaint and other transcripts attribute it to Murphy.  Lavallee Decl.
26  Exs. D at 10, Ex. E at 10, Ex. F at 14.  Thus, this is an issue of fact inappropriate on a motion to dismiss.

    [17]  Similarly, Defendants point to their disclosure that their commercial operations only concerned the sale of lead
27  compounds and plastics to argue that their statements were not misleading.  DB 23:7-9 (citing ¶241); *see also*
    DB 21:16-19.  But what they are citing is information that was disclosed the day before in the Company's ***May 9,
28  2017 corrective disclosure about the prior quarter***.  As such, this ***confirms*** the falsity of their prior statements.
    Likewise, it has no bearing on the Company's false statements about the ***current*** commercial operations.

1    These statements and the others identified in ¶¶356, 357 and 362 were false and misleading because, *inter*

2    *alia*, the AquaRefining process and the Reno Plant were malfunctioning, they continued to face the same severe

3    problems that existed in 2015 and persisted throughout the Class Period, the modules were not operational and

4    barely ran and Aqua Metals did not commercially produce AquaRefined lead at ***any*** point during the Class Period.

5    ¶¶358-61, 363-66.[18]  Indeed, Defendants produced little to no AquaRefined lead throughout the Class Period and

6    sold none.  *Id.*  Defendants have ***admitted*** that, even by the end of the Class Period, they had not commenced the

7    commercial production of AquaRefined lead and only transitioned from "proof of concept" to commercial

8    production in the summer of 2018.  *Id.*  At the end of the Class Period, Defendants also admitted they were still

9    working on commissioning the process.  *Id.*

10                                                            ***

11    Again, Defendants do not dispute the existence of the problems plaguing the AquaRefining process and the

12    Reno Plant as detailed in the Complaint.  DB 27:3-5.  Instead, they mischaracterize them as unanticipated "hiccups,

13    "unexpected setbacks," or "scaling issues" – problems first encountered when scaling up production.  DB 17-18;

14    CB 2.  The assertion that the fundamental problems with the AquaRefining technology, including the 'sticky lead

15    issue' discussed by CW1, 4 and 5, could not have been anticipated before trying to scale is completely belied by the

16    reports of those CWs and others.  This is not a case where problems only surfaced after leaving the testing site.  As

17    CWs explain in detail, severe, pervasive and fundamental problems with the core AquaRefining technology,

18    including the sticky lead issue, existed and were known since 2015 at the Testing Sites and were never resolved and

19    persisted throughout the Class Period, yet were not disclosed until the end of the Class Period.  ¶¶61-120.  The

20    defects were so fundamental that not only could the technology not "scale," but Defendants resorted to touting

21

22    [18]  Defendants' argument that CW1, 2, 4 and 5's statements that they could not get AquaRefining to work or
function contradicts other allegations that the modules could only work for an hour and not much lead was coming
23    off the modules is patently absurd.  DB 18:2-11.  A technology that breaks down after an hour does not "function,"
let alone "continuously."  Moreover, CW1's statement does not support Defendants' contention that the problems
24    only arose when the Company started to scale up.  DB 18:21-24.  CW1 specifically described the known issues and
that it was also known they would persist and worsen as the Company attempted to scale and CW1 was criticizing
25    Defendants for building the plant before solving the known issues.  ¶¶63-72.  Likewise, Clarke's argument that
CW1, 2 and 5 lacked knowledge that the AquaRefining process was not functioning (CB 5:15-24), also must be
26    rejected as they all witnessed the process routinely malfunctioning.  As detailed below, CW1 was not a "low-level"
engineer but an engineer whose role included designing the modules and attempting to fix the very problems at
27    issue (¶¶61-76); CW2 witnessed that the process was not operating properly, prepared reports about the lack of
AquaRefined lead production and helped out on the production line (¶¶77-87); and CW5 was a Senior Process
28    Engineer who worked on the Reno Plant floor to try to develop the AquaRefining process and attended production
meetings (¶¶113-20).  *See* § II.B, *infra*.

1   faked images of ingots and blocks that were not actually pure AquaRefined lead because the AquaRefining

2   technology was so severely flawed that it could produce little to no pure AquaRefined lead. *See also Cutler v.*

3   *Kirchner*, 696 Fed. App'x 809, 814 (9th Cir. 2017) ("In context, these statements represented that 1View was doing

4   the particular things [defendant] had told investors it was going to do."); *Carlton v. Cannon*, 184 F. Supp. 3d 428,

5   446, 470-72 (S.D. Tex. 2016) (where a start-up company experienced "serious and fundamental design flaws," and

6   "severe obstacles to scaling the technology to commercial size," at its testing and commercial facilities,

7   representations regarding the efficacy of its technology and portrayals of operations as commercially viable,

8   "successful[]," and progressing as designed and intended were false as they "painted a misleading picture of

9   conditions at the . . . plant"), *amended on other grounds*, 2016 WL 3959164 (S.D. Tex. July 22, 2016).[19]

10       Likewise, Clarke's argument that CWs only saw a "slice of the full picture" so could not know if the

11   problems were "readily soluble" (CB 1:14-15, 5:8-24) is belied by their accounts and the Company's admissions.

12   *Allaire Corp.*, 224 F. Supp. 2d at 329 ("The Plaintiffs do, however, present extensive evidence that Spectra was not

13   operable – at least not as its customers and investors understood that it should operate."); *Carlton*, 184 F. Supp. 3d

14   at 474.  Fundamental problems that existed from testing and persisted throughout the Class Period are not "readily

15   soluble."  Moreover, the accounts are from employees who worked at the facilities, regularly witnessed the issues

16   first-hand, were in some instances tasked to attempt to resolve the issues (¶¶61-120), and were one of only 15-70

17   Company employees at a given time ( ¶45; RJN Ex. 1 at 9; Lavallee Decl. Ex. B).

18       Finally, although Defendants concede (except as to the two statements challenged by Clarke noted above)

19   that such statements are not forward-looking (DB 17), they repeatedly argue that they disclosed the risks (*see*

20   *generally* DB 19-24).  Not only are these arguments unavailing because the risks addressed different issues, but risk

---

[19] Defendants' reliance on *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393 (N.D. Cal. June 26, 2018), is misplaced.  DB 18-19.  In *Norfolk*, there were no allegations that the technology faced problems in testing or that known fundamental problems persisted through the class period.  The confidential sources had no personal knowledge of the facts as they did not work at the facility at issue or witness what they relayed.  2018 WL 3126393, at *14, 23.  Significantly, the Court found statements that defendant "successfully produced its first commercially salable product," "produced . . . oil," and "just began commercial production" *were* contradicted by witness accounts that the defendant "was never able to produce commercially salable oil," but the allegations failed because they did not demonstrate that the CWs had personal knowledge of what they relayed nor did they demonstrate that defendants were informed of the purported information.  *Id.* at *6, 20-24.  Further, most of the CW's assertions did not contradict defendants' statements.  By contrast, here the CWs' accounts, based on personal knowledge, consistently explain specific problems that were present during testing and persisted throughout the Class Period and were witnessed by Defendants.  These problems were objective, corroborated by multiple witnesses, and subsequently admitted to by Defendants.

factors cannot protect false statements of present fact and, thus, are of no import.  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (cautionary language cannot insulate from liability defendants' "representations of 'present facts' that were false when made"); *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) ("material omissions or misstatements of historical fact" not cured by cautionary language).   Additionally, the risk factors themselves were misleading and offer no protection as discussed herein.  *See* § I.F.2, *infra*.

### C.        Misrepresentations Concerning Partnerships With IB and JCI

Throughout the Class Period, Defendants touted Aqua Metals' partnerships with JCI and IB as proof of a "validated" AquaRefining (¶390), and as providing "everything" the Company needed to "de-risk," "scale our business," and "accelerate [our] growth" (¶397), and touted that the Company was working on retrofitting a JCI facility (¶404).  These statements and the others identified at ¶¶390, 397 and 404 were false and misleading because, not only were the partnerships premised on sham site visits, the AquaRefining process was ***not*** validated and continued to be riddled with the same problems that existed in 2015 and the Reno Plant was not operational.  ¶¶391-96; 398-403; 405-10.  Thus, representations that the partnerships validated the technology or provided everything necessary to grow was false and misleading when made.  *See Miller*, 519 F.3d at 886 ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers").

