1  Michael R. Hogue (SBN 272083)
   hoguem@gtlaw.com
2  GREENBERG TRAURIG, LLP
   4 Embarcadero Center, Suite 3000
3  San Francisco, CA 94111
   Telephone: (415) 655-1300
4  Facsimile: (415) 707-2010

5  Robert A. Horowitz
   horowitzr@gtlaw.com
6  MetLife Building
   200 Park Avenue
7  New York, NY 10166
   Telephone: (212) 801-9200
8  Facsimile: (212) 801-6400
   (*pro hac vice*)

9  Attorneys for Defendants
   AQUA METALS, INC., THOMAS MURPHY,
10 SELWYN MOULD

11 Steven M. Schatz
   Boris Feldman
12 Dylan G. Savage
   Alexander K. Brehnan
13 WILSON SONSINI GOODRICH & ROSATI P.C.
   sschatz@wsgr.com
14 boris.feldman@wsgr.com
   dsavage@wsgr.com
15 abrehnan@wsgr.com
   650 Page Mill Road
16 Palo Alto, CA 94304
   Telephone: (650) 493-9300
17 Facsimile: (650) 565-5100

18 Attorneys for Defendant STEPHEN R. CLARKE

   **UNITED STATES DISTRICT COURT**
19 **NORTHERN DISTRICT OF CALIFORNIA**

20 | In Re Aqua Metals, Inc. Securities Litigation | CASE NO. 4:17-CV-07142-HSG |

   **CLASS ACTION**

21 **DEFENDANTS AQUA METALS, INC.,**
   **STEPHEN R. CLARKE, THOMAS**
22 **MURPHY, and SELWYN MOULD'S**
   **REPLY MEMORANDUM OF LAW IN**
23 **FURTHER SUPPORT OF THEIR MOTION**
   **FOR AN ORDER DISMISSING**
24 **PLAINTIFF THE PLYMOUTH COUNTY**
   **GROUP'S SECOND AMENDED**
25 **COMPLAINT TITLED "CONSOLIDATED**
   **COMPLAINT FOR VIOLATION OF**
26 **SECURITIES LAWS"**

27 **DATE:      January 30, 2020**
   **TIME:      2:00 p.m.**
28 **CTRM:      2, 4th Floor**
   **JUDGE: Haywood S. Gilliam, Jr.**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT .................................................................................................................................2

    I.      The Core AquaRefining Technology Works: It Was Successfully Tested and Proven to Produce AquaRefined Lead..................................................................2

    II.     The SAC Fails to Allege Materially Misleading Statements of Current Fact ........4

    III.    The Forward-Looking Statements Are Protected by the Safe-Harbor....................8

    IV.    The SAC Fails to Adequately Allege Scienter ......................................................12

    V.     The SAC Fails to State a Claim Against Mr. Murphy and Mr. Mould for Making False Statements .......................................................................................14

    VI.    The SAC Fails to State a Claim for Control Person Liability................................15

CONCLUSION.............................................................................................................................16

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' 2D AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adaptive Broadband Sec. Litig.*,
  No. C-01-1092, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...................................14

*In re Allied Nev. Gold Corp.*,
  No. 3:14-CV-00175-LRH-WGC, 2016 U.S. Dist. LEXIS 104090 (D. Nev.
  Aug. 8, 2016) ............................................................................................13

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d. 784 (9th Cir. 2017) ...................................................................11

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .....................................................................11

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) .....................................................................11

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ................................................................4, 8

*Cutler v. Kirchner*,
  696 Fed App'x 809 (9th Cir. 2017) ............................................................11

*In re ECOtality, Inc. Sec. Litig.*,
  No 13-03791-SC, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014)..............9

*In re Energy Recovery Sec. Litig.*,
  No-15-cv-00265-EMC, 2016 WL 324150 (N.D. Cal. Jan. 27, 2016) ......12

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) .....................................................................11

*Gammel v. Hewlett-Packard Co.*,
  905 F. Supp. 2d 1052 (C.D. Cal. 2012) ....................................................11

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)........................................................................9

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135, (2011).................................................................................15

*In re LeapFrog Enters., Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007 ......................................................11

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' 2D AMENDED COMPLAINT

*M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*,
   No. CV 17-1479 PA, 2017 WL 5635424 (C.D. Cal. Aug. 20, 2017)......................................9

*Markette v. Xoma Corp.*,
   No. 15-cv-03425-HSG, 2017 U.S. Dist. LEXIS 160194.......................................................15

*Maverick Fund L.D.C. v. First Solar, Inc.*,
   No. CV 15-1156-PHX-DGC, 2018 WL 6181241 (D. Ariz. Nov. 27, 2018)........................ 12

*Miramontes v. Mills*,
   No. CV 11-8603 MMM, 2015 U.S. Dist. LEXIS 158943 (C.D. Cal. Nov. 24,
   2015) .....................................................................................................................................7

*Mulligan v. Impax Labs, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................................9, 10

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
   No. 15-cv-02938-HSG, 2018 U.S. Dist. LEXIS 106868 (N.D. Cal. June 26,
   2018) ........................................................................................................................7, 8, 9, 13

