1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    ARLIS HAMPTON, et al.,                  Case No.  17-cv-07142-HSG

8                    Plaintiffs,             **ORDER GRANTING MOTION TO DISMISS**

9          v.                                Re: Dkt. No. 128

10   AQUA METALS, INC., et al.,

11                   Defendants.

12          This is a consolidated securities class action brought by Plymouth County Retirement

13   Association and Denis Taillefer, and 1103371 Ontario Ltd. (collectively, the "Plymouth Group" or

14   "Plaintiffs") against Defendant Aqua Metals, Inc. ("Aqua Metals" or the "Company") and its co-

15   founders Stephen R. Clarke ("Clarke"), Thomas Murphy ("Murphy"), and Selwyn Mould

16   ("Mould," and together with Clarke and Murphy, the "Officer Defendants," and collectively with

17   Aqua Metals, "Defendants").  Plaintiffs allege violations of Sections 10(b) and 20(a) of the

18   Securities Exchange Act of 1934 (the "Exchange Act") and Sections 15 U.S.C. 78j(b) and t(a) of

19   the Securities Act of 1933 (the "Securities Act").  Dkt. No. 119 ("SAC") at 1.  Plaintiffs bring this

20   securities class action "on behalf of investors who purchased or otherwise acquired common stock

21   of Aqua Metals" between May 19, 2016 and November 9, 2017 ("Class Period").  SAC at 1.

22          Pending before the Court is Defendants' motion to dismiss the SAC, Dkt. No. 128

23   ("Mot."), for which briefing is complete.  Dkt. Nos. 129 ("Supp. Br."); 131 ("Opp."); 136

24   ("Reply").  On January 16, 2020, the Court took the Motion under submission.  Dkt. No. 138.[1]

25   For the reasons below, the Court **GRANTS** the Motion.

26

27

28   _____
     [1] The Court finds this matter appropriate for disposition without oral argument, and the matter is deemed submitted.  *See* Civil L.R. 7-1(b).

United States District Court
Northern District of California

## I.    BACKGROUND

### A.    Summary of Alleged False and Misleading Statements[2]

Aqua Metals is an early-stage company that was incorporated in 2014 and went public in 2015.  SAC ¶¶ 45, 51.  It developed a technology known as "AquaRefining" that recycles lead-acid batteries ("LABs").  *Id*. ¶ 46.  By 2015, at its test facility in California, the Company had produced high purity lead from recycled LABs on a small-scale prototype of what would become the basis of an AquaRefinery module, and had successfully replicated that performance on a prototype of a full-scale electrolyzer, to produce 99.99% pure AquaRefined lead.  *Id*. ¶ 123.

On May 19, 2016, the Company announced a strategic partnership with Interstate Batteries ("IB"), pursuant to which IB invested about $10 million in the Company, and agreed to supply the Company with more than one million LABs for the AquaRefineries.  *Id*. ¶ 122; Dkt. No. 128-2, Declaration of Michael Hogue in Support ("Hogue Decl.") Ex. 3 (5/19/2016 Press Release).  To prepare for commercializing the technology, in August 2016, the Company announced it had largely completed construction of its first AquaRefining facility at its Tahoe Reno Industrial Complex ("TRIC"), and began commissioning AquaRefining modules to prepare for commercial operations.  SAC ¶ 139, 145.

On November 1, 2016, the Company announced production of AquaRefined lead with a commercial-scale module at its TRIC facility.  SAC ¶¶ 158, 160; Hogue Decl. Ex. 7 (11/1/2016 Press Release).  The production was from a single AquaRefining module.  SAC ¶ 163.  The press release included photographs showing the AquaRefined lead produced on the module's six electrolyzers and a conveyor carrying the lead to an ingot casting area.  *Id*. ¶ 159.  The Company stated that "there can be no assurance that as we commence large scale operations at our TRIC facility that we will not incur unexpected costs or hurdles that might restrict the desired scale of our intended operations or negatively impact our projected gross profit margin."  Hogue Decl. Ex. 8 (11/7/2016 10-Q at 21); Ex. 10 (11/7/2016 Earnings Call).  The Company repeated these

---

[2] Plaintiffs contend that the Motion must fail because Defendants have not addressed every alleged misstatement in the SAC.  Opp. at 9-10.  The SAC contains nearly 550 paragraphs of allegations spanning over 200 pages.  Defendants' choice to address the statements by category does not concede the merits of any of Plaintiffs' allegations.

United States District Court
Northern District of California

1    warnings in its prospectus filed in connection with its November 21, 2016 public offering.  SAC
2    ¶¶ 180-186.
3        On February 9, 2017, the Company announced a battery-recycling partnership with
4    Johnson Controls ("JC"), the world's largest recycler of used LABs and manufacturer of
5    automotive batteries.  *Id.* ¶ 192; Hogue Decl. Ex. 11 (2/9/2017 Press Release).  Under the
6    agreement, JC agreed to acquire approximately 5% of the Company, and become its first licensee
7    of the AquaRefining technology.  SAC ¶ 194.  IB and JC have not alleged that they were
8    defrauded, or joined in this action.
9        On February 14, 2017, the Company issued a press release highlighting that it had
10   "[s]uccessfully commissioned and was in the process of scaling up production of AquaRefined
11   lead" at its TRIC facility.  *Id.* ¶ 200; Hogue Decl. Ex. 13.  In its 2016 Form 10-K filed March 2,
12   2017, the Company cautioned that "the limited nature of our operations to date are not sufficient to
13   confirm the economic returns on our production of recycled lead [and] [t]here can be no assurance
14   that the commencement of commercial scale operations at our TRIC facility will not incur
15   unexpected costs or hurdles that might restrict the desired scale of our intended operations or
16   negatively impact our projected gross profit margin."  Hogue Decl. Ex. 15 at 11.  On May 9, 2017,
17   the Company issued a press release reporting its first quarter results, and Clarke was quoted as
18   stating that the AquaRefinery was "now in commercial operation and generating revenue . . .."
19   SAC ¶ 227; Hogue Decl. Ex. 16.  The Company disclosed that the revenue was only from the sale
20   of lead compounds and plastic generated from breaking and separating LABs, and not yet from the
21   sale of AquaRefined lead.  SAC ¶¶ 288(f).
22       The next day, the Company filed its Form 10-Q with "no material changes from the risk
23   factors set forth in" its 2017 10-K.  Hogue Decl. Ex. 18 (5/10/2017 Form 10-Q).  On May 31,
24   2017, the Company announced that it hosted its first analyst visitor day at TRIC, where analysts
25   observed the critical processes in operation.  SAC ¶ 243.  The analysts confirmed they saw the
26   AquaRefining process "up and operational."  *Id.* ¶¶ 253, 254.  At least one analyst reported that
27   the "battery breaking system/equipment . . . is having issues to appropriately separate/filter
28   components from the bigger load of feedstock."  *Id.* ¶ 230.

United States District Court
Northern District of California

1   In a July 25, 2017 press release, the Company announced the "commencement of

2   commercial revenues" in the second quarter with expected revenues of $603,000. *Id.* ¶ 253;

3   Hogue Decl. Ex. 20. On August 9, 2017, the Company announced its second quarter results, SAC

4   ¶ 272, and stated that because the revenue was generated from the sale of lead compounds "that

5   have a less established market and some demand uncertainty, . . . following the commissioning of

6   all 16 modules, [the Company] may choose to run TRIC at less than 120 tonnes per day, should

7   this provide for a more optimal product mix." *Id.* ¶ 265.