Defendants concede these statements are not forward-looking.  DB 20:16-26 (non-forward-looking statements section).  They concern the current state of the technology and what the partnerships would currently provide the Company and are, thus, actionable.  *See, e.g., Allaire Corp.*, 224 F. Supp. 2d at 334-35 (touting partnership as allowing development of "scalable web applications" actionable given known scalability problems).

Defendants' argument that the allegation that the partnerships were premised on sham site visits is unsupported or unreasonable fails.  DB 6:6-9, 20:25-26; CB 5:23-26.  Multiple CWs provide consistent accounts of the sham site visits and that the visits were attended by representatives of JCI and IB before the relationships were announced.  ¶¶393, 402, 409.  Defendants' sole authority, *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008), is misplaced.  There, the Ninth Circuit found the allegations were sufficient and that "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later

1    stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.* at 1057.  The

2    allegations here are not facially implausible.

3           While Defendants argue that JCI and IB remain strategic partners of the Company (DB 2:15-20, 5:6-10,

4    6:3-6, CB 3:9-11, 5:24-26), in truth, at the end of the Class Period, the Company admitted it had not entered into

5    any licensing, joint venture or strategic alliance agreements, which remains true to date.  ¶¶284-85, 394.  Indeed,

6    Defendants have admitted JCI postponed the deadline to conclude discussions regarding a possible definitive

7    agreement with Aqua Metals until 2021.  ¶305.  Moreover, IB started selling its Aqua Metals' stock around the

8    time the truth began to be revealed.  ¶500.  The current relationship between the parties consists of ***IB selling***

9    ***batteries to Aqua Metals*** and, in June 2018, Aqua Metals extending and re-pricing IB warrants by ***decreasing the***

10   ***exercise price from $7.12 to $3.33*** and extending the expiration date from June 24, 2018 to June 23, 2020.  ¶503.

11          Statements that the JCI partnership is a "tremendous step forward" and Mould's statements in an article

12   that it "is a great statement to the industry and the world that aqua refining is the future" (¶390) and that "[i]t allows

13   us to build out the facility to its full capacity" (¶397), as well as statements that the IB partnership is a "strong

14   validation" of the AquaRefining technology and based on Aqua Metals' "breakthrough technology" are neither

15   opinion nor puffery (¶390).  DB 24:4-9, 31:15-16.  The statements are not opinions as they contain "embedded

16   statements of untrue facts" suggesting that the AquaRefining process was validated and functioning properly when

17   it was not.[20]  *See Omnicare*, 135 S. Ct. at 1321.[21]  Moreover, the statements are not puffery as they "affirmatively

18   create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."

19   *Quality Sys.*, 865 F.3d at 1143-44.  *See* ¶¶391-92, 398-400.  And "even 'general statements of optimism, when

20   taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a

21

22

23   _____

24   [20] Even if any statement is deemed an opinion, Plaintiff sufficiently pled that the statements were false and that
     Defendants knew the technology was malfunctioning and plagued with problems.  *See* § II, *infra*.  *Align Tech.*, 856

25   F.3d at 616.

26   [21] *See also Washtenaw Cty. Emps.' Ret. Sys. v. Talbots, Inc.*, 2013 WL 5348569, at *30 (D. Mass. Sept. 23, 2013)
     (representations that company was "in good shape on full price inventory" and "quite pleased with the inventory

27   strategies" not mere puffery or inactionable opinion where company knew of "widespread inventory management
     difficulties"); *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 481 (E.D.N.Y. 2001) (defendants' positive

28   characterizations of the company's current and future business conditions not puffery or inactionable opinion when
     made at time company was aware of "'adverse business trend' render[ing] those statements misleading").

1    company's operation that the speaker knows to be performing poorly." 865 F.3d at 1143-43. Indeed, the market's

2    reaction to these announcements evidence that these statements were not mere puffery.[22] ¶¶129-30, 196-98.

3          **D.    Misrepresentations Concerning Lead Production Rates**

4          Defendants also issued misstatements regarding lead production rates (Compl. § VII.E), including

5    affirmative false statements about the purported current capacity (¶428), as well as mixed statements containing

6    both present facts and forward-looking statements (¶¶434, 441, 450, 459).

7          The affirmative statements regarding productions levels include, *inter alia*, that the Reno Plant "has

8    currently got a capacity of 120 tonnes a day" of AquaRefined lead; that "we have implemented process and other

9    improvements which have increased the capacity of the TRIC facility to 120 tonnes per day" and that Aqua Metals

10   has "120 [tons per day of AquaRefined lead] under our belt." ¶428. Likewise, when questioned about these

11   increased target production figures, Murphy said, "[w]e wanted to make sure we could do it, before we told

12   anybody ... we started to test that idea and found out we could, then we validated it and then we did." *Id.* (The

13   Complaint attributes this to Clarke, however transcripts attribute it to Murphy. Lavallee Decl. Ex. C at 12.)

14         Defendants ignore these statements and, thus, they should be sustained. In any event, as the Reno Plant

15   was not operational due to the known problems with the technology, Defendants' statements regarding their

16   **current** capacity were false and misleading when made. ¶¶429-33. *See Vrakas v. U.S. Steel Corp.*, 2018 WL

17   4680314, at *9 (W.D. Pa. Sept. 29, 2018) ("[a]ssuring investors that capacity exists when it does not" is an

18   affirmative active misstatement). As CWs relay, Defendants were "nowhere near" their production numbers and it

19   was "absolutely impossible" to reach them with the existing problems. ¶433. As CW4 stated, Clarke would tell

20   investors how much product they would produce and then, after, go to the VP of Recycling and say, now that I

21   have said that, how can we make that happen, which was not possible. ¶99. The Reno Plant could not produce

22   anything more than a 5-gallon bucket of AquaRefined lead – and this based on multiple short runs prior to

23   equipment break-downs that needed days of maintenance before running again – a far cry from 80 or 120 or 160

24   *tons per day.* ¶433. Defendants admit that it was not until June 2018 that Aqua Metals produced its first block of

25   AquaRefined lead and that, as of October 2018, it was only producing 2 metric tons per day. *Id.*

26

27   [22] Defendants' attempt to narrowly interpret Mould's statements to mean the partnership provided "a source of
     supply and demand" and that these statements cannot be linked to the fraud (DB 31:26-32:1) is not credible. By

28   touting these partnerships, Defendants knowingly led the market to believe these partnerships were validation of
     AquaRefining and its production capabilities.

Defendants also repeatedly issued mixed statements including, *inter alia*, that Aqua Metals was "on track" to produce, had implemented a plan to achieve and was on schedule to produce 80 metric tons of lead per day by the end of 2016 and then 120 metric tons of lead per day in 2017.  ¶¶434, 441, 450, 459.  Defendants' sole challenge that the statements are forward-looking statements protected by the safe harbor fails

Contrary to Defendants' assertion (DB 14:5-15:11; CB 3:16-23), portions of these statements that the Company was "on track" to obtain such production levels are not forward-looking but statements of present fact. Indeed, courts routinely hold that the term "on track" refers to a state of current business conditions, which places the statement outside of the safe harbor.  *See, e.g., Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016) ("'on track' assurances were representations about the *current* state of affairs")[23]; *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 950, 951, 957, 964, 967 (N.D. Cal. 2014) (statements that company had "begun to implement changes" and was "on track" were not forward looking)[24] *See also Allaire Corp.*, 224 F. Supp. 2d at 334-35 (representations regarding product "scalability" actionable when "directly contrary to the known capabilities of the product"). Thus, these present statements of fact were false and misleading when made. ¶¶435-38, 442-447, 451-456, 460-465.[25]  Moreover, even the forward-looking portions of these statements are not

---

[23] Defendants' attempt to distinguish *Rihn* is unavailing (DB 15 n.7), as Defendants here knew that the technology was plagued with problems and could not produce the touted production levels. 2016 WL 5076147, at *6 ("when Defendants represented that the NDA was 'on track' to be submitted by March 31, 2015, without mentioning that no meaningful assessment of the manufacturing and quality assurance systems had been conducted, Defendants created an impression of a state of affairs that differed in a material way from the one that actually existed").