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046, (9th Cir. 2014) .................................................................................................14

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) .............................................................................................11

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ......................................................................................................4

*Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*,
   No. 17-15216, 2018 U.S. App. LEXIS 11192 (9th Cir. May 1, 2018).......................................9

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..................................................................................................12

*Rihn v. Acadia Pharm. Inc.*,
   No. 15-CV-00575 BTM (DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)...................10

*In re SolarCity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) ......................................................................................15

*In re Syntex Corp. Sec. Litig.*,
   855 F. Supp. 1086 (N.D. Cal. 1994) *aff'd*, 95 F.3d 922 (9th Cir. 1996) ..................................4

*In re Volkswagon "Clean Diesel" Mktg. Sales Practices & Prods. Liab. Litig.*,
   MDL No. 2672, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ......................................................14

*Xu v. Chinacache Int'l Holdings Ltd.*,
   No. 2:15-cv-7952 CAS, 2016 WL 4370030 (C.D. Cal. Aug. 15, 2016) ....................................9

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' 2D AMENDED COMPLAINT

*Zaghian v. Farrell,*
    675 Fed. App'x. 718 (9th Cir. 2017) ........................................................................12

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ..........................................................................13, 14

**Other Authorities**

H.R. Conf. Rep. 104-369 (1995), *reprinted at* 1995 U.S.C.C.A.N. 730 ......................................11

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' 2D AMENDED COMPLAINT**

Defendants[1] respectfully submit this Reply Memorandum of Law in further support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 128).[2]

## PRELIMINARY STATEMENT

In an effort to create a faulty premise upon which Plaintiffs then rely to argue that Defendants' statements throughout the class period were false, Plaintiffs continue to conflate the AquaRefining technology (which is a module with six electrolyzers that converts recycled lead from lead acid batteries into pure AquaRefined lead), with the entire commercial lead recycling process (which starts with traditional battery breaking and concludes with casting lead ingots). The AquaRefining technology is only a part, or subset, of the entire process.

Based on issues the Company faced in scaling the technology, i.e., incorporating the technology into the commercial process, Plaintiffs assert Defendants' statements that they successfully tested and proved the AquaRefining technology were a lie that made their subsequent statements false and misleading. But what Defendants represented was that they successfully tested and proved the AquaRefining technology; specifically, they (correctly) stated that the module and electrolyzer—which was all that existed when the statements were first made—were able to convert recycled lead into AquaRefined lead without the use of a smelter, i.e., the technology worked. Once it is understood that technology is distinguishable from the entire lead recycling process, it becomes clear the issues that presented themselves while scaling the technology (and the corresponding references) in no way undermined the truth of Defendants' assertions that the AquaRefining technology was successfully tested and proven. With that clarification, the basis for much of Plaintiffs' allegations of falsity falls away.

Plaintiffs' allegations concerning forward-looking statements are unavailing. Despite their protests to the contrary, most of the statements at issue were forward-looking and were accompanied by "meaningful cautionary statements" and therefore fall within the PSLA safe-

---

[1] All capitalized terms not otherwise defined herein shall have the meanings given them in Defendants' moving brief (ECF No. 128) ("DB").

[2] Although Plaintiffs assert that Defendants only challenged two causes of action in their moving brief (Plaintiff's opposition brief (ECF No. 131) ("PB")) 1:8-9), Defendants specifically reserve all rights to challenge these causes of action at a later stage (DB 1, n.1).

harbor. The cautionary statements warned the public of the risks inherent in commercializing this brand new AquaRefining technology and those are the risks that caused the Company's delays in meeting its projections and forecasts throughout the class period.

Plaintiffs also fail to adequately plead scienter. The primary basis for Plaintiffs' scienter allegations is that Defendants knew the technology did not work, a fact contradicted by Plaintiffs' own allegations. Moreover, Clarke, who made most of the statements at issue, actually purchased 200,000 shares during the class period and Mr. Mould and Mr. Murphy sold less than 10 percent of their shares. Further there are no allegations that any of the Defendants derived any benefits from the statements.

Finally, the allegations against Murphy and Mould should be dismissed because the statements they are alleged to have made are not actionable.

## ARGUMENT

I.  **The Core AquaRefining Technology Works: It Was
    Successfully Tested and Proven to Produce AquaRefined Lead.**

The SAC and Plaintiffs' arguments rely on the premise that the AquaRefining technology "d[id] not work" and was "fundamentally flawed." (*See, e.g.*, SAC ¶ 303, PB at 1.) But this faulty premise is belied by Plaintiffs' own CWs who acknowledge that the core technology did, in fact, work: during the class period the AquaRefining modules produced AquaRefined lead without smelting. (*See, e.g.*, SAC ¶¶ 95, 97; DB at 18.) Moreover, Plaintiffs now acknowledge that the Company has begun commercial production of AquaRefined lead (SAC at ¶ 288(k)), thus demonstrating beyond doubt the AquaRefining technology works.