8   In an October 23, 2017 press release, the Company updated the public on the operations at

9   the TRIC facility. *Id.* ¶ 289; Hogue Decl. Ex. 26. The Company explained that it was "in the

10   process of synchronizing all of these stages, which is critical to maximizing efficiencies,

11   optimizing working procedures and minimizing waste." SAC ¶ 279; Hogue Decl. Ex. 26. On

12   November 9, 2017, the Company issued a press release and filed its third quarter Form 10-Q.

13   Hogue Decl. Exs. 30, 31. The Company discussed various problems it was experiencing in

14   scaling the AquaRefining process to produce lead on a commercial scale, including that the lead

15   that was being produced was stickier than lead the Company previously produced, and that it also

16   tended to stick to the shoot exiting from the modules, requiring manual assistance to remove it.

17   SAC ¶ 286; Hogue Decl. Ex. 29 at 4 (11/9/2017 Earnings call).[3]

18   On June 11, 2018, the Company announced the first commercial production of

19   AquaRefined lead. SAC ¶ 288(i). On August 18, 2018, the Company announced it "took the first

20   step to move beyond 'proof of concept' and transitioned into commercialization." *Id.* ¶ 288(j) (the

21   first "proof of concept" referring to commercialization of AquaRefind lead).

22   **B.    Procedural Background**

23   In ruling on the Defendants' first motion to dismiss, the Court upheld both Plaintiffs'

24   Count Two claim for scheme liability and its Count Three claim for control person liability against

25   all Defendants. Dkt. No. 113 at 15, 17, 18. The Court granted the motion to dismiss the Count

26   One misrepresentation cause of action with leave to amend, finding that it was a "puzzle

27

28   [3] The Court assumes that the word "shoot" in the cited transcript was a phonetic representation of
"chute."

4

pleading." *Id.* at 11.  In response to the Court's ruling, the SAC contains a new section which Plaintiffs contend identifies each false and misleading statement, and provides detailed evidence demonstrating the falsity of each statement.  SAC § VII.A-E.  Defendants' current Motion does not challenge the claims the Court already declined to dismiss.  Mot. at 1 n.1, 33.  Defendants only challenge the Count One misrepresentation claim, and the Count Three control person claim "as it relates to Count One."  *Id.*

## II.    REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice of, or consider incorporated by reference, thirty-four documents attached to the Motion.  Dkt. No. 128-1.  Plaintiffs object to four of these documents as irrelevant for the purpose for which they are offered, and contend that these documents are not cited, referenced, or relied upon in the SAC.  Dkt. No. 132.[4]  Defendants counter that these documents may be used to establish undisputed facts, to highlight what information was available to the market, or to assess the context in which these allegedly false statements were made.  Dkt. No. 135.

Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine.  *See* 899 F.3d 988 (9th Cir. 2018).  Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records."  *Id.* at 999 (citation and quotations omitted).  The Ninth Circuit has also clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document.  *Id.*  Separately, the incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself.  *Id.* at 1002.  This is to prevent plaintiffs from cherry-picking certain portions of

---

[4] These include Hogue Decl. Exs. 31-33.  Defendants initially requested judicial notice as to Hogue Decl. Ex. 30, but after Plaintiffs opposed that request, Defendants withdrew it.  Dkt. No. 135 at 2, n.2.  The Court therefore declines to take judicial notice of that exhibit.

United States District Court
Northern District of California

documents that support their claims, while omitting portions that weaken their claims. *Id*. However, it is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id*. at 1014.

As to the thirty exhibits for which Plaintiffs do not oppose judicial notice of the publication or existence of the documents, the Court **GRANTS** Defendants' request for judicial notice as to Exhibits 1-29, and 34. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings subject to judicial notice); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (same); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice of press releases); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 979–80 (N.D. Cal. 2010) (taking judicial notice of slide presentations to analysts).

With regard to the disputed exhibits, Defendants seek judicial notice of Exhibit 31, a number of Form 4's filed with the SEC describing Clarke's stock holdings. Dkt. No. 128-1 at 2-3. Plaintiffs contend that the SAC does not allege insider selling by Clarke, or that he was financially motivated to commit fraud based on stock sales, and that these documents are thus irrelevant. Second, Defendants seek judicial notice of Exhibits 32 and 33 (Form 4's filed by Defendants Mould and Murphy) to show that those defendants retained certain percentages of their stock holdings in Aqua Metals. Mot. at 28.

The Court will take judicial notice of these exhibits. The Form 4's are properly judicially noticed for their truth because they contain relevant information required for an assessment of the SAC's scienter allegations, and their authenticity is not in question. *See* Fed. R. Evid. 201(b); *In re Rigel Pharmaceuticals*, 697 F.3d 869, 884–85 (9th Cir. 2012) (concluding that "because none of the defendants sold stock during the period between the allegedly fraudulent statements and the public disclosure of detailed data, which is the period during which they would have benefitted from any allegedly fraudulent statements, the value of the stock and the stock options does not support an inference of scienter").

While the SAC does not reference the Form 4's specifically, they necessarily form the basis for Plaintiffs' allegations regarding Murphy and Mould's stock sales because they are the only public source for the allegations concerning the sale dates, number of shares sold, and price

United States District Court
Northern District of California

per share, all of which come directly from those Form 4's.  *See* SAC ¶¶ 494-498 (Murphy sales); ¶ 494, 499 (Mould sales); Hogue Decl. Exs. 32, 33.  The documents thus "form[] the basis of the plaintiff's claim."  *Khoja*, 899 F.3d at 1002.  Because the Form 4's provide relevant information concerning an inference of scienter, their authenticity is not in question, and courts routinely consider such documents, the Court **GRANTS** Defendants' request to take judicial notice of the Form 4's.

### III.    LEGAL STANDARD

#### A.    Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

#### B.    Heightened Pleading Standard

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or

contrivance . . . . " 15 U.S.C. § 78j(b).   Under this section, the SEC promulgated Rule 10b–5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).  To prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *In re Rigel*, 697 F.3d at 876.  Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement, which requires that a party "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). Additionally, all private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that the complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

### C.    PSLRA Safe Harbor

To assert a claim under the PSLRA for false and misleading statements, a plaintiff must identify "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  Allegations of misleading statements based on omissions must meet the materiality requirement—that is, a plaintiff must show that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Under the PSLRA's safe harbor "a person shall not be liable with respect to any forward-

looking statement" if it is either: (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) is immaterial; or (iii) plaintiff fails to demonstrate actual knowledge that it is false. 15 U.S.C. § 78u–5(c)(1). Forward-looking statements include, among others: (a) a projection of revenues or other financial items, (b) management's plans and objectives for future operations, including plans or objectives regarding the issuer's products, (c) future economic performance, or (d) the assumptions underlying or relating to any statement described above. *Id.*; 15 U.S.C. § 78u–5(i).

Forward-looking statements are protected by the safe harbor if they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements. 15 U.S.C. § 78u-5(c). Oral statements are deemed to be "accompanied by meaningful cautionary statements" if the oral statement identifies a readily available document where the cautionary statements may be found. 15 U.S.C. § 78u-5(c)(2); *Emplrs. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004) (oral statement that refers listeners to readily available written document sufficiently designates statement as containing forward-looking statements).

Forward-looking statements identified as such and accompanied by meaningful cautionary statements are also protected by the safe harbor provision without regard to the speaker's state of mind (*i.e.*, even if they were made with actual knowledge that they were false or misleading). *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111–13 (9th Cir. 2010) (15 U.S.C. §§ 78u–5(c)(1)(A) and (B) are read disjunctively). And even if the forward-looking statement is not accompanied by meaningful cautionary language, it still is non-actionable unless Plaintiff alleges sufficient facts demonstrating that the statement was made with actual knowledge that it is false or misleading. *In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1141 (9th Cir. 2017) (citing *Cutera*, 610 F.3d at 1112–13).

## IV.    DISCUSSION

The basis for Plaintiffs' complaint is their claim that Defendants made materially false and misleading statements and failed to disclose problems that Aqua Metals was having in ramping up

its LAB recycling process.  In their Motion, Defendants raise two arguments: (1) the SAC does not adequately establish liability under Section 10(b) of the Exchange Act and Rule 10b-5(b) for false and misleading statements; and (2) Count Three alleging liability against individual defendants as control persons under Section 20(a) of the Exchange Act must be dismissed.