[24] Defendants cases are inapposite. In *In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280, at *5-7 (N.D. Cal. Sept. 16, 2014), the court found the "context" not merely the use of the phrase "on track" rendered a statement forward-looking, and expressly noted that an "on-track" statement could be construed as a statement "regarding current business conditions" or "present status, and in that sense the truth of the statements does not depend on any future condition." *Id.*  In *Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191 (D. Nev. 2011), unlike here, defendant "did not, at any time, state expressly that it was 'on track' to meet its goal of completion by 2008." *Id.* at 1199. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009), is also distinguishable from the case at hand because *Avaya* involved **financial projections**. *See ECOtality*, 2014 WL 4634280, at *6 (observing difference between "financial projections" and "objectives for future operations"). *Avaya* does not stand for a "hard and fast rule[]" that an "on track" statement is necessarily forward-looking. *Id. Norfolk*, 2018 WL 3126393, at *2, dismissed on-track statements as forward-looking because, unlike here, there were no facts contradicting the statements. For example, the Court found that February 2014 statements that the Company was "'on track to reach full nameplate capacity in the **back half of 2015**' are … not contradicted by the [CW assertion] that Moema was not close to achieving commercial viability in **2014**." *Id.* at *3.  Defendants misstate the court and the allegations there, stating that the statements were not contradicted by "allegations that the facility was not close to achieving commercial viability in **2015**." DB 14:19-20.

[25] Defendants argument regarding "expect," which relates to only a handful of the nearly 50 challenged production level statements (DB 15:3-4; CB 3:9-23), is equally unavailing as the statements were accompanied with factual predicate for the statements. Even if they were forward-looking, they are not protected as discussed *infra* at §I.F.2

1    protected as discussed *infra* at § I.F.2.  ¶¶439-40, 448-49, 457-458, 446-67.

2        **E.    Misrepresentations Concerning Licensing**

3        Defendants also issued misrepresentations touting that they were transitioning into licensing, representing,

4    *inter alia*, that "we don't plan to ship any modules until quarter three of 2017 not because we can't, but we just

5    think it's prudent to have got six to seven months of operating experience under our belt before we do that." ¶412

6    (identifying this and other mixed statements); *see also* ¶420 (identifying forward-looking statements).

7        These statements were false and misleading because Defendants were nowhere near expanding operations

8    or licensing as they still did not have a proven technology, the modules constantly broke down and their one facility

9    was not operational.  ¶¶413-19, 421-26.  That Aqua Metals was clearly not in a position to license its technology

10   during the Class Period is underscored by fact that, to date, they have still not done so.  ¶¶284-85.

11       It is unclear what licensing statements Defendants challenge as the one statement Defendants cite and

12   quote – that the Company was "absolutely serious about a global rollout" –  is a statement from the background

13   section of the Complaint that is not challenged by Plaintiff.  DB 17:1-3.  In any event, the statements of present fact

14   about existing conditions embedded in the mixed statements are not forward-looking and thus fall outside the safe

15   harbor.  ¶413.  *See also Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4-5 (D.N.J. Jan. 12, 2018) (misstatements

16   about ability to grow were not forward-looking when "substantial obstacles" existed impeding that growth).  And,

17   as discussed below, the forward-looking portions of the statements and forward-looking statements were not

18   accompanied with meaningful cautionary language and were made with actual knowledge.  ¶¶418-19, 425-26.

19       **F.    The Safe Harbor Does Not Protect Any of Defendants' Statements**

20       The Private Securities Litigation Reform Act of 1995 provides a limited safe harbor for statements that are

21   properly identified as forward-looking and accompanied by adequate cautionary language or are forward-looking

22   but made without actual knowledge of their falsity.  15 U.S.C. §78u-5(c)(1); *see also Quality Sys.*, 865 F.3d at

23   1144.  Dismissal based on cautionary language requires a stringent showing and the safe harbor only applies if "the

24   cautionary language 'relate[s] directly to that to which plaintiffs claim to have been misled.'"  *In re LeapFrog*

25   *Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) (quoting *In re Worlds of Wonder Sec. Litig.*,

26   35 F.3d 1407, 1415 (9th Cir.1994)).  "The cautionary warning ought to be precise and relate directly to the forward-

27   looking statements at issue," and "mention *important* factors of similar significance to those actually realized."  *In*

28   *re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004).  Where "defendants make mixed

statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor." *Quality Sys.*, 865 F.3d at 1142.

### 1. Most of Defendants Statements Were Not Forward-Looking

With few references to specific statements, Defendants argue that three categories of misstatements are protected by the safe harbor: (a) statements regarding "plans and projections concerning commissioning the AquaRefinery facility and commercializing the AquaRefining process"; (b) "statements regarding projected production levels and revenue"; and (c) "statements regarding licensing plans and future facilities." DB 12-17.

As to the first category, Defendants fail to quote or cite to *any* statements. DB 12:4-14:4. That is not surprising, as none of the misleading statements regarding commissioning the AquaRefinery facility and commercializing the AquaRefining process are "plans or projections," as Defendants concede elsewhere (DB 17). Rather, they are statements of "past or present" fact and therefore fall outside the safe harbor. *Berson*, 527 F.3d at 990 ("descriptions of the present aren't forward-looking"); *Livid Holdings Ltd.*, 416 F.3d at 947; *Celera Corp.*, 2013 WL 4726097, at *2. These include that Aqua Metals is "transitioning into commercial operations now" (¶350), the Reno Plant is "successfully commissioned" (¶356), AquaRefining is "now in commercial operation and generating revenue" (¶357).

Furthermore, Plaintiff does not challenge statements regarding "revenues" or "additional facilities." As to production levels and licensing, while Plaintiff does challenge certain statements that are mixed statements, as expressly identified in the Complaint and discussed above, these statements were not accompanied by meaningful cautionary language. Moreover, because Defendants' statements were made with actual knowledge of their falsity, Defendants cursory reliance on the safe harbor on this ground (DB 16) also fails. *See* § II, *infra*.[26]

### 2. The statements were not accompanied by meaningful cautionary language

Even as to any statements or portions of statements that could be construed as forward-looking, Defendants fail to meet the requisite showing of meaningful cautionary language.

To begin with, several of the statements that fall into the categories challenged by Defendants were not

---

[26] *In re Rackable Sys. Inc. Sec. Litig.*, 2010 WL 3447857, at *5 (N.D. Cal. Aug. 27, 2010) (CB 2:21-23, 3:24-4:3), is inapposite as the statements there were projections about gross margin and earnings per share (EPS), plaintiffs failed to plead that defendants knew their projections were false when made and the opinion does not discuss cautionary language. Moreover, Rackable was a "large and complex" company, not a company with one core technology and less than 70 employees at its height.

accompanied by, nor refer to, **any** cautionary language. *See, e.g.*, ¶¶390, 412, 450, 459 (Clarke's statements regarding the JCI partnership, licensing and production levels); ¶¶390, 397 (Mould's statements regarding the JCI partnership). Likewise, the analyst statements for which Defendants are liable are not accompanied by, nor refer to, any cautionary language. *See* ¶374. Thus, while most of the statements are not forward-looking as discussed above, to the extent any are forward-looking, they are not protected. Defendants challenge only the "production level" statements that were made without any cautionary language (as noted *supra* note 6) and argue – without any support – that they were "similar" to the Company's other statements which were accompanied with cautionary language. DB 16:18-23. This is to no avail as "[t]he making of a cautionary statement on one occasion does not provide a shield of liability for all statements" later issued. *In re Apple Computer, Inc. Sec Litig.*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002).