Plaintiffs confuse the core AquaRefining technology's successful ability to recycle lead through an electrochemical process without smelting on a small scale, with the issues the Company encountered (including in combining the traditional front-end battery breaking process and back-end ingoting process with the new technology) that delayed its ability to scale that same technology to a commercial level.[3] Delays in scaling production have no bearing on whether the Company

---

[3] Plaintiffs take the Company's post-class statement that it was "engaged in the business of producing recycled lead through a novel and unproven technology," completely out of context,

had successfully tested the technology on a small scale and to a limited degree, or whether the AquaRefining technology was proven—both of which were true. The Company specifically warned that issues were likely to arise as the Company scaled the technology, and acknowledged that it had developed and conducted only "limited testing" of the AquaRefining process. (Exh. 18 at 15.) Notwithstanding this clear distinction between a proven concept on a small scale and commercial scale operations, Plaintiffs use their overbroad and faulty premise that the technology did not work as the foundation for their allegation that many of Defendants' class period statements were false.[4]

For example, Plaintiffs' allegations that the Company's statements regarding its strategic partnerships with IB and JC were misleading are grounded solely on this faulty premise. Plaintiffs do not dispute that the partnerships existed; their complaint is that the partnerships could not have validated the AquaRefining technology or assisted in the Company's growth because the technology did not work and claims that this is the "embedded fact" that renders the statements false or misleading. But the technology did work and Plaintiffs provide no viable alternative basis for its allegations that the statements were false. Notwithstanding their counterintuitive and baseless claim that these major industry players must have been duped by "sham" visits, Plaintiffs provide nothing to refute the fact that IB and JC have continued to partner with the Company long after the close of the class period. Moreover, saying that the partnerships validated the technology is not an indicator that the technology was guaranteed to work flawlessly at a commercial level; it is simply an indicator that industry leaders saw value in the technology. That the Company and its officers thus viewed the partnership as important and expressed their enthusiasm is mere opinion, puffery, and/or obvious truth, and is certainly not securities fraud. The "embedded fact" that the technology did not work itself is simply not true, and the statements, such as the JC partnership "is

---

imputing it to the core technology even though the statement clearly relates solely to commercialization under the header, "Our business model is new and has not been proven by us or anyone else." (*See* DB at 23:10-28.)

[4] Statements that the Company did not anticipate or foresee any serious issues operating at a commercial level were necessarily forward looking, as discussed in Section III, *infra*.

a great statement to the industry and the world that aqua refining is the future" (SAC ¶ 390), are simply too vague to be misleading. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) *aff'd*, 95 F.3d 922 (9th Cir. 1996) (holding that statements like "we're doing well and I think we have a great future" to be nonactionable corporate optimism); *see also Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (holding non-actionable statement that revenue and growth were "significant events" as too vague for investor to rely on).

## II.     The SAC Fails to Allege Materially Misleading Statements of Current Fact.[5]

Representations Concerning Lead Production and Transitioning to Commercial Operations. Plaintiffs use the same faulty premise to allege that the Company's statements regarding the successful limited production of a single ingot of 99.9% pure AquaRefined lead announced in November 2016 were false. (SAC ¶¶ 158, 166, 339, 350, 356; Exh. 7; *see also* Exh. 10, 11/7/2016 Q3 Earnings Call.) Plaintiffs' contention is purportedly based on statements of the CWs, but the CWs provide no basis for their knowledge regarding the ingot other than speculation and hearsay. (*See* DB at 19, *infra* Section IV.) The CW's statement that the ingot was not made from LABs broken at the Reno plant is a red herring: the Company itself disclosed in its 10-Q that it was not operating at a commercial scale and had not yet begun breaking batteries (SAC at ¶ 350; Exh. 8 at 21.) Thus, the only remaining basis for Plaintiffs' allegation is its faulty premise that the technology did not work so the Company's representations that the ingot was made of AquaRefined lead must be false.

Plaintiffs also make allegations regarding a caption to a photograph showing a single AquaRefining module with a stream of lead infused electrolytes falling from the module to the conveyor belt describing the lead as "flowing like a waterfall." (SAC at ¶ 350.) Plaintiffs contend these statements were false and misleading because of the issues described by the CWs. But none

---

[5] Plaintiffs argue that Defendants' motion to dismiss must fail because Defendants have not addressed every single misstatement that Plaintiffs allege in the SAC to be false and misleading. (PB at 9:8-10, 10:15-16.) Plaintiffs ignore that the SAC contained 550 paragraphs of allegations spanning over 200 pages, while Defendants were limited in their moving briefs to only 40 pages. Thus, Defendants' choice (out of necessity) to address the statements by category in no way concedes the merits of any of Plaintiffs' claims or arguments.

1   of the CWs claim to have observed the module in the photograph, which would be necessary to

2   refute the description, i.e., observe that the lead was not flowing off the module. To conclude the

3   description was false, one would have to assume that the lead never flowed off the chute without

4   getting stuck, a claim none of the CWs made.