**A.      Forward-Looking Statements are Protected by the Safe Harbor**

**i.      The AquaRefining Facility and Commercializing the Process**

Defendants contend that the Company's statements regarding its plans and projections concerning commissioning the AquaRefinery facility and commercializing the AquaRefining process fall within the PSLRA's definition of forward-looking statements.  The risk disclosures in the Company's periodic SEC filings during the Class Period clearly identified a number of risk factors that could potentially cause actual results to differ materially from those described in what Defendant submits were forward-looking statements, including the following from the Company's Form 10-Q filed on May 19, 2016:

> We have tested our AquaRefining process on a small scale and to a limited degree, **however there can be no assurance that we will be able to produce lead in commercial quantities at a cost of production that will provide us with an adequate profit margin**. The uniqueness of our AquaRefining process **presents potential risks associated with the development of a business model that is untried and unproven**.
>
> While the testing of our AquaRefining process has been successful to date, **there can be no assurance that we will be able to replicate the process**, along with all of the expected economic advantages, on a large commercial scale
>
> While we believe that our development and testing to date has proven the concept of our AquaRefining process, **we have not undertaken the build-out or operation of a large-scale facility capable of recycling LABs and producing lead in large commercial quantities**. We have commenced the development of our initial LAB recycling facility in TRIC which we expect to complete in the second quarter of 2016 and at which point we expect to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 ton per day by the close of the third quarter of 2016.  However, **there can be no assurance that as we commence large scale manufacturing or operations at our TRIC facility that we will not incur unexpected costs or hurdles that might restrict the desired scale of our intended operations or negatively impact our projected gross profit margin**.

Hogue Decl. Ex. 2, at 5-6 (emphasis added).

The Company's August 10, 2016 Form 10-Q contained many of the same risk factor disclosures, *id.* Ex. 5 at 20, and in its November 7, 2016 Form 10-Q, the Company continued to caution that it had "tested [its] AquaRefining process on a small scale and to a limited degree," and said that "[w]hile we believe that our development, testing and limited production to date has proven the concept of our AquaRefining process, we have not undertaken the processing of used LABs nor have we commenced the production of lead in large commercial quantities." *Id.* Ex. 8 at 21.

Similarly, the Company's March 2, 2017 Form 10-K (incorporated by reference in its Form 10-Q's filed on May 10, 2017 and August 9, 2017) cautioned that:

> We commenced the commercial scale production of recycled lead at our TRIC facility during January 2017.  However, **there can be no assurance that we will be able to produce lead in commercial quantities at a cost of production that will provide us with an adequate profit margin**.  The uniqueness of our AquaRefining process presents **potential risks** associated with the development of a business model that is untried and unproven. While we believe that our development, testing and limited production to date has proven the concept of our AquaRefining process, **the limited nature of our operations** to date are **not sufficient** to confirm the economic returns on our production of recycled lead.  There can be no assurance that the commencement of commercial scale operations at our TRIC facility will not incur unexpected costs or hurdles that might restrict the desired scale of our intended operations or negatively impact our projected gross profit margin.

*Id.* Ex. 15 at 11, and incorporated by reference in Ex. 18 at 13 and Ex. 22, at 14 (emphasis added).

These disclosures identified a number of factors that might cause the actual results to differ materially from those in the forward-looking statements.  In fact, the Company specifically warned that issues were likely to arise as the Company scaled the technology, and acknowledged that it had developed and conducted only "limited testing" of the AquaRefining process.  Hogue Decl. Ex. 18 at 15.  Notwithstanding this clear distinction between small scale and commercial scale operations, Plaintiffs rely on the broad premise that the technology did not work as the foundation for their allegations that many of Defendants' Class Period statements were false.  That claim fails in light of these disclosures.  *See Browning v. Amyris, Inc.*, No. 13-cv-2209-WHO, 2014 WL 1285175, at *13-14 (N.D. Cal. Mar. 24, 2014) (granting motion to dismiss where SEC filings warned of the type of risks that underlay the events described in complaint, including fact

United States District Court
Northern District of California

that defendant's technology might not perform as expected when applied at a commercial scale).

Accordingly, the Company's statements regarding commissioning the AquaRefining facility and commercializing the AquaRefining Process are protected by the safe harbor.

### ii.   Statements Regarding Projected Production Levels and Revenues

Plaintiffs also focus on statements regarding production levels and revenues.  Plaintiffs allege that many of the misrepresentations "are not protected by meaningful cautionary language" because "[n]one of Aqua Metals' risk disclosures mention production rates nor do they warn against or disclose the known and pervasive issues with the AquaRefining technology that rendered it incapable of the touted production rates."  SAC ¶ 449; *see also id.* ¶¶ 419, 426, 440, 458, 467.  For example, a statement that a company is "on track" falls within the safe harbor if that statement is accompanied by cautionary language.  *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 Fed.Appx. 543, 547 (9th Cir. 2018).[5]  Similarly, statements about production targets and revenue goals are plainly forward-looking.  *See, e.g.*, *In re ECOtality, Inc. Sec. Litig.*, No. 13-03791-SC, 2014 WL 4634280, at *5 (N.D. Cal. Sep. 16, 2014) (statement that company expected to be in a position to generate predictable revenue streams was forward-looking).

In *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, No. 15-cv-02938-HSG, 2018 WL 3126393 at *3 (N.D. Cal. June 26, 2018), the Court found that a company's statements that a facility was "in good shape to bring full production online" in the spring and was "on track to reach full nameplate capacity in the back half of 2015" were forward-looking statements that were not contradicted by allegations that the facility was not close to achieving commercial viability in 2015.  *Id.* (noting the company could still have made "strong and steady progress," and been "deep into the commissioning process," and infrastructure and upstream could still have been "online" and "functioning as expected" without being "close to achieving commercial viability" at the plant).  Similarly, statements made using the word "expect" when referring to future events are also forward-looking and thus protected by the safe harbor when accompanied by adequate cautionary

---

[5] *Pompano* and the other unpublished Ninth Circuit decisions cited in this order are not precedent, but may be considered for their persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

language.  *See, e.g.*, *Browning*, 2014 WL 1285175, at \*13 (statement that "we expect [to] produce between 2 million and 3 million liters of Biofene this year" was forward-looking).

The Company's cautionary statements beginning in May 2016 identified a number of risk factors that could delay production, including: (1) it had only tested the AquaRefining process on a small scale and to a limited degree, such that there could be no assurance that the Company would be able to replicate the process on a large commercial scale or that it would not incur unexpected costs or hurdles that might restrict its intended operations or negatively impact its projected profit margin; (2) the uniqueness of the AquaRefining process presented risks associated with the development of an untried and unproven business model; and (3) no one had successfully produced recycled lead in commercial quantities other than by way of smelting, so that while the Company began commercial-scale production in January 2017, it could not assure that it would be able to produce lead in commercial quantities at a production cost that would provide an adequate profit margin.

Plaintiffs contend that Clarke's affirmative statements that there is "little risk associated with the actual AquaRefinery themselves [sic]" and "we don't anticipate any issues operating at full scale," SAC ¶ 344, mean the Company's statements were about then-existing facts.  Plaintiffs also contend that denying that there were any issues in the face of known current and pervasive material problems is a statement of present fact.  Opp. at 13 (citing *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 990 (9th Cir. 2008) ("descriptions of the present aren't forward-looking")).  However, the PSLRA does not require that the cautionary statement at issue include the precise particular factor that ultimately causes (or could cause) the forward-looking statement to be untrue.  *See, e.g.*, *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir.2004)  ("The safe harbor requires that the cautionary language mention "important factors that could cause actual results to differ materially from those in the forward-looking statement."); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012) (cautionary language referencing product quality and defects was sufficient to satisfy the safe harbor's threshold requirements, even though it did not specifically refer to a specific operating system); *In re Nuvelo, Inc. Secs. Litig*., No. C 07-4056 VRW, 2008 WL 5114325, at \*16

United States District Court
Northern District of California

1    (N.D. Cal. Dec. 4, 2008) ("the law does not require specification of the particular factor that

2    ultimately renders the forward-looking statement incorrect").