In any event, none of Defendants' purported cautionary language was meaningful to protect Defendants' statements. The purportedly cautionary language Defendants rely on (DB 12:4-13:26, 21:22-24; CB 2:9-3:23) never once warns against the known fundamental problems concerning the AquaRefining process, which had persisted since 2015, rendering the technology incapable of producing much, if any, pure AquaRefined lead. *See Zaghian v. Farrell*, 675 Fed. App'x 718, 720 (9th Cir. 2017) (safe harbor did not apply where defendants did not disclose the known risk). Rather, the cautionary language warns that there is no guarantee that AquaRefining will be commercially successful, a statement that Plaintiff does not challenge.

Indeed, without specifying what statements they seek to protect, Defendants cite risk disclosures that are irrelevant to the false statements.[27] DB 12:9-13:13; CB 2:19-22. The warnings (a) state "there can be no assurance that we will be able to produce lead in commercial quantities *at a cost of production that will provide us with an adequate profit margin*," (b) warn of "*potential risks*" with their "*business model*" and (c) state that the Company cannot "confirm the *economic returns*" and may "incur *unexpected costs or hurdles*" when commencing large scale manufacturing. DB 12:13-13:12. None of this "relate[s] directly to that which plaintiffs claim to have been misled" – that the core AquaRefining technology was plagued with pervasive problems and could barely produce any AquaRefined lead – and, thus, is not meaningful. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th

---

[27] *In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605, at *3 n.3 (S.D. Fla. Apr. 25, 2011) (noting that court had previously denied portion of summary judgment motion premised on safe harbor protection because the defendants "fail[ed] to identify any particular statement that falls within the protection of the safe harbor").

1   Cir. 2017);  *LeapFrog Enters.*, 527 F. Supp. 2d at 1047; *In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at

2   *12 (S.D. Cal. Jan. 3, 2005) (citing *Provenz v. Miller*, 102 F.3d 1478, 1494 (9th Cir. 1996)) (a warning provides no

3   protection "if it is overly generalized and does not directly address the allegedly misleading future projection"); *see*

4   *also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503-04 (9th Cir. 1992).

5          Moreover, warning of "***potential***" risks, or "***unexpected***" hurdles where severe problems were known,

6   offers no protection and are, in and of themselves, misleading.  *See, e.g., LifeLock, Inc.*, 780 Fed. App'x at 484

7   ("risk disclosures only discussed the possibility of future problems" and "did not warn investors" of current

8   problems); *Cutler*, 696 Fed. App'x. at 813 ("These statements were misleading because they disclosed a risk 'in the

9   abstract' but omitted the fact that it had 'already … come to fruition.'"); *Berson*, 527 F.3d at 986 (rejecting risk

10  warnings that failed to alert the reader that "some of these risks may already have come to fruition"); *In re*

11  *Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("There is a difference between knowing that any

12  product-in-development may run into a few snags, and knowing that a particular product has already developed

13  problems so significant as to require months of delay … .  To warn that the untoward may occur when the event is

14  contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have

15  already occurred is deceit.").  Indeed, the relied-on "cautionary" language is embedded with additional false

16  statements discussed above (*see* § I.B), including that the "testing of our AquaRefining process has been ***successful***

17  to date," the technology is "***proven***" and that "[w]e ***commenced the commercial scale production of recycled lead***

18  ***at our TRIC facility during January 2017***."  DB 12:13-13:12.  *See, e.g.*, *Fecht v. Price Co.*, 70 F.3d 1078, 1081

19  (9th Cir. 1995) (such "cautionary" language "not only does not cure, but arguably contributes to the alleged

20  misconception").

21          Defendant Clarke's statements that there will be "learning" and "improvements" and "hard work" and that

22  "we're not expecting to always work right" (DB 13:19-24), and the statement that Aqua Metals was subject to "all

23  the risks inherent in a pre-revenue startup" (CB 2:20, 3), are general, vague and do not come close to cautioning

24  investors about specific, persistent and existing unresolved problems.  *See In re Immune Response Sec. Litig.*,

25  375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) ("cautionary statement must discredit the alleged misrepresentations to

26  such an extent that 'the risk of real deception drops to nil'"); *Zaghian*, 675 Fed. App'x at 720 ("The cautionary

27  language also must have consisted of non-boilerplate warnings that were tailored to the forward-looking

28  statements."); *In re Energy Recovery Sec. Litig.*, 2016 WL 324150, at *17-18 (N.D. Cal. Jan. 27, 2016) (boilerplate

language insufficient).  Furthermore, while Defendants stated that they encountered "surprises" with the breaker in February 2017, they simultaneously assured investors that those surprises were "dialed in now and it's operating," there were "products ready to ship," and there were no present concerns.  ¶¶208-09.  Thus, these representations defeat any warning that was provided and also fail to disclose the known problems that plagued the technology.[28] Investors were led to believe there were no operational issues at that time when severe problems persisted.  *See In re BP Prudhoe Bay Royalty Trust Secs. Litig.*, 2007 WL 3171435, at \*3 (W.D. Wash. Oct. 26, 2007) (representations that problems have been addressed "despite … known facts and risks" is misleading); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015) ("later admissions" supported falsity of statements that "issues were not 'behind' the Company").

Defendants summarize portions of the language it quotes at DB 12-13, discussed above, in arguing that their production level statements are protected by the safe harbor.  Yet none of these warnings mention any factors impacting statements regarding the ability to produce the touted production levels nor does the purportedly cautionary language warn against the known problems concerning the process and the Reno Plant that would make such rates impossible.  As to licensing, the only language Defendants rely on is the vague boilerplate statement that "[f]ailure to successfully integrate such licensing arrangements, joint ventures, or strategic alliances into our operations could adversely affect our business."  DB 17:7-9.  This purported disclosure amounts to nothing more than a "blanket warning."  *Apple Computer*, 243 F. Supp. 2d at 1025.

Defendants also argue that cautionary language need not "include the particular factor that ultimately causes the forward-looking statement to be untrue."  DB 16:7-9.  This is no defense to the failure to disclose known fundamental problems with the core AquaRefining technology and the Reno Plant that rendered the statements false and misleading when made.[29]

At best, this is a factual dispute inappropriate on a motion to dismiss.  *See Westley v. Oclaro, Inc.*, 897

---

[28] *Browning v. Amyris, Inc.*, 2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) (DB 13-14) is distinguishable.  There, the cautionary language was explicit, warning of precise reasons why the company might not meet commercial production levels and admitting those goals were substantially higher than current production.  *See id.* at \*13-14.

[29] As such, Defendants' cases are inapposite.  DB 10, 16.  *Szymborski*, 776 F. Supp. 2d at 1198 (the company "accompanied its forward-looking statements with cautionary language that ***warned of exactly such risks***"); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1070 (C.D. Cal. 2012) (the warnings actually disclosed product defects); *In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at \*16 (N.D. Cal. Dec. 4, 2008) (language "precise and relate[d] directly to the forward-looking statements at issue").

F. Supp. 2d 902, 920 (N.D. Cal. 2012) ("Under Ninth Circuit law, if there is a legitimate factual dispute as to whether [the] cautionary language is sufficient, then dismissal is not warranted.").

### G.   Defendants' Remaining Arguments Specific To Murphy and Mould Fail

Murphy and Mould also seek to escape liability by arguing that they lacked sufficient control over any of their public statements.  DB 30:3-32:22.  They are wrong for several reasons.

As an initial matter, both of these officers are alleged to have made at least one actionable misstatement and, thus, cannot escape liability.  *Provenz*, 102 F.3d at 1484 ("[l]iability depend[s] on the plaintiffs' success in demonstrating that *one* of the statements made by the company was actually false or misleading").  As detailed above, and contrary to Defendants' assertion, Mould and Murphy made false and misleading statements on earnings calls or in articles.  *See supra* 21:11-22:2 & n.22, 25:24-26:5 (discussing statements by Mould (¶¶390, 397)); 10:21-22 & n5, 11:6-13, 17:9-18:9, 22:10-25 (discussing statements by Murphy (¶¶356, 362, 382, 428).  Moreover, and as Defendants do not contest (DB 31:7-8), because Murphy signed Aqua Metals' SEC filings, he is liable for the misrepresentations contained therein as corporate officers are considered to have made statements in filings that they sign.  ¶¶339, 350, 356-57, 397, 420, 428, 434, 441, 450, 459.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000); *Cutler*, 696 Fed. App'x. at 812.  These statements were misleading for the reasons discussed above.