5       That the Company did not ultimately complete transitioning into commercialization or

6   successfully commence commercial production of AquaRefined lead until 2018 (PB at 15), does

7   not render any of its November 2016 statements false or misleading. In its SEC filings, the

8   Company repeatedly warned of the risks associated with transitioning to commercialization. For

9   example, in its November 7, 2016 Form 10-Q, the Company explained that "[w]hile we believe

10  that our development, testing and limited production to date has proven the concept of our

11  AquaRefining process, we have not undertaken the processing of used LABs nor have we

12  commenced the production of lead in large commercial quantities." (Exh. 8.) The Company further

13  disclosed that its operations consisted of "limited testing" of the AquaRefining process. (Exh. 18

14  at 15.) Lest there be any doubt as to Dr. Clarke's belief in the technology, he purchased 200,000

15  shares of Company stock in the November 2016 public offering. (Exh. 31.)

16      Representations Concerning Commercial Operation with Product Ready to Ship. In

17  February 2017, Defendants used such terms as "commercial operations" and "commercial-scale

18  production" to describe the phase of AquaRefinery operations the Company was moving into (not

19  that it had completed). Plaintiffs allege these phrases misled the market to believe the Company

20  was already producing AquaRefined lead in commercial quantities. But that conclusion was

21  expressly contradicted by the Company's disclosures throughout the class period that it was not

22  producing AquaRefined lead in commercial quantities at any time during the class period. (*See,*

23  *e.g.,* Exh. 24 at 7; Exh. 18 at 4.)

24      Because Defendants represented in Q1 of 2017 they had "products" ready to ship, Plaintiffs

25  contend Defendants misled the market to believe they specifically had AquaRefined lead ready to

26  ship. That inference is particularly unwarranted given Plaintiff's concession in SAC ¶ 47 that the

27  recycling of LAB batteries generates a variety of products for sale, including lead ingots, sulfuric

28

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' 2D AMENDED COMPLAINT**

1    acid, separated plastics, in addition to AquaRefined lead. Thus, Plaintiffs are dead wrong when

2    they point to the Company's May 9, 2017 disclosure that the products it had ready to ship were

3    lead compounds and plastics, not AquaRefined lead, as "proof" that the Company misled the

4    market when it said it had "product ready to ship."

5         Plaintiffs take Clarke's description of challenges in the February 14, 2017 earnings call

6    and his statement that "we've got that dialed in now and it's operating'" which "means we can

7    provide feedstock to the AquaRefiners and make AquaRefined lead" to mean "there were no

8    operational issues." (PB at 28.) But the Company's belief it had solved the front-end problems

9    with transporting lead paste to the AquaRefining module in no way guaranteed that other problems

10   with the front-end battery breaking process would not present themselves and certainly was not a

11   representation concerning other parts of the commercial process. Indeed, CW1 explained that "as

12   the process goes to large-scale, even just one change can impact everything and make existing

13   issues worse." (SAC at ¶ 70.) The Company continued to warn of the risks associated with its

14   efforts to produce commercial quantities of lead.

15        In its Form 10-K filed March 2, 2017, the Company stated it "commenced the commercial

16   scale production of recycled lead during January 2017." (SAC at ¶ 221, 356.) Plaintiffs yet again

17   jump to the conclusion that "commercial scale production" of recycled lead means the Company

18   began to produce AquaRefined lead in commercial quantities (PB at 17), which again is belied by

19   their acknowledgement that they knew the entire commercial process generated several products

20   for sale other than AquaRefined lead. Further, the Company clearly stated shortly thereafter that

21   its revenue came from the sale of plastic and lead compounds, not AquaRefined lead. (*See* Exh.

22   24 at 7 (Murphy states that sales consisted of "plastic and lead compounds"); Exh. 18 at 4.)

23   Whatever the terminology used to describe its operation—"commercial operations", "commercial

24   production", or "commercial scale"—the critical fact is the Company never represented that it was

25   producing AquaRefined lead in commercial quantities. (*Id*.)

26        Plaintiffs allege all these statements and others were false and misleading because of the

27   problems described by the CWs. (PB at 17-18.) However, the existence of those problems (sticky

28

lead and hard lead) does not contradict Defendants' statements that the AquaRefinery was in commercial operation, the Company had product ready to ship, or any of the other statements Plaintiffs allege to be false and misleading. *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, No. 15-cv-02938-HSG, 2018 U.S. Dist. LEXIS 106868, at *7 (N.D. Cal. June 26, 2018) (Solazyme could still have made "strong and steady progress," been "deep into the commissioning process," and infrastructure and upstream could still have been "online" and "functioning as expected" without being "close to achieving commercial viability" at the plant.)

          <u>Representations Regarding Visitor Days and Site Visits.</u>   The   CW   statements concerning the site visits do not contradict the Company's statements (PB at 11:6-13) or the analyst statements (PB at 10:23-11:5). The analyst statements alleged to be false are statements reporting what they observed during the visits. The CWs acknowledge that modules were up and running during the visits. The CWs do not deny that semi-truckloads of used batteries were being delivered for offloading and recycling and that lead products (as the Company explained, not ultra-pure AquaRefined lead) were being shipped. Thus, Plaintiffs have not alleged facts demonstrating that any statements made by Defendants or the analysts about the visits were false or misleading.