3           Accordingly, taking these allegations in the light most favorable to Plaintiffs, the SAC

4    does not sufficiently plead under Ninth Circuit precedent that these disclosures were insufficient to

5    trigger application of the PSLRA's safe harbor.

6    **B.    Non-Forward-looking Statements**

7           **i.    The Alleged Confidential Witness Statements Do Not Contradict the
              Company's Statements Regarding Issues the Company was Experiencing
8              During its Commercial-Scale Transition**

9           The SAC alleges that statements regarding the status, success, and commercialization of

10   the AquaRefining process were false and misleading because the statements concealed that

11   AquaRefining "was malfunctioning and not commercially viable," SAC at 16, and "did not work

12   and suffered from significant issues, including the sticky lead, hard lead and other problems."  *Id.*

13   ¶¶ 342(vii).  The issue here is whether the Confidential Witnesses' ("CWs") statements

14   concerning the scaling issues contradict the statements the SAC alleges to be false and misleading.

15          The CWs all appear to agree, notwithstanding alleged problems relating to scaling, that the

16   AquaRefining technology worked to some extent, and the CWs' statements appear to support,

17   rather than contradict, the Company's statements.  *Id.* ¶¶ 339, 344.  For example, CW1 stated that

18   the AquaRefining modules would run "a few hours at a time."  *Id.* ¶ 75.  CW2 states that "they

19   couldn't get the equipment to work," but also states that "one module worked for about an hour or

20   so at a time."  *Id.* ¶ 78.  CW3, who was only involved in the front-end battery breaking part of the

21   process, stated that he or she "personally ran the machinery during the [investor/analyst] visits,"

22   and ensured that the "machinery kept running" during the visits.  *Id.* ¶¶ 89, 92.  CW4 indicated the

23   module would work for about an hour per day and that limited amounts of AquaRefined lead were

24   produced.  *Id.* ¶¶ 95, 97.  And CW5 stated that "the process wasn't working" but acknowledges

25   that lead was produced from the modules.  *Id.* ¶ 115.

26          Defendants contend that the problems the Company ultimately faced could not have been

27   anticipated before trying to scale the technology to produce commercial quantities of lead,

28   including a "sticky lead issue" discussed by CW1, CW4, and CW5, *id.* ¶¶ 63, 66-68, 72, 97, 115,

1    and the breaker issue described by CW3. *Id.* ¶ 88. For example, Clarke discussed the breaker

2    problem with analysts during the February 14, 2017 earnings call, *id.* ¶ 208, and again during the

3    May 9, 2017 earnings call. *Id.* ¶ 232. During the May 9, 2017 call, while Clarke told the analysts

4    that "every single one of the processes that we need to operate is operating," *id.* ¶ 362, he did not

5    state that the processes were operating to produce lead at a commercial scale. *Id.* This is key

6    because CW1 acknowledged that "as the process goes to large-scale, even just one change can

7    impact everything and make existing issues worse." *Id.* ¶ 70. Consistent with this reality,

8    throughout the Class Period, the Company kept pushing back the date it projected to reach

9    commercial scale from Q4 2016, *id.* ¶ 163, to early 2017, *id.* ¶ 168, to the first half of 2017, Form

10    10-K filed March 2, 2017, and then to the end of 2017.

11         Further, the Company clearly stated that its revenue came from the sale of plastic and lead

12    compounds, not AquaRefined lead. *See* Hogue Decl. Ex. 24 at 7 (sales consisted of "plastic and

13    lead compounds"); Ex. 18 at 4. Whatever the terminology used to describe its operation—

14    "commercial operations", "commercial production", or "commercial scale"—the critical fact is the

15    Company did not represent that it was producing AquaRefined lead in commercial quantities. *Id.*

16    The existence of a number of issues (sticky lead, for example) does not contradict Defendants'

17    statements that the AquaRefinery was in commercial operation, the Company had product ready to

18    ship, or any of the other statements Plaintiffs allege to be false and misleading.

19         In *Norfolk*, for example, the Court found statements that defendant "successfully produced

20    its first commercially salable product," "produced . . . oil," and "just began commercial

21    production" were contradicted by witness accounts that the defendant "was never able to produce

22    commercially salable oil." *Norfolk*, 2018 WL 3126393 at *6, 20-24. However, the Court also

23    held that the allegations failed because they did not demonstrate that the CWs had personal

24    knowledge of the information relayed or demonstrate that the defendants were informed of the

25    purported information. *Id.* at *6, 20-24. The Court agrees with Defendants' reading of *Norfolk*,

26    and finds that the Company's statements as alleged, taken together, were not false or misleading

27    and were not contradicted by the CWs statements.

28            **ii.**    **The Company Disclosed Risks and Issues Surrounding Commercialization**

United States District Court
Northern District of California

In its Form 10-Q filed on May 19, 2016, in addition to announcing its strategic partnership with IB, and IB's $10 million investment in Aqua Metals, the Company explained its progress in moving from prototype to commercialization: (i) it built and operated both a small-scale unit of its AquaRefining process and a full-size production prototype, (ii) it tested the AquaRefining process "on a small scale and to a limited degree," but stated it was providing no assurance it would be able to economically produce lead in commercial quantities; (iii) through those operations it was able to "successfully produce 99.99% pure lead on a limited scale," and (iv) it "commenced the development" of its LAB recycling TRIC facility.  Hogue Decl. Ex. 2 at 5-6.  Similarly, in its August 10, 2016 Form 10-Q, the Company did not report any additional progress in commercializing the AquaRefining process, and pushed back the date by which it expected to install sixteen AquaRefining modules at its TRIC facility from the close of the third quarter to the close of the fourth quarter.  Hogue Decl. Ex. 5 at 17.  And in a November 1, 2016 press release, the Company announced production of the "first-ever Aqua-Refined lead at its [TRIC facility]" that was 99.9% pure.  SAC ¶¶ 158, 166, 350; Ex. 7; *see also* Hogue Decl. Ex. 10 (11/7/2016 Q3 Earnings Call).

In its November 7, 2016 Form 10-Q, the Company again explained that the production was done by "conduct[ing] limited operations through the processing of recycled lead through a single AquaRefining module . . . ."  Hogue Decl. Ex. 8 at 16.  The Company also reported that it had not yet begun processing batteries at the TRIC facility, and that it obtained the recycled lead from other sources before processing it through the AquaRefinery.  *Id.*   The Company once again stated in its 10-Q that it was not operating at a commercial scale, saying that "[o]ver the coming weeks we plan to fully integrate the front-end battery-breaking portion of the facility."  *Id*. ¶ 350.  The Company also updated its progress in commercializing the AquaRefining process consistent with its November 1 press release where it pushed back the expected date of commercial production to "early in 2017."  *Id*. ¶ 163.  In its November 7, 2016 press release, the Company disclosed it had just commissioned the first production module, *id.* ¶ 166; Hogue Decl. Ex. 9, enabling it to begin transitioning into commercial operations.  *Id.* ¶ 172.

The Court finds that the SAC fails to sufficiently plead that the Company's statements

16

regarding the successful limited production of 99.9% pure AquaRefined lead announced in November 2016 were false or misleading. *Id.* ¶¶ 158, 166, 339, 350, 356; Hogue Decl. Ex. 7; Ex. 10 (11/7/2016 Q3 Earnings call). The only remaining basis for Plaintiffs' allegation is the premise that the commercialization of the technology did not work, such that the Company's representations that an ingot was made of AquaRefined lead were necessarily false.