Further, despite Defendants' argument to the contrary (DB 31:2-7), as a participant on Aqua Metals' earnings calls and a Company Contact on press releases (¶¶344, 350, 356-57, 362, 367, 382, 390, 397, 404, 412, 420, 428, 434, 441, 450, 459), Murphy had control over these statements and is liable for "failing to correct a falsehood" and "silently listen[ing] as others made statements that [he] knew were false."  *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 655 (5th Cir. 2005) (defendant liable for silently listening while false statements were made during conference calls and roadshows); *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *8 (W.D. Wash. Dec. 6, 2008) ("a high-ranking company official cannot knowingly fail to correct a false oral statement made by another official at a conference with analysts or similar setting").  Indeed, as courts have held, Murphy "may not cloak himself in his silence and avoid liability for the misleading statements of his co-defendants made to public stock analysts during a conference call at which he was present."  *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. 2010) (following *Barrie*).  This is particularly true since Murphy stayed silent when it came to speaking the truth, yet conveniently spoke up and elaborated on

1    Clarke's statements when it helped perpetuate the fraud.  *See, e.g.*, ¶¶362, 382, 428.[30]  Murphy was also on multiple

2    calls where false images were included in the slide presentation and failed to correct them.  ¶350.

3            Finally, Mould and Murphy are also responsible for analyst misstatements (¶374), as they participated in

4    the sham demonstrations and failed to correct the analyst statements (¶¶76, 92, 105-07, 120).  *See* § I.A, *supra*.[31]

5    **II.     PLAINTIFF PLEADS FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER**

6            A complaint sufficiently alleges scienter when it "state[s] with particularity facts giving rise to a strong

7    inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2)(A); *Tellabs Inc. v.*

8    *Makor Issues & Rights Ltd.*, 551 U.S. 308, 314 (2007).  The required state of mind includes deliberate recklessness

9    or an intent to deceive.  *Quality Sys.*, 865 F.3d at 1144.  Deliberate recklessness is an extreme departure from the

10   standards of ordinary care.  *Scheuneman v. Arena Pharm., Inc.* 840 F.3d 698, 705 (9th Cir. 2016).  This departure

11   presents a danger of misleading investors that is either known or so obvious that defendants must have been aware

12   of it.  *Id.*

13           It is well established that the test is whether "***all*** of the facts alleged, ***taken collectively***, give rise to a strong

14   inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*,

15   551 U.S. at 323.   An inference is "strong" if a reasonable person would deem the inference "cogent and

16   compelling" and "at least as likely as any plausible opposing inference."  *Id.* at 324, 328-29.  An inference of

17   scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing

18   inferences'" – the inference need only be equally plausible to any non-culpable inference.  *Id.*[32]

19           Plaintiffs allege a series of facts that collectively – and even individually – support a strong inference of

20

21   [30] *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070-71 (N.D. Cal. 2012) (DB 30,
     31), does not command a different result.  In *Juniper*, it was never alleged that the director defendant was present

22   on the calls, only that his role as Chairman gave him "ultimate authority."  Here, not only is Murphy's involvement
     on the call's alleged, but Murphy co-founded the Company and was CFO as well a director.

23   [31] Defendants' reliance on *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 145 (2011), and

24   *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (DB 30:5-25), is misguided.
     *Janus* held that investment advisors are not "makers" of statements by their mutual fund clients.  *Hefler* found
     defendants not liable for statements in SEC filings they did not sign or review and because plaintiffs "fail to show

25   how [defendants] had 'ultimate authority'. . . . as opposed to more senior Wells Fargo leadership."  *Id.* at *32-33.

26   [32] Defendants misquote *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014), for
     the proposition that the Complaint "must include facts" tending to exclude the possibility of an alternative

27   explanation.  DB 9; CB 4-5.  In fact, in deciding a RICO case, the court merely held that providing facts tending to
     exclude an alternative theory was one way to render plaintiffs' allegations plausible.  Furthermore, the court
     expressly recognized that "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings

28   stage of litigation."  *Id.* at 999 n.8.

scienter that is the most plausible theory.  These include detailed allegations regarding Defendants' knowledge of the problems contradicting the statements of milestones achieved, of the site visits, of the meaning of strategic partnerships and regarding licensing and production rates.

###### A.    By Conceding Knowledge of the Problems With The AquaRefining Process, The Company's Core Product, Defendants Concede Scienter

Defendants concede their "knowledge of problems is not disputed."  DB 27:4; *see also* DB 28:2 ("Defendants do not claim to have been unaware of the facts."); DB 26:24-27.[33]

Instead of disputing knowledge, Defendants challenge scienter stating that "[t]he issue is not whether they had knowledge but instead whether that knowledge contradicted their public statements."  *See* DB 28:2-4; *see also id.* at 30.  But this assertion stems from Defendants' attempt to recast the false statements to escape liability.

Contrary to Defendants' assertion, the issue in Count One is not "whether the statements regarding the scaling issues were made with scienter."  DB 27:4-6.  Rather, the issue is whether Defendants knowingly or recklessly made misrepresentations about the milestones actually achieved (including during the testing, commissioning, operating and commercialization phases), the site visits and statements regarding production rates and their ability to license the AquaRefining technology.  As the CWs explain, the existing problems rendered Defendants' statements false and misleading.  Therefore, Defendants' concession of knowledge, even standing alone, is sufficient to find a strong inference of deliberate recklessness.  *Cf. Vrakas*, 2018 WL 4680314, at *15 ("While it is plausible that the Individual Defendants were not driven by a specific intent to deceive their investors when they made the relevant statements, the inference that the Individual Defendants were aware of the falsity of their claims is certainly 'at least as compelling as any opposing inference.'" (quoting *Tellabs*, 551 U.S. at 324)); *Anderson v. Peregrine Pharms. Inc.*, 2013 WL 4780059, at *8 (C.D. Cal. Aug. 23, 2013) (allegation that "defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter"); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 881 (D. Minn. 2007) ("One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate."); *In*

---

[33] Defendants challenge CW1's statements that Defendants were aware of problems during the few months before the Reno Plant was built.  DB 25:18-26:20.  However, as discussed below, Plaintiffs alleges sufficient particularity with respect to CW1 such that CW1's testimony supports a strong inference of scienter.

1   *re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("[r]ecklessly turning a 'blind eye' to

2   impropriety is equally culpable conduct").  Moreover, the fact that the problems here relate to the Company's core

3   products bolsters the inference of scienter.  *See, e.g., Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) ("we can

4   impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company"),

5   *overruled on other grounds*, *Align Tech.*, 856 F.3d 605 (9th Cir. 2017).

6       **B.    The CWs Provide Corroborating Accounts Of Defendants' Knowledge And Deliberate
            Recklessness Through Defendants' Observations, Discussions, Participation In Meetings
7            and Reports**

8           Even beyond Defendants' concession, there is overwhelming direct evidence demonstrating Defendants'

9   knowledge and deliberate recklessness, which, for the most part, Defendants ignore.

10          Indeed, the Complaint details the consistent statements, based on personal knowledge, of numerous CWs

11  (who span multiple levels and were employed at both the Testing Sites and the Reno Plant) explaining Defendants'

12  knowledge of the fundamental problems and operational failures and the lack of AquaRefined lead produced

13  through: (i) their knowledge of Defendants' personal observations beginning in 2015 at the Testing Sites and

14  persisting at the Reno Plant and throughout the Class Period; (ii) Defendants' conversations with Aqua Metals'

15  employees, including the CWs; (iii) Defendants' attendance at meetings at which CWs were present and

16  Defendants' access to reports; and (iv) CW's personal knowledge of Defendants ***efforts to conceal*** the problems

17  and operational failures through sham site visits and by creating and touting fake images of purportedly

18  AquaRefined lead and the Reno Plant as "continuously" producing AquaRefined lead.  ¶¶61-120; 468-88.  These

19  allegations more than suffice to support a strong inference of scienter.  *Quality Sys.*, 865 F.3d at 1145

20  ("statements … reported by [CWs] with sufficient reliability and personal knowledge must themselves be

21  indicative of scienter"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008)

22  (CWs supported a strong inference of scienter where, as here, they "spanned levels of [the company's] hierarchy

23  and geographic origin, [and] where the accounts remained consistent over time.").