          <u>Representations Concerning Lead Production Rates.</u>  Plaintiffs  confuse  statements regarding the TRIC facility's expected capacity to produce lead (i.e. its potential to produce lead) with its current production of lead. (PB at 22). A review of the statements in context clearly shows that the Company was not representing that it was currently producing 120 tons of AquaRefined lead, but had future plans to do so and was in the process of installing equipment that it believed could support 120 tons in the future. (*Compare*, Exh. 10 at 2, 9 ("we expect to expand our capacity to 120 tonnes a day in early 2017" and stating that only 6 of 16 modules were currently installed and that 120 tons required 16 operating modules) *with* PB at 22:11-13[6].) Further, while the Company regularly set forth its production goals, those goals were quintessential forward-looking statements, and were accompanied by meaningful cautionary language concerning risks and issues

---

[6] Plaintiffs assert that this statement was mistakenly attributed to Clarke in the SAC rather than Murphy. Regardless of who made the statement, it is not actionable, and in any event, Plaintiffs are bound by their pleading. *Miramontes v. Mills*, No. CV 11-8603 MMM (SSx), 2015 U.S. Dist. LEXIS 158943, at *12-14 n.25 (C.D. Cal. Nov. 24, 2015).

the Company might face as it attempted to scale operations. Indeed, Plaintiff disavows any claims based on revenue generation (PB at 25:16), which obviously is directly tied to production goals.

## III.    The Forward-Looking Statements Are Protected by the Safe-Harbor.

In both the SAC (*see* SAC at ¶ 527) and their briefing, Plaintiffs argue that even if statements are forward looking (PB at 25), Defendants are liable if the statements were made with "actual knowledge" of their falsity. This argument is in direct contravention of the PSLRA and its well-settled interpretation by the Ninth Circuit in *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-13 (9th Cir. 2010) (forward-looking statements accompanied by meaningful cautionary language are protected by the safe harbor without regard to the speaker's state of mind <u>even if the statement was made with actual knowledge</u> it was false or misleading).

<u>Forward-Looking Statements.</u> Though Plaintiffs assert their claims are not based on the Company's "plans and projections concerning commissioning AquaRefining facilities and commercialization of the AquaRefining process" or statements regarding revenues or additional facilities, that is precisely what Plaintiffs' claims are.[7] (*See, e.g.*, SAC at ¶ 441 ("[l]ead production . . . <u>projected</u> to scale quickly"; SAC at ¶ 450 "<u>our goal</u> is to increase production") (emphasis added); SAC at ¶ 459 ("we are <u>on track</u> to be at 120 metric tonnes") (emphasis added).)

Plaintiffs attempt to turn these forward-looking statements into statements of current fact or "mixed" statements by arguing that when the Company said it was "on track" to meet certain goals in the future it was referring to "current business conditions." (PB at 23.) In similar factual circumstances, courts—including this one—have found statements that a company is "on track" to meet production or business goals are forward-looking statements. *See Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, No. 15-cv-02938-HSG, 2018 U.S. Dist. LEXIS 106868, at *7 (N.D. Cal. June 26, 2018). Plaintiffs attempt to distinguish *Norfolk* on the basis that there were no facts contradicting the statements but there were: the defendant there stated it was "on track" to reach "full nameplate capacity" by the end of 2015 at a facility undergoing commissioning even though confidential witnesses there—as here—alleged that commercial production was not ongoing at any point

---

[7] Plaintiffs also identify forward-looking statements regarding revenues (*see, e.g.*, SAC at ¶¶ 390, 450) and the proposed additional facilities (*see, e.g.*,  SAC at ¶397).

during the class period. *Norfolk*, 2018 U.S. Dist. LEXIS 106868 at *8, 13-14. But, the court discredited the allegations, holding the on-track statements at issue were forward looking, even if the facility had not been close to commercial viability in 2014. Here, as in *Norfolk*, the Company's on-track statements were similarly about *future* goals and milestones, and thus, they are forward-looking and protected by the safe harbor.[8] (*See, e.g.*, SAC at ¶ 434 (the Reno Plant was "on track" to achieve 80 tons of output by end of 2016 and expand that to 160 tons by 2018); SAC ¶ 459 ("We expect TRIC to achieve a production rate of 120 metric tons" by end of 2017).)

The only two circuit courts that have addressed the "on-track" language concluded the statements were forward-looking. *See Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, No. 17-15216, 2018 U.S. App. LEXIS 11192, at *5 (9th Cir. May 1, 2018) (the statement that sites were "on track" falls within the safe harbor); *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (statements that a company is "on track" when read in context, cannot meaningfully be distinguished from the future projection of which they are a part). Plaintiffs did not even address the Ninth Circuit's decision in *Pompano Beach*, and its attempt to distinguish *Institutional Investors* because it dealt with financial projections is a distinction without a difference because production goals and financial projections are inextricably intertwined.

Plaintiffs' handful of district court cases in support of their position are distinguishable. For example, in *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 964 (N.D. Cal. 2014) the "on track" statement related to the company's efforts—already underway—in response to an FDA warning letter. In contrast, the Company's statements using "on track" related to future events or goals.[9] Indeed, the *Mulligan* court acknowledged that in other instances, statements regarding

---

[8] *See also M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, No. CV 17-1479 PA (MRWx), 2017 WL 5635424, *11 (C.D. Cal. Aug. 20, 2017) (although present facts might inform a projection, that does not prevent a statement from being a forward-looking protected by the safe harbor because all forward-looking statements inherently rely on present conditions); *Xu v. Chinacache Int'l Holdings Ltd.*, No. 2:15-cv-7952 CAS (RAOx), 2016 WL 4370030, at *7 (C.D. Cal. Aug. 15, 2016) (statements that company was "on track to complete" a business objective were forward-looking, "[a]lthough the phrase 'on track' sounds in the present tense").