### iii.  The SAC Fails to Allege Sufficient Facts to Support an Inference that Statements Regarding the Transition to Commercialization were False or Misleading

That the Company did not ultimately complete the transition to commercialization or successfully commence commercial production of AquaRefined lead until 2018 does not, by itself, make any of its November 2016 statements that it was transitioning to commercialization false or misleading. For example, in its November 7, 2016 Form 10-Q, the Company explained that "[w]hile we believe that our development, testing and limited production to date has proven the concept of our AquaRefining process, we have not undertaken the processing of used LABs nor have we commenced the production of lead in large commercial quantities." Hogue Decl. Ex. 8. The Company further disclosed that its operations consisted of "limited testing" of the AquaRefining process. *Id.* Ex. 18 at 15. A review of the statements in this context makes plain that the Company was not representing that it was currently producing 120 tons of AquaRefined lead, but instead had future plans to do so and was in the process of installing equipment that it believed could support a 120-ton capacity in the future. *See id.* Ex. 10 at 2, 9 (explaining that "**we expect** to expand our capacity to 120 tonnes a day in early 2017," and stating that only 6 of 16 modules were currently installed and that producing 120 tons would require 16 operating modules) (emphasis added).

Further, months later on February 9, 2017, the Company announced a "Break-through Battery Recycling Partnership" with JC and JC's agreement to acquire just under a 5 percent ownership stake in Aqua Metals. SAC ¶¶ 192-194; Hogue Decl. Ex. 11. The Court finds that the SAC fails to adequately allege that statements regarding this partnership (as well as the May 2016 partnership with IB), *id.* ¶¶ 390, 397, 404, were in any way misleading. The SAC's assumption that these sophisticated players in the battery recycling industry were defrauded, then continued to

17

1  partner with Aqua Metals after the alleged fraud was revealed, is an "unreasonable inference" that

2  the Court will not draw.  *Gilead*, 536 F.3d at 1055 ("Courts do not 'accept as true allegations that

3  are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'").

4        Similarly, during an earnings call, the SAC alleges that Clarke stated that the Company

5  experienced "challenges" and "surprises."  SAC ¶ 208.  Clarke referenced issues with the front-

6  end of the LAB recycling process, *i.e.*, breaking batteries and transporting lead paste to the

7  modules.  *Id.*  Clarke explained that the Company "got that dialed in now and it's operating,"

8  which "means we can provide feedstock to the AquaRefiners and make AquaRefined lead."  *Id.*

9  Yet there was no representation in the SAC or by the Company that TRIC was operating to

10  produce lead on a commercial scale, and the Company once again cautioned investors that

11  "[w]hile we believe that our development, testing and limited production to date has proven the

12  concept of our AquaRefining process," "[t]here can be no assurance that the commencement of

13  commercial scale operations at our TRIC facility will not incur unexpected costs or hurdles that

14  might restrict the desired scale of our intended operations or negatively impact our projected gross

15  profit margin."  Hogue Decl. Ex. 15 (3/2/2017 10-K) at 11.  The only new information in the Form

16  10-K was that the Company again pushed back the date on which it expected to achieve a

17  production rate of 120 metric tons per day.  *Id.* at 19.

18        In May 2017, the Company announced that it was finally engaging in commercial

19  operations and potentially generating revenue.  SAC ¶ 234.  But at the same time, Clarke reported

20  various issues the Company experienced in ramping up production, said there was no revenue for

21  the quarter, and reported that the only product being shipped was metallic lead pre-ingot (not

22  AquaRefined lead) and plastics.  *Id.* ¶¶ 236-37, 241.  During the earnings call, Clarke stated that

23  the Company would not provide "forward guidance on ramp-up of revenue, products, or capacity."

24  *Id.* ¶ 509(a).  These disclosures did not contradict any of the Company's prior non-forward-

25  looking statements, and to the extent they were inconsistent with the Company's forward-looking

26  projections, the Company had warned repeatedly throughout the Class Period that it might not be

27  able to meet its projections.

28

United States District Court
Northern District of California

### iv. The SAC Fails to Allege Sufficient Facts to Support an Inference that Statements and Disclosures Regarding Revenue and Commissioning the Process were False or Misleading

On July 25, 2017, the Company in a press release reported revenue for the first time. Clarke explained the Company "worked hard to bring the front-end of the process into consistent operation." *Id.* ¶ 253. This release specifically stated the Company "began revenue producing operations from the sale of lead alloys and plastics," not AquaRefined lead. Hogue Decl. Ex. 20. And the Company's August 2, 2017 press release described the Company's hosting of its first Investor Day during which "[i]nvestors were able to view the full production process at the AquaRefinery as it happened." SAC ¶¶ 255, 367; Hogue Decl. Ex. 21.

In an August 9, 2017 press release, the Company reported its second quarter results. SAC ¶ 260; Hogue Decl. Ex. 23. The Company had previously reported that the product shipped in April was lead compounds and plastics rather than AquaRefined lead, SAC ¶ 241, so the fact that "much of [the] revenue for the second quarter came from" "selling lead components from the AquaRefining feedstock," *id.* ¶ 263, was not new information. Clarke cautioned that the Company was "running a series of trials" in an attempt to "fully map the performance of the modules." Hogue Decl. Ex. 24 (8/9/2017 Earnings Call) at 10; SAC ¶ 261. In a September 28, 2017 8-K, the Company announced progress in implementing its agreement with JC. SAC ¶ 404; Hogue Decl. Ex. 25 at 1. In its October 23, 2017 press release, the Company noted it produced small quantities of AquaRefined lead and explained various scaling issues including optimizing the appropriate control parameters and operating procedures and the "need to periodically assist lead removal." SAC ¶ 277-79; Hogue Decl. Ex. 26.

The SAC alleges that these disclosures regarding the Company's revenue and the commissioning of the AquaRefining Process contradicted the Company's prior statements reflecting optimism about the commissioning the process. *Id.* For example, the SAC appears to allege that the Company's November 9, 2017 statement that it had "not commenced the commercial production of AquaRefined lead" contradicted its prior statements. SAC ¶ 282. But again, as noted, throughout the Class Period, the Company cautioned that it would face certain issues as the modules, once commissioned, were put into commercial operation and the operation

was scaled.  The allegation that the Company's prior statements were misleading because it had

not yet commenced commercial production at that time ignores the numerous disclosures that the

Company made describing the issues surrounding scaling of production.  While the Company

announced in November 1, 2016 that it produced AquaRefined lead with a commercial scale

Aqua-Refining module, *id.* ¶¶ 160, 350, that was before it announced it had even commenced

commercial operations.  Thereafter, the Company clearly disclosed that while it began commercial

operations and commercial production in the first quarter of 2017, it had produced and sold only

lead compounds and plastics, not AquaRefined lead.  *Id.* ¶ 241.

The SAC also alleges that the Company's description of AquaRefining as an "unproved

technology" contradicts its previous statements.  *Id.* ¶ 282.  Plaintiffs contend that after the end of

the Class Period, Defendants admitted for the first time that the AquaRefining process was

"unproven technology" SAC ¶¶343, 348, which directly contradicts their prior statements.  Opp. at

23 (citing *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) ("later statement[s]"

supported falsity as they "directly contradicted or were inconsistent with" Defendants' earlier

statements), *abrogated on other grounds as recognized by S. Ferry LP, No. 2 v. Killinger*, 542

F.3d 776, 783-84 (9th Cir. 2008)).  That statement was made in the Company's November 9, 2017

Form 10-Q explaining the risks of Aqua Metals' business model for scaling the technology to

produce commercial quantities of lead:

> **Our business model is new and has not been proven by us or
> anyone else.** We are engaged in the business of producing recycled
> lead through a novel and unproven technology. . . . Our lead recycling
> production line at TRIC is the first of-its-kind and neither we nor
> anyone else has ever successfully built a production line that
> commercially recycles LABs without smelting.  While we have
> commenced limited lead recycling operations at our TRIC facility, to
> date all revenues have been derived from the sale of lead compounds
> and plastics and we have not commenced the commercial production
> of AquaRefined lead.  Further, there can be no assurance that we will
> be able to produce AquaRefined lead in commercial quantities at a
> cost of production that will provide us with an adequate profit margin.