24          Defendants argue that the CWs do not provide personal knowledge of Defendants' "belief" or "state of

25  mind" regarding the problems.  DB 26:7-9, 27:5-7; CB 1:15-18, 5:28-6:2.  This argument fails for two reasons.

26  First, Defendants "misapply the test."  *Maverick Fund L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *10 (D.

27  Ariz. Nov. 27, 2018) (in arguing that the confidential witnesses do not demonstrate scienter because they have no

28  personal knowledge of the defendants' state of mind, "[d]efendants misapply the test").  The allegations need only

1   establish the reliability and personal knowledge of the confidential witnesses – which accounts must be indicative

2   of defendants' scienter. *Id.* at *11. *See also Quality Sys.*, 865 F.3d at 1145. The Complaint establishes the personal

3   knowledge of the confidential witnesses – each CW is specifically described by their positions and duties, terms

4   and location of employment at Aqua Metals, and how the CW came to know the information provided, including

5   by routinely witnessing the problems and inability to produce AquaRefined lead first-hand and having direct

6   interactions and conversations with Defendants. *Id.* ¶¶61-120. Moreover, the CWs corroborate each other's

7   accounts and are employees who worked at the Testing Sites and Reno Plant, witnessed the problems and lack of

8   production of AquaRefined lead on a daily basis and were one of only 15 to 70 Company employees (including a

9   maximum of 35 at the Reno Plant), at a given time. ¶45; RJN Exs. 1 at 9 & 27 at 17; Lavallee Decl. Ex. B. *First*

10   *Solar, Inc.*, 2018 WL 6181241, at *11 (CW corroborating accounts reliable where, "based on their position

11   descriptions, [the CWs] were positioned to know").

12          Defendants' assertion that CW1, in particular, is not described with the requisite particularity (DB 25:27-

13   26:2) ignores the detailed allegations. The Complaint details CW1's position (engineer), employment period (2015

14   to 2017), specific role and duties (provide guidance and design advice for the AquaRefining machinery in an effort

15   to fix the problems), work locations (the Testing Sites) and firsthand knowledge. ¶¶61-62. Despite Defendants'

16   representation, the Complaint does not describe CW1 as a "low-level" engineer. *Id.* To the contrary, CW1's duties

17   included designing the very modules at issue here and attempting to fix the very problems that Defendants knew

18   about. *Id.* In great levels of detail, CW1 describes the process's testing (¶¶63, 65-66), including the use of lead

19   from an outside source (¶¶73-74) and the sticky lead and hard lead that CW1 worked on trying to resolve (¶¶63-

20   70). CW1 *spoke directly* to Defendants about the process problems at issue and attempts to solve them since 2015.

21   ¶¶64, 67. The Complaint also describes CW1's involvement in the Reno Plant's "chaotic" opening while

22   unsuccessfully trying to fix the defects that plagued the AquaRefining process prior to its opening. ¶72.[34]

23   Moreover, while CW1 may be the only source employed at the Testing Facilities attesting to the conditions at that

24   time (DB 25), the fact that CW1's accounts are corroborated by other sources as persisting at the Reno Plant lends

25   credibility to such statements. These allegations are more than sufficient to establish CW1's "reliability and

---

[34] The significance of CW1's duties was compounded by the fact that, in May 2015, the Company employed only 15 people, four of which were executive officers, including the three Individual Defendants. Lavallee Decl. Ex. B at 22. In March 2016 (five months before the Reno Plant opened), the Company employed 21 full-time employees and 7 contractors. RJN. Ex. 1 at 9.

1    personal knowledge." *Quality Sys.*, 865 F.3d at 1145.

2         Second, this assertion completely ignores that the CWs base their accounts on first-hand interactions with

3    Defendants regarding the fundamental problems with the AquaRefining technology and Defendants' efforts to

4    conceal these very problems.  CW1 describes conversations with Clarke and Mould about the Company's inability

5    to solve the fundamental hard lead and sticky lead problems (¶¶63-64) and bringing suggestions for fixes directly to

6    Clarke and Mould (¶67).  Further, CW1 describes Clarke and Mould witnessing the scaling issues when taking the

7    technology from the small test lab to the full size test lab[35] and that they decided to "go big" (*i.e.*, open the Reno

8    Plant) before fixing them.  ¶71.[36]  CW2 regularly saw Defendants Clarke and Mould visit the plant and witness the

9    problems, witness that the Reno Plant was inoperable and attend meetings where the fundamental problems were

10   discussed.  ¶79.  CW2 further describes Clarke's directives to "stage everything up" and to only run the machines

11   for the sham site visits that were orchestrated to conceal these very issues.¶83.  CW3 witnessed Clarke and Mould

12   "r[u]n the show" at the sham site visits.  ¶92.  CW4 describes first-hand conversations with Clarke and Mould on

13   several occasions about the problems and the Company's inability to meet the touted production numbers (¶98),

14   describes seeing Clarke and Mould witness the problems (¶104) and describes witnessing Clarke and Mould stage

15   the sham site visits designed to conceal these very issues (¶¶105-09).  CW4 also describes that *after* Clarke made

16   statements to investors about how much product they would produce, Clarke would go the VP of Recycling and

17   say now that I have said that, how can we make it happen, which was impossible because of all the unsolved

18   problems.  ¶99.  And CW5 describes attending meetings with Clarke and Mould where the problems were

19   discussed, that Clarke saw the problems and CW5 saw Clarke and Mould show visitors around during the sham

20   site visits.  ¶¶116-18, 120.[37]  CW2, 3, 4, and 5 also detail the reports Defendants had access to (and which were

21   emailed to Mould (¶93)) which showed the AquaRefining problems and lack of AquaRefined lead production at

22   the Reno Plant (¶¶86, 93, 110, 119).

---

25   [35] Contrary to Clarke's assertion, CW1's statement is self-explanatory – as the Company "scaled" from the small to
     the full sized lab – *i.e.*, scaling larger – the "scaling" issues were apparent.  CB 6:7-11.

26   [36] Defendants cite two cases for the proposition that conclusory or generalized claims about specific knowledge are
     insufficient to create a strong inference of scienter.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998

27   (9th Cir. 2009); *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1213 (D. Ariz. 2009).  Because
     CW1 describes specific conversations, as well as their substance, Defendants' reliance on these cases is misguided.

28   [37] Clarke's cases are inapposite as the witnesses in those cases lacked any interaction with the defendants.  CB 6.

1    The suggestion that Defendants may have thought the problems were "readily soluble" or not "significant"

2    defies credulity.  DB 26:7-9; CB 1, 5:23.  The CWs (many of whom were tasked with engineering, operating and

3    fixing the technology) describe the complete malfunction of the Company's core technology that existed and

4    persisted since its testing in 2015 and continued throughout the Class Period despite efforts to resolve the defects.