[9] Plaintiffs argue *In re ECOtality, Inc. Sec. Litig.*, No 13-03791-SC, 2014 WL 4634280, *6 (N.D. Cal. Sept. 16, 2014) is distinguishable because it stated that "context" could render an "on track" statement as present if it "<u>does not depend on any future condition</u>." (emphasis added) However,

future FDA actions had been found to be forward-looking, but that in *Mulligan* the statements only contained present or historical facts. *Id.* Similarly, in *Rihn v. Acadia Pharm. Inc.*, No. 15-CV-00575 BTM (DHB), 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016) (PB 27:25-28:1), the court acknowledged that an "on track" statement may be forward looking, but that in that case, the statements at issue were a representation of present conditions pertaining to an NDA process. *Id.* at *7. Given that the *Rihn* defendants had complete control over the timing of the submission of the NDA, and therefore complete control over whether they were on track, the on-track statement was deemed not forward-looking. In contrast here, the Company was in the process of scaling a new technology and adapting it for commercial use in the future; the commercialization of the process was not entirely within the Company's control.

    <u>The Statements Were Accompanied by Meaningful Cautionary Language.</u> Plaintiffs further argue that even if statements in the Complaint are forward-looking, "Defendants fail to meet the requisite showing of meaningful cautionary language" and that "none" of the cautionary language was sufficiently meaningful to protect Defendants' statements. (PB at 25-26.) Plaintiffs argue that Defendants never warned "against the known fundamental problems concerning the AquaRefining process." (PB at 26.)

    The Company's cautionary statements identified these factors, among others:

       (i)     it had only tested the AquaRefining process on a small scale and to a limited degree so there could be no assurance that it would be able to replicate the process on a large commercial scale or that it would not incur unexpected hurdles that might restrict its intended operations,

       (ii)    the uniqueness of the AquaRefining process presented risks associated with the development of an untried and unproven business model, and

       (iii)   no one had successfully produced recycled lead in commercial quantities other than by way of smelting so while the Company began commercial-scale production in January 2017 it still could not assure that it would be able to produce lead in commercial quantities at a cost of production that would provide an adequate profit margin. (Exh. 2 at 5-6.)

---

the court expressly concluded statements that the company was on track to release a new product in a future quarter were "quintessentially forward-looking." *Id.* at *7. The court found it unnecessary to address whether the other on-track statements were forward-looking because Plaintiffs failed to adequately allege they were false or made with scienter.

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' 2D AMENDED COMPLAINT**

Plaintiffs assert that these cautionary statements do not relate directly to that to which Plaintiffs claims to have been misled, and that Defendants' cautionary statements should have discussed the sticky lead issue and any other specific issues it was facing in scaling the technology. (PB at 26-27.) But, the PSLRA does not require that the cautionary statement include such details. The Company disclosed the particular factor that ultimately caused the forward-looking statements to be untrue—the commercialization of brand new technology that had never been tested on a commercial scale.[10] *See, e.g., Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012). Plaintiffs' caselaw is inapposite. Plaintiffs' reference to *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d, 784, 798 (9th Cir. 2017), was in the context of applying the bespeaks caution doctrine. The alleged misleading statement—how the company characterized an FDA warning letter—concerned only past facts and therefore fell outside the PSLRA's safe harbor. Moreover, *In re LeapFrog Enterprises, Inc. Sec. Litig.* actually supports Defendants' position. 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) (cautionary language addressing risks relating to "<u>types of problems</u> relevant to LeapFrog" were sufficient).

In connection with its assertion that "warning of 'potential' risks, where severe problems were already known, offers no protection," Plaintiffs cite to *Cutler v. Kirchner*, 696 Fed App'x 809, 813 (9th Cir. 2017). But there, the problems the company was experiencing impacted its current financial performance, not the likelihood its future goals would be realized, and the other statements were not forward-looking. Plaintiffs other cases are similarly distinguishable.[11] Further,

---

[10] Even so, the report that accompanied the PSLRA specified that "failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." H.R. Conf. Rep. 104-369, at 44 (1995), *reprinted at* 1995 U.S.C.C.A.N. 730, 743.