Hogue Decl. Ex. 27 (11/9/2017 Form 10-Q) at 20 (emphasis in original).

However, based on the above disclaimers, the SAC does not plausibly allege that the

Company represented that the AquaRefining technology was proven to produce lead in

United States District Court
Northern District of California

commercial quantities.  The Company instead explained that the AquaRefining process proved successful in a small-scale unit, a full-size production prototype, and a single commercial scale AquaRefining module in its TRIC facility.  *Id*.  The Company's prior risk disclosures in its Form 10-K's filed in 2016 and 2017 (incorporated by reference in the Form 10-Qs), stated: "While the testing *of our AquaRefining process has been successful to date, there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a large commercial scale*."  Hogue Decl. Ex. 1 at 11; Ex. 15 at 11 (emphasis in original).[6]

### v.   Statements As Corporate Optimism

Defendants contend that statements such that AquaRefining is a "breakthrough technology," SAC ¶ 390, that the Company achieved a "major milestone," *id*. ¶ 350, or that the "partnership with [JC] is a tremendous step forward," *id*. ¶ 397, are non-actionable statements of corporate optimism or puffery not "capable of objective verification" as required for a statement to be misleading.  Defendants also contend that other statements, such as "[w]e believe this [IB partnership] serves as a strong validation of our technology," *id.* ¶ 390, or "I don't have a single thing that we're worried about," *id*. ¶ 344, are nonactionable opinion or optimism statements because there are no allegations that Defendants did not believe the statements to be true when made, and the statements contain no purported objectively verifiable facts, much less ones that the SAC adequately alleges were untrue.  *See City of Dearborn Heights Act 345 Police & Fire Ret.*

---

[6] Plaintiffs also challenge the Company's statements regarding its licensing plans and plans for future facilities.  For example, Plaintiffs refer to a number of statements by Clarke "touting" the Company's "strategic relationships," including discussions with multiple strategic partners and his statement that the Company was "absolutely serious about a global rollout."  SAC ¶¶ 284, 389, 496.  Defendants contend that these are forward-looking statements relating to future plans, because in both its 2015 Form 10-K filed on March 28, 2016 and its 2016 10-K filed on March 2, 2017, the Company listed as a risk factor that its "business strategy includes licensing arrangements and entering into joint ventures and strategic alliances.  Failure to successfully integrate such licensing arrangements, joint ventures, or strategic alliances into our operations could adversely affect our business."  Hogue Decl. Ex. 15 at 11.  Plaintiffs allege, however, that "this is [sic] no way discloses the actual known risk and issues to licensing – that AquaRefining was not working."  SAC ¶¶ 419, 426.  Notwithstanding the scaling issues—which were covered by extensive disclosures regarding the risk inherent in commercializing the AquaRefining process—the technology was working in some capacity as noted in these disclosures, and licensing was a possibility.  Accordingly, the statements regarding licensing activities and future facilities are also not actionable, as the SAC fails to allege that they were false or misleading, whether they were statements of present fact or forward looking.

United States District Court
Northern District of California

*Sys. v. Align Tech., Inc*., 856 F.3d 605, 615-16 (9th Cir. 2017) (to plead falsity of opinion statement "plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue.") (internal quotations omitted).

Corporate optimism, or "puffery," is not actionable under the PSLRA because:

> When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation. Indeed, professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.

*Cutera*, 610 F.3d at 1111 (9th Cir. 2010) (citations and internal quotations omitted); *see also Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 606 (9th Cir. 2014) (statement that revenue and growth were "significant events" was non-actionable because it was too vague for reasonable investor to rely on) (internal citations omitted)); *In re Syntex Corp. Sec. Litig*., 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) *aff'd*, 95 F.3d 922 (9th Cir. 1996) (holding that statements like "we're doing well and I think we have a great future" were nonactionable corporate optimism). The Court finds that the above statements are nonactionable statements of optimism and corporate puffery.

***

Taking these allegations and representations as a whole, the Court finds that the SAC's allegations that the Defendants' statements may have contradicted prior public statements are insufficient to plead that the non-forward looking statements were false or misleading, and are therefore non-actionable.

## C.    The SAC Fails to Adequately Allege Scienter

A complaint sufficiently alleges scienter when it "state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A); *Tellabs Inc. v. Makor Issues & Rights Ltd*., 551 U.S. 308, 314 (2007). The required state of mind includes deliberate recklessness or an intent to deceive. *In re Quality Sys. Inc. Sec. Litig*., 865 F.3d at 1144. Deliberate recklessness is an extreme departure from the standards of ordinary care. *Scheuneman v. Arena Pharm., Inc*., 840 F.3d 698, 705 (9th Cir. 2016).

It is well established that the test is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323.  An inference is "strong" if a reasonable person would deem the inference "cogent and compelling" and "at least as likely as any plausible opposing inference." *Id*. at 324, 328-29.  An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'"—the inference need only be equally plausible to any non-culpable inference. *Id.*  Reckless conduct satisfies the scienter standard "to the extent it reflects some degree of intentional or conscious misconduct." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (quoting *In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999)).

Plaintiffs allege a series of facts that they contend collectively support a strong inference of scienter, including allegations regarding Defendants' knowledge of problems inconsistent with the statements regarding milestones achieved, site visits, the meaning of strategic partnerships and licensing and production rates.

Defendants concede that their "knowledge of problems is not disputed." Mot. at 27-28. ("Defendants do not claim to have been unaware of the facts.").  Instead of disputing knowledge, Defendants challenge scienter on the basis that "[t]he issue is not whether they had knowledge but instead whether that knowledge contradicted their public statements." *See id.* at 28, 30.  Plaintiffs allege that Defendants' scienter is evidenced by awareness of or reckless disregard for "ongoing and significant problems with the AquaRefining process well before the [TRIC facility] was built." SAC ¶¶ 469-471.

### i. Confidential Witness Statements Do Not Show Personal Knowledge or Knowledge of Falsity

As an initial matter, Plaintiff's allegations are primarily based on reports from a confidential witness, CW 1.  *Id*.  A complaint relying on confidential witness statements must meet the following two requirements: (a) the confidential witness statements introduced to establish scienter must be described with sufficient particularity to establish his or her reliability and personal knowledge, and (b) those statements must themselves be indicative of scienter.

*Zucco Partners*, 552 F.3d at 995. The SAC initially fails with respect to the first prong to describe CW1 with the required particularly, stating only that he or she was an "engineer" who worked at AquaMetals from 2015 to January 2017. SAC ¶ 469. The SAC does not identify CW1's title, who he or she reported to, and what the relationship was to Clarke, Mould, and Murphy. The allegations regarding CW1 do not provide a basis for the Court to establish his or her reliability and personal knowledge. Accordingly, the SAC "fails to allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged." *Zucco Partners*, 552 F.3d at 996.

Similarly, CW1's allegations fall short of demonstrating the second prong—a strong inference of scienter with regard to Defendants' purported knowledge of "significant problems" with the AquaRefining process "well before the Reno Plant was built." *Id*. ¶ 469. CW1 provides the conclusory allegation that there were issues with the modules that "were known, including by Clarke and Mould, since 2015," and that Clarke and Mould knew the technology would have scaling issues. *Id*. ¶¶ 470, 471. But CW1 does not provide any facts concerning Clarke's or Mould's belief as to whether these issues, to the extent they existed, would be material or significant. In fact, as noted, the Company repeatedly warned that it might face challenges scaling the process: "While the testing of our AquaRefining process has been successful to date, there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a large commercial scale." Hogue Decl. Ex. 2 (5/19/2016 10-Q) at 5-6. Therefore, these "generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter" because they do not establish that the "witness reporting them has reliable personal knowledge of the defendants' mental state." *Zucco Partners*, 552 F.3d at 998. Accordingly, the CWs also fail to provide sufficient facts concerning Clarke's or Mould's belief as to whether these issues, to the extent they existed, would prove to be significant.