5    *See, e.g., Impax Labs*, 36 F. Supp. 3d at 970 ("scienter is strengthened by the allegation of pervasive and long

6    standing problems").   It is implausible to suggest that a fundamental problem with the core technology that existed

7    from testing in 2015 and persisted throughout the Class Period was "readily soluble" or "insignificant" – as

8    Defendants suggest.  Defendants' assertion is further belied by the consistent and detailed CW accounts that

9    Defendants orchestrated sham site visits ***to actively conceal the very problems they admit knowing***.  Finally, as

10   noted above, the crux of the case is not about whether the Company will be able to commercially operate

11   AquaRefining but rather whether Defendants' statements about they said they had already achieved were accurate.

12   Moreover, CW2, 3 and 4 confirmed that the images Defendants touted to the market as showing the

13   AquaRefining process in continuous operation and producing purported bars and blocks of pure AquaRefined lead

14   were fake.  ¶¶82, 91, 100-03.  As CW4 explained, Clarke, Murphy and Mould set up the images knowing that they

15   were fake when the images were taken.  ¶103.  Contrary to Defendants assertion (DB 27:7-10), the accounts from

16   the CWs – who were among only 16 employees at the Reno Plant when the fake images were created – are plead

17   with particularity.  RJN Ex 27 at 17.  CW2's account is based on personal knowledge of the images as CW2

18   worked at the Reno Plant when they were created.  ¶82; *see also* ¶¶77, 80, 82, 86 (CW2 also witnessed that the

19   process constantly malfunctioned, witnessed and prepared reports about the lack of lead production and helped out

20   on the production line).  CW3's account is based on personal knowledge from working as a Production Supervisor

21   at the Reno Plant and seeing that the Company was not making an amount of recycled lead that could be cast into a

22   bar when that the images were published.  ¶¶88-91, 93.  Contrary to Defendants' argument, CW4's account is

23   based on personal knowledge and experience – indeed, CW4 was a Production Manager at the Reno Plant and had

24   a "front row seat" at Aqua Metals.  ¶¶94-112.  CW4 knew that, even two months after the images were first

25   published, the Company was not making an amount of AquaRefined lead that could be cast into a bar.  Therefore,

26   CW4 asked CW4's supervisor and friend, the VP of Recycling, who was in some of the images, about it, who then

27   relayed the images were fake and that Clarke, Murphy and Mould set up and staged the images knowing they were

28   fake. ¶¶100-03.  While CW4's account includes conversations with the VP of Recycling (¶101), the allegations are

1   credible as they are "sufficiently reliable, plausible and coherent."  *LifeLock, Inc.*, 780 Fed. App'x at 484 n.5

2   (crediting a hearsay report for scienter); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (same).

3   CW4's statements regarding conversations CW4 had with the VP of Recycling  are "specific in time, context, and

4   details" and relate to crucial issues at the Company and CW4's job at the Company.  *Lloyd*, 811 F.3d at 1208.

5   Moreover, CW4's information is consistent with information provided by other CWs.  At the pleading stage, this is

6   more than enough to credit the information CW4 obtained in these conversations.  *LifeLock, Inc.*, 780 Fed. App'x

7   at 484 n.5; *Lloyd*, 811 F.3d at 1208.[38]

8       **C.    Plaintiff Sufficiently Alleges That All Defendants Intentionally Engaged In Fraudulent Acts
             To Deliberately Conceal The Pervasive Problems With The AquaRefining Process**

9           The sufficiency of the scienter allegations is also underscored by this Court's prior findings.  In sustaining

10   the scheme liability count, this Court found that Plaintiff had sufficiently alleged that "Defendants intentionally

11   engaged in a fraudulent scheme to conceal material facts" (Op. 15:16-17) because:

12           Defendants used these invitational site visits to assuage analysts' concerns in response to skepticism in the
             market about whether the AquaRefining process was viable. *Id.* ¶¶ 224–25 (Defendant Clarke stating: "We
13           believe the best way to address this misinformation is to *openly show analysts and investors our facility in
             operation as we continue to scale it up.*" (emphasis in original)). However, according to CWs, the modules
14           were not actually able to operate for more than an hour before they broke down. *Id.* ¶¶ 75, 78, 95. Plaintiff
             alleges that in light of that fact, employees were told not to run the "machines until [the visitors] show up"
15           and would receive a call to start the machines about five minutes before visitors arrived. *Id.* ¶¶ 82, 84; *see
             also id.* ¶¶ 82 (CW2 claiming they "only ran the machines when investors came to the plant"), 100 ("CW4
16           said, because the module could not operate for more than about an hour before it would break down, CW4
             had to start it at a time where it would run during the investors' visit and not break down."). Defendants
17           Clarke and Mould "ran the show" and would escort visitors around the plant for only five to ten minutes
             and spend their remaining time in a conference room. *Id.* ¶¶ 90, 100.

18

19   Op. 14:11-23.  *See also, e.g.*, ¶¶478-87.  The Court further concluded that these acts "[led] to the dissemination of

20   untrue statements."  Op. 15:17 (and referencing both affirmative statements by Defendants and analyst statements).

21   This finding is equally applicable to the sufficiency of the allegations of scienter for the misrepresentation claims –

22   particularly for those regarding the site visits.

23           Defendants ignore the Court's prior holding, asserting instead that the confidential witnesses do not state

24   what Defendants "said" at the sham visits.  DB 27:5-7.  However, this misses the point.  As a preliminary matter,

25

26   ───────────────────

27   [38] This is nothing like Defendants' cases. DB 27.  *In re Allied Nev. Gold Corp.*, 2016 WL 4191017, at *6 (D. Nev.
     Aug. 8, 2016) (witness accusation that "everybody knew" was unreliable hearsay); *In re Diamond Foods, Inc. Sec.
     Litig.*, 2012 WL 6000923, at *6 (N.D. Cal. Nov. 30, 2012) (statements were merely "hearsay-with[in]-hearsay"
28   with no reliable bases for her personal knowledge); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d
     1056, 1068 (W.D. Wash. 2003) (witness provided only hearsay and no basis for his knowledge).

1   CWs reported on what occurred at the presentations of the technology.  And as the Court has already held, the
2   "staged glimpses of the Company's facilities and processes presented a different picture than what the CWs
3   describe as the true state of affairs."  Op. 14:24-25; *see also In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 593
4   (S.D.N.Y. 2010) (involvement in presentations "designed to address investor concerns" support an inference of
5   scienter).  Thus, any separate statements that the Defendants might have made to the visitors is irrelevant to the
6   issue of the statements made to the investing public.  Moreover, it is highly implausible that analysts would report
7   that they observed the technology fully operational if, during some private conversation with Defendants, they were
8   secretly told that it really was not operating properly.

9
10          **D.      Although Not Required, The Additional Allegations Of Motive Further Support an
                      Inference of Scienter**

11          It is well established, both by the U.S. Supreme Court and the Ninth Circuit, that it is unnecessary to allege
12   "motive" in order to establish scienter.  *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not
13   fatal....[rather] allegations must be considered collectively; the significance that can be ascribed to an allegation of
14   motive, or lack thereof, depends on the complaint's entirety"); *Siracusano*, 585 F.3d at 1182 (motive is "a relevant
15   consideration" but "the absence of a motive allegation is not fatal."); *see also Petrie v. Elec. Game Card, Inc.*, 761
16   F.3d 959, 970 (9th Cir. 2014) (same).

17          As a corollary to this, courts recognize that the mere fact that an insider does not engage in insider trading
18   or even purchases additional shares during the Class Period does not undermine allegations of scienter.  *See, e.g,*
19   *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012) ("the Court
20   again rejects the proposition that a strong inference of scienter is negated by the fact that the Individual Defendants
21   purchased and/or retained FRB stock during the Class Period"); *Resh v. China Agritech, Inc.*, 2019 WL 1055240,
22   at *6 (C.D. Cal. Jan. 8, 2019) (treating defendant's purchases during relevant period "only as a competing
23   inference" that "neither support[ed] nor negate[ed] scienter").  Accordingly, contrary to Defendants' assertion, the
24   mere fact that Clarke did not dispose of a significant number of shares during the Class Period does not undermine
25   the strong inference of scienter against him.  DB 28:18-21; CB 4:13-16.[39]

26   _____

27   [39] None of Defendants' cases cited for the proposition that the "absence of sales by Clark ... and Murphy and
28   Mould's retention of more than 90% of their holdings ***contradicts any inference of scienter***" supports that
     proposition.  The cases cited by Defendants (DB 29:3-12) merely held that the insider trading allegations there did

1    Nevertheless, Plaintiff does bolster its compelling scienter allegations with allegations of motive.

2    One, both Defendants Murphy and Mould did engage in insider trading.   To determine whether sales are

3    suspicious, courts consider: (i) the amount and percentages of shares sold; (ii) the sale's timing; and (iii) whether the

4    sales were consistent with the insider's prior trading history.   *No. 84 Emp'r-Teamster Joint Council Pension Tr.*

5    *Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003).   No one factor is dispositive.   *Middlesex Ret.*

6    *Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1180 (C.D. Cal. 2007).[40]

7    In this case, despite never having sold shares before the Class Period, Defendants Murphy and Mould sold

8    over $2 million of stock in a mere two-month burst.   ¶¶493-99.   Where, as here, defendants sold their stock when

9    they knew about adverse information before the public, the timing may be found suspicious.   *In re Intuitive*

10   *Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 838-39 (N.D. Cal. 2014); *Nursing Home Pension Fund, Local 144 v.*

11   *Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (reasoning that timing of sales was suspicious where defendant

12   sold shares one month before a report of lower-than-expected sales).   Defendants Murphy and Mould sold stock

13   just days before the May 2017 disclosures that became market-moving events.   ¶¶497, 499.   Moreover, as

14   Murphy's first sale occurred near the then-trading peak, his sales further support an inference of scienter.   ¶495.