[11] While Plaintiffs cite to *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991) for boilerplate language regarding disclosures, the case actually supports Defendants' position. Not only is the case distinguishable because it is pre-PSLRA, but the court *rejected* plaintiff's contention that the risk disclosures were insufficient because they failed to sufficiently apprise investors of production problems the company was experiencing. *See also Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) (largely discredited pre-PSLRA case so there was no safe-harbor for forward looking statements); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (defendants had no affirmative duty to disclose stop-work orders because securities laws do not require firms to disclosure all information and report of backlog resulting from stop-work orders was not a forward-looking statement because it did not relate to projections); *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (misstatements

Plaintiffs' allegations that the cautionary statements are too general or vague simply lack merit.[12]

## IV.    The SAC Fails to Adequately Allege Scienter.

Plaintiffs argue in opposition that Defendants "concession of knowledge, even standing alone" is sufficient to find a strong inference of scienter. (PB at 31.) Plaintiffs misconstrue Defendants' argument, which is that Defendants knew of certain issues in scaling the new technology, but those issues were not related to the core AquaRefining process, were considered solvable, and certainly were not hidden; to the contrary, they fell squarely within the risks the Company warned it would likely face as it worked to commercialize the new technology. There is no requirement that a Company describe in detail each and every issue that arises, especially when it has already warned that it would face issues. Further, Plaintiffs' cases are distinguishable because, unlike here, they involved public statements directly contradicted by facts within those defendants' knowledge.[13]

<u>Confidential Witnesses.</u> To plead scienter, Plaintiffs rely on the CWs. (PB at 32.) For example, Plaintiffs' allegations relating to the Testing Facility arise <u>solely</u> from CW1 (as Plaintiffs now concede), and such allegations are not described with sufficient particularity nor are they indicative of scienter.[14] The SAC describes CW1 as an "engineer" at Aqua Metals from 2015 to 2017, but never identifies his title, who he reported to, and the nature of his relationship to Clarke, Mould, and Murphy. Even if accepted as true, CW1's allegations fall far short of demonstrating a

---

[12] at issue related to facts already known to defendants and were not made in the context of future risks or future goals).

[12] Defendants' cases on boilerplate cautionary language are inapposite because the Company's cautionary statements were not vague boilerplate. *See Zaghian v. Farrell*, 675 Fed. App'x. 718, 720 (9th Cir. 2017) (referencing boilerplate warnings as insufficient); *In re Energy Recovery Sec. Litig.*, No-15-cv-00265-EMC, 2016 WL 324150, *17-18 (N.D. Cal. Jan. 27, 2016) (same).

[13] For example, in *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143-1145 (9th Cir. 2017), executives had access to information demonstrating declining sales, yet made statements to the effect that they had looked at sales data and their sales pipeline was growing. In contrast, here, defendants acknowledged risks and issues relating to the AquaRefining process.

[14] The caselaw relied upon by Plaintiffs is distinguishable. For example, in *Maverick Fund L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, *35 (D. Ariz. Nov. 27, 2018) the CWs at issue were identified by role, including who they worked under or reported to. Plaintiffs do not include allegations with such information about CW1. Further, in *Maverick*, the CWs had personal knowledge of events described, and did not rely on hearsay.

1   strong inference of scienter with regard to Defendants' purported knowledge of "significant

2   problems" with the AquaRefining process "well before the Reno Plant was built." (*Id*. at ¶ 469.)

3   CW1 alleges there were issues with the modules that "were known, including by Clarke and

4   Mould, since 2015," and Clarke and Mould knew the technology would have scaling issues. (*Id*.

5   at ¶¶ 470, 471.) But he does not provide any facts concerning Clarke's or Mould's belief as to

6   whether these issues, to the extent they existed, would prove to be significant. Such "generalized

7   claims about corporate knowledge are not sufficient to create a strong inference of scienter"

8   because they do not establish that the "witness reporting them has reliable personal knowledge of

9   the defendants' mental state." *Zucco Partners*, 552 F.3d at 998.

10      The CWs' statements regarding the authenticity of lead ingots and images of AquaRefining

11   allegedly "staged" necessarily fail because they are not pled with the particularity required under

12   the PSLRA when relying on CWs. *Zucco Partners,* 552 F.3d at 995. CW2 was an Environmental

13   Systems Supervisor who does not claim to have had personal knowledge that the ingots were not

14   AquaRefined lead (SAC at ¶¶ 77, 82), CW3 <u>says nothing</u> relating to the authenticity of

15   photographed ingots and only claims that the Company was not making enough AquaRefined to

16   cast it into bars (*id*. at ¶ 91), and CW4—who did not even work at the Company when the ingot

17   and images in question were made and taken—bases his allegations entirely on hearsay. (*Id*. at ¶¶

18   100-103.); *In re Allied Nev. Gold Corp.*, No. 3:14-CV-00175-LRH-WGC, 2016 U.S. Dist. LEXIS

19   104090, at *42 (D. Nev. Aug. 8, 2016) ("statements of a confidential witness are disregarded if

20   lacking in specificity or based on hearsay, rumor, or speculation").[15]

21      <u>Officer and Director Resignations.</u> Plaintiffs point to the resignations of Clark, Murphy,

22   Weinswig, and Mould, but resignations by themselves do not support a strong inference of

23   scienter. *See, e.g.*, *Norfolk County Retirement Sys. v Solazyme, Inc.*, No. 15-cv-02938-HSG, 2018

24   U.S. Dist. LEXIS 106868, at *29 (N.D. Cal. June 26, 2018) (management departures, without

25

26

27

28

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' 2D AMENDED COMPLAINT**

further context, do not support a strong inference of scienter).[16] Further, Murphy disclosed to investors that his retirement was based in part on his age and health issues. (Exh. 24 at 7.)