> ### ii. The CWs' Allegations Regarding Defendant's Involvement in Visitor Presentations and Display of Images are Insufficient to Show Personal Knowledge or Knowledge of Falsity

Plaintiffs also allege, based on the CW statements, that Defendants were aware of and recklessly disregarded "serious problems" at the TRIC facility and with the "lack of AquaRefined

United States District Court
Northern District of California

lead produced." SAC ¶ 472.  For example, Plaintiffs allege that Defendants' knowledge of purported problems with the technology is evident from their direct involvement "in the staged investor shows."  *Id.* ¶ 478.  In support, the CWs make a number of statements in the SAC regarding the inauthenticity of "lead ingots" and images of AquaRefining, which were allegedly "staged" by Clarke, Mould, and Murph and were not the product of any AquaRefining materials or processes.  Lead ingots are lead compounds mined from LABs and processed through the AquaRefining process and converted into an electrolyte, which then goes through a casting process to make an ingot of lead.  *Id.* ¶¶ 47, 48, 177.  Plaintiffs also make allegations regarding a photograph showing a single AquaRefining module with a stream of lead-infused electrolytes falling from the module to the conveyor belt, where the caption of the photo described the lead as "flowing like a waterfall."  *Id.* ¶¶ 159, 350.

Plaintiffs contend that these statements were false and misleading because of the issues described by the CWs, and because Defendant was "nowhere near expanding operations or licensing as they still did not have a proven technology …."  Opp. at 24.  Defendants contend these allegations fail because they are not pled with the particularity required under the PSLRA when relying on confidential witnesses.  *Zucco Partners*, 552 F.3d at 995.  Defendants also contend that the CWs offer no actual evidence as to what Defendants said during the presentations or the Defendants' state of mind when they made these public statements.

For example, the only related allegations in the SAC based on personal knowledge are from: (1) CW2, who was responsible for air emissions, not AquaRefining, and who bases the claim that AquaRefining was not working only on the air filtration system because, although the filtration system was turned on, it only pulled air out of the room and there was nothing to vent, SAC ¶ 81-82; (2) CW3, who simply speculates that the Company was not making a sufficient amount of AquaRefined lead to cast it into a bar, based on the amount of lead production, *id.* ¶ 91; and (3) CW4, who did not work at the Company at the relevant time, *id.* ¶ 94, and admittedly premises his statements solely on hearsay.  *Id.* ¶¶ 101-103.  The SAC also alleges that CW2 was an Environmental Systems Supervisor, but there are no facts alleged to show that he or she had personal knowledge that the lead ingots displayed were not, or could not be, AquaRefined lead.

*Id.* ¶¶ 77, 82.  CW3 does not allege that the photos are inauthentic, but instead only speculates that the Company was not making enough AquaRefined to cast it into bars and that the lead that was cast was lead that did not go through the AquaRefining process, and  this CW does not provide any other relevant information relating to the authenticity of photographed ingots.  *Id.* ¶ 91.  Lastly, CW4 did not even work at the Company when the ingot and images in question were made and taken.  *Id.* ¶¶ 100-103.  Importantly, none of the CWs claim to have observed the module in the photograph, which would be necessary to refute the description, *i.e.*, observe that the lead was not flowing off the module.  *In re Allied Nev. Gold Corp*., No. 3:14-CV00175-LRH-WGC, 2016 WL 4191017, at *11 (D. Nev. Aug. 8, 2016) ("statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation") (citations omitted); *In re Metawave Communs. Corp. Sec. Litig*., 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) (noting that court must be able to tell whether CW is speaking from personal knowledge or "merely regurgitating gossip and innuendo; "[A] shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough.").

### iii.   Insider Stock Sales

It is well established by both the Supreme Court and the Ninth Circuit that it is unnecessary to allege "motive" in order to establish scienter.  *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal….[rather] allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the complaint's entirety"); *Siracusano*, 585 F.3d at 1182 (motive is "a relevant consideration" but "the absence of a motive allegation is not fatal."); *Petrie v. Elec. Game Card, Inc*., 761 F.3d 959, 970 (9th Cir. 2014) (same).  Nevertheless, the SAC alleges stock sales by Mould and Murphy as further evidence of scienter.  SAC ¶¶ 493-502.

"Suspicious" stock sales "only give rise to an inference of scienter when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information . . ..  Three factors are relevant to this inquiry: (1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales

were consistent with the insider's trading history." *Metzler*, 540 F.3d at 1066-67 (internal

citations and quotation marks omitted).  For individual defendants' stock sales to raise an

inference of scienter, Plaintiffs must provide a meaningful trading history for purposes of

comparison—the court must consider, among other factors, "the amount and percentage of shares

sold by insiders." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.

Holding Corp.*, 320 F.3d 920 (9th Cir. 2003); *Zucco Partners*, 552 F.3d at 1005.

   The SAC does not allege that Clarke, who allegedly made most of the statements at issue,

sold any Aqua Metals stock.  Nor, it appears, could it, because public records confirm he did not

sell any such stock during the Class Period, and instead acquired $200,000 of stock in the

November 2016 public offering.  Hogue Decl. Ex. 31.  While Plaintiffs allege that Mould and

Murphy each sold 60,000 shares during the Class Period, SAC ¶¶ 493-499, the SAC fails to

include any allegations concerning the percentage of their holdings they sold.  In fact, as reported

in the Company's May 2018 proxy statement, Mould and Murphy each retained more than 90

percent of their Aqua Metals stock.  Hogue Decl. Exs. 32 and 33 (SEC Form 4's).[7]

   The absence of sales by Clarke, who made many of the statements at issue, and Murphy

and Mould's retention of more than 90% of their holdings, contradict any inference of scienter.  *In

re Versant Object Tech. Corp.*, No. C 98-00299 CW, 2001 WL 34065027, at *6 (N.D. Cal. Dec. 4,

2001) (no inference of scienter where plaintiffs failed to allege any stock sales by the speaking

defendants); *see also Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no inference of

scienter where two insiders sold small percentages of their shares); *Silicon Graphics*, 183 F.3d at

987-988 (no inference of scienter where most of insider sales made by non-speaking defendant);

*In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1078 (N.D. Cal. 2010) (sales not

probative of scienter where no defendant sold more than 20% of their stock at any given time).[8]

---

[7] Further, Murphy and Mould's stock sales on April 10, 2017 and May 5, 2017 were made
pursuant to 10b-5 trading plans, SAC ¶ 498 ("Murphy's April 10 and May 5, 2017 stock sales
were pursuant to 10b-5 trading plan …"), which weighs against an inference of scienter.  *Metzler
Inv. GMBH*, 540 F.3d at 1067 n.11 (sales according to predetermined plans may rebut an inference
of scienter).

[8] Plaintiffs' allegation of scienter based on IB's sale of 228,420 Aqua Metals shares in April and
May 2017 is particularly unavailing.  SAC ¶¶ 500-502.  IB is not an insider, nor are they a party to

United States District Court
Northern District of California

### D.   Mould and Murphy

The SAC also attempts to hold Mould and Murphy individually liable for certain statements that Defendants contend they did not make personally.  As the Supreme Court stated in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43(2011):

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by--and only by--the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit--or blame--for what is ultimately said.

*See also City of Royal Oak Retirement Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070 (N.D. Cal. 2012) ("A defendant can be liable under § 10(b) for a false or misleading statement only if the defendant 'made the statement.'"); *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (dismissing complaint against officers under *Janus* based on absence of facts alleging officers had ultimate authority over statements).