15   *Am. W. Holding Corp.*, 320 F.3d at 939 ("troubling" to the court that insiders sold "near the stock's peak"); *In re*

16   *Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *19 (S.D. Cal. Aug. 1, 2006) (noting that "[t]he

17   suspicious trade occurred at a time that would have maximized the personal benefit from undisclosed inside

18   information").   Defendants conveniently ignore the timing of these sales.[41]

19   To the extent that Defendants urge that the sales occurred under a 10b-5 trading plan, Defendants ignore

20   that Murphy and Mould's March 2017 sales were *not* pursuant to a trading plan.   RJN Exs. 32-33.   Moreover, since

21   Murphy's and Mould's plans were created during the Class Period and only two months before the May 2017

22   partial disclosures (and that Murphy has not engaged in a single trade since), they are not exculpatory at this stage.

---

24   not support an inference of scienter.   Clark's cases are inapposite as they simply found that patterns of insider
     trading only negated already weak allegations of scienter, most critically, under circumstances where the plaintiff
25   failed to sufficiently allege defendants knew their statements were false when they were made.   *See, e.g.,* CB 4-5.

26   [40] Defendants' reliance on *Am. W. Holding Corp.* is perplexing as Plaintiff here provides the very pre-class period
     comparison necessary to conclude that the class period trading was "unusual and suspicious."   320 F.3d at 939.

27   [41] The timing of sales by IB also support an inference of scienter.   The day before the truth was revealed to the
     market, IB who sold more than 228,000 shares for proceeds of more than $3.8 million.   ¶¶500-01.   Defendants do
28   not attempt to address the timing of these sales, and instead remark that IB is not an insider.   DB 29:14.   Yet,
     Defendants ignore that IB had an observer on Aqua Metals' Board during the Class Period.   ¶¶501-02.

¶498; *see Applestein v. Medivation, Inc.*, 2011 WL 3651149, at *7 (N.D. Cal. Aug. 18, 2011) ("Rule 10b5–1 plans do[] not preclude a finding of fraud because, at the time the plans were adopted ... the individual defendants were allegedly already aware of the unblinding"); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("a 10b5–1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith").[42]

Defendants' assertion that the fact that only Mould and Murphy engaged in insider trading contradicts an inference of scienter because they did not make many of the statements at issue is misguided on several levels. First, as discussed herein, they are each liable for making false and misleading statements. Second, they are also liable for engaging in a fraudulent scheme, which they do not challenge on this motion to dismiss. Third, both Defendants are liable as control persons. Finally, even sales by non-speakers can support an inference of scienter. *See Am. W. Holding Corp.*, 320 F.3d at 938-39.

Two, although ignored by Defendants, the corporate resignations also support an inference of scienter. Such "corporate reshuffling" adds to the scienter puzzle. *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (holding that inference was supported where defendants left as company's financial difficulties came to light); *Volkswagen*, 2017 WL 66281, at *14 (same). Here, the Complaint contains sufficient allegations "to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F.3d at 1002. Five months after the Class Period closed, defendants Clarke and Murphy, the Company's CEO and CFO, resigned. ¶¶293, 295, 298, 300, 302. The Company announced Clarke's resignation simultaneously with announcing corporate governance changes. ¶300. In the same time period, the Company also announced that Mould would not seek reelection to the Board. ¶298.

Finally, the Company's public offering is also indicative of scienter. Conducting a public offering to obtain capital is probative of motive. *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (allegations about a secondary offering were probative of scienter where the company's finances were that the funds were absolutely necessary); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016)

---

[42] Defendants' reliance on *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) is misguided. First, the trades there were not suspicious but in line with pre-class period trading, not suspiciously timed and the amounts were not all significant. Second, while the Court noted in a footnote that the fact that sales were placed according to a pre-determined plan "may 'rebut [ ] an inference of scienter,'" this comment was not the basis for its conclusion and the plans were not created two months before sales made days before corrective disclosures. *Id.* at 1067 n.11.

1  (collecting cases and finding that motive to artificially inflate price in connection with secondary public offering

2  strengthened the inference that defendants acted with scienter); *Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457,

3  474 (S.D.N.Y. 2013) (noting that "misstatements that artificially inflate a stock price in advance of a public offering

4  are sufficient to support scienter on a motion to dismiss"). Here, the Complaint does not allege merely that a public

5  offering was made for capital. ¶¶505-06. Rather, Plaintiff alleges how Defendants conducted the offering while

6  operating at a loss and in need of funds for further research and development – as, unknown to investors, the

7  technology was malfunctioning. *Id.*[43]  This motive evidence is stronger than the generic "desire to raise capital"

8  that may be attributable to any company. *In re Portal*, 2005 WL 1910923, at *12.

9  **III.    THE COMPLAINT STATES CLAIMS FOR CONTROL PERSON LIABILITY**

10          The Court has already sustained Count Three for 20(a) control person liability (Op. 15:21-17:6), and

11  Defendants do not challenge Count Three as it relates to Count Two for scheme liability.   DB 32:24-33:3.

12  Accordingly, the motion to dismiss Count Three should be denied.  While Defendants challenge the Count Three

13  control person claim "as it relates to Count One," they do so only on grounds that Plaintiff has failed to allege a

14  primary violation under Count One.  Because Plaintiff has plead primary violations of Count One, Plaintiff's

15  control person claims as to Count One must be sustained.  *See In re Intuitive Surgical*, 65 F. Supp. 3d at 839.

16                                              **CONCLUSION**

17          For these reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss.

18  However, if the Court finds otherwise, Plaintiff respectfully requests leave to amend.  *See Khoja v. Orexigen*

19  *Therapeutics, Inc.*, 899 F.3d 988, 1011 (9th Cir. 2018).

21  DATED: December 6, 2019                    Respectfully submitted,

22                                             **BERMAN TABACCO**

23                                             By:    */s/ Nicole Lavallee*
                                                      Nicole Lavallee

27  [43] Defendants' cases are inapposite. DB 29-30; S*eaman v. Cal. Bus. Bank*, 2013 WL 5890726, at *6 (N.D. Cal.
28  Oct. 30, 2013) (capital raised to avoid regulatory action); *In re Atmel Corp. Sec. Litig.*, 2016 U.S. Dist. LEXIS 104090 (N.D. Cal. Jan. 29, 2004) (allegations of a desire to raise capital *alone* insufficient).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kristin J. Moody
A. Chowning Poppler
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email:  nlavallee@bermantabacco.com
          kmoody@bermantabacco.com
          cpoppler@bermantabacco.com

Leslie R. Stern
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email:  lstern@bermantabacco.com

Shannon L. Hopkins
Stephanie A. Bartone
**LEVI & KORSINSKY, LLP**
1111 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
Email:  shopkins@zlk.com
          sbartone@zlk.com

Rosemary M. Rivas
**LEVI & KORSINSKY, LLP**
388 Market Street, Suite 1300
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294
Email: rrivas@zlk.com

*Counsel for the Plymouth County Group and
Co-Lead Counsel for the Class*