Trading. As Plaintiffs concede, to evaluate whether insider sales are unusual or suspicious, the Court must consider among other factor the amount and percentage of shares sold by insiders. (PB at 34.) For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a meaningful trading history. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009). As discussed in Defendants opening brief, Plaintiffs' allegations concerning the timing of Murphy's and Mould's stock sales without regard to the percentage of their holding they each sold is probative of nothing, and, if anything, their lack of stock sales since March 2017 and entrance into Rule 10b5-1 trading plans weighs against a finding of scienter. (DB at 28-29; Exh. 18 at 9.) Defendant Clarke held and purchased additional stock both during and after the Class Period, notwithstanding Plaintiffs' efforts to downplay this significant fact. Lastly, Plaintiffs cannot demonstrate scienter relating to inside trading by focusing on Interstate Batteries – a non-insider.

Public Offering. Plaintiffs' reliance on Aqua Metals' public offering also fails because the need to raise capital does not support an inference of scienter, especially for a company like Aqua Metals that is launching a new technology. (DB at 29-30.)

## V. The SAC Fails to State a Claim Against Mr. Murphy and Mr. Mould for Making False Statements.

Murphy is not liable for the three statements[17] he allegedly made because they are not false

---

[16] Plaintiffs' cases are inapposite, distinguishable, or support Defendants' position. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1062-1063 (resignations did not demonstrate inference of scienter); *In re Adaptive Broadband Sec. Litig.*, No. C-01-1092, 2002 WL 989478, *14 (N.D. Cal. Apr. 2, 2002) (allegations of resignations and suspension of severance payments, taken alone, would not support scienter); *In re Volkswagon "Clean Diesel" Mktg. Sales Practices & Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 66281, *41 (N.D. Cal. Jan. 4, 2017) (inference that resignations, firings, and suspensions supported inference of scienter where, unlike here, several had "expressly admitted wrongdoing").

[17] Plaintiffs assert that an issue of fact exists as to whether Murphy or Clarke made one of the statements, arguing that this defeats the motion to dismiss. (PB at 17 n.16.) But the standard on a motion to dismiss is whether the facts pled are sufficient, not whether issues of fact exist, and regardless of who made the statement, it is not actionable. (*See supra* at 5-7.) Thus, the issue of who made the statement need not be determined in dismissing the SAC.

or misleading. Nor can Murphy be liable for the statements made by others on earnings calls he attended. Plaintiffs cite no authority post-dating the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43, 131 S. Ct. 2296, 2302 (2011) that would permit such a claim to stand and Defendants have found none. Plaintiffs' attempt to distinguish *Janus* and argue its inapplicability on the basis that it did not involve company officers (PB 30 n.31) has been rejected by this Court. *See In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1006-1007 (N.D. Cal. 2017) ("the *Janus* court's interpretation of the word 'make' applies whether or not the case involves a third party or corporate officers."). Plaintiffs also cite no authority, much less a post-*Janus* authority, supporting its position that Murphy can be held liable for statements made by analysts regarding the visits, particularly considering that the SAC fails to allege that Mr. Murphy was involved in any aspect of the visits.

Mould's February 2017 statements in an article regarding Aqua Metal's announcement of its partnership with Johnson Controls are clearly puffery and opinion statements and Plaintiffs' conclusory allegation that Mould knew the statements were false is insufficient. (DB 38-39). *See Markette*, 2017 U.S. Dist. LEXIS 160194 at *17 (holding opinion statement not actionable even where "beliefs and expectations were ultimately not borne out" and holding conclusory allegations that defendant's beliefs were insincere were insufficient). Moreover, Plaintiffs' argument that the statements contained the "embedded fact" that the "AquaRefining process worked and could be scaled" (PB at 21) fails because 1) this is not an embedded fact and 2) even if it were, the statement would be consistent with the then existing facts (*see* Section I). Plaintiffs' argument as to why the statement is not puffery fails on similar grounds because there was no misstatement as to the state of affairs contained in the statement. Since the SAC fails to allege any actionable statement as to Mould, the SAC claims against him should be dismissed.[18]

## VI.   The SAC Fails to State a Claim for Control Person Liability.

For the reasons discussed above and in Defendants moving brief (DB at 32-33), the SAC fails to sufficiently allege any primary violations under Count One and thus Count Three for

---

[18] Clarke's statements were also not false or misleading for the reasons set forth herein and in his supplemental briefs.

control person liability under Section 20(a) should be dismissed to the extent it relates to Count One.

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be granted in all respects.

Dated: December 20, 2019

GREENBERG TRAURIG, LLP

By:  /s/ Michael R. Hogue
Michael R. Hogue
Robert A. Horowitz (*pro hac vice*)

*Attorneys for Defendants Aqua Metals,*
*Inc., Thomas Murphy, and Selwyn Mould*

WILSON SONSINI GOODRICH & ROSATI P.C.

By:  /s/ Steven M. Schatz
Steven M. Schatz
Boris Feldman
Dylan G. Savage
Alexander K. Brehnan

*Attorneys for Defendant Stephen R. Clarke*