For example, Plaintiffs contend that Mould and Murphy made false and misleading statements on earnings calls or in various articles.  *See* SAC ¶¶ 390, 397 (discussing statements by Mould); *id.* ¶¶ 356, 362, 382, 428 (discussing statements by Murphy).  Moreover, because Murphy signed the SEC filings, Plaintiffs contend that he is liable for the misrepresentations contained in them.  *Id.* ¶¶ 339, 350, 356-57, 397, 420, 428, 434, 441, 450, 459.  Plaintiffs also contend that as a participant on Aqua Metals' earnings calls and a Company Contact on press releases (*id*. ¶¶ 344, 350, 356-57, 362, 367, 382, 390, 397, 404, 412, 420, 428, 434, 441, 450, 459), Murphy had

---

this action.  In any event, IB retained nearly 94% of its shares.  Hogue Decl. Ex. 19 (5/16/2017 Schedule 13D/A) (showing IB held 3,483,452 shares as of May 16, 2017).  Plaintiffs also point to the Company's November 2016 public offering to raise capital as evidence of scienter.  SAC ¶ 506.  However, motives common to most corporate officers, such as the desire for the corporation to appear profitable to keep stock prices high or a need for capital infusions, do not create a sufficient inference of scienter.  *See, e.g.*, *Seaman v. Cal. Bus. Bank*, No. 13-cv-02031-JST, 2013 WL 5890726, at *6 (N.D. Cal. Oct. 30, 2013) (allegations that defendants were motivated to raise capital to avoid further regulatory action insufficient to support inference of fraudulent intent).

United States District Court
Northern District of California

control over these statements and is liable for "failing to correct a falsehood" and "silently

listen[ing] as others made statements that [he] knew were false."  Opp. at 29 (citing *Barrie v.*

*IntervoiceBrite, Inc.*, 409 F.3d 653, 655 (5th Cir. 2005) (defendant liable for silently listening

while false statements were made during conference calls and roadshows)).

An individual's role as an officer—on its own—is insufficient for the individual to be

deemed to have "made" a statement under *Janus* for purposes of 10(b).  *See Hefler*, 2018 WL

1070116, at *9 (individual officers not liable under 10b-5 for statements made in company press

releases and SEC filings where individuals did not sign SEC filings and absent specific facts

showing individuals had ultimate authority over alleged misstatements).  Here, there is no

allegation that Mould signed any of the SEC filings or press releases, nor are there any allegations

that he was responsible for or had ultimate authority over their content.  Similarly, Plaintiffs'

claim that Murphy was liable for statements on earnings calls and in press releases merely because

he attended the earnings calls and was a "Company Contact" on certain press releases, SAC ¶ 168,

fails because absent factual allegations demonstrating he had ultimate control and authority over

these statements, he is not subject to liability for them.  *Juniper Networks, Inc.*, 880 F. Supp. 2d at

1071 (Chairman of the Board could not be held liable under *Janus* for statements of other

individual defendants including those made during analyst or investor calls).

The SAC also alleges Mould made two misstatements during the Class Period, both of

which appeared in a February 10, 2017 KOLO News article announcing JC's partnership with the

Company.  *See* SAC ¶ 390, n. 92; Hogue Decl. Ex. 12.  The first challenged statement was "I think

Johnson Controls backing us is a great statement to the industry and the world that aqua refining is

the future."  *Id*.  The Court finds that this statement is nonactionable corporate optimism or

puffery.  In addition, it is non-actionable opinion because the SAC fails to make factual allegations

demonstrating that Mould thought the statement was false when he made it, and the statement

contains no objectively verifiable fact that is challenged.  *See Dearborn Heights*, 856 F.3d at 615-

16.

The second challenged statement was "Johnson Controls … is major for this facility.  It

allows us to build out the facility to its full capacity."  SAC ¶ 397 n. 100; Hogue Decl. Ex. 12.

That statement follows a sentence written by the author Colin Lygren (and not attributed to Mould) that "[t]his new partnership with Johnson Controls brings a spent battery supply and a buyer of the finished product." *Id.* The SAC fails to sufficiently allege any facts showing that Mould's belief that the partnership with JC provided a source of supply and demand that would assist in building a facility was inconsistent with any true fact existing at the time. Therefore, the SAC fails to allege the omission of facts in these statements that "affirmatively led the plaintiff in a wrong direction (rather than merely omitted to discuss certain matters)." *See Irving Firemen's Relief & Ret. Fund v. Uber Tech.*, No. 17-cv-05558-HSG, 2018 WL 4181954, at *5 (quoting *In re Omnivision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090 (N.D. Cal. 2013)).

Murphy is alleged to have made three misleading statements. The first was on the February 14, 2017 earnings call when he stated that "we're starting to – beginning commercial operations." SAC ¶ 356. However, Clarke, not Murphy, actually made that statement. Hogue Decl. Ex. 14 at 10. Therefore, under *Janus*, Murphy cannot be liable for the statement. The second and third statements were on the August 9, 2017 earnings call where Murphy, in answering a question related to potential licensing of the technology, referenced "the level of [potential licensee] interest on multiple site visits and observing processes in operation . . . ." SAC ¶ 382. The SAC fails to allege how that statement was material, particularly given that it was part of Murphy's broader answer that licensing is "a little bit low priority for us at the moment," that "we are obligated to JC[] to agree a rollout schedule with them before we start formalizing any additional licensing arrangements," and the Company's prior warnings that its licensing plans might not be successful. *Id.* ¶ 362.

Accordingly, the alleged stock sales by Mould and Murphy and other evidence discussed above also do not provide the required strong evidence of scienter.

### E.    Section 20(a) Control Person Liability Claim

Plaintiffs assert a Section 20(a) claims against Clarke, Murphy, and Mould on a "control persons" theory of liability. *Id.* ¶¶ 545-550. To prove a prima facie case under Section 20(a), plaintiff must prove: "(1) a primary violation of federal securities laws"; and "(2) that the defendant exercised actual power or control over the primary violator." *See Howard v. Everex*

1 | *Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

2       Defendants do not contend that the officer Defendants did not have control; rather, they

3 contend that the Section 20(a) claim must be dismissed because Plaintiffs have not, and cannot,

4 make out any primary claims in Count I, and therefore Plaintiffs' Exchange Act Count 3 must be

5 dismissed as to all of the Officer Defendants as it relates to Count One.  *See, e,g.*, *Markette v.*

6 *Xoma Corp.*, 2017 WL 4310759 (N.D. Cal. Sept. 28, 2017).

7       The Court previously denied Defendant's motion to dismiss Plaintiffs' Section 20(a)

8 control liability claim because Plaintiffs have sufficiently pled that the Officer Defendants had the

9 requisite control.  Because the Court grants the Motion as to Count One, the Plaintiffs will dismiss

10 the Section 20(a) control liability as it relates to that cause of action.

## V.   CONCLUSION

12       Accordingly, the Court **GRANTS** Defendants' motion to dismiss the Section 10(b), Rule

13 10b–5(a) and (c) scheme liability claim and Section 20(a) control person liability claim as it

14 relates to Count One without leave to amend because Plaintiffs had a chance to amend and again

15 failed to plead viable causes of action.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir.

16 1992).

17       The Court **SETS** a further telephonic case management conference for December 8, 2020

18 at 2:00 P.M. to discuss the plan for promptly resolving the remaining causes of action.  The parties

19 shall file a joint case management statement, including a proposed case schedule, no later than

20 December 1, 2020.  All counsel shall use the following dial-in information to access the call: Dial-

21 In: 888-808-6929/Passcode: 6064255.  For call clarity, parties shall NOT use speaker phone or

22 earpieces for these calls, and where at all possible, parties shall use landlines.  The parties are

23 further advised to ensure that the Court can hear and understand them clearly before speaking at

24 length.

25       **IT IS SO ORDERED.**

26 Dated:  11/16/2020

27

28                             HